# EXHIBIT 1

 **Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
12/05/2024
CT Log Number 547921070

## Service of Process Transmittal Summary

**TO:**    Bryant Cargile, VICE PRESIDENT OF TAX AND INTERNAL AUDIT
Whiting-Turner Contracting Company
300 East Joppa Road, Hampton Plaza
Baltimore, MD 21286-

**RE:**    **Process Served in California**

**FOR:**    Whiting-Turner Contracting Company  (Domestic State: MD)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | G.A. ABELL, INC. dba Precision Electric Company, a California Corporation vs. THE WHITING-TURNER CONTRACTING COMPANY |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibit(s) |
| **COURT/AGENCY:** | San Diego County - Superior Court, CA<br>Case # 24CU022713C |
| **NATURE OF ACTION:** | Breach of the covenant of good faith and fair dealing |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 12/05/2024 at 13:24 |
| **JURISDICTION SERVED:** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after this summons and legal papers are served on you (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Luke Thompson<br>Thompson Law & Consultation<br>9757 Marilla Dr, #248<br>Lakeside, CA 02040<br>619-987-3231 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/05/2024, Expected Purge Date: 12/10/2024<br><br>Image SOP<br><br>Email Notification,  Meredith Phillips  Meredith.Phillips@whiting-turner.com<br><br>Email Notification,  Bryant Cargile  Bryant.Cargile@whiting-turner.com<br><br>Email Notification,  Dan China  dan.china@whiting-turner.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

NOTICE OF REMOVAL EXHIBIT 1   p. 1



**CT Corporation**
**Service of Process Notification**
12/05/2024
CT Log Number 547921070

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                          Thu, Dec 5, 2024
**Server Name:**                   Jimmy Lizama

| | |
|---|---|
| Entity Served | THE WHITING-TURNER CONTRACTING COMPANY |
| Case Number | 24CU022713C |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
THE WHITING-TURNER CONTRACTING COMPANY, a Maryland Corporation; and DOES 1 through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
G.A. ABELL, INC. dba Precision Electric Company, a California Corporation

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
11/14/2024 10:16:58 AM
Clerk of the Superior Court
By Y. Modica          ,Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero o bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Diego Superior Court, Central Division<br><br>330 West Broadway, Sand Diego, CA 92101 | CASE NUMBER:<br>*(Número del Caso):*<br>**24CU022713C** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Luke Thompson - 9757 Marilla Dr, #248, Lakeside, CA 02040 - (619) 987-3231 - lthompson@thompsonlawconsultation.com

DATE: ~~November 7, 2024~~ November 15, 2024     Clerk, by _____, Deputy
*(Fecha)*                                      *(Secretario)*   Y. Modica        *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*  THE WHITING-TURNER CONTRACTING COMPANY, a Maryland Corporation
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

For your protection and privacy, please press the Clear.
This Form button after you have printed the form.

[ Print this form ]  [ Save this form ]          [ Clear this form ]

Luke Thompson, Esq (282762)
**Thompson Law & Consultation**
9757 Marilla Dr. #248
Lakeside, CA 92040
619.987.3231
lthompson@thompsonlawconsultation.com

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
11/14/2024 10:16:58 AM
Clerk of the Superior Court
By Y. Modica        ,Deputy Clerk

*Attorney for Plaintiff G.A. ABELL, INC. a California Corporation.*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| G.A. ABELL, INC. dba Precision Electric Company, a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE WHITING-TURNER CONTRACTING COMPANY, a Maryland Corporation; and DOES 1 through 20, inclusive<br><br>Defendants. | Case No.   24CU022713C<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>1) **BREACH OF CONTRACT AND ABANDONMENT;**<br>2) **REASONABLE VALUE**<br>3) **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**UNLIMITED CIVIL ACTION**<br>**Claim Amount: Greater than $25,001.00**<br><br>**JURY DEMAND**<br><br>**[IMAGED FILE]** |

//

Plaintiff G.A. ABELL, INC. ("Plaintiff"), a California Corporation dba Precision Electric

Company alleges as follows:

## JURISDICTION AND VENUE

1.    The causes of action stated below seek a principal amount of more than

**COMPLAINT - BREACH OF CONTRACT**

**Page 1**

twenty-five thousand dollars ($25,000.00), and are ones in which the above-entitled Court has jurisdiction.

    2.    This Court has jurisdiction and venue is proper pursuant to California Code of Civil Procedure §410.10, §395, §395.5, & 392(a)(2) because the subcontract described herein was entered into and the work of improvement was performed in the County of San Diego, all actions alleged herein occurred in the County of San Diego, and all relevant known parties operate or are residents of the County of San Diego.

<div align="center">

**PARTIES**

</div>

    3.    Plaintiff, G.A. ABELL, INC., is a California Corporation dba Precision Electric Company ("Precision") that is, and at all times herein discussed was, authorized to do business in California, licensed by the California Contractors State  License Board ("CSLB") and with its principal place of business at 8137 Winter Gardens Boulevard, Lakeside, California 92040.

    4.    Defendant THE WHITING-TURNER CONTRACTING COMPANY ("Whiting-Turner")  is a Maryland Corporation, that was at the time of the actions described herein doing business in San Diego County, California while purporting to be licensed as a general contractor with the California State Licence Board License #311107 and which license expires on July 31, 2025 and is doing work as a general contractor with its principal place of business for California is purported to be 300 E. Joppa Rd. 8th Floor, Baltimore, MD 21286.

    5.    Plaintiff is unaware of the true names, capacities, whether individual, corporate, or otherwise, or basis for liability of defendants Doe(s) 1 through 20, inclusive, and therefore sue said defendants by their fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of said fictitiously named defendants is liable to Plaintiff on the causes of herein alleged and/or assets some interest, legal or equitable, in the subject matter of this action, and therefore Plaintiff sues and said defendants by said fictitious names. Plaintiff will move to amend this complaint when the true names and capacities of said fictitiously named defendants have been ascertained.

    //

<div align="center">

**FACTS COMMON TO ALL CAUSES OF ACTION**

</div>

COMPLAINT - BREACH OF CONTRACT

<div align="center">

**Page 2**

</div>

Plaintiff, for all Causes of Action against Defendant and DOES 1 through 20, alleges that:

6.      Plaintiff realleges and incorporates by reference paragraphs 1 through 5, above, as though set forth in full.

7.      Prior to entering into a subcontract agreement for electrical work at the Fashion Valley Mall ("FVM"), Whiting-Turner had entered into various construction contracts with Simon Property Group, Lp (the "Owner") for various phases of improvements at FVM (the "Project"), located at 7007 Friars Road, San Diego, CA 92108.

8.      Precision is informed and believes that during the course of construction for phase 1 and phase 2 of these projects, Whiting-Turner had entered into at least two separate electrical subcontract agreements with other electrical subcontractors.

9.      On or around August 12, 2022, Whiting-Turner had requested a bid from Precision for Phase 3 portion of the Project. Precision provided its firm fixed price bid for the Project based on plans, specifications and other bid-related documents (collectively, "Bid Documents") provided to Precision prior to Precision's bid submission to Whiting-Turner on September 16, 2022. Precision bid, a true and correct copy of which is included and incorporated herein as **Exhibit 01,** included a defined scope of work ("SOW") based on the Bid Documents.

10.     Whiting-Turner issued a subcontract agreement to Precision, which after review and comments, the parties executed the fixed scope and fixed price, $2,927,990.00, subcontract agreement on or around October 13, 2022 (the "Subcontract"). A true and correct copy is included and incorporated herein as **Exhibit 02.**

11.     Plaintiff is an electrical subcontractor with extensive experience performing substantially similar electrical work over the last twenty-five years, including facilities of similar size and scope and previous work at the FVM location.

12.     Plaintiff began work on the Project on or around October 17, 2022, and completed or substantially performed and completed all duties and obligations required of Precision under the Subcontract, including all contract modifications and additional work as directed by Whiting-Turner.

**COMPLAINT - BREACH OF CONTRACT**

**Page 3**

13.    Plaintiff alleges that it timely performed the SOW in conformity with the Subcontract and the Project's contract documents and as directed by Whiting-Turner, or that any such work was delayed by Whiting-Turner and/or the Owner.

14.    Plaintiff is informed and believes and thereon alleges that any and all delays to the Project are the result of the actions or inactions of Whiting-Turner, the Owner, and/or other subcontractors or vendors for which Precision was not and is not responsible. To the extent that the Project was delayed, the causes for the delays to the Project are only partially known to Precision.

15.    Over the course of Precision's performance on the Project, a substantial number of changes to the original SOW were issued and/or directed by Whiting-Turner, forcing Precision to perform almost double the amount of work in Precision's original bid as well as the Subcontract's original scope of work. This additional work was the direct result of changes issued and/or directed by Whiting-Turner and the Owner as well as the failure of Whiting-Turner to properly schedule, sequence, and manage the Project's activities, other subcontractors, and owner-directed changes.

16.    As a result of the delays and changes to the Project, Precision incurred massive additional costs during its performance. The additional costs and magnitude of the changes and delays were not and could not have been known at the time Precision submitted its bid to Whiting-Turner for the Project.

17.    Over the course of the Project Whiting-Turner issued Precision a total of 17 change orders, totaling $ 1,895,687.00, consisting of 93 Proposed Change Orders ("PCOs") from Precision related to the Project changes.

18.    At the time of the execution of the Subcontract and pursuant to the Project schedule dated July 28, 2022, which was included in the Subcontract, Precision's SOW was to begin on October 19, 2022, and be completed by October 30, 2023, for a total of 377 calendar days in duration. (See, **Exhibit 02**, Exhibit G, pgs. 69-78).

19.    The Project's actual start date was on or around October 6, 2023, and was completed on or around April 9, 2024, with Precision beginning its work on site on October 13,

COMPLAINT - BREACH OF CONTRACT

Page 4

2023 and completing all work required by Whiting-Turner on or around August 7, 2024, or 664 days of performance, more than 287 additional calendar days duration than required under the Subcontract.

20.     Based on Precision's on-site experience on the Project, Precision is informed and believes that Whiting-Turner either failed to properly include all anticipated electrical work for the Project or failed to properly manage the changes and durations on the Project with respect to the Owner's constant changes. In addition, Whiting-Turner failed to secure the additional time required to complete all the additional work required on the Project.

21.     Because of Whiting-Turner failure to properly manage the Project, Precision was forced to perform a massive amount of additional work at the change order rates prescribed by the Subcontract under Section 6(a), which limited Precsion's overhead rate to 10% of the value of the actual material and labor costs incurred on the respective change orders. (Pg. SC3).

22.     Making matters worse, Whiting-Turner failed to fulfill its obligations regarding the timely handling of change orders, change order approvals, and payments for the additional work, forcing Precision to incur substantial burdens to Precision's cashflow related to its labor and materials costs, as well as its overhead. The Subcontract did not permit Precision to bill for the change order-related costs in the monthly billing cycle until the change orders were approved and executed by Whiting-Turner, often months later. (See, *Id.*, Sections 5(d) and 6(a) pg. SC2-3).

23.     As Whiting-Turner was well aware, Precision is not permitted to delay payment to its employees, and in many cases, its vendors as well, simply because Precision cannot bill Whiting-Turner for the work performed.

24.     The Subcontract further prohibits Precision from refusing to continue its work, including change order work, while it waits for approved change orders. (See, *Id.*, Section 6(a) pg. SC3).

25.     As a result of Whiting-Turner's failure to properly manage the project, Precision suffered significant damages, principally related to the excessive labor overruns as a result of the excessive change orders and poor scheduling, material price increases due to delays,

COMPLAINT - BREACH OF CONTRACT

<div align="center">Page 5</div>

additional overhead costs, and cash flow related costs due to the failure to timely provide approved change orders.

26.     Whiting-Turner failed to perform its duties to properly provide a complete project scope of work, control changes to the scope of work during construction, timely process change orders, properly schedule and sequence work, and negotiate the changes with Precision in good faith. In doing so, Whiting-Turner radically changed the form, substance, and nature of the Project from the original design, all while forcing Precision to continue its performance at great cost to Precision.

//

## FIRST CAUSE OF ACTION

## (BREACH OF CONTRACT AND ABANDONMENT against WHITING-TURNER and Does 1-5)

27.     Plaintiff realleges and incorporates by reference paragraphs 1 through 26, above, as though set forth in full at this point.

28.     On or around October 30, 2022, Precision signed a fixed scope fixed price subcontract agreement in which Precision agreed to provide certain electrical installation labor, materials, parts, equipment, supplies, and services for a work of improvement known and described as The Fashion Valley Mall Phase 3, Electrical Phase 4 project (the "Project"). Whiting-Turner executed the agreement on or around November 2, 2022. **Exhibit 02**.

29.     In total, Whiting-Turner issued $1,895,687.00 in change orders to Precision over the entire course of the Project, bringing the revised Subcontract value to $4,823,677.00, of which Precision has received payment totaling $4,761,607.45.

30.     Pursuant to the terms of the Subcontract, Precision provided all or substantially all the electrical labor, materials, supplies, equipment, and services to the Project for the benefit of Whiting-Turner and the Owner at the direction of Whiting-Turner, excepting those duties or obligations excused by the action(s) or inaction(s) of Whiting-Turner.

31.     Whiting-Turner  breached the Subcontract by failing to exercise due care regarding

:

**COMPLAINT - BREACH OF CONTRACT**

1      a. providing a complete project scope of work at the time of bid and throughout the

2        duration of the Project;

3      b. controlling changes to the scope of work during construction;

4      c. timely processing Precision's proposed change orders;

5      d. scheduling and sequencing the Project's work and other subcontractors;

6      e. sequencing and completing construction activities that directly affected Precision's

7        scope of work; and

8      f. negotiating in good faith with Precision the changes, including, but not limited to,

9        changes that were known by Whiting-Turner or should have been known by

10       Whiting-Turner either at the time of bid or prior to Whiting-Turner directing

11       Precision to perform the additional work described in the change orders issued.

12    32. As a direct and proximate result of Whiting-Turner's breach of the Subcontract,

13  Precision has suffered damages in the sum of at least $850,000.00 for labor, materials, supplies,

14  equipment, services, and administrative costs, along with delay costs, to be determined at trial,

15  of which $0.00 has been paid.

16    33. Precision has made several demands to Whiting-Turner for payment related to

17  these damages discussed herein to this action, see, **Exhibit 03** and **Exhibit 04**, and all such

18  demands have been rejected.

19    34. Plaintiff has retained the law firm of Thompson Law & Consultation to pursue this

20  and prosecute this action.

21  //

22         <u>**SECOND CAUSE OF ACTION**</u>

23     **(REASONABLE VALUE against Whiting-Turner and DOES 1 through 10)**

24    35. Plaintiff realleges and incorporates by reference paragraphs 1 through 34, above,

25  as though set forth in full at this point.

26    36. Within the last two years, Precision provided electrical labor, materials, parts,

27  supplies, and services on the Project (the "Work") to Whiting-Turner for the benefit of

28  Whiting-Turner and the Owner and at the special request of Whiting-Turner.

**COMPLAINT - BREACH OF CONTRACT**

37.     The total and reasonable value of Precision's Work, including actual and reasonable overhead and profit, was and is the sum of $6,076,938.00.

38.     Only a portion, $4,761,607.45, of the value of Precision's Work has been paid. There is now due, owing, and unpaid $1,315,330.56 to Precision by Whiting-Turner, together with applicable interest thereon at the rate of market rate from July 1, 2024, until paid.

//

### THIRD CAUSE OF ACTION

### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING against Whiting-Turner, and DOES 1 through 10)

39.     Plaintiff realleges and incorporates by reference paragraphs 1 through 38, above, as though set forth in full at this point.

40.     During the course of Precision's performance of its Subcontract with Whiting-Turner made representations to Precision regarding the Project's scope of work but knowingly failed to timely disclose to Precision the true and substantially different size, amount, and nature of the Project's scope at the time of bid and throughout Precision's performance. Such representations were false and Whiting-Turner knew or should have known they were false at the time the representations were made or the disclosures were not made.

41.     Precision is informed and believes and thereon alleges that Whiting-Turner had no intention of compensating Precision for the additional work demanded by Whiting-Turner, which work Precision performed, and thereby received the benefit of Precision's work without proper compensation.

42.     Precision reasonably relied on said representations and disclosures from Whiting-Turner and would not have performed the entirety of the additional work had the complete scope of work been timely disclosed.

43.     Plaintiff has been injured by providing labor, materials, services, and equipment for which it has not been compensated in the amount of at least $1,315,330.56 or such amount as may be proven at trial.

//

COMPLAINT - BREACH OF CONTRACT

Page 8

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

On the First Cause of Action

  1.  For the principal sum of $1,315,330.56 or such amount as may be proven at trial;

  2.  For interest thereon at the rate of ten percent (10%) per annum from July 1, 2024; and

  3.  Determination by this Court that the original Subcontract as described herein was abandoned by Whiting-Turner;

//

On the Second Cause of Action

  1. For the principal sum of $1,315,330.56 plus additional costs incurred to be proven at trial; and

  2. For interest thereon at the rate of ten percent (10%) per annum from July 1, 2024.

//

On the Third Cause of Action

    1.  For the principal sum of $1,315,330.56 plus additional costs incurred to be proven at trial.

//

On all Causes of Action

    For such other and further relief as this Court deems just and proper.

///

DATED: October 29, 2024          **Thompson Law & Consultation**

By:

Luke Thompson (SBN 282762)
lthompson@thompsonslawconsultation.com
Attorney for Plaintiff:
G.A. ABELL, INC. dba Precision Electric Company

COMPLAINT - BREACH OF CONTRACT

# EXHIBIT 01



# PRECISION ELECTRIC COMPANY

BID LINE (619) 966-9671

Page **1** of **3**

September 16, 2022

**Project: Fashion Valley Mall Phase 4**

   We are pleased to provide our proposal for electrical work for the above referenced project. Our bid proposal includes all material, tax, labor, insurance, tools, equipment, submittals, O&M manuals, startup and testing. Our bid is based upon electrical drawings dated 7/25/22 and 8/3/22. Specification section 26 is listed.  Items not shown or cross-referenced on the listed drawings or specification are not considered in this proposal's scope of work and are not included in the proposal price. <u>We have noted no Addenda.</u>

| DESCRIPTION | AMOUNT |
|---|---|
| ELECTRICAL | $ 1,189,000.00 |
| MAIN CONCOURCE SAFE OFF | $ 12,000.00 |
| ESCALATOR SAFE OFF, ROUGH IN AND LIGHTS | $ 68,000.00 |
| FOOD COURT RESTROOMS SAFE OFF, ROUGH IN AND LIGHTS | $ 104,000.00 |
| TEMPORARY POWER | $ 20,000.00 |
| TEMPORARY LIGHTING | $ 10,000.00 |
| VANS RESTROOM SAFE OFF, ROUGH IN AND LIGHTS | $ 28,000.00 |
| LIGHT FIXTURES | $ 1,416,000.00 |
| RELOCATE AND MODIFY FIRE ALARM | $ 28,000.00 |
| RELOCATE ELECTRICAL ALLOWANCE | $ 24,000.00 |
| CORING ALLOWANCE | $ 18,000.00 |
| TOTAL | $ 2,917,000.00 |

8137 WINTER.GARDENS BLVD. • LAKESIDE, CALIFORNIA 92040-3114 •(619) 390-2991 • FAX (619) 390-0623
CA LICENSE A, B, C-7, C-10, C-46 #534116

NOTICE OF REMOVAL EXHIBIT 1  p. 15



# PRECISION ELECTRIC COMPANY

BID LINE (619) 966-9671

Page **2** of 3

**Clarifications**:
- Bond Rate: 1%, based on total bid price.
- Trenching is based on normal production rates for equipment & hand digging.
- Haul off of spoils has been included.
- We will provide anchor bolts and paper template for your use.
- Price includes salvage rights on demo electric items.
- All work is based on Mon.-Thur. 10:00pm - 8:00am.
- Proposal is contingent upon contract terms and conditions, on a project specific basis, being acceptable to PECo.
- Base Bid includes EMT infrastructure only for Fire Alarm System.
- A complete Simplex Fire alarm system has been provided for Vans restrooms.
- It is assumed all circuits shown on floor plans are existing and can be intercepted inside planters.
- Where circuits are to be intercepted / extended it is assumed there will be clear and unobstructed access to soffits.
- Temporary power will include (1) 200amp panel, spider boxes within 100', lighting per minimum OSHA standards, (8) flood lights to move as needed and weekly maintenance.
- We have included up to (8) mobilizations.
- We have included cleanup of areas of work to "like new conditions" after each work day.
- Up to (100) hours for fixture adjustments with owner has been included.
- Title 24 commissioning reports have been included.
- We have included labor and material for seismic joint locations.
- We have included fire stopping for our scope of work.
- Coring & x-ray has been provided for our scope of work.
- We have provided any and all lifts to perform our scope of work.
- New breakers have been provided where required.
- By listing Precision Electric Company, Contractor accepts and agrees to terms of this proposal.
- Our bid is based on private rates.

**We exclude the following**:
- Temporary power usage fees, task lighting.
- All fees. To include, but not limited to, permits, plan check, air pollution, and third-party accounting systems such as Textura CPM.
- Storing / Relocating Kiosk's / Directories.
- Parking fees.
- Allowances are not included.
- Site home run conduits to existing panels. (see home run excavation allowance)
- Cast-in-Place concrete, rebar, housekeeping pads, concrete wash out requirements.
- Drilling, light pole / bollard base, plywood templates for anchor bolts and steel pipe bollards.
- Painting, patching, access panels, and cutting or replacing of ceiling tiles.
- HVAC control wire, conduit and low voltage devices.

8137 WINTER.GARDENS BLVD. • LAKESIDE, CALIFORNIA 92040-3114 • (619) 390-2991 • FAX (619) 390-0623
CA LICENSE A, B, C-7, C-10, C-46 #534116



# PRECISION ELECTRIC COMPANY

BID LINE (619) 966-9671

Page **3** of **3**

- Low voltage subcontractors.
- Fixture ceiling hanger wires. We will tie off only.
- Saw cut, breakout, removal, & patch back.
- Demolition. We will safe off only.
- VFD's or Combination Starters for Mechanical Equipment.
- Cord and plugs for owner provided equipment.
- All carpentry or structural work, including tie off points for safety harness.
- Dumpster fees or container, including City Recycling fees.
- Grade staking or site surveying. Landscape Repairs, S.W.P.P's
- Removal, disposal, handling or abatement of hazardous materials.

If you should have any questions, please contact us.

Respectfully submitted: Adam Cox (619) 554-7900

**Estimating Department**

Note: This proposal may be withdrawn if not accepted within 90 days.

8137 WINTER GARDENS BLVD. • LAKESIDE, CALIFORNIA 92040-3114 • (619) 390-2991 • FAX (619) 390-0623
CA LICENSE A, B, C-7, C-10, C-46 #534116

NOTICE OF REMOVAL EXHIBIT 1  p. 17

# EXHIBIT 02

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# SUBCONTRACT

## THE WHITING-TURNER CONTRACTING COMPANY

Address Reply to:     THE WHITING-TURNER CONTRACTING COMPANY
3911 Sorrento Valley Blvd  Suite 100
San Diego, CA  92121

SUBCONTRACT NO.    <u>019777-26B</u>

SUBCONTRACT FOR    Phase 4 Electrical

SUBCONTRACTOR
Address    Precision Electric Company
8137 Winter Gardens Blvd.
Lakeside, CA  92040
CA License No. 534116

Remittance Address    8137 Winter Gardens Blvd
Lakeside, CA  92040

OWNER    Simon Property Group, Lp
60 Columbia Road  Building B, 3rd Floor
Morristown, NJ  07960

PROJECT    Fashion Valley Mall Redevelopment Phase 3
7007 Friars Rd.
San Diego, CA  92108

This agreement, made this  day of October 13, 2022, by and between Precision Electric Company hereinafter called the Subcontractor, and THE WHITING-TURNER CONTRACTING COMPANY, of Baltimore Maryland. with its principal office located at 300 East Joppa Road, Baltimore, Maryland. a body corporate of the State of Maryland. hereinafter called the Contractor,

WITNESSETH, that the Subcontractor and Contractor for the consideration hereinafter named. agree as follows:

ARTICLE 1. **DEFINITIONS.--**
(a) As used herein, the following terms shall have the meanings indicated:
"Architect" or "Engineer" means the architect or engineer directing the work as agent of the Owner, or any other person authorized by the General Contract to direct or pass upon any matter or thing connected with the performance of the General Contract.
"Contract Documents" means (a) the General Contract, (b) all general. supplementary and other conditions applicable to the Project, (c) the Drawings and Specifications, and (d) all bulletins and addenda issued in connection with the Project.
"Drawings and Specifications" means the drawings and specifications described in Article 2 hereof. and all addenda and/or revisions thereto.
"General Contract" means the contract executed or to be executed by the Owner and the Contractor in connection with the construction of the Project and any amendments thereto.
Where the contract entered into between Owner and Contractor is a Construction Management Agreement, the term "Contractor" shall be deemed to mean "Construction Manager".
"Subcontract" means this document and all of the Contract Documents which shall be made a part of this Subcontract and are incorporated herein by reference.
(b) Where the term "Contractor" is used in the Specifications, insofar as it has application to the work required to be done by the Subcontractor as provided herein, it shall be deemed for the purposes hereof to refer to the Subcontractor. The term "Contractor" or "General Contractor" when used in the Contract Documents shall be deemed to

SCI

 

NOTICE OF REMOVAL EXHIBIT 1  p. 19

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

make reference to the Subcontractor insofar as it has application to the work covered by this Subcontract. The term "Subcontractor" may be referred to as "it" whether Subcontractor is incorporated or not.

**ARTICLE 2. SCOPE OF WORK**--The work to be performed and materials to be furnished by the Subcontractor are as specified in Article 3 hereof and in accordance with Drawings and Specifications prepared by Retail Design Collaborative and MG2 dated 07/29/2022 and 08/03/2022 respectively, and as set forth in Exhibit B.

**ARTICLE 3. PROVISION OF LABOR AND MATERIALS**--
    (a) The Subcontractor agrees to furnish and pay for all labor and supervision, tools, apparatus, supplies, equipment, and services, and also to furnish, deliver, install, and pay for all materials necessary for the performance and completion of the work described under the Scope of Work, free from all claims and liens of materialmen, suppliers, laborers, truckers, subcontractors, and others making claims through the Subcontractor. All such work shall be done to the satisfaction of the Owner, the Architect and/or Engineer, and the Contractor in accordance with the Contract Documents. Subcontractor agrees to submit daily work reports and monthly progress reports and schedule updates upon request by the Contractor. The Subcontractor agrees that with respect to the Scope of Work hereunder it will stand in the Contractor's shoes with respect to the Contractor's obligations to the Owner under the Contract Documents and will perform all work and obligations as set forth on the Contract Documents to the satisfaction of the Owner. At all times that Subcontractor has personnel at the Project site, it shall also have present an authorized representative of Subcontractor who shall supervise and direct Subcontractor's personnel and be responsible for their actions. Such representative shall be authorized to act on behalf of the Subcontractor and communications to such representative shall be binding upon Subcontractor.
    (b) In the event any deviations from the Contract Documents are incorporated in any shop drawings of or by the Subcontractor, such deviations and the reasons therefore shall be fully explained in writing by separate letter to the Contractor and Owner at the time the shop drawings are submitted to the Contractor and Owner. Failure to so specify and explain any such deviation will automatically void any inadvertent approval of the same by the Contractor, Architect, Engineer and/or Owner.
    (c) The Subcontractor represents and warrants that it is an expert in the particular line or lines of work herein contracted to be done and that it is competent to know whether the materials, methods and apparatus specified for this work are sufficient and suitable to secure the results contemplated by the Contract Documents. The Subcontractor shall be responsible for fulfilling the requirements of the Contract Documents. Subcontractor agrees to cooperate in carrying out Contractor's quality assurance program including, but not limited to, furnishing necessary documentation and facilitating inspections and quality checks.
    (d) In the event that Subcontractor employs union labor the Subcontractor agrees to be bound by the terms and provisions of the agreement establishing the Impartial Jurisdictional Disputes Board, any such successor Board, or any subsequent method agreed to be employers and the unions affiliated with the Building and Construction Trades Department, AFL-CIO, for the settlement of jurisdictional disputes. The Subcontractor also agrees that any assignments of disputed work shall be made in accordance with any agreement of record between the disputing trades, or any published decision of record compiled and published by the Building and Construction Trades Department, AFL-CIO in Agreements and Decisions Rendered affecting the Building Industry.

**ARTICLE 4. DILIGENT PERFORMANCE**--
    (a) Subcontractor agrees to commence, pursue diligently and complete the work in such sequence and order and according to such schedules as Contractor shall establish from time to time during the course of the work, and shall perform the work so as not to delay any other trades or contractors, time being of the essence of this Subcontract. Any written dates furnished by the Subcontractor and approved by Contractor and Owner for delivery of materials, samples, shop drawings, etc., shall become a part of this Subcontract. Subcontractor shall furnish information requested by the Contractor in connection with monitoring and updating the Project schedule and shall immediately notify Contractor in writing of any interruption of the work or late delivery which causes or may cause a delay in Subcontractor's performance. No extension of completion date shall be permitted unless approved in writing by the Contractor and Owner, and Subcontractor shall be responsible for any losses or penalties incurred by Contractor as a result of delays in completing Subcontractor's work. If Contractor determines that the Subcontractor is behind schedule or will not be able to maintain the schedule, Subcontractor shall submit a remedial plan to recover, shall work overtime, shift work, or work in an altered sequence, if deemed necessary, in the judgment of the Contractor to maintain the progress of the work. Any such overtime, acceleration, shift or altered sequence work required to maintain progress or to complete the work on a timely basis shall be at Subcontractor's expense and shall not entitle Subcontractor to an extension of time or additional compensation. Contractor may supplement Subcontractor's forces, at Subcontractor's expense, if deemed necessary by the Contractor to maintain the Project schedule. Subcontractor shall be liable to the Contractor for any delay or damages, including consequential or liquidated damages, threatened or assessed against the Contractor to the extent caused by the Subcontractor.
    (b) To the fullest extent permitted by applicable law, Contractor shall have the right at any time to delay or suspend the work or any part thereof without incurring liability therefore. An extension of time shall be the sole and exclusive remedy of Subcontractor for any delays or suspensions suffered by Subcontractor, but only to the extent that a time extension is obtained from the Owner, and Subcontractor shall have no right to seek or recover from Contractor any damages or losses, whether direct or indirect, arising from or related to any delay or acceleration to overcome delay, and/or any impact or effect of such delays on the Work.
    (c) Subcontractor shall cooperate fully with Contractor in providing promptly any information requested by Contractor in connection with preparation of schedules for the Project, including, but not limited to, detailed information concerning the sequence, beginning and ending dates of activities, cost breakdowns related to such activities, and any information requested for Critical Path Method scheduling if used for the Project. The costs of all such activities on the part of Subcontractor are included in the Subcontract Amount.
    (d) In the event of any dispute under this Subcontract or as to the work to be performed, Subcontractor shall continue to diligently perform the work as directed by Contractor without interruption, deficiency or delay.

SC2

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

ARTICLE 5. **PAYMENT**--

(a) Payment of amounts due under the Subcontract. shall be made as follows: The Contractor shall, pay to the Subcontractor an amount equal to ninety percent (90%) or such higher percentage as required by applicable law of the value of the work performed by the Subcontractor as determined by the Architect and approved by the Contractor during any calendar month within fifteen (15) days after payment therefor has been received by the Contractor from the Owner. or within such shorter period specified by applicable law, statute or regulation. The Contractor shall be under no obligation to make any payment to the Subcontractor except to the extent that the Contractor has received funds from the Owner for the work invoiced by the Subcontractor; that is to say, the Subcontractor shall not be entitled to payment if for any reason, the Owner fails to pay the Contractor in accordance with the General Contract, such payment from the Owner being a condition precedent to any obligation of Contractor to Subcontractor. Subcontractor expressly assumes the risk of the Owner's non-payment and the subcontract price includes this risk as the Subcontractor understands and acknowledges that it is to be paid exclusively out of a fund the sole source of which is the Owner's payment to the Contractor. The Owner's non-payment to Contractor will result in non-payment to Subcontractor by Contractor. Retainage and any other balance of the Subcontract Amount shall be payable fifteen (15) days or within such shorter period specified by applicable law, after the work under this Subcontract has been completed and accepted by the Owner, Architect, and Contractor and following approval by the Architect of the final application for payment, and settlement of all claims, if any, under this Agreement, provided that Subcontractor has fully performed all of its obligations hereunder. The Contractor is hereby authorized to deduct and offset from any payment an amount equal to any and all sums or obligations owing by the Subcontractor to the Contractor and costs necessary to complete the work to be performed under this Subcontract, and any and all claims liquidated or unliquidated, by the Contractor against the Subcontractor, arising hereunder, under any other contract or agreement between the Subcontractor and the Contractor or from any other liability or obligation of the Subcontractor to the Contractor whether under this Subcontract or otherwise.

(b) The Subcontractor agrees to submit to the Contractor applications for payment by the 25th of each month, or at such other time as provided in the Contract Documents so as to enable the Contractor to timely apply to the Owner for payment. As a condition precedent to the payment of any application. the Subcontractor shall (1) produce waivers of mechanics lien rights and claim releases in the form required by Contractor by Subcontractor and all persons supplying labor or materials to the Subcontractor on the Project through the period covered by the application, or (2) exhibit such other evidence as the Contractor may require that charges for all labor and material have been paid. Any payments made by Contractor to Subcontractor are to be held in trust by Subcontractor for the payment of any lower tier Subcontractor or supplier. The Contractor shall have the right to contact Subcontractor's suppliers and subcontractors of any tier, direct or indirect, to determine the current status of indebtedness and Subcontractor authorizes them to provide such information. Contractor in its discretion may make checks payable jointly to Subcontractor and the supplier or subcontractor or directly to the supplier or subcontractor for the account of the Subcontractor.

(c) Payment by the Contractor to the Subcontractor or for its account shall not be deemed to be an admission or approval by the Contractor of the sufficiency and adequacy of the work covered by the payment.

(d) Notwithstanding any other provisions of this Agreement, Contractor shall be under no obligation to make any payment to the Subcontractor under any provision hereof except to the extent that Contractor has received funds from Owner, payment by Owner being a condition precedent to payment of the Subcontractor. Subcontractor expressly assumes the risk of the Owner's non-payment and the subcontract price includes this risk as the Subcontractor understands and acknowledges that it is to be paid exclusively out of a fund the sole source of which is the Owner's payment to the Contractor. The Owner's non-payment to Contractor will result in non-payment to Subcontractor by Contractor. Notwithstanding the foregoing, nothing in this Subcontract shall be construed to prohibit Subcontractor from pursuing its rights, if any, to a mechanic's lien or statutory bond claim in  the event that non-payment of the Subcontractor was caused by the failure of the Owner to pay Contractor amounts legally due.  Subcontractor further  agrees that, prior to exercising its rights or filing any claims. if any,  against the Contractor or any surety for non-payment caused by the failure of the Owner to pay Contractor amounts legally due. Subcontractor shall first timely  exercise and exhaust  any rights and remedies that may exist with respect to enforcing a mechanic's lien on the Project.

(e) Contractor may apply any payments otherwise due Subcontractor hereunder to any other indebtedness. liability or obligation of Subcontractor to Contractor whether under this Subcontract or any other agreement or circumstance.

ARTICLE 6. **ADDITIONAL OR OMITTED WORK**--

(a) In the event that the Contractor directs Subcontractor to perform additional work, Subcontractor agrees that it will promptly perform and diligently complete such work whether or not Contractor and Subcontractor have agreed on the cost of such work. Subcontractor shall submit to Contractor a lump sum proposal for such work. which proposal shall include a detailed cost breakdown for each component of the work, indicating both quantities and unit prices. and such proposal shall be submitted to Contractor not later than 7 days after Contractor directs Subcontractor to perform extra or additional work or such lesser period if required by the Contract between Owner and Contractor.  If a lump sum price or unit price for the additional work cannot be agreed upon. or Subcontractor fails to submit such proposal within 7 days after Contractor directs Subcontractor to perform extra or additional work, Subcontractor agrees to do the work on the basis of its actual cost plus percentage fees for overhead and profit as set forth in Article 10. The Contractor shall not be liable for payment for any additional work performed by the Subcontractor unless such work is first expressly authorized by the Contractor in writing and payment is made by the Owner to the Contractor for such extra work, payment by Owner to Contractor being a condition precedent for Contractor to pay Subcontractor for such work. Both authorization in writing by the Contractor and actual payment by the Owner to the Contractor for such extra work shall be conditions precedent to Contractor's obligation to pay Subcontractor for such additional work. Any additional compensation or time to be given to Subcontractor shall be set forth in a Subcontract supplement and shall constitute a full and final equitable adjustment of compensation, time or any other alleged entitlement, known or unknown. arising in connection with the facts and circumstances described in and which gave rise to such contract supplement and Subcontractor waives all damages, direct. indirect and consequential. relating to such facts and circumstances, including, but not limited to, impact. reduced productivity, interference by other trades. lack of coordination of the work by Contractor. inefficiencies. acceleration, delays, extended overhead, diminished bonding capacity or lost profits.

(b) In the event that the Subcontractor performs any such authorized additional work on an actual cost plus basis. it shall furnish each day to the representative of the Contractor, duplicate payroll sheets, timesheets. material tickets.

SC3

Document Generated from CMiC



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

equipment charges, and a statement or slips for all other charges, retaining a copy of each thereof, and securing on each thereof the signature of the duly accredited representative of the Contractor. Such signed copies of payroll sheets, timesheets, material tickets, statements and slips shall accompany the application for payment.

(c) Should the Contractor during the execution of this Contract require the Subcontractor to omit any work embraced within the terms of this Subcontract, said omission being for the account of the Owner, the Contractor, or any other subcontractor on the work, the Subcontractor agrees to omit such work, and the Contractor will deduct from any monies due the Subcontractor the value of such omitted work as reasonably determined by Contractor.

(d) In the event of any dispute, controversy, or claim for additional compensation or time extensions, except for payment for extra or additional work expressly directed by Contractor in accordance with Section 6 (a) of this Subcontract, the compensation for which shall be fully and finally governed by Section 6 (a) of this Subcontract and for which no further claim can or shall be made, notice in writing shall be given to the Contractor no later than seven (7) days following the occurrence on which such claim is based, unless the notice provision in the General Contract between the Owner and Contractor is less than seven (7) days, in which case, Subcontractor shall give notice to Contractor within 2 days less than the time required for Contractor to give notice to the Owner according to the notice provision in the General Contract. Such notice shall describe the dispute, controversy or claim in detail so as to allow Contractor to review its merits. Such notice shall also provide detailed information to substantiate such claim including supporting documentation and calculations, and including any information requested by Contractor. Any claim not presented within such time period shall be deemed waived by Subcontractor.

(e) If the Subcontractor shall make any claim against the Contractor for extra work or additional compensation for which the Owner or its agents may be liable, the Contractor may present such claim or claims to the Architect and/or Owner for determination and decision provided (1) such claim is not, in the judgment of the Contractor, made in bad faith, (2) Subcontractor has given notice in accordance with Article 6 (d) and in the form required by the General Contract, and has presented the claim to Contractor within the time required by Article 6 (d), (3) Subcontractor has both requested in writing that Contractor present the claim and has agreed in writing, on terms satisfactory to Contractor, to pay all costs of Contractor in presenting and pursuing such claim. Further, if Contractor requires that Subcontractor execute a liquidating agreement or similar agreement on terms satisfactory to Contractor further memorializing the understanding of the parties in connection with the presentation of such claims, Subcontractor shall execute such agreement as a precondition for Contractor to submit such claim. Presentation of the claim by Contractor shall not be construed as an acknowledgment of the validity thereof, or a waiver of any right of the Contractor, and such action shall be without prejudice to its rights. If the claim is presented by the Contractor to the Architect and the Owner, the decision of the Architect and/or Owner shall be final and binding upon the Subcontractor to the same extent and purpose that it is final and binding on the Contractor.

(f) No additional time or compensation will be allowed for weather delays or difficulties or inconveniences arising from mud, dust, water, ice, snow, wind, heat or cold or similar natural or physical conditions unless permitted under the General Contract and a claim therefore is made as set forth in Section 6(e). Contractor assumes no responsibility for material received, unloaded or stored for or by Subcontractor. Materials, tools, supplies, equipment, etc., belonging to or leased to Subcontractor are its responsibility and no claim for missing or stolen property will be allowed. Contractor shall not be required to provide hoisting facilities or temporary power, water or heat unless otherwise provided herein.

(g) Contractor may direct Subcontractor to work overtime or premium time and Subcontractor shall comply with such direction. If approved in advance in writing by Contractor's authorized representative, Subcontractor may be reimbursed for such work but only for the difference between regular time and overtime for direct payroll cost and the related payroll taxes, insurance, and benefits, and shall not be entitled to any additional compensation for overhead or profit or for inefficiencies or declines in productivity or other impacts. Subcontractor shall be responsible for the costs of overtime work caused by failure of Subcontractor to provide sufficient manpower, maintain the progress of the Work, or otherwise meet its obligations hereunder.

## ARTICLE 7. DEFAULT--

(a) In the event the Subcontractor shall, in the judgment of the Contractor, (1) become unable to fulfill its financial obligation, become insolvent, or file or have filed against it any petition in bankruptcy, make an assignment for the benefit of creditors, or commence or have commenced against it or enter into any other proceeding or arrangement for relief of debtors, reorganization or deferral or discharge of debts, (2) fail to pay, when due, for materials, supplies, labor, taxes, or other items purchased or used in connection with the work, (3) fail to pursue the work in accordance with this Subcontract and the schedules established by the Contractor, (4) fail to supply a sufficiency of properly skilled supervisors, workmen, or of materials, tools, equipment, or supplies of the proper quality (including failure occasioned by a strike, picketing, boycott, or other cessation of work by Subcontractor's employees), (5) interfere with or disrupt, or threaten to interfere with or disrupt the operations of the Contractor, the Owner, or any other laborer, materialmen, supplier, subcontractor, or other person working on the job, whether by reason of any labor dispute, picketing, boycotting, or by any other reason, (6) violate any applicable federal, state, or local laws or regulations, (7) advise Contractor or demonstrate to Contractor that Subcontractor will be unable to timely and adequately perform any of its obligations under this Subcontract, or (8) commit any other breach of this Subcontract, then any such event shall immediately with no further action or notice required on the part of the Contractor, constitute a default by the Subcontractor under this Subcontract, and any such event shall be deemed to be a breach of this Subcontract. The Contractor will give the Subcontractor written notice of default. Upon receipt of such notice, Subcontractor shall have two (2) days in which to cure any such default provided, however, that if, in the judgment of the Contractor, such default cannot be cured within a two (2) day period after such notice, or Subcontractor has advised Contractor or Contactor has otherwise determined that Subcontractor is unable to cure or remedy said default, the Contractor will notify the Subcontractor of default but the Subcontractor will not have any right to cure such default and the Subcontractor may be terminated immediately. In the event of a default for which there is no right to cure as provided hereinabove, or in the event of the expiration of the 2-day cure period set forth hereinabove without all such defaults having been fully cured, the Contractor may terminate this Subcontract, take possession of all or any materials, fabricated items wherever located, supplies, equipment and tools pertaining to the Project whether on the Project site, in the Subcontractor's premises or in transit, and may make independent arrangements for completion of the work.Subcontractor grants to Contractor a right of entry into any premises owned or leased by Subcontractor for the foregoing purposes. The amount of completion cost, as well as any other costs, damages, or expenses, including Contractor's legal fees and expense, incurred as a result of such default shall

SC4

Document Generated from CMiC 

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

be charged against any unpaid balance due to the Subcontractor under this Agreement or under any other agreement between Contractor and Subcontractor; and, if said total costs, damages or expenses shall exceed the balance due, the Subcontractor agrees to pay the amount of said excess immediately upon demand of the Contractor. The materials, supplies, equipment and tools taken by the Contractor may be used in completing the Project and may be incorporated into the improvements being constructed. With respect to any of such items incorporated into the Project, or consumed in the job, the net reasonable value of the same as of the date of taking shall be taken into account in the calculation of the aforesaid total completion costs, damages, and expenses. With respect to any such items which are not so incorporated or consumed, or which have a salvage value, the Contractor may, at its option (1) assume title to the same or any part of the same, as of the date of default and take into account the net reasonable value thereof as of the date of taking in the calculation of the total completion cost, damages, and expenses or (2) return the same to Subcontractor and take into account the net reasonable value of the use thereof by Contractor in the calculation of the said total completion cost, damages, and expenses

(b) In addition to, and not in substitution of, the remedies herein above specified, Contractor may immediately, in the event of default or failure of Subcontractor to perform its obligations hereunder, provide or arrange for such workmen and materials necessary to continue and complete the work contracted for hereunder for the account of the Subcontractor and at Subcontractor's cost and expense, and apply any and all funds due or to become due to the Subcontractor thereto, all without terminating, rescinding or voiding this Subcontract or releasing the Subcontractor from any liability hereunder or from any damages caused by Subcontractor's failure to perform.

(c) In the event of a default by the Subcontractor under this Subcontract, all sums and obligations owing to the Contractor by the Subcontractor in any right or capacity, whether under this Subcontract or otherwise, immediately shall become due and payable to the Contractor.

(d) In the event the Contractor does not terminate this Subcontract, but assents to delayed completion of the work by the Subcontractor, such assent shall not be construed as a waiver of the Subcontractor's obligation to reimburse the Contractor for any costs, damages, or expenses incurred as a result of such delay; and all such costs, damages, and expenses shall be paid or reimbursed to Contractor upon demand.

(e) In the event that Contractor wrongfully exercises any of its rights under this Article 7, Subcontractor's sole and exclusive remedy shall be payment of the Subcontract Amount for the portion of the Subcontract performed by Subcontractor, and Subcontractor hereby waives any and all other rights, claims and remedies under this Subcontract and/or at law.

## ARTICLE 8. RELEASES OF CLAIMS AND WAIVER OF LIENS--

Subcontractor agrees to provide to Contractor, and to provide and obtain from its subcontractors and suppliers of all tiers, executed releases of claims and/or waivers of liens and lien rights in the form required by Contractor and at such times as may be requested by Contractor. Subcontractor shall hold all monies paid by Contractor in trust for the payment of lower tier subcontractors and suppliers, promptly apply all payments made hereunder to Subcontractor's cost for labor and materials for the Project, and shall further take any and all necessary actions to keep the Project free and clear of all claims for liens and any and all claims against Contractor or Owner or any bonds posted by either of them in connection with the Project. In the event that any person furnishing labor or materials to the Subcontractor files a notice of intent to place a lien on the Project or files a lien on the Project or files a notice of claim or makes a claim against the Contractor or Owner or any bonds posted by either of them in connection with the Project, Subcontractor shall promptly but in no event later than any time required for a release bond to be posted under the General Contract take all necessary steps to have such notice or lien or claim withdrawn, including, if requested by Contractor, the posting of a bond. In the event that Subcontractor does not fulfill its obligations under this Article 8, Contractor may take all actions which it deems reasonable or necessary to protect the Project from liens and claims and the costs of any such actions including the cost of posting a release bond and attorney's fees, shall be deducted from amounts payable by Contractor to Subcontractor under this Agreement or any other agreement or circumstance. Subcontractor shall remain liable in the event that monies payable to it are insufficient to pay any damages or expenses arising from such liens.

## ARTICLE 9. MISCELLANEOUS--

(a) The Subcontractor shall not sublet, assign or transfer this Subcontract or any part thereof, or the money due or to become due under it, without the written consent of Contractor; and any assignment or transfer without such consent shall be void. Subcontractor hereby assigns to Contractor, upon termination of this Subcontract for any reason prior to its complete performance, all of subcontractor's rights in and to any agreements or purchase orders for labor or materials, equipment or services related to the Project, as well as any shop drawings, plans, specifications, or other documents prepared by or on behalf of the Subcontractor and such assignment shall create no rights in any other person unless accepted by Contractor. Contractor may assign this Subcontract, including but not limited to the Owner, the Owner's lender, or other entities as required by the Owner, to another contractor upon termination of the General Contract, or to any other persons or entities as required by the General Contract.

(b) The Subcontractor shall not cause any unnecessary interference with or delay to the Contractor or to other subcontractors on said Project and shall repair promptly and be responsible for all damage done to the work of the Contractor or other subcontractors by Subcontractor, its agents, employees, subcontractors, or suppliers. Subcontractor shall be directly responsible to the Contractor or other subcontractors whose work is so damaged. The Contractor shall be responsible to the Subcontractor for physical damage to Subcontractor's work only if such damage is directly and proximately caused by the sole negligence of the Contractor.

(c) The Subcontractor shall clean up and remove daily from the job site dirt, trash and debris arising from its work as directed by the Contractor. In the event the Subcontractor fails to clean up and remove such dirt, trash and debris, the Contractor may, at its discretion, arrange for the same at Subcontractor's expense.

(d) To the fullest extent permitted by applicable law, Subcontractor agrees to defend, indemnify and hold harmless the Contractor and/or Owner, their officers, directors, agents and employees, from and against any and all claims, suits, liens, judgments, damages, losses and expenses, including, but not limited to, attorney's fees, arising in whole or in part and in any manner from the acts or omissions of the Subcontractor, its officers, directors, agents, employees or subcontractors, in the performance of this Contract, regardless of whether such lien, claim, suit, judgment damage, loss or expense is caused in part by a party indemnified hereunder. Nothing herein shall be construed to require Subcontractor to indemnify Contractor and Owner and/or their respective officers, directors, agents and employees from the sole

SC5



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

negligence of Contractor or Owner, and/or their respective officers, directors, agents and employees. The Subcontractor shall defend and bear all costs of defending any actions or proceedings brought against the Contractor and/or Owner, their officers, directors, agents and employees, arising in whole or in part out of any such acts or omissions, provided, however, that the Contractor and/or Owner shall have the right to approve counsel to conduct such defense. Nothing herein shall be construed to create an indemnity obligation prohibited by applicable law or to waive Subcontractor's rights against any other subcontractor or supplier which may have contributed to causing the injury or damage. In claims against any person or entity indemnified under this Section by an employee of the Subcontractor or Sub-Subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts they may be liable, the indemnification obligation under this Section shall not be limited by a limitation in amount or types of damages, compensation or benefits payable by or for the Subcontractor or Sub-Subcontractors under workers compensation acts, disability benefits, acts or other employee benefit acts.

(e) Subcontractor acknowledges that, before executing this Agreement, it has carefully examined this Agreement, the Contract Documents and the Project site, has made such investigation of the Work required to be done and the material required to be furnished and, based upon such examination and investigation. Subcontractor represents that it fully understands and can perform all requirements of the Contract Documents.

(f) With regard to the subject matter of this Subcontract: (1) Subcontractor shall have no greater rights and/or remedies against Contractor with respect to any matter (including, but not limited to, omissions, alterations, extra work and additional compensation) than Contractor has against Owner pursuant to the Contract Documents; (2) Subcontractor assumes all obligations, duties and responsibilities by which Contractor is bound to Owner pursuant to the Contract Documents; (3) Subcontractor shall be bound to Contractor to the same extent that Contractor is bound to Owner by all of the terms, provisions and conditions set forth in the Contract Documents; and (4) Owner shall have all rights and remedies against Subcontractor that Owner has against Contractor pursuant to the Contract Documents.

(g) The Contractor shall have the right at any time, and for any or no reason, including for convenience, to terminate this Subcontract and require the Subcontractor to cease work thereon. The Subcontractor, in such event, shall be entitled to further payment only as provided in Article 5. The Subcontractor agrees to be bound by any and all provisions in the General Contract respecting renegotiation as well as termination for any reason.

(h) Subcontractor agrees to clearly note on each payment check to, and related invoice of, its subcontractors and material suppliers which exceed One Thousand Dollars ($1,000.00), as being for work or materials provided pursuant to this Agreement for this Project, by name, all to be subject to Contractor's inspection upon request. Subcontractor also agrees to submit promptly to Contractor, upon request, the name, address and telephone number of each subcontractor or supplier of any tier, to Subcontractor for labor, materials, or equipment used on this Project. Contractor may contact any such subcontractors and suppliers and Subcontractor authorizes them to provide Contractor with any requested information

(i) The Subcontractor warrants its workmanship and materials furnished against any defects, faults or damages arising therefrom during the period of construction and for a period of one year from the date of final completion of the Project (or for such longer period of time as may be required herein or by the Contract Documents). The Subcontractor shall remedy such defective workmanship, material, or damages at the request of the Contractor, at times convenient to the Owner, and to the satisfaction of Owner, Architect and Contractor.

(j) Subcontractor shall comply with all applicable federal, state, and local laws and regulations by which it is bound and shall perform this Subcontract in strict conformity with applicable laws, codes, ordinances, rules, regulations and requirements of Federal, State, County and Municipal authorities and of the National Board of Fire Underwriters and any local fire Underwriters and any local fire insurance exchange now or hereafter in effect. In the event of any discrepancy between the present requirements of such laws or authorities and the provisions of this Subcontract, the former shall govern, and the Subcontractor shall perform the work as required thereby at no extra cost. Should the Subcontractor incur additional costs because of any future change in such requirements, additional compensation therefor shall be subject to Articles 5 and 6 hereof. If the Subcontractor performs any work or is otherwise in violation of any such laws, codes, ordinances, rules, regulations or requirements, it shall bear all costs arising or resulting therefrom. Where applicable, this contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.

(k) Subcontractor shall be represented on the job site during the course of its work by qualified, full-time supervisors acceptable to Contractor. The Contractor shall have the right to require at any or all progress meetings, whether called by the Owner, the Contractor, or others, the presence of a representative of the Subcontractor authorized to act in its behalf. All work hereunder shall be performed by persons well qualified and experienced in the kind of work to be performed and licensed as required by law. Subcontractor shall enforce discipline and good order among its employees, suppliers, and subcontractors engaged in the work. Contractor may require Subcontractor to remove from the project any such employees, suppliers, or subcontractors or others employed on the work that Contractor may deem incompetent, improper, or a hindrance to progress of any work on the Project, whereupon any such employee, supplier, or subcontractor shall be so removed and shall not again be employed on any part of the work without written consent of the Contractor.

(l) The Subcontractor agrees that it shall not engage in discriminatory employment practices in violation of any Federal, State, or local law, or Owner requirements regarding employment discrimination, including any order or regulation of any agency authorized to enforce any such law. To the extent applicable, the Subcontractor agrees to comply with Title VII of the Civil Rights Act of 1964, Executive Order 11246, and all additional orders, regulations, amendments, etc., pertaining thereto, including certification of non-segregated facilities. The Subcontractor agrees to furnish such additional information, certifications, and policies as may be required by the Contract Documents. The Subcontractor agrees to comply with all applicable rules, regulations and relevant orders of the Secretary of Labor issued pursuant to the Rehabilitation Act of 1973, the Vietnam Era Veterans Readjustment Assistance Act of 1974, and the Americans With Disabilities Act of 1990. If applicable to the work under this Subcontract, Subcontractor shall comply with the

SC6

Document Generated from CMiC  

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

requirements of Executive Order 13496 and 29 C.F.R. 471, Appendix A, and the employee notice set forth therein is incorporated by reference into this Subcontract.

(m) Subcontractor shall comply with all applicable federal, state and local laws, regulations and orders relating to occupational safety and health, and related procedures established by Contractor and shall, to the extent permitted by law, indemnify and hold Contractor and Owner, their directors, officers, agents and employees, harmless from any and all liability, public or private, penalties, contractual or otherwise, losses, damages, costs, attorney's fees, expenses, causes of action, claims or judgments resulting from a claim filed by anyone in connection with the aforementioned acts, or any rule, regulation or order promulgated thereunder, arising out of this Agreement or any subcontract hereunder. Subcontractor further agrees in the event of a claim of violation of any such laws, regulations, orders or procedures arising out of or in any way connected with the performance of this Agreement, Contractor may immediately take whatever action is deemed necessary by Contractor to remedy the claim of violation. Any and all costs or expenses paid or incurred by Contractor in taking such action shall be borne by Subcontractor, and may be deducted by Contractor from any payments due Subcontractor. Subcontractor shall have the primary responsibility to safeguard and protect its employees on the Project from injuries as well as any other persons or property which could be affected by Subcontractor's operations on the Project. In addition but not in substitution for Subcontractor's primary responsibility for safety, the Subcontractor agrees to (1) comply with all safety rules and regulations and work practices and procedures established by the Contractor and/or the Owner; (2) take all necessary steps to promote safety and health on the job site; (3) cooperate with Contractor and other contractors in preventing and eliminating safety and health hazards; (4) train, instruct and provide adequate supervision to assure that its employees are aware of, and comply with, applicable Federal and State safety and health laws, standards, regulations and rules, safe and healthful work practices and all applicable safety rules, regulations, and work practices and procedures of the Contractor; (5) not create any hazards or expose any of its employees, employees of the Contractor or employees of Subcontractors to any hazards; (6) immediately abate all hazards within its control regardless of whether it created such hazard; and (7) where the Subcontractor is aware of the existence of a hazard not within its control, notify the Contractor of the hazard as well as warn exposed persons to avoid the hazard.

(n) In the event of variations, conflicts, ambiguities or inconsistencies between or among the terms, provisions or conditions of this Subcontract and any other Contract Documents, the terms, provisions and conditions which grant greater rights or remedies to Contractor or impose higher standards with regard to the obligations, responsibilities and scope of work of the Subcontractor shall control. Notwithstanding any other provisions of this Subcontract or of the Contract Documents, no provision hereof shall be construed to permit Subcontractor to pursue against the Contractor rights and remedies available to the Owner against the Contractor in the General Contract unless such rights and remedies are specifically and explicitly made available to the Subcontractor herein. In particular, disputes hereunder shall not be resolved by arbitration, but rather shall be resolved by litigation unless Contractor directs Subcontractor in writing to arbitrate a specific dispute. In the event that arbitration is provided in the General Contract for disputes between Owner and Contractor or Contractor otherwise chooses, at its sole discretion to submit a matter to arbitration, Subcontractor agrees, upon request of Contractor, to submit any disputes as determined by Contractor in its sole discretion, to arbitration and, if necessary, consolidation of said disputes with any arbitration or administrative proceedings between Contractor and Owner or any other party.

(o) The Subcontractor agrees to provide and furnish prior to commencing work, certificates in duplicate of insurance covering its work under this Contract for Worker's Compensation, General Liability Insurance to include Bodily Injury and Property Damage Insurance, and other insurance with limits and coverages as set forth in the Contract Documents or in Exhibit A attached hereto, whichever is greater. All policies of insurance shall be in "occurrence" form and with companies and in amounts acceptable to the Contractor, and shall not be subject to modifications or cancellation during the terms of the work hereunder without thirty (30) days prior written notice to the Contractor by certified or registered mail. Subcontractor will not change or terminate said policies without the written consent of the Contractor. The Subcontractor accepts exclusive liability for contribution tax or premiums for Unemployment Compensation, Social Security, Withholding Tax and Worker's Compensation.

(p) The Subcontractor agrees to furnish a bond guaranteeing its performance of this Subcontract, and the payment of its subcontractors and suppliers, if so requested by the Contractor, in amount and form and with such surety as are acceptable to the Contractor. The cost of the bond shall be paid by Subcontractor unless otherwise provided herein. Subcontractor shall be deemed not to have provided a bond meeting the requirements of this Subcontract in the event that the bond is conditioned upon the payment of monies due Subcontractor hereunder to an escrow agent or other third party who will disburse payment to subcontractors, material suppliers or other creditors of the Subcontractor.

(q) The Subcontractor understands and agrees that it shall not deal directly with representatives of the Owner, but shall handle all matters connected with this Subcontract, the work, or the furnishing of the materials or payment therefor, exclusively through the Contractor, unless otherwise directed in writing by the Contractor.

(r) This Subcontract shall be governed by the laws of the State of Maryland, without regard to principles of conflict of laws. Any action or suit arising hereunder shall be brought in the jurisdiction where Contractor's principal office is located without regard to principles of conflict of laws or forum non conveniens. In the event of litigation between them, Contractor and Subcontractor waive trial by jury. If requested by Contractor, Subcontractor agrees to submit any dispute under this Subcontract to arbitration under the Construction Industry Rules of the American Arbitration Association, or pursuant to any Arbitration procedure and rules governing the General Contract, if any.

(s) Neither party hereto may waive or release any of its rights under this Agreement, except in writing. The waiver by either party hereto of any breach of any provision of this Subcontract shall not be construed as, or constitute, a continuing waiver, or a waiver of any other breach of any provision of this Subcontract.

(t) If any provision of this Agreement is held by a Court of competent jurisdiction or arbitrator(s) to be invalid or unenforceable, whether in whole or in part, such provision shall be ineffective only to that extent without invalidating or rendering unenforceable any valid portions of the provision and/or any other provision of this Subcontract.

(u) The Parties agree that they have both had the opportunity to obtain the assistance of counsel in reviewing the terms of this Subcontract prior to execution, and as such this Subcontract shall be construed neither against nor or in favor of either party, but shall be construed in a neutral manner.

(v) Owner shall be considered a third party beneficiary of all of Contractor's rights under the Subcontract, but not the obligations. Subcontractor shall have no rights or claims directly against Owner except to the extent of any mechanic's lien rights available by statute. All other legal or equitable claims by Subcontractor, including claims against Owner of quantum meruit or unjust enrichment, are hereby waived and released. This Subcontract and the exhibits attached hereto

SC7

Document Generated from CMiC    

NOTICE OF REMOVAL EXHIBIT 1   p. 25

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

and incorporated by reference herein contain the entire agreement of the parties with respect to the subject matter of this Agreement, and supersede all prior negotiations, agreements and understandings with respect thereto. This Subcontract may be amended only in writing signed by both Contractor and Subcontractor.

ARTICLE 10. **SUBCONTRACT AMOUNT**—The Contractor agrees to pay the Subcontractor for the performance of its work hereunder the following sum or sums, which shall unless otherwise specified, include all taxes, insurance premiums, charges for permits and all other fees and charges, and shall be firm and binding on the Subcontractor for the work and not conditioned upon a firm completion date or on any labor increases or material escalation costs which might occur during the course of construction: <u>Two Million Nine Hundred Twenty Seven Thousand Nine Hundred Ninety Dollars 00/100 ($2,927,990.00)</u>

Percentage fees for overhead and profit for extra work, subject to the provisions of Article 6 hereof, shall be: <u>10%</u> for work performed by Subcontractor's own forces and <u>5%</u> for work performed by its subcontractors and suppliers. Sub-subcontractor shall likewise be entitled to <u>10%</u> for work performed by their own forces and <u>5%</u> for work performed by their subcontractors and suppliers. No fee will be allowed on overtime premiums. Such percentages include all office overhead and supervision above the foreman level.

ARTICLE 11. **CONTRACT ALTERATIONS AND OMISSIONS**—Any terms and conditions, to the extent inserted or added as part of an exhibit hereto by Contractor into this Subcontract, are hereby acknowledged by both parties to form a part of this Subcontract. In the event any terms and conditions are inserted or added as part of an exhibit hereto by Subcontractor, such terms and conditions shall only become part of this Subcontract if, and only if, each such term or condition is initialed by both Parties. In the event of conflict between any such properly added terms and conditions, and the standard terms in this Subcontract, the added terms and conditions shall prevail. In the event any such changes to this Subcontract form, including alterations and omissions noted thereon, are inconsistent with the requirements of the second sentence of Article 3(a), the requirements of the second sentence of Article 3 (a) shall prevail in all respects.

[SIGNATURES ON FOLLOWING PAGE]


NOTICE OF REMOVAL EXHIBIT 1   p. 26

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

SUBCONTRACTOR:
Precision Electric Company

BY: _Adam Cox_
SIGNATURE

Adam Cox

PRINTED NAME

General Manager

TITLE

DATE: 10/31/2022

WITNESS: Dominic Taylor    _Dominic Taylor_


CONTRACTOR:
THE WHITING-TURNER CONTRACTING COMPANY

BY: _Art Rodriguez_
SIGNATURE

Art Rodriguez

PRINTED NAME

Vice President

TITLE

DATE: 11/2/2022

WITNESS: Thomas Jakobowski    _Thomas Jakobowski_

SC9

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## LIST OF EXHIBITS

The Exhibits listed below are hereby incorporated into this Subcontract:

    Exhibit A – Insurance
    Exhibit B – Scope of Work
    Exhibit C – EEO Letter
    Exhibit D – Contractor/Subcontractor EH&S Manual
    Exhibit E – Project-Specific Quality Management Plan
    Exhibit F – Subcontractor Plan for COVID-19
    Exhibit G - Proposed Construction Schedule
    Exhibit H - Document Log
    Exhibit I - California Addendum
    Exhibit J - SOV, Labor Rates, & Unit Prices
    Exhibit K - Discount Billing Program
    Exhibit L - Construction and Administration Package
    Exhibit M - Payment Bond
    Exhibit N - Performance Bond
    Exhibit O - Site Specific Safety Plan

(Revised 1/2/19)

SC10

Document Generated from CMiC

G-C    S-C

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# EXHIBIT A

## INSURANCE

### GENERAL INSURANCE REQUIREMENTS

Prior to commencement of any work on the Project, Subcontractor shall, at its own expense, maintain, during the term of this Subcontract and any extensions thereof, the following insurance in the forms and with limits to satisfy both the requirements listed on this Exhibit A and those specified by the Subcontract and/or any other applicable Contract Documents.

All insurance policies must be from insurers authorized to conduct business within the state(s) where the project is located. The insurance companies must also have a Best's Rating of at least "A-" and a financial size of "Class VII" or better. Subcontractor shall disclose and shall be responsible for payment of any deductibles or self-insured retention under these policies. No self-insured retentions shall be allowed under any of Subcontractor's policies without prior written consent of Contractor. Failure to adhere to these requirements shall constitute a material breach of the Subcontract.

Any limit of insurance listed in this Section shall serve as only a minimum limit requirement of coverage. It is understood and agreed that this Exhibit shall in no way limit Subcontractor's liability to any dollar value or insurance coverage limits stated herein.

### WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE

This insurance will pay the subcontractor's obligations under appropriate worker's compensation statutes, including federal benefits under the U.S. Longshore and Harbor Workers Compensation Act, the Federal Employers' Liability Act and the Jones Act, covering all employees who perform any of the obligations of the Subcontractor under this Subcontract. The Workers Compensation Insurance shall be carried with statutory limits compliant with the relevant legislation of the state(s) where any of Subcontractors operations or work are being performed for the Project.

Employers liability coverage shall provide limits of at least $500,000 each accident for bodily injury and $500,000 each employee for disease. The policy limit for disease shall be at least $500,000.

For Connecticut projects, Subcontractor hereby agrees that Whiting-Turner is reimbursing Subcontractor a sufficient amount as payment for the Workers Compensation Premium for its workers on this Project.

### COMMERCIAL GENERAL LIABILITY INSURANCE

This insurance must be written on Standard ISO CGL Form CG 00 01 (or any equivalent form) on an "occurrence" basis, responding to claims arising out of occurrences which take place during the policy period. The commercial general liability coverage limits shall be the maximum limits available under the policy, but in no event less than, the following:

$1,000,000 each occurrence for bodily injury and property damage
$1,000,000 each incident for personal and advertising injury
$2,000,000 products-completed operations aggregate
$2,000,000 general aggregate
$100,000 fire legal liability
$10,000 medical expense

The general aggregate limit shall apply separately to each project. The products and completed operations coverage is to be maintained for a period at least equivalent to the period under which the Contractor is potentially liable for work performed whether under the Contract Documents and/or at law, whichever period is greater. The Whiting-Turner Contracting Company is to be included as an additional insured.

The contractual liability coverage shall include protection for the Subcontractor from general liability claims arising out of the liability assumed under the indemnification provisions of the Subcontract without exclusion or limitation for work subcontracted by Subcontractor, to any tier. There shall be no exclusion or limitation for liability arising out of explosion, collapse and underground hazards (XCU) or subsidence, if the scope of subcontractor's work involves digging, excavation, grading, or use of explosives. There shall be no exclusion or limitation for residential work if such work is part of the scope of the Subcontract.

If the scope of Subcontractor's work could cause or contribute to water intrusion or the development of "mold", "fungi" or "bacteria", including but not limited to work that involves exterior insulated finish systems (EIFS), the construction of the building envelope (skin, windows, waterproofing, roofing, flashings, etc.), fire suppression, plumbing systems or HVAC systems, the Subcontractor's general liability policy shall not contain any exclusion for such exposures. If Subcontractor's general liability policy excludes such coverage, and this coverage cannot be added by endorsement, then Subcontractor  is required to carry separate Pollution Liability Insurance with mold specifically included as a covered loss.

The commercial liability coverage, including any umbrella excess, shall include faulty workmanship as a trigger of occurrence. In any state where faulty workmanship is not considered a trigger of occurrence, including Pennsylvania, Ohio and Kentucky, any insurance policy which provides that it is governed by the laws of such states shall not be acceptable, unless an endorsement is provided that expressly includes faulty workmanship in the definition of occurrence. Umbrella excess must be endorsed with similar language to ensure follow form coverage of primary insurance.

(Exhibit Revised 3/2022)

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

BUSINESS AUTOMOBILE LIABILITY INSURANCE
This insurance shall apply to any auto, including all owned, hired and non-owned vehicles, to a combined single limit of at least $1,000,000 each accident. For those subcontractors subject to the Motor Carrier Act of 1980, the Motor Carrier Act endorsement # MCS-90 should be attached to the policy, with a primary limit of at least $1,000,000 each accident.

Any statutorily required "No-Fault" benefits and uninsured/underinsured motorists' coverage should be included. Any deductible under this policy must be disclosed and will be fully assumed by the subcontractor.

UMBRELLA EXCESS LIABILITY INSURANCE
This insurance must provide coverage in excess of the limits of employers' liability, commercial general liability and business automobile liability. The umbrella coverage limits shall be the maximum limits available under the policy which shall be at least $5,000,000 each occurrence and a $5,000,000 aggregate and include coverage as broad as the primary insurance. Umbrella excess must be endorsed with primary non-contribution language to ensure follow form coverage of primary insurance.

PROOF OF INSURANCE/ENDORSEMENTS/ADDITIONAL INSURED REQUIREMENTS
Prior to commencing work and throughout the Subcontract term and any extensions thereof, as a material term of the Subcontract, Subcontractor shall provide Whiting-Turner with certificates of insurance using the ACORD form or its equivalent executed by a duly authorized representative of each insurer and with copies of any necessary riders or endorsements attached. Such riders and endorsements shall be in a form reasonably acceptable to Whiting-Turner, evidencing that Subcontractor's insurance coverage is in compliance with the insurance requirements set forth in this Exhibit A and in the Contract Documents.

All insurance policies shall be endorsed to provide at least 30 days prior written notice to Whiting-Turner of cancellation or non-renewal of any insurance provided pursuant to this Exhibit A or at least 10 days notice of cancellation due to non-payment of premiums.

Whiting-Turner, the Owner and other entities as required by the Contract Documents or otherwise required by Owner or Contractor shall be named as an additional insured under the Commercial General Liability, Auto Liability and Umbrella Excess Liability policies of insurance, and special policies listed below, if applicable, per standard ISO endorsement forms 2010 (10/01) for Ongoing Operations and endorsement form 2037 (10/01) for Products/Completed Operations, if available, or otherwise per standard ISO endorsement forms 2010 (07/04) for Ongoing Operations and 2037 (07/04) for Products/Completed Operations, or equivalent. Coverage's shall be maintained by Subcontractor for itself and for the additional insureds for a period at least equivalent to the period under which the Contractor is potentially liable for work performed whether under the Contract Documents and/or at law, whichever period is greater. Such insurance shall include cross-liability coverage as provided under standard ISO forms separation of insured clause. It is expressly agreed and understood by and between Subcontractor and Whiting-Turner that the insurance afforded the additional insureds shall be the primary insurance and that any other insurance carried by Whiting-Turner shall be excess of all other insurance carried by the Subcontractor and shall not contribute with the Subcontractor's insurance. Subcontractor further agrees to provide endorsements on its insurance policies as required to comply with these requirements. Subcontractor further agrees to include, to the fullest extent permitted by applicable law, the following language on its insurance certificate to acknowledge compliance with these requirements; however, Subcontractor's failure to provide such endorsements or acknowledgement shall not affect Subcontractor's agreement hereunder:

"Whiting-Turner, the Owner, [insert the names of additional insured entities] and other entities as required by the Contract Documents or otherwise required by Owner or Contractor  are Additional Insured's under the primary and umbrella excess liability insurance policies on a primary and non-contributory basis for Ongoing Operations and  for Completed Operations and such coverage shall comply with the provisions of standard ISO endorsement forms. A Waiver of Subrogation in favor of the above listed parties shall apply to  the primary and umbrella excess policies required under this Subcontract. Additional Insured's shall be provided at least 30 days prior notice of cancellation or non-renewal, or at least 10 days notice of cancellation due to non-payment."

In the event applicable State law prohibits any of the above language from being included in Certificates of Insurance, Subcontractor shall provide a Certificate of Insurance reflecting coverage provided in policies for Additional Insured status for ongoing and product completed operations, Waivers of Subrogation, and a 30 day cancellation notice. The Certificate of Insurance shall contain wording from the policies and endorsements verifying the foregoing are covered by the policies and endorsements.  Notwithstanding any other provisions to the contrary herein or in the Subcontract, the additional insured obligations herein are independent obligations from any indemnity obligations under the Subcontract, such that in the event any or all of the indemnity obligations under the Subcontract are determined to be void or otherwise unenforceable, the additional insured obligations shall remain in full force and effect.

WAIVER OF SUBROGATION
Subcontractor hereby waives all rights of subrogation against Owner, Whiting-Turner, the Architect and its consultants, and any of Subcontractor's sub-contractors and consultants, and their respective trustees, directors, officers, employees and agents for recovery of damages to the extent those damages are covered by any insurance policies the Subcontractor is required to maintain as set forth herein.  Subcontractor agrees to obtain, at its own cost, and deliver to Whiting-Turner copies of any endorsements necessary to provide such a waiver under the applicable insurance coverage. Umbrella excess must be endorsed with waivers of subrogation language to ensure follow form coverage of primary insurance.

SPECIAL COVERAGE – IF APPLICABLE

SC12

Rev. 1/2/15

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

1. Pollution Liability – If the scope of services or work under this Subcontract could result in a potential environmental hazard, including but not limited to, transportation, handling, storage or abatement of hazardous substances, or involve work such as demolition, earthwork, or utilities that could result in a potential environmental exposure, Subcontractor shall purchase and maintain Pollution Liability Insurance which shall be on an occurrence basis with a limit as required by contractor, which shall be the maximum limits available under the policy, but in no event less than $2,000,000 per claim. The coverage is to be maintained for a period at least equivalent to the period under which the Contractor is potentially liable for work performed whether under the Contract Documents and/or at law, whichever period is greater. If Subcontractor can only provide this insurance on a "claims made" basis, such policy shall include a retroactive date prior to the initiation of any work and Subcontractor shall continually maintain such policy or shall purchase an "extended reporting period" endorsement providing coverage for at least three (3) years beyond project completion or such longer period of time as specified in the Contract Documents.

2. Blasting – If the scope of the Subcontractor's work involves any blasting operations, Subcontractor agrees to provide specific evidence, to the satisfaction of Contractor, that the insurance policy covers such operations.

3. Professional Liability – If the scope of Subcontractor's work involves the performance of any delegated design, design assist, or design services (including but not limited to architecture, engineering, landscape architecture, surveying, construction management, environmental consulting, testing, rigging, shoring or fastening) performed by or on Subcontractor's behalf, Subcontractor and any design subcontractors/consultants/vendors working under the Subcontractor shall each maintain Professional Liability coverage with limits as required by the Contract Documents which shall not be less than $2,000,000 per claim or the value of the Subcontract, whichever is greater. If Professional Liability coverage is provided on a "claims made" basis, the policy shall include a retroactive date prior to commencement of services and Subcontractor shall continually maintain such policy or shall purchase an "extended reporting period" endorsement providing coverage for at least three (3) years beyond project completion or such longer period of time as specified in the Contract Documents.

4. Aircraft Liability Insurance – If the Subcontractor or any lower tier subcontractor/vendor uses any type of owned, leased, chartered or hired "manned" aircraft on the Project, Subcontractor shall provide Aviation insurance with minimum limits of 10M per occurrence; Any subcontractor or lower tier Subcontractor/Vendor using Drones on the Project shall provide Unmanned Aircraft Liability coverage with minimum limits of 1M per occurrence; All such policies shall name Contractor as an Additional Insured and provide a Waiver of Subrogation in favor of Contractor.

5. Cyber Insurance - If the Contract Documents require the Contractor or its Subcontractors to provide Cyber Insurance and/or if Subcontractor's scope of work involves Building Information Systems, Security/Access Control Systems or Data Systems, Subcontractor shall maintain Cyber Insurance of the types and limits required by the Contract Documents, which shall not be less than the following coverage: S2M in Information Security & Privacy Liability, Regulatory Defense & Penalties, Media Content Liability (infringement of intellectual property, including but not limited to infringement of copyright, trademark, and trade dress, and invasion of privacy violations), Privacy and Breach Notification Costs, including credit monitoring services, Extortion & Ransomware, including digital/virtual currency; *and S100K in* Social Engineering Fraud.

SC13

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT B**

**SCOPE OF WORK**

All Subcontractors that supply and/or install equipment related to Industrial Control Systems (ICS), Supervisory Control and Data Acquisition (SCADA) systems, Distributed Control Systems (DCS), and other control system configurations such as Programmable Logic Controllers (PLC) shall designate a representative of their company to subscribe to the Industrial Control Systems Cyber Emergency Response Team (ICS-CERT) advisories from the Cybersecurity and Infrastructure Security Agency (CISA). The designated representative shall monitor all advisories to determine if any of the identified cybersecurity vulnerabilities impact the equipment that is being supplied and/or installed under this Subcontract. In coordination with any requirements in the Drawings and Specifications set forth in Exhibit B, the Subcontractor shall ensure that the most recent software patches and cybersecurity updates produced by the equipment manufacturer are applied to the equipment within thirty (30) days of the date of Substantial Completion and prior to turnover of the equipment to the Owner. If the Drawings and Specifications require the Subcontractor to perform equipment maintenance for any duration during the warranty period, the Subcontractor shall continue this requirement throughout the duration of the maintenance period. The Subcontractor shall train the Owner's designated representatives on how to assume these responsibilities prior to the date of Substantial Completion, or prior to the conclusion of any required maintenance period, whichever is later.

(Exhibit Revised 9/2021)

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 1 | Subcontractor is responsible for the complete scope of work which shall conform to the Contract Documents and is to include all design services (as applicable), labor, supervision, insurance, bonds (as applicable), taxes, material, fabrication, delivery, installation, tools, trucking, equipment, layout, shop drawings, submittals, unloading, scaffolding, ladders, hoisting, transportation, permits (as applicable), engineering (as applicable), incidentals, maintenance, support functions and other items or services necessary for, related to, and reasonably incidental to the proper execution and completion of the work. |
| 2 | The scope of work shall include General Conditions, General Requirements and the following items as they apply to the work in this subcontract unless specifically noted otherwise in the specific scope requirements. |
| 3 | Subcontractor has read, understands and agrees to the scope of work in its entirety. Subcontractor understands the following general and specific scopes of work are provided to ensure that subcontractor submits a complete and responsible bid proposal. However, the following is not a "checklist" and subcontractor is ultimately responsible for the complete scope of work outlined in the Contract Documents. |
| | **Standard Requirements** |
| 4 | Subcontractor accepts the Owners Contract terms and conditions as well as the terms and conditions of The Whiting-Turner Contracting Company subcontract. Subcontractor acknowledges that the Owner Contract becomes a part of the Contract Documents. |
| 5 | Subcontractor to perform work in accordance with the Contract Documents. |
| 6 | Subcontractor acknowledges receipt of all documents associated with this subcontract. This is to include; but is not limited to, all Drawings (all sheets listed on drawing logs), Exhibits listed within contract, etc. |
| 7 | In the event that discrepancies arise between the requirements of the Contract Documents and any governing codes, or authorities having jurisdiction, subcontractor shall notify Whiting-Turner immediately. In such event, subcontractor shall be responsible for including the more stringent condition within their base scope. Work installed incorrectly will be repaired at no additional cost to Whiting-Turner and / or the Owner. |
| 8 | Where discrepancies exist between Contract Documents by various trades, the subcontractor is to consult Whiting-Turner before proceeding. Subcontractor understands when discrepancies exist within the Contract Documents, the costlier condition shall apply. |
| 9 | Subcontractor has included all the requirements as identified within the project Conditions of Approval included in the Contract Documents. |
| 10 | Subcontractor understands that the intent of the contract documents is to provide complete workable systems as it relates to work under this scope. Items not called for in the contract documents, but normally required, to conform to the intent of the complete workable system shall be included as a part of this subcontract. |
| 11 | In the event that discrepancies arise between the requirements of the Contract Documents and any governing codes, or authorities having jurisdiction, subcontractor shall notify Whiting-Turner immediately. In such event, subcontractor shall be responsible for including the more stringent condition within their base scope. Work installed incorrectly will be repaired at no additional cost to Whiting-Turner and / or the Owner |
| 12 | Subcontractor is aware of the legal and regulatory consequences of knowingly destroying cultural resources or removing artifacts, human remains, bottles, and other significant cultural materials from the site. Significant cultural materials include but are not limited to: aboriginal human remains; chipped stone; ground stone; shell and bone artifacts; concentrations of fire-cracked rock; ash and charcoal; shell; bone; and historic features such as privies or building foundations. |
| 13 | Subcontractor acknowledges that they have visited the site and are fully aware of site conditions, staging area, access, parking restrictions. Furthermore subcontractor assumes all liability associated with taking the site "as is" and assuming all risk for all unforeseen conditions and being provided an "unclassified site". |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|------|-------------|
| 14 | Subcontractor shall obtain and maintain in good standing all applicable City Business Licenses, including for their tier subs, and trade specific permits. |
| 15 | Prior to the commencement of work or within 10 days of the Notice to Proceed or Contract date, whichever is sooner, subcontractor shall furnish a certificate of insurance naming "The Whiting-Turner Contracting Company" and the owner as additionally insured. The coverages shall meet or exceed those specified in Whiting-Turner's Exhibit A of this subcontract. Additionally insured language shall be modified to be exactly per Whiting-Turner requirements. Subcontractor shall include a Waiver of Subrogation as required per the Contract Documents. |
| 16 | Prior to starting work, subcontractor shall<br>    a.    Verify existing conditions and elevations, and then report any discrepancies with the Contract Documents to Whiting-Turner. Subcontractor understands that the start of their work shall constitute acceptance of such conditions.<br>    b.    Obtain approval, produce and procure (haul route, traffic control, and noise) permits as required by authorities having jurisdiction.<br>    c.    Coordinate and attend preconstruction meeting(s) with Whiting-Turner and the authorities having jurisdiction.<br>    d.    Have visited the site and become aware of the existing conditions that are not shown on the plans and specified in this scope of work listed herein.<br>    e.   Notify Dig Alert/C-Below and confirm "Mark Out" of existing underground utilities.<br>    f. Have read, understand, and will implement all findings, conclusions, and construction considerations established in the contract documents.<br>    g. Have read, understand, and will implement all grades, elevations, slopes, and thicknesses established in the contract document civil, landscape, hardscape, structural, architectural, mechanical, plumbing, electrical drawings, specifications and exhibits. |
| 17 | Subcontractor shall provide qualified and English speaking supervision at all times subcontractor is on project site. Full-time competent on-site supervision is required by all Subcontractors during performance of their own work. In the case of contracts involving Second Tier Subcontractors, the Primary Subcontractor will provide onsite supervision and coordination of their subcontractors and direct hire work. The contractor will be Back-charged for time spent performing such coordination by Whiting-Turner if it does not exist. Should any subcontractor need to use any scaffolding, hoisting services, lift equipment, etc. competent person will be needed to operate and/or sign any indemnifications, insurance and/or waivers required for this equipment. |
| 18 | Subcontractor is responsible to notify Whiting-Turner of any RFI's or submittals that should be included in a bulletin update. Costs related to additional RFI's/Submittals due to a drawing bulletin are to be included in the bulletin pricing. If RFI's or submittals are superseded by a drawing bulletin which causes a conflict, subcontractor to notify Whiting-Turner to clarify the discrepancy within five (5) business days. |
| 19 | Subcontractor includes all surface preparation (including shot blasting or mechanical removal of contaminants) required to complete the scope of work included herein. Subcontractor shall review all areas at least 2 weeks prior to scheduled installation with the Whiting-Turner Superintendent. |
| 20 | Subcontractor includes patching or replacement of all fireproofing, (if applicable), drywall, ceiling tile, finishes, etc. if damaged or removed during the installation of this scope of work. |
| 21 | Subcontractor includes all sleeves, cutting and patching for your work with fire stops or fire-safing as specified and indicated on the Contract Documents and as required by code and the authorities having jurisdiction. |
| 22 | Subcontractor shall supply all access panels in general construction required for access to your work. Installation of these access panels will be installed by the framing/drywall subcontractor. Subcontractor shall indicate, as part of their bid, the total number of access panels required. The installation of any additional access panels above and beyond the amount identified will be the responsibility of Subcontractor. |
| 23 | Subcontractor shall furnish, install, and coordinate all future tenant stub-outs per the Contract Documents. |

The Whiting-Turner Contracting Company

Exhibit R
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 24 | Subcontractor will meet, as applicable to this scope of work, the specified goals outlined in the Contract Documents to achieve LEED Certification Requirements. This process will include but not limited to the coordination and obligation of certification required regarding materials recycled content, VOC levels, SDS sheets showing conformance with performance requirements, distance from site to sourcing, cost of materials, distance from site to fabrications, etc. |
| 25 | Subcontractor Project Manager and Superintendent/Foreman are required to meet with the Whiting-Turner Superintendent(s) prior to beginning work to review the contractual scope of work, schedule, phasing and schedule durations. Any logistical issue and duration issues encountered after this meeting and/or subcontractor beginning work prior to meeting will be installed at subcontractor's expense. |
| 26 | Subcontractor shall furnish, install, and coordinate all future tenant stub-outs per the Contract Documents. Subcontractor will meet, as applicable to this scope of work, the specified goals outlined in the Contract Documents to achieve LEED Certification Requirements. This process will include but not limited to the coordination and obligation of certification required regarding materials recycled content, VOC levels, SDS sheets showing conformance with performance requirements, distance from site to sourcing, cost of materials, distance from site to fabrications, etc. |
| 27 | will be the Project Manager,  will be the Field Foreman &  will be the dedicated QA/QC person for this subcontract during the duration of the project. Subcontractor shall not remove any persons without the prior written consent of Whiting-Turner. |
| 28 | Subcontractor Project Manager and Superintendent/Foreman are required to meet with the Whiting-Turner Superintendent(s) prior to beginning work to review the contractual scope of work, schedule, phasing and schedule durations. Any logistical issue and duration issues encountered after this meeting and/or subcontractor beginning work prior to meeting will be installed at subcontractor's expense. Subcontractor Project Manager  and Superintendent/Foreman  met on site with _____ of Whiting-Turner on  _____day of  _____month during _____  year. All management positions (field and office) for this subcontractor are subject to the approval of Whiting-Turner and removal and replacement at Whiting-Turner discretion at any time for any reason. |
| 29 | Subcontractor is responsible for all items discussed and reviewed during the scope review meeting held prior to award (Exhibit K) |
| 30 | Subcontractor has reviewed the site logistics plan (Exhibit R) and is fully aware of the site conditions throughout the different phases of the project. |
| 31 | Subcontractor has reviewed, understands, and will abide by the geotechnical report provided by Kleinfelder dated 08/19/2019 (Revised 09/27/2019). |
| 32 | Subcontractor has reviewed, understands, and will abide by the asbestos (ACM) report provided by APEX dated 10/11/2019. |
| 33 | Should any question of union jurisdiction arise with respect to this Contract, the Subcontractor shall immediately take steps to settle such disputes and will use such labor as may be determined to have jurisdiction, at no additional cost to Whiting-Turner or the Owner. Should the Subcontractor fail to take expeditious action, they will be responsible for any time lost because of delays arising from such a dispute. |
| | **Invoice and Change Order Pricing Administration:** |
| 34 | Subcontractor shall submit a schedule of values for approval prior to issuance of first invoice. This schedule of values will be used for all progress billings pending Whiting-Turner and Owner approval. Subcontractor agrees to make revisions and provide additional detail and level of breakout as requested by Whiting-Turner. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|------|-------------|
| 35 | Subcontractor shall provide pencil drafts of the application for payment on the 20th of each month. Final approved invoices are to be submitted by the 25th of each month for work completed through the 30th. Invoices to be submitted on Whiting- Turner's modified AIA G702 and G703 forms as attached (Exhibit L – Construction and Administration Package). No FAX copies will be accepted. Lien Releases are to be provided with each invoice. Subcontractor is aware that all invoices and release of lien forms must be notarized. Subcontractors utilizing union trades shall submit monthly verification of current trust fund payment. Subcontractor shall provide pencil drafts of the application for payment on the 15th of each month, or soonest weekday if 15th falls on a weekend or holiday. Subcontractor agrees to make revisions and provide additional detail and level of breakout as requested by Whiting-Turner.<br><br>    Both pencil drafts and final invoices are to be submitted electronically to Whiting-Turner Project Manager, no paper copies will be accepted. |
| 36 | Subcontractor shall supply certified payroll sheets with their monthly billings. |
| 37 | Subcontractor recognizes they are responsible to keep all existing facilities, new construction, or appurtenances that are not to be demolished free from damage. Subcontractor must take every precaution to ensure that existing surfaces remain in their present condition. Subcontractor shall and will respect work done by others. Subcontractor is aware that, if they are working on or near the surface of a finished product, the product must be properly protected against any damage. The protection and maintenance will be the responsibility of the Subcontractor. The cost to fix damaged assemblies, whether finished or rough, will be done at the expense of Subcontractor responsible for damage. |
| 38 | Change Order Pricing and Processing:<br>a.Overhead:<br>Defined as any office labor, management labor, estimating, secretarial, accounting, etc. above a working foreman. Materials considered overhead are items such as, but not limited to, copy machines, fax machines and all items associated with office work.<br>b.Profit:<br>Fee for work performed as percentage of cost of work. No fee shall be attributed to overhead.<br>c.Small Tools: (Value less than $500.00)<br>Shall be considered overhead unless specific tasks require equipment / tools be purchased to accomplish such work at which time they will become property of the Owner.<br>d.Insurance:<br>Liability insurance, health insurance for office staff, automobile and equipment insurance, theft insurance, shall be considered overhead.<br>e.Mark-Up:<br>Allowable mark-up for change order work shall be governed by the limits set forth within the owner contract. Furthermore, at no time shall the combined total mark up of this subcontractor and its sub-tiers and suppliers exceed 10% of the cost of work. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|------|-------------|
| 39 | Per owner contract, if a change in work is requested by contractor and its subcontractors, a preliminary estimate of the change must be received within Seven (7) days of issue arising. Within twenty days of issue or completed T&M ticket, subcontractor must submit actual change order request with itemization of all costs of materials and labor, with extensions listing quantities and total costs, and any claim for extension of time. "If no change order request is submitted by contractor (subcontractors) within such period, it shall be conclusively presumed that the change described in the price request does not call for any change in the work that will result in an increase in the contract sum, the GMP or contract time, and has not caused (and will not cause) damage to contractor (subcontractor), and such change shall be performed by contractor without any such increase, and such price request shall be deemed a fully approved change order." "Failure of the contractor (subcontractors) to so notify the owner shalst of work.subcontractor shall be obligated to complete its activities within the specified duration regardless of the actual start date.e an extension of time to the Project Schedule and direct on site costs attributable to the delay, if any. The foregoing no-damages delay clause shall be included in all sub-tier subcontracts-Turner will only be liable for claims and dollar amounts, approved in writing prior to the commencement of work. |
| 40 | Subcontractor understands that there will be no compensation for extra work done without written authorization from Whiting-Turner. All extra work performed on a Time and Material basis must have Whiting-Turner Time and Material tickets filled out and signed by Whiting-Turner field personnel <u>daily</u>. Time and Material tickets are to have a corresponding Change Request / Authorization or Potential Change Item No. noted on the Time and Material ticket. If tickets are not signed daily by Whiting-Turner and /or do not contain a Change Request Authorization or Potential Change Item No., work will not be compensated for. |
| 41 | Subcontractor understands that all additional work performed <u>must</u> have a Change Request /Authorization (CR/A) or Potential Change Item (PCI) number assigned. Subcontractor further understands that additional work performed without a Change Request/Authorization or Potential Change Item number will be done at no cost to Owner and/or Whiting-Turner. Only a Project Manager or Project Engineer can issue a CR/A or PCI number. Superintendents are not authorized to issue CR/A or PCI numbers. |
| 42 | In the event that subcontractor is unable to provide a proposal for change request within the time frame specified by Article (6), Item (a) of the Whiting- Turner subcontract; Subcontractor shall submit a written request requesting additional time. This request shall be specific as to the additional time required and the date that the proposal will be received by Whiting-Turner. Upon review of said request, Whiting-Turner will determine if additional time is allowable. |
| 43 | Subcontractor understands and agrees that once subcontractor has turned pricing in to Whiting-Turner for submission to the Owner the pricing is final. Subcontractor will not come back and revise / add onto pricing at a later date. This is to ensure that all costs are to be turned in at <u>one</u> time. Pricing is to be provided to Whiting Turner within five (5) days of when the Change Request Authorization or Potential Change Item has been provided. |
| 44 | Subcontractor to furnish detailed unit pricing for adds and deducts as applicable or requested by Whiting-Turner. Subcontractor must have labor and equipment breakdown sheet completed and approved prior to execution of this subcontract. Subcontractor acknowledges all labor and equipment rates are subject to audit by Owner and/or Whiting-Turner. Rates shall remain through the duration of the project. |
| 45 | Subcontractor shall provide additional manpower and materials, upon issuance of a C/RA, required to fully execute any extra work being performed to supplement the labor force already onsite performing work under this contract. Manpower should not be taken from the contracted labor in order to complete C/RA work. |
| 46 | Subcontractor shall only take direction from Whiting-Turner personnel. In the event the subcontractor takes direction from a party other than Whiting- Turner personnel any extra costs incurred will not be compensated. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**Fashion Valley Mall Redevelopment**                    General Scope of Work

| Item | Description |
|------|-------------|
| 47 | Should Allowances within the Subcontract or any portion of Allowances not be used it shall be returned to Whiting-Turner in the form of a deductive contract supplement. Subcontractor shall not use any portion of this Allowance within the Subcontract prior to receiving approval from Whiting-Turner in the form of a Change Request / Authorization (CR/A) or Potential Change Item (PCI) and tracked using a Whiting-Turner Time and Material Ticket. |
| 48 | Subcontractor expressly agrees not to make, and hereby waives, except as set forth herein any claim for delay costs, loss of productivity or efficiency, lost profits or extended home office overhead, on account of any delay, obstruction or hindrance for any cause whatsoever, whether or not foreseeable, and whether or not anticipated including but not limited to the causes from Unavoidable delays including Acts of God (such as earthquake, tornado, flood, hurricane, etc.); unusually severe weather; previously undisclosed hazardous material onsite requiring abatement or removal prior to continuation of work; Owner's or Architect's (and their respective agents' and employees') acts, omissions to act, or failures to timely act for which the Subcontractor shall advise the General Contractor in a timely manner so as to prevent untimely acts; strikes lockouts or other labor disturbances, riots, insurrections, and civil commotions; embargoes; or sabotage which a reasonably prudent Subcontractor under similar circumstst of work.subcontractor shall be obligated to complete its activities within the specified duration regardless of the actual start date.e an extension of time to the Project Schedule and direct on site costs attributable to the delay, if any. The foregoing no-damages delay clause shall be included in all sub-tier subcontracts |
| 49 | Subcontractor shall provide value engineering and continually assist in providing ideas to reduce the overall cost and schedule of the project. |
| 50 | Subcontractor shall be expected to utilize MBE/WBE/DBE vendors and suppliers where possible and provide a monthly report on actual cost expended. |
| | **Safety:** |
| 51 | Subcontractor shall be responsible for all temporary protection, etc., for work performed under this subcontract. Upon identification of a hazard, subcontractor shall remedy immediately by any practical means necessary. Whiting-Turner will specifically provide perimeter protection to areas of work in which falls can occur. (i.e. building edge, stair openings, elevator shafts and any other open penetrations where a safety hazard could exist). Whiting-Turner shall be responsible to maintain all safety equipment and barricades until such time as created hazard no longer exists. Unauthorized removal of barricades, protection, etc. is grounds for removal from site. Should subcontractor fail to remedy hazard, Whiting-Turner will correct hazard and forward costs to subcontractor. Note: Whiting-Turner will maintain the building perimeter cables. Subcontractors are not to remove/undo cables without authorization from WT. |
| 52 | Any fall hazards created by this subcontractor in the course of their work shall be protected by Subcontractor. This applies also to the labeling of hole covers per WT safety standards. All workers near fall zones must be tied off per CALOSHA/OSHA standards. Safety zones must be approved by WT superintendent. Delineation or barricading of fall hazards created in the course of this scope are included to be erected the same day that the hazard is created, such that the hazard is not left exposed at the end of shift. |
| 53 | Subcontractor has read, understands, and will comply with the Whiting-Turner Site Specific Safety Plan in addition to standard CALOSHA/OSHA Safety Rules. All subcontractors' employees and their subtier employees and vendors performing work onsite will participate in onsite safety orientation reviewing said Whiting-Turner Safety plan prior to starting work. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|------|-------------|
| 54 | Subcontractor must ensure that safety procedures must be implemented per all CalOSHA/OSHA, State, Local, Whiting-Turner and Owner requirements, whichever is more stringent. All personnel onsite to wear Whiting-Turner and OSHA mandated personal protective equipment (PPE). Safety vest to designate at a minimum the primary subcontractor who holds a contract with Whiting-Turner. Hardhats to have both primary subcontractor designation and logo and employee first and last name. All hard hats to bear Whiting-Turner safety orientation stickers in visible location. Subcontractor shall ensure that all subcontractor personnel comply with requirements of Site Specific Safety Program, Safety Orientation, and Subcontractor Safety Manual. If required, subcontractor shall obtain at no cost to Whiting-Turner any and all OSHA, state, and local permits required in the course of it work. Subcontractor to replace any PPE deemed unacceptable immediately. |
| 55 | In the event a subcontractor's personnel are observed using equipment in an unsafe manner, subcontractor shall provide (upon request from Whiting-Turner) training documentation, provide retraining, or replace operator/user with qualified personnel. Whiting-Turner will issue a written safety notice to any subcontractor personnel observed committing an unsafe act and in some instances suspend or remove subcontractor employee from site. |
| 56 | Subcontractor shall caution all open excavations, equipment, etc. per CalOSHA/OSHA and/or Whiting-Turner safety requirements. |
| 57 | Subcontractor shall provide qualified flagmen, vehicular/pedestrian control and safety and traffic control personnel for material hauling, hoisting, staging, etc. around the work area, public streets, sidewalks, etc. efficiently and quickly where deemed necessary per requirements of Authority Having Jurisdiction (AHJ) and Whiting-Turner. |
| 58 | Subcontractor to notify Dig Alert "USA" Underground Service Alert, or third party private locator (C-Below) for private or public utility mark-out prior to any excavation. Subcontractor to provide Whiting-Turner with utility mark out request/order number with expiration date. In addition, subcontractor to walk site with Whiting-Turner Supervision to become familiar with existing site utilities and hazards prior to any excavation or drilling. Area of work is to be walked and approved by Whiting-Turner Superintendent before any work may commence. Information pertaining to the location of existing utilities, structures or conditions are approximate and not guaranteed. Subcontractor to hand dig (pothole) all known or suspected intersections and change of directions or elevations of underground utilities prior to excavation. Subcontractor to utilize vacuum truck as necessary per Whiting-Turner underground utility standards. |
| 59 | Subcontractor shall notify Whiting-Turner of any personal injury requiring medical treatment of any of subcontractor's employees or others at the Project Site immediately. Subcontractor shall provide copies of all investigation, witness statements, and medical condition/release forms within twenty-four (24) hours of occurrence. Furthermore, subcontractor is responsible to document on the daily report if an employee was injured that day. |
| 60 | Subcontractor shall provide to Whiting-Turner all Site Specific Safety Plans (SSPs), Safety Data Sheets (SDS), Quality Control Management Programs (QCMPs) and Injury Illness Prevention Program (IIPP) electronically as well as organized and tabulated hard copy 3-inch binders prior to starting work onsite, and within 10 days of the Notice to Proceed or Contract date. |
| 61 | Subcontractor shall update SDS binders in WT Trailer as often as new material is brought onto, or removed, from the jobsite to ensure accuracy of the information within. This will occur both electronically and physically |
| 62 | Subcontractor shall hold safety meetings a minimum of once a week. All subcontractors' superintendents, foreman and employees are responsible for attendance. A copy of subcontractors' weekly safety meeting minutes and attendance sheet must be forwarded to Whiting-Turner's field office each week. Subcontractor shall attach copy of completed pre-task hazard evaluations to weekly safety meeting minutes. Failure to provide safety "tailgate" meeting minutes and attendance sheets will result in delays of monthly payments until they are up to date and correct. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|---|---|
| 63 | All onsite subcontractor employees shall attend and participate in weekly jobsite safety toolbox talks and quarterly Whiting-Turner Safety Stand Downs. |
| 64 | Subcontractor at no time shall permit public access to the construction areas. Visitors / Vendors are required to check in at the Whiting-Turner field office and shall be escorted onto the project by Whiting-Turner personnel. Any non-project personnel on project site must be immediately directed to Whiting-Turner Trailer. |
| 65 | Should Subcontractor need to remove or relocate any temporary construction fencing or barricades to perform this scope of work, Subcontractor shall first notify Whiting-Turner prior to any removal and agrees to remove and replace all fencing and barricades immediately. Fencing and barricades shall be handled with care and will put back in good condition. |
| 66 | Subcontractor shall be responsible for all installation, removal and disposal of safety components caused by their scope of work, or necessary to complete their scope of work in its entirety. |
| 67 | All subcontractor work areas are to have a minimum (1) spill/cleanup kit ready for use at all times by this subcontractor. The cleanup kit shall include mop/buckets as necessary to manage dust/footprints as well as clean sweep and/or water absorbent. Certain trades with large scopes of work or higher potential hazards should provide additional kits suited towards their scope of work. Do not hose down hardscapes in order to clean up spills, use dry clean up methods whenever possible. These materials are to become the property of Whiting-Turner after the project completion by this subcontractor and be delivered to the Whiting-Turner jobsite trailer. |
| 68 | Subcontractor understands that this is an operating and open mall facility, and that protection of the public is of primary concern. Subcontractor includes all coordination and precautions necessary, as caused or necessitated within their scope of work, to protect the public, inclusive of temporary shut-down/fencing of drop hazard zones, visual protection from arc flash, methodology to prevent air-borne particulates or gases from entering public spaces, etc.. If work is to extend beyond Whiting-Turner provided barricades/fencing, spotter and additional delineation is to be provided. Any such activity should be approved in writing in (48) hour minimum advance from Whiting-Turner. Any work occurring outside of the jobsite fence line must be performed/completed and cleared prior to mall operating hours. |
| 69 | A 48-hour notice must be given to the mall office and the engineering department to shut down a fire sprinkler system. This subcontractor must give this notice along with zoned map in writing to Whiting-Turner with sufficient time to coordinate with the mall. Any fees associated with shutdown and cost associated with fire watch are the responsibility of this subcontractor. All system shutdowns are to be conducted in off hours relating to the Mall hours, and the system must be brought back online as soon as possible. |
| 70 | All subcontractor foremen to have "QUICKSTOP Q-COM Talon Fire Sprinkler Head Tool" or similar readily available at all work areas, and at minimum for every ten workers onsite in case of accidental sprinkler head strike. If used, Whiting-Turner to be notified immediately. All subcontractor employees who may come in contact with any electrical work shall carry a voltage tester (hot stick) and utilize to ensure safety. |
| 71 | In the event of any utility strike, public safety concern or incident, or damage to any surface, Whiting-Turner to be notified as soon as safely possible. Subcontractor to call emergency services prior to Whiting-Turner if necessary. |
| 72 | All barricades, delineation, signage must be presentable by mall standards, as in white delineators and danger tape, laminated printed signage, etc. |
| 73 | Direct all public and/or media communication and questions to Whiting-Turner. Do not provide any information at any time to the public or media without Whiting-Turner and owner approval. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|---|---|
| 74 | Subcontractor responsible for all dust control as required for their scope of work. While on site the subcontractor shall use any means necessary to prevent dust from becoming a nuisance to the public, neighbors and to other workers. All work that could possibly infiltrate dust or smell into a tenant space shall have appropriate means of control such as fire resistant visqueen, negative air pressure and/or "smoke eater", etc. |
| 75 | Subcontractor shall not stage trucks on public streets, within shopping center vehicular right-of-ways, or parking areas without advanced written approval from Whiting-Turner Superintendent. |
| 76 | CalOSHA/OSHA's updated regulations and remediation requirements for air-borne silica dust are acknowledged and accounted for in this subcontractor's scope. |
| 77 | No cleaning methods which produce airborne particulates like dust should be utilized (as in no leaf blowers or otherwise). |
| 78 | All equipment onsite should at all times have both control box and keys within the unit and usable in case of emergency. Subcontractor to provide additional key to each piece of equipment onsite to Whiting-Turner the same day the equipment comes onsite. |
| 79 | Clean off the platform of all lifts or other equipment so that it they free of debris and dust at the end of each working shift. All lifts to have clearly the company name (including the prime subcontractor) and on the dashboard both the prime subcontractor name and foreman cell number and name at all times |
| 80 | Subcontractor to provide contacts for emergencies that occur outside of normal working hours (including weekends, holidays) |
| 81 | Fire watch as required by this subcontract is inclusive of 20lb fire extinguisher provided by this subcontractor (not WT's general extinguishers), and employee dedicated to fire watch and competent of fire watch in compliance with hot work permit. This employee cannot perform any other work while on fire watch. |
| 82 | Toilet/Handwash facilities will be provided nearby the work areas by Whiting-Turner. It is all subcontractor's responsibility to keep these facilities in general good working order, and notify Whiting-Turner should they not be. Construction personnel shall not use public facilities within the mall or within any tenant space at any time. |
|  | **Schedule:** |
| 83 | It is understood that the schedule is of the essence on this project and each subcontractor is responsible for completion of its work in coordination with the work of all other subcontractors within the required sequence and time frame so that the established schedule is met. |
| 84 | Subcontractor understands and agrees to the contract schedule and will adjust manpower and equipment to meet specified durations. Subcontractor understands and agrees to any schedule durations and/or milestones indicated in the specific scope of work. The more stringent shall govern. |
| 85 | Schedule dates (durations) are of the essence. Subcontractor agrees to work overtime, shifts, nights and/or weekends as required to meet the schedule. The proposed schedule durations include anticipated impacts due to weather. It is agreed to work additional hours and weekends to makeup for lost time during the week due to weather as necessary to maintain the project schedule as determined by Whiting Turner. This subcontractor shall coordinate directly with all other contractors as necessary to complete and maintain this schedule. Subcontractor recognizes that delays of his work activities directly affecting other trades, contractors and/or project completion date may result in assessment of liquidated/consequential damages. Three-week schedules will be reviewed each week at the progress meetings to analyze progress on the project. These schedules are binding and shall be adhered to under this Subcontract. |
| 86 | Subcontractor agrees to work in multiple areas as required to keep contract schedule and major milestone dates. Subcontractor understands during the execution of work covered by this subcontract the site will be congested by many other trades working closely together. Any required phasing and coordination as required by the overall site schedule is hereby included in this subcontract. Whiting-Turner reserves the right to resequence work at any time to maintain the overall project schedule. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 87 | The schedule includes "estimated" start dates for the construction activities. Subcontractor shall be issued a copy of the proposed construction schedule realizing some activities may be performed in altered sequences, as construction areas deem necessary. |
| 88 | Subcontractor is aware the construction schedule requires multiple move-ins, and has included all associated costs. |
| 89 | Subcontractor has reviewed the master schedule, agrees to, and includes the following: <br> a. Activities may be performed in altered sequences, as construction areas deem necessary. <br> b. Completion of subcontractor activities within the specified duration regardless of the "estimated" actual start date. <br> c. The more stringent date or duration within the specific scope of work and master contract schedule. <br> d. Overtime, shifts, nights and/or weekends as required to meet contractual dates or durations. <br> e. The proposed schedule durations or dates include anticipated impacts due to weather. <br> f. Coordination directly with all other trades as necessary to complete and maintain scheduled dates or durations <br> g. Delays of subcontractor work activities directly affecting other trades and interim or final project completion dates may result in the assessment of liquidated/consequential damages. <br> h. Coordinated weekly look ahead schedules, noting they become binding and shall be adhered to under this Subcontract. <br> i. It is understood that the subcontractor shall be obligated to complete its activities within the specified duration regardless of the actual start date. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**Fashion Valley Mall Redevelopment**                    General Scope of Work

| Item | Description |
|------|-------------|
| | **Clean Up:** |
| 90 | Subcontractor shall perform daily and final clean-up of debris for all work performed under this subcontract. This clean up shall be performed often enough to ensure no other trades are hampered by debris and/or if debris causes a safety situation  as determined by Whiting-Turner. Subcontractor includes at a minimum ten total man hours for daily movement of barricades and clean-up of trash generated from the scope of work listed herein. All trash is to be taken to a designated location as directed by Whiting- Turner and placed in the appropriate bins as required to comply with the site recycling policy. After the 1st verbal and 2nd written warning, should Subcontractor continue to fail to comply with daily clean-up and barricade requirements, Whiting- Turner will assign man-power to complete the daily clean-up at the expense of this Subcontractor. If we notice excessive lack of responsiveness, Whiting-Turner will clean up any debris utilizing labor and deduct these costs from the contract of the responsible Sst of work.subcontractor shall be obligated to complete its activities within the specified duration regardless of the actual start date.e an extension of time to the Project Schedule and direct on site costs attributable to the |
| 91 | Should subcontractor fail to clean work areas as required a failure to clean notice will be issued to subcontractor. This shall constitute the area will be cleaned by alternate methods forwarding all costs associated back to the subcontractor. Upon receipt of the second failure to clean notice, Whiting-Turner will hire for the duration of subcontractor's scope of work sufficient clean up labor and supervision to clean work trash generated and deduct these costs from the contract of the responsible subcontractor(s). Clean up budgets are required line items in subcontractors SOV, after second notice, total amount will be deducted from Contract. Clean up labor and supervision will be directed solely by Whiting-Turner Superintendent. |
| 92 | Subcontractor shall participate in weekly composite clean up of the project. Subcontractor shall supply 1 worker for every 10 employees onsite. (For Example, Sample Subcontractor has 12 employees onsite, Sample Subcontractor shall have two employees report for clean up) Subcontractor understands that employees are to sign in with Whiting-Turner at 10:00 pm sharp the day of at specific location chosen by Whiting-Turner Supervision. Subcontractor understands composite clean shall be performed until Whiting-Turner Supervision determines general project clean up has been achieved. Subcontractor understands employees are required to sign out to record participation. Should subcontractor fail to participate, subcontractor understands they will be back charged one man day per their labor sheets. |
| 93 | All removal of debris/trash from the jobsite to containers, dumpsters or trucks are to be by this subcontractor for this scope of work. This includes all necessary existing finish and hardscape protection, buggies with taped wheels, "sticky pads" to prevent track out of dust or mud on boots and other measures as determined by Whiting-Turner Superintendent. Dumping construction materials or debris in mall trash compactors or dumpsters is prohibited. Covering of dumpsters on a daily basis, regardless of potential rain, is included. |
| 94 | Subcontractor includes all cleaning efforts required to keep the hardscape on and off of the jobsite clear of any traces of dirt or debris that resulted from their scope of work.  This includes, but may not be limited to: broom sweeping, tire cleaning, street sweeping. |
| | **Requests for Information (RFIs) and Submittals:** |
| 95 | Subcontractor shall generate and submit RFIs required to complete the work as specified by the Contract Documents. RFIs shall be generated and submitted to allow ample time for review, approval, fabrication and delivery prior to and in accordance with the construction schedule. All RFIs shall be generated and submitted no earlier than (10) days prior to needing response, or sooner as required to maintain the construction schedule. Failure to provide such information in the time frame specified (so that schedule is not delayed) could result in consequential damages and/or defaults. Delay claims due to RFI's not submitted within the allotted time frame to have a response generated as not to affect subcontractor's scope of work progress will be found VOID. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 96 | Subcontractor, if applicable to scope of work, is aware of the design-build and deferred submittal procedures and has included it within their scope of work. Subcontractor includes all deferred submittals as indicated in the contract documents. Subcontractor includes all engineering, calculations, licensed engineer stamps, etc. as required for a complete turnkey design-build deferred submittal. Subcontractor will be responsible for all deferred fees and drawing processing with the city. Subcontractor to provide three (3) hard copies of stamped and approved shop drawings and calculations along with one soft copy transmitted via box.com or external thumb drive. The process for the deferred submittals will be as follows:<br>•Subcontractor will submit deferred submittals through Whiting-Turner to the Design Team<br>•The Design Team will review and stamp deferred submittal package approved for design intent<br>•Subcontractor will then take the stamped deferred submittal package to the City<br>• Subcontractor will be responsible for tracking progress, responding to city comments, resubmissions as necessary, and all associated plan check fees, permits, etc.<br>• Subcontractor, if necessary, can engage a plan expeditor to assist with the process (as required by schedule All costs associated with the services of the plan expeditor will be paid by Subcontractor. |
| 97 | Subcontractor shall provide submittals, coordination Drawings, shop drawings, pertinent manufacturer's data, mock-ups, samples, as-built, procurement log, etc. required to complete the work as specified by the Contract Documents. Submittals shall be coordinated to allow ample time for review, approval, fabrication and delivery prior to and in accordance with the construction schedule. All submittal data shall be received within (10) days of notice to proceed and/or contract date, whichever is sooner or as specified by the submittal log and as required to maintain the construction schedule. Failure to provide such information in the time frame specified (so that schedule is not delayed) could result in consequential damages and/or defaults. |
| 98 | Submittals that do not comply with the requirements of the Contract Documents or which provide alternates that do not comply with the Contract Documents will not be approved. Additional time necessary to correct submittals rejected by Whiting-Turner, the Architect or their engineers shall be responsibility and cost of the subcontractor. |
| 99 | Subcontractor shall provide all composite wiring diagrams as required per the Contract Documents or as required for the proper installation and coordination of systems. |
| 100 | All submittals transmitted to Whiting-Turner shall be organized by specification section. Each submittal shall reference each specification section with title sheets. All digital submittal files to be saved and named by specification number, bookmarked, and provided unflattened upon request. |
| 101 | As part of submittal packages, subcontractor shall identify all adjacent trades and provide pertinent manufacturers literature to properly coordinate installation of work. Provide written explanation of preferred sequence and practices / procedures to properly coordinate work. |
| 102 | Whiting-Turner will keep a continuous tracking list of all project submittals broken up by responsibility. Subcontractor understands this list will be a "live" file updated weekly by subcontractor for completion, procurement, status, etc. "Google" Docs, Office 365 or similar are an acceptable means for this. |
| 103 | Subcontractor assumes full responsibility that any submitted alternate items and procedures will meet the Contract Document requirements. Subcontractor is responsible for costs of redesign, modifications or additional scope of work required by use of alternate items furnished under this scope of work. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|---|---|
| 104 | Prior to submission of first invoice, subcontractor shall provide to Whiting-Turner:<br>a.  Complete list of all suppliers, vendors, manufacturers, etc. complete with addresses, phone numbers and contact person.<br>b.Schedule of values for review by Whiting-Turner.<br>c.Quality Assurance & Quality Control Program<br>d.Pre-task Management Plan to include the following, but not limited to:<br>i.Installation protocols and QC inspections<br>ii.Inspection parties and frequency of inspections<br>iii.Sample of QC field report<br>*** Failure to provide documentation results in the rejection of the first invoice. |
| 105 | Subcontractor to provide Whiting-Turner with all procurement and lead time information as part of product data submittals. |
| 106 | Subcontractor shall prepare, and maintain weekly or more often as required, a material status/ procurement report for all material to be used on the project. The report shall include material item, supplier, purchase order number, telephone number, and a schedule for shop drawings, fabrication, and deliveries. Whiting-Turner reserves the right to check directly with suppliers on all items that are critical to the project schedule. |
| 107 | Subcontractor shall include all closeout documents as required by Whiting-Turner and the Contract Documents. Subcontractor shall include costs for closeout documents. Subcontractor shall provide six (6) three ring binders with copies of all close out documents including warranties, operations and maintenance manuals, building system commissioning, demonstrations, training, equipment schedules and pertinent manufacturers data per the Contract Documents. Binders shall include table of contents, dividers, etc. |
| 108 | Subcontractor shall provide a minimum 1year warranty for all work performed under this scope of work. Subcontractor understands that all warranties shall be specified commencing on the date of final completion and/or the formal date of the Notice of Completion. All warranties, equipment manuals, and as-built documents shall be provided to Whiting-Turner prior to issuance of retention funds. Warranties must be notarized. |
| 109 | Extended warranties and routine maintenance on base building equipment utilized during the construction period including all costs to recondition the equipment to a new condition in a manner acceptable to the Architect and Owner prior to the issuance of a "Certificate of Substantial Completion" by the Owner. |
| 110 | Subcontractor shall maintain As-Built Drawings daily. Whiting-Turner reserves the right to request As-Built Drawings as a condition precedent for monthly payment. Subcontractor shall be responsible for any additional costs as a result of not providing current As-Built information. |
| 111 | Subcontractor understands that they are to notify architect in writing, at the time of submission, any deviations in submittals from the requirements of the Contract Documents. Subcontractor's responsibility for deviations in submittals shall not be relieved by Architect's review of the submittals, unless Architect gives written acceptance of specific deviations clearly identified by subcontractor by clouding and the words "CONTRACT DEVIATION" in Bold Face Print. When submittal is revised for resubmission, identify changes made since previous submittal. |
| 112 | No substitutions are included in subcontract scope except as specifically defined herein.  Substitutions may be requested at a later date per outline in specifications accompanied with cost impacts for owner/architect review and approval. |
| 113 | Subcontractor to submit photos of all utility work that will be concealed underground or overhead with a general picture and an up close picture of the utility in place with a measuring tape showing exact location from a known benchmark (the surface of the ground or soffit, for example) in weekly As-builts |
|  | **Coordination/Logistics:** |
| 114 | Subcontractor to procure and any long lead fabrications at no cost to the Whiting-Turner or Owner until the work is ready to commence. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

**General Scope of Work**

| Item | Description |
|---|---|
| 115 | Subcontractor understands that if any piece of equipment or materials are not delivered to or installed at the project site in a timely manner as required by the schedule, the subcontractor shall be solely responsible for disassembly, re-assembly, manufacturer's supervision, shoring, general construction modifications, delays, overtime costs, etc. No additional costs or delays shall be incurred by Whiting-Turner or the Owner. |
| 116 | Subcontractor includes taking all steps necessary and modifications to ensure that all materials and equipment can be delivered and installed in sections sufficiently small to fit within construction openings in the building and that the weight and size of all equipment pieces do not exceed the capacity of the construction hoisting and/or elevator system. |
| 117 | Subcontractor includes any out of sequence "comeback work" required as a result of temporary construction provisions. This includes, but is not limited to, temporary openings, tie-ins, block-outs, foundations, leave-out areas, temporary water, temporary power, temporary safety provisions, temporary call boxes, outside hoist openings at the curtain wall, etc. |
| 118 | Subcontractor shall be issued access to electronic documents only. It is the subcontractor's responsibility to reproduce hard copies as needed for their field and office. Subcontractor will provide means of electronic access to documents via Procore software for all field and office personnel at no cost to Whiting-Turner. Drawing sets will be compiled with markups by Whiting-Turner within Procore, but Subcontractor is to verify all sheets, addenda, RFI's, and Submittals for a fully accurate and complete Contract Document package. |
| 119 | Subcontractor understands that no jobsite trailer or storage container is permitted onsite without written consent provided by Whiting-Turner Supervision. Subcontractor understands that due to the location of the jobsite and the jobsite conditions storage and staging of materials on the jobsite is not feasible. This project site will utilize a "Just in Time" Delivery system. Any delivery of material to the jobsite must be installed within 48 hours of arrival on the jobsite. It is this subcontractor's responsibility to coordinate deliveries with vendors as necessary to ensure deliveries in this nature. If necessary, Subcontractor agrees to receive material at offsite locations (Not Provided by WT) and delivered to the project site per the 48 hour requirement. |
| 120 | Subcontractor shall provide storage and security for all tools, materials and equipment used or stored on project site. Subcontractor is required to coordinate all storage, staging, with Whiting-Turner Supervision, which may be subject to change at any time during the course of construction, at no additional charge to Whiting-Turner. Whiting-Turner is not responsible for theft or damage to tools, materials, installed work, equipment, etc. during construction. Subcontractor shall secure stock piled materials. |
| 121 | Subcontractor is responsible to submit any RFI that affects their scope of work three weeks ahead of time. Delay claims due to RFI's not submitted within the allotted time frame to have a response generated as not to affect subcontractor's scope of work progress will be found VOID. |
| 122 | Subcontractor shall load and haul away all spoils generated from this scope of work listed herein unless otherwise stated in the specific scope of work. Note: spreading of spoils without written consent is strictly prohibited and all rework will be at subcontractor's expense. |
| 123 | Should Subcontractor need to remove or relocate any temporary construction fencing or barricades to perform this scope of work, Subcontractor shall first notify Whiting-Turner prior to any removal and agrees to remove and replace all fencing and barricades immediately. Fencing and barricades shall be handled with care and will put back in good condition. |
| 124 | Subcontractor understands that the sequence of construction may require multiple mobilizations and have included the cost of those mobilizations in the original contract value. |
| 125 | Subcontractor shall notify all required agencies and authorities having jurisdiction prior to starting the scope of work listed herein. |
| 126 | Subcontractor is aware that temporary power will be provided in project areas for small hand tools only. Generators and equipment necessary for heavy construction, welding, cutting, etc. (including exhaust hoses out of building as needed) will not be available and will be the subcontractor's responsibility to provide. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**Fashion Valley Mall Redevelopment**     General Scope of Work

| Item | Description |
|------|-------------|
| 127 | Subcontractor shall provide any special condition lighting, task lighting, or spot lights as required to perform subcontractor's scope of work. (General temporary building lighting will be provided by others.) |
| 128 | Subcontractor is aware that other contractors will be working in close proximity. Subcontractor is responsible for cooperating and coordinating the work with other subcontractors to avoid unnecessary conflicts, safety hazards, or delays. |
| 129 | Subcontractor will provide all required hoisting/rigging and certified riggers necessary to complete subcontracted hoisting work. |
| 130 | Subcontractor has included haul routes as approved by the City of San Diego, Cal-Trans and any other Authority Having Jurisdiction (AHJ). Subcontractor acknowledges they are responsible for submitting the proposed haul route to the City of San Diego for approval. |
| 131 | On-site parking will not be available. Subcontractor is responsible for providing parking for its own workers at an off-site location, and shuttling workers to and from the jobsite for each shift. |
| 132 | Subcontractor shall coordinate as necessary with other trades to ensure that no conflicts for layout, etc. will arise during the installation of work under this subcontract. |
| 133 | Subcontractor includes the required field scraping and/or grinding of steel coatings at their welded attachments and touch up of the galvanized or primed finishes as required per contract documents after the weld has been completed and/or inspected. |
| 134 | Subcontractor is responsible for their own quality control, layout and field verification based on survey control provided by others. Subcontractor shall verify that the survey staking is in conformance with the latest set of contract documents. Furthermore, Subcontractor agrees to provide caution as it relates to survey staking and any re-staking due to subcontractor negligence will be re-staked at the sole cost of subcontractor. |
| 135 | Subcontractor to refer and verify all documents including but not limited to: Landscaping, Architectural, Structural, Civils and MEPF Drawings for dimensions. This includes edge of slab dimensions, elevations, openings, depressions, curbs, etc. |
| 136 | Subcontractor shall maintain tolerances as set forth in contract documents and industry standards for this scope of work (whichever is more stringent) as well as coordination of tolerances for related trades. |
| 137 | Subcontractor shall submit and have approved by Whiting-Turner all logistics plans regarding necessary barricade modifications, deliveries and access to main work areas, and hoisting a minimum 72 hours prior to work taking place. |
| 138 | Subcontractor understands all loading restrictions for the existing and new building decks noted on the structural plans, and will ask any relevant questions in a formal RFI with ample time for review/response prior to the mobilization of any equipment/material to elevated decks or platforms should the distribution of weight be in question. Subcontractor will ensure that at no point will the structure be overloaded by its own work or by the contributing factors of its own work and the work of others. Provide all hoisting of equipment associated with this unit of work. This contractor must be aware of the structural capacities of areas to be used for its hoisting, rigging, equipment, scaffold and material storage and shall not exceed rated capacities without taking appropriate steps to compensate for the imposing construction loads with may exceed the design criteria of the existing structure or the capacity of the existing roadways, sidewalks and curbs. Any modifications, temporary or permanent, to the buisible for tracking progress, responding to city comments, resubmissions as necessary, and all associated plan check fees, permits, etc.<br>• Subcontractor, if necessary, can engage a plan expeditor to assist with the process (as required by schedule All costs associated with the services of the plan expeditor will be paid by Subcontractor. only be liable for claims and dollar amounts, approved in writing prior to the commencement of work.onditions due solely to its work. All costs associated with the above requirements are included in the contractor's base bid. |
| 139 | All means of transporting water necessary for this scope of work to the work area shall be by this subcontractor including water buffalos, water lines, pumps, etc. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
| --- | --- |
| 140 | Subcontractor responsible for controlling construction water intrusion into existing tenant spaces, which are to remain active during demolition and construction. Subcontractor to regulate dust and debris to ensure tenant storefronts, hardscapes and other finishes are not affected. Any impact to tenant storefronts to be remedied immediately by this subcontractor |
| 141 | At all locations where demolition, retrofit or new construction could cause vibrations into adjacent tenant spaces, this subcontractor will take particular care to utilize methods that are minimally disruptive as to vibration, dust disruption, etc. During shifts where this work will occur, this subcontractor will monitor affected tenant spaces and provide pictures to verify no disruption occurred. Any costs associated with cleaning, replacement of product, etc. due to this subcontractor's activities are included. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| | **Testing and Inspections:** |
| 142 | Subcontractor is responsible to verify with Whiting-Turner Supervision and coordinate all necessary testing and inspections directly with inspection agencies or local authorities. Subcontractor shall provide a designated person assigned to the project to ensure that the QC process is followed. Be advised that any failed inspections of work can result in payment of re-inspection fees by subcontractor. Any lost time or production, as a result of failed inspections will require this subcontractor to apply means and manpower necessary to prevent project delays, at no additional cost to Whiting-Turner. All Inspection and Re-Inspection requests are to be provided to Whiting-Turner Supervision in writing and electronically 48 hours before the inspection is needed. |
| 143 | Subcontractor will provide lifts, gear and safe access as necessary to accommodate inspectors, etc. |
| 144 | Subcontractor is responsible for all cost associated with re-inspections and special inspection overtime. |
| 145 | Subcontractor shall coordinate and comply with all testing and inspection agencies, including all testing required by the specifications and local building codes. |
| 146 | Subcontractor includes overtime inspections as required to complete this scope of work and maintain the schedule. |
| | **Meetings:** |
| 147 | Daily meetings will be held as determined by WT Supervision. All subcontractors are required to attend these meetings to adequately control the flow of work and to discuss/coordinate daily activities and logistics with other subcontractors on the project. Minutes will be issued each week of the previous week. Attendance is mandatory while the subcontractor is on site and three (3) weeks prior to performing work and three (3) week after the completion of this subcontractor's work. Lack of attendance constitutes acceptance of work plan discussed during meeting. |
| 148 | Subcontractor understands that pull planning will be utilized during the entire duration of the project and that participation in pull planning is mandatory. Subcontractor agrees that at least (1) competent supervisor will attend all pull planning activities including but not limited to: daily check-ins and progress updates, weekly re-pull meetings, and any other pull planning meetings as determined by the Whiting-Turner superintendent. Attendance is mandatory while the subcontractor is on site and three (3) weeks prior to performing work and three (3) week after the completion of this subcontractor's work. Lack of attendance constitutes acceptance of work plan discussed during meeting. |
| | **Permits:** |
| 149 | A "General Building Permit" will be supplied by others. All other permits (including noise and/or deferred submittal), licenses, and fees required to execute the scope of work contracted herein is the responsibility of subcontractor. |
| | **SWPPP/BMP:** |
| 150 | Subcontractors will be required to clean and remove any mud, dirt, and/or debris tracked onto private and/or public roadways, curb and gutter or sidewalk during construction operations or deliveries. This shall be accomplished as often as Whiting-Turner Supervision requires and at the end of each workday. |
| 151 | Subcontractor shall comply with the requirements for dust / erosion control as indicated in the Contract Documents. |
| 152 | Prior, during and after weather events subcontractor, at a minimum, is responsible to: |
| | a.Cover, secure and remove subcontractor's work area exposed earth with 10 mil visqueen. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

### Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 153 | Subcontractor shall abide by all requirements of the Storm Water Pollution Prevention Program. A copy of the current SWPPP is available at the Whiting-Turner field office for review. All subcontractors are required to remove and replace any SWPPP's materials as required to perform their scope of work at no cost. A weekly inspection by others will occur a minimum of once per week. Subcontractor acknowledges that all reports generated from this inspection showing subcontractor negligence and/or implied fault will be addressed or corrected immediately by the end of the work day while being coordinated with Whiting-Turner Supervision. |
| 154 | Subcontractor shall be responsible for providing dust control for subcontracted operations. Water shall be applied and coordinated with Whiting-Turner Supervision in conformance with applicable provisions of the authority having jurisdiction. |
| 155 | Subcontractor shall remove, relocate and/or replace BMP's furnished and installed by others as required to perform subcontractors own work. |
| 156 | Each subcontractor is to have onsite measures of pumping water while working to assist as necessary should inclement weather present flooding into work areas. This includes mobile pump with hose and float and necessary power cabling for use. These materials are to become the property of Whiting-Turner after the project completion by this subcontractor and be delivered to the Whiting-Turner jobsite trailer. |
| | **Specific Foreman/Superintendent Responsibilities:** |
| 157 | Subcontractor shall fill out each day, a "Contractors Daily Work Report" complete with number of tradespeople, names of trades people, classification, hours of work, description of daily activities, areas of work, equipment used, and shall  include a description of inspections scheduled for that particular day. These reports are required to be signed by the Subcontractors foreman/superintendent, and provided each day (No Later than 8 am) to the Project Superintendent for Whiting-Turner. Furthermore, subcontractor understands that any delay claim entertained by Whiting-Turner must be documented on individual daily reports with photos and a description otherwise subcontractor claim will be voided. Copies are to be provided in hard copy form and digital form. Failure to provide daily work reports will result in delays of monthly payments until they are up to date and correct. |
| 158 | Prior to 11:30 pm each day subcontractor is onsite, Subcontractor shall mark the daily manpower on the WT Manpower board located in the Superintendent trailer. |
| 159 | Subcontractor shall perform daily pre-task activity hazard analysis (AHA) and provide completed forms to Whiting-Turner Supervision prior to performing the activity. |
| 160 | Subcontractor shall provide weekly updates of a record set of drawings at the Whiting-Turner jobsite office while on site. Each record set shall be stamped "As-Built" and shall be signed and dated by the subcontractor. Record sets are to be electronically provided with limits of work and dimensions from job control (gridlines or otherwise) |
| 161 | The subcontractor shall maintain a set of as-built drawings throughout its involvement on the project. This set shall clearly mark all items of work installed by the subcontractor in their actual locations, with survey information such as elevations as required. The subcontractor shall also make this set of as-built drawings available for inspection by Whiting-Turner or the Architect throughout the project. Failure to provide as-built drawings will result in delays of monthly payments until they are up to date and correct. |
| 162 | The subcontractor shall turn in their set of as-built drawings to Whiting-Turner upon completion of the subcontractor's work, but no later than five (5) working days prior to the projected acceptance of the subcontractor's work. Each record set shall be stamped "As-Built" and shall  be signed and dated by the subcontractor. Drawing As-builts consist of 2 reproducible/bond sets, and 1 copy on  (flash drive). As-builts to be provided in both PDF and CAD. |
| 163 | Whiting-Turner will be conducting periodic quality control checks of subcontractor's work. Subcontractor agrees that any deficiencies will be resolved within 48 hrs. Whiting-Turner will require periodically Subcontractor's Quality Control Inspection Reports. |

The Whiting-Turner Contracting Company

Exhibit B
DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

General Scope of Work

| Item | Description |
|------|-------------|
| 164 | Three-week schedules shall be reviewed each week at the progress meetings to analyze progress on the project site. These schedules are binding and shall be adhered to under this subcontract. Subcontractor understands that during the execution of work covered by this subcontract the site will be congested by many other trades working closely together. The subcontractor should assume that each item of this subcontractor's work may not be done in one continuous operation. Furthermore, phasing and remobilizations as required by the General Contractor are hereby included in this subcontract. No claims will be accepted for costs incurred due to the delays caused by others. |
| 165 | Subcontractor includes night shift work for the duration of this project.  Night shift work will be (4) days (10)hrs per day, Night shifts will be Monday-Thursday Night from 10PM-8AM. |

The Whiting-Turner Contracting Company

Page 33 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

Specific Scope of Work
26A - Electrical and Fire Alarm

| | Description |
|---|---|
| | **General** |
| 1 | Subcontractor includes furnishing and installing a complete scope of work for the Electrical, Fire Alarm Systems, Low Voltage, Emergency Power Systems, scopes of work outlined in the Contract Documents. |
| 2 | Subcontractor shall furnish and install all electrical power and fixtures as shown in the contract documents at all locations including but not limited to, main concourse, food court restrooms, Vans restrooms, escalators, etc. |
| 3 | **General MEPF** |
| 4 | Subcontractor shall furnish and perform all penetrations, cutting, sleeves, recessing, patching and sealing (including fire caulking, firestopping, and/or fire safing), etc., for work related to this contract scope as specified and indicated on the Plans and Specifications and as required by code and the authorities having jurisdiction including State, Local, and/or Federal requirements whichever is more stringent. Sawcutting by others. |
| 5 | Roof penetrations shall not interfere with the operation or servicing of equipment (i.e. not located in front of access doors). The locations, configurations, sizes and height of roof penetrations shall be fully compatible with the type of roof system and manufacturer's warranty and at minimum 12" above the highest point of the finished roof surface. Each penetration shall be a minimum of 18" from raised platforms, curbs and adjacent penetrations. Coordination with Roofing and Mechanical subcontractors is included with regards to installation of roof penetrations and jacks/flashings. Furnish and install all sleepers (or other proper means of support) under conduits and similar horizontally run items on the roofs, regardless of if shown on contract documents. |
| 6 | Subcontractor shall supply all access panels with shop drawings in general construction required for access for this work. Installation of these access panels will be by others. |
| 7 | Subcontractor shall provide all handholes, precast pull/splice boxes, frames, covers, plates, grating, manhole covers/frames, grounding devices or other necessary access vaults and accessories for valves, elbows, etc. as required. Include final adjustment of these boxes to grade. |
| 8 | All piping/ducting/conduits etc. should be kept as high and tight as possible in all interior spaces, and jog down or over only around obstructions, before returning to the maximum height possible in all cases. |
| 9 | Subcontractor shall protect the roofing membrane and/or waterproof deck coating systems with temporary plywood protection during the installation of the subcontractor's work in such areas. Clean up of clippings, screws and metal shavings shall be daily at these areas to prevent tracking and staining, furnish and install sleepers under conduits and similar items that run horizontally on the roof membrane. |
| 10 | Subcontractor shall be responsible for all trench compaction and backfill for any SOG/underground operations. Subcontractor will return grade to it original state upon completion and documented with Whiting-Turner Supervision. Subcontractor agrees to coordinate and phase said installs to achieve contractual milestone dates, and maintain aggressive schedule. |
| 11 | Subcontractor to perform all excavation, shoring and bracing, spoil removal, backfill, compaction and patching required for this scope of work and per the Contract Documents. All Spoils generated by the Electrical, Security & Fire Alarm scope of work to be removed from the jobsite immediately. Subcontractor includes all recompact ion as required per the Contract Documents. |
| 12 | Subcontractor shall excavate and backfill all trenches as required to install the scope of work listed herein (+/- .10'). Furthermore, subcontractor also includes benching, sloping, stepping, etc. to complete the scope of work listed herein per the contract documents. includes all spoil removal from site and backfill to +- .10'. includes 90% compaction. |
| 13 | Subcontractor is to provide all labor, materials, and documentation required by the authorities having jurisdiction to obtain the final "Certificate of Occupancy" (CO). |
| 14 | Subcontractor includes patching or replacement of all fireproofing (if applicable), drywall, finishes and ceilings if damaged or removed during the installation of this scope of work. |
| 15 | Subcontractor understands that if any piece of equipment or materials are not delivered to or installed at the project site in a timely manner as required by the schedule, the subcontractor shall be solely responsible for disassembly, re-assembly, manufacturer's supervision, general construction modifications, delays, overtime costs, etc. No additional costs or delays shall be incurred by Whiting-Turner or the Owner. |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**Fashion Valley Mall Redevelopment**

Specific Scope of Work
26A - Electrical and Fire Alarm

| | |
|---|---|
| 16 | Subcontractor includes all operating instructions and operator training per the Contract Documents. This includes, but is not limited to, providing the services of a factory trained specialist to supervise the commissioning, startup and initial operation of the respective equipment included herein. Subcontractor shall, in addition to startup services, provide factory trained specialists to instruct Owner's operators during a five (5) day operating instruction period. |
| 17 | Subcontractor shall provide shop drawings for all embed and sleeve locations prior to placement. Subcontractor shall verify all embed and sleeves are appropriately placed prior to each pour. Subcontractor shall verify embed and sleeve placement after each pour. |
| 18 | Subcontractor responsible to coordinate and for all items noted to be by the this trade on all drawings, including architectural, structural, plumbing, mechanical, fire sprinkler, landscaping, vertical transportation and fixture drawings. Subcontractor shall fully coordinate with the Structural, MEPF and Vertical Transportation with regards to line and low voltage needs for related equipment, fixtures, dampers, etc., whether denoted on the this trade's plans or not. In the event that discrepancies arise between these, this subcontractor shall be responsible for the more stringent condition within their base scope. Work installed incorrectly will be repaired at no additional cost to Whiting-Turner and / or the Owner. |
| 19 | This subcontractor shall specify and provide an emergency contact for outside of working hours (including weekends) should any systems fail and need remediation, and take all steps necessary to promptly bring service back online. |
| 20 | Subcontractor includes all costs associated with coring through existing slab on metal deck in order to provide new penetrations for this subcontractor's routing, and shall coordinate with structural concrete, demolition and reinforcing steel subcontractors. |
| 21 | Where new work occurs in public areas, all work by this subcontractor shall be concealed to the maximum extent possible for permanent aesthetics. No exposed conduits will be allowed. |
| 22 | |
| 23 | **Foundation, Excavation & Backfill** |
| 24 | Subcontractor shall excavate and backfill all trenches as required to install the scope of work listed herein (+/- .10'). Furthermore, subcontractor also includes benching, sloping, stepping, etc. to complete the scope of work listed herein per the contract documents. |
| 25 | Subcontractor will ensure all excavations are received within 1/10' of expected elevation and that it is left within in the same tolerance, and removal of all excess spoils immediately from site. Should the conditions not be reviewed with a Whiting-Turner superintendent 48 hours prior to work taking place, this subcontractor will take responsibility for the elevation of the pads and any remediation to bring them back to +/- 1/10' when left for others |
| 26 | Subcontractor includes haul off of spoils generated by said excavations included herein not used by subcontractor for backfills. |
| 27 | Subcontractor shall adequately brace trenches against adjacent loading while working |
| 28 | Subcontractor to exercise great caution when backfilling and shall notify Whiting-Turner Supervision immediately in the event of damaged water proofing or drain board. |
| 29 | Subcontractor is to rip, flip, flop, and/or process stockpiles as required applying water for moisture control prior to compaction. Furthermore, subcontractor agrees to furnish, install, secure, and remove plastic coverings on grade and stockpiles to prevent rainwater from over saturating fill material/areas or erosion. |
| 30 | **Electrical/Light Fixtures** |
| 31 | The scope of work for this project includes the remodel of existing public areas of the existing mall. The remodel will include replacement of existing lighting fixtures in place. Some new lighting fixtures, relocation of existing floor boxes and receptacles for kiosks and carts, as well as power and data for some new signage. All this work is fed from existing panels. |
| 32 | Subcontractor shall replace all burnt out lights of new fixtures within this scope of work prior to final turnover. |
| 33 | Subcontractor shall furnish and install all bracing as required for their scope of work listed herein. |
| 34 | Subcontractor shall furnish and install all miscellaneous support required for work including lighting fixture supports. |
| 35 | Subcontractor is to provide and install all conduits, pull boxes, vaults and wiring shown on the drawings. |
| 36 | Subcontractor includes safe off and removal of all fixtures called to be demolished. |
| 37 | Subcontractor shall protect adjacent surfaces while installing retrofit fixtures to ensure no plaster patch or paint is required. |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**Fashion Valley Mall Redevelopment**

Specific Scope of Work
26A - Electrical and Fire Alarm

| | |
|---|---|
| 38 | Subcontractor shall provide and install \power to the new DOAS unit to be installed as part of the Vans restroom scope. |
| 39 | Subcontractor shall provide and install all power and lights required for escalator construction, including but not limited to new lights at Bloomingdales, Nordstroms, Mesa Park, and Macy's canopies, new power to the flipped Mesa Park escalator. |
| 40 | Subcontractor includes relocation of power for all (6) new escalators and includes coordination with escalator company to ensure requirements are met. |
| 41 | All emergency lighting fixtures shall have a battery backup and be verified prior to turnover. |
| 42 | Subcontractor shall coordinate with framers and provide layout for all backing required for electrical fixtures. |
| 43 | Subcontractor includes wire pulling for any relocated fixtures. |
| 44 | All exterior fixtures shall be wet rated, whether shown on plans or not. |
| 45 | All spare or empty conduits and conduit systems are to have pull ropes installed and secured, with identification labels at each end. Pull ropes are to be 1/2" nylon per the Contract Documents. |
| 46 | Subcontractor shall furnish and install all labeling/identification of equipment, panels, conduit, circuits and components as required per the Contract Documents. |
| 47 | Subcontractor shall provide all grounding and bonding for electrical systems as required. |
| 48 | Subcontractor shall furnish and install all required circuit breakers. |
| 49 | Subcontractor responsible for furnishing and installation of emergency lighting and power backup devices as shown on project documents. |
| 50 | Subcontractor shall furnish and install all acoustical, and fire putty wraps around boxes depending on wall type, Fire Caulking, Grout Pack, and Acoustical Caulking for all penetrations required for this scope of work. |
| 51 | Subcontractor to furnish and install all conduit and j-boxes for signage, inclusive of labels and pull strings. |
| 52 | Subcontractor to furnish and install all electrical to kiosk and directory locations per the Contract Documents, including data requirements. Coordination with owner/vendors will be required. |
| 53 | Subcontractor to furnish and install all electrical components, including lights, power outlets, etc., to shade structures/canopies as shown on all contract documents including landscaping and architectural details. Subcontractor includes routing through tube steel to be concealed. |
| 54 | Subcontractor shall furnish and coordinate installation of seatwall bench receptacles with concrete subcontractor. |
| 55 | Subcontractor shall furnish, install, and coordinate all landscaping electrical requirements with the Landscape Subcontractor. |
| 56 | Subcontractor includes all service connections to utilities as applicable to this scope of work and per the Contract Documents. |
| 57 | Subcontractor is to furnish and install all lighting fixtures, including but not limited to Architectural Lighting Fixtures specified by the Lighting Consultant for the project and all other lighting contained within the Contract Documents. If there are differences between plans, the more stringent is to apply. |
| 58 | Subcontractor shall furnish and install a complete Lighting Control System for the entire scope of work as indicated in the Contract Documents. Subcontractor includes an interface between said areas, per the contract drawings. |
| 59 | All fixtures, equipment and work including installation shall fully comply with current ADA codes. Subcontractor must request specific written direction before proceeding with any work that is found to be non-compliant. |
| 60 | Subcontractor to deliver all items in appropriately sized sections to allow proper access and handling given the site constraints. This includes necessary rigging and handling through the physical space and opening limitations driven by selective demolition in an existing, live mall. |
| 61 | - |
| 62 | Subcontractor shall furnish and install all site lighting lights and poles, including furnishing light pole anchorage bolts and bolt templates (by pour schedule) to the concrete subcontractor. |
| 63 | **Fire Alarm** |
| 64 | Subcontractor shall provide a complete turn-key design/build fire alarm system as required by governing codes and regulations. This shall include but is not limited to all panels, battery back up, devices, fixtures, conduit, cable, phone lines, horns, strobes, enunciators, switches, accessories, control panels, hangers, etc. Subcontractor understands this is a design build system and will include any changes required by city and or governing authorities. |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Fashion Valley Mall Redevelopment

| | |
|---|---|
| 65 | Subcontractor understands that the Vans restroom has no existing fire alarm and must be installed as a brand new system. |
| 66 | Subcontractor to furnish and install all smoke detectors, and supply only detectors at smoke fire dampers (for installation by Mechanical Subcontractor). Mechanical Subcontractor will be providing non addressable smoke/fire dampers if applicable. |
| 67 | Subcontractor includes applicable coordination with other subcontractors to ensure a complete functioning fire alarm system is provided. |
| 68 | Subcontractor to relocate fire alarm devices as required for this project, including all necessary permits to do so. |
| 69 | Subcontractor shall employ a qualified professional engineer to provide engineering for products and systems including attachment to building structure required to meet design intent of Contract Documents, including engineering calculations, shop drawings and other submittals signed and sealed by the qualified professional engineer. Deferred Submittal for fire alarm is included as well as tracking of such submittal on a routine basis for Whiting-Turner procurement log. This includes any minor application fees, travel expense, and/or subcontractor's time as needed. Deferred submittals will be ready for Architect review (15) days after contract award. |
| 70 | Subcontractor shall utilize the mall preferred vendor (Simplex Grinnell) for the Fire Alarm scope of work and tying into the existing system. |
| 71 | **Temporary Power/Lighting** |
| 72 | This subcontractor shall include sufficient labor and material to install and maintain the minimum temporary systems outlined herein and as requested by WT. |
| 73 | Subcontractor to provide temporary lights which consists of (8) light carts. |
| 74 | Subcontractor shall furnish materials and labor to install and maintain  temporary power connections, and spider boxes as needed, but at least every 100 linear feet throughout the project for use by other trades. |
| 75 | Subcontractor shall furnish materials and labor to provide and maintain temporary power connection off existing mall services (located in mall corridors), and lighting at WT auxiliary laydown areas. |
| 76 | Subcontractor shall furnish and install all temporary construction lighting while existing lighting is demolished, existing lights are replaced, and as needed for task lighting for all scopes of work. |
| 77 | Subcontractor shall include cost for the temporary lighting system lamp and ballast replacement until substantial completion and removal of the temporary lighting system. |
| 78 | Where existing exit lighting and signage is scheduled to demolish, this subcontractor shall provide temporary compliant exit lighting and signage until permanent fixtures can be installed. If power is not available, then "nuclear" exit signage and battery powered lighting with solar sensors are to be used. Subcontractor is responsible to maintain all egress lighting within the mall |
| 79 | All temporary power and lighting is to be strung high and tight to overhead rather than laid on the ground where possible, set on movable skids to keep out of low lying areas where water can pool, and protected by ADA compliant ramps/cord covers where necessary. All maintenance throughout the project of these shall be included. |
| 80 | **Coordination:** |
| 81 | Subcontractor includes all costs associated with participating in coordination meetings, completing documentation, and performing the project commissioning per the Contract Documents. |
| 82 | Subcontractor to coordinate with all other trades including preliminary exploration in order to safe off, drop, reroute, or remove all existing systems in order for demolition, structural retrofit, and other new work above ceiling and below ground work. Lock-out, Tag-out (LOTO) procedures shall be implemented as needed. |
| 83 | Subcontractor to identify and make safe all existing electrical services as required to facilitate the demolition and/or retrofit work within the structures and site areas of the Project.  Subcontractor will clearly mark all services that require demolition and those scheduled to remain. |
| 84 | Whether or not specifically shown, this subcontractor includes safe off of all A/V equipment that is existing in areas to be demolished. This includes coordination with Owner's mall management, their subcontractor and Whiting-Turner in order to ensure safe off is completed correctly and without damage to the overall system. |

NOTICE OF REMOVAL EXHIBIT 1  p. 55

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## Fashion Valley Mall Redevelopment

Specific Scope of Work
**26A - Electrical and Fire Alarm**

| | |
|---|---|
| 85 | Subcontractor is to furnish and install light fixtures and all components needed including providing a sample. Subcontractor to also provide sealant for where penetrations are made in the Drywall, EIFS, Plaster, and Metal Panel systems. Subcontractor to work with Drywall, EIFS, Plaster, and Metal Panel Subcontractors to ensure proper seal and correct caulking is being used. |
| 86 | Subcontractor shall coordinate with Whiting-Turner supervisions and others for the installation of sleeves, boxes, conduit, emt, bangers, light fixtures etc. during/prior to reinforcing installation. |
| 87 | Subcontractor shall coordinate with escalator manufacturer and install electrical components meeting all jurisdictional requirements and contract documents to ensure a complete and operational escalator installation. Subcontractor shall coordinate directly with escalator subcontractor for final locations of all receptacles, conduit routing, light fixtures, switches, and disconnects. Furthermore subcontractor will take acknowledgment of the escalator shop drawings and review of for plan and/or specification discrepancies prior to any rough in of installation begins. |
| 88 | Subcontractor shall coordinate with landscaping subcontractor for all lighting to be installed in landscaped areas for conduit and final install sequence, as well as the irrigation controller. |
| 89 | Subcontractor shall coordinate with fire sprinkler and mechanical subcontractors for all necessary aspects of the fire alarm tie-in. |
| 90 | Subcontractor shall coordinate with plumbing and accessories subcontractors for all necessary aspects of the restroom sinks, dryers, toilets, etc.. |
| 91 | Subcontractor shall coordinate with mechanical subcontractor for all necessary aspects of the mechanical system. |
| 92 | Subcontractor includes one wipe down inside all panels and broom sweep of all electrical rooms prior to turn over. |
| 93 | - |
| 94 | **Testing:** |
| 95 | Subcontractor acknowledges all excavation, filling, and compaction shall be performed under the direct observation of the geotechnical engineer. Any materials placed or improvements constructed in the absence of the geotechnical engineer's approval shall be presumed defective. This subcontractor is responsible to provide Whiting-Turner Supervision a 48-hour written notice if observation and/or testing are needed to perform the scope of work listed herein. |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Fashion Valley Mall Redevelopment

Specific Scope of Work
26A - Electrical and Fire Alarm

| | |
|---|---|
| 96 | Subcontractor shall coordinate and comply with all testing and inspection agencies, including all testing required by the geotechnical engineer.  Any materials placed or improvements constructed in the absence of the geotechnical engineer's approval shall be presumed defective.  This subcontractor is responsible to provide Whiting-Turner Supervision a 48-hour written notice if observation and/or testing are needed to perform the scope of work listed herein. |
| 97 | **Safety:** |
| 98 | Subcontractor shall fill or  provide temporary walking surfaces at all open excavations by the end of each working shift. |
| 99 | Subcontractor is to ensure that all areas are returned to a protected status, prior to crews leaving each shift, in order to maintain public safety. This may include but is not limited to: backfill, trench plates, temporary walking surfaces, etc. |
| 100 | Subcontractor shall furnish, install, maintain, document, and remove perimeter Whiting-Turner specified orange debris netting at all trenches. |
| 101 | All excavations performed by subcontractor shall conform to State of California construction safety orders. Subcontractor to obtain a permit from the State of California division of industrial safety when a person is required to descend more than 5'. This permit and all other required CALOSHA/OSHA permits, for this project, shall be obtained by Subcontractor and a copy is to be provided to Whiting-Turner prior to start of construction. |
| 102 | **Submittals/RFIs/Warranties/Closeout:** |
| 103 | Subcontractor includes all labor, materials, testing, and documentation required for early occupancy and as necessary to obtain the required "Temporary Certificates of Occupancy" (TCO).  There may be various areas within this project which require early occupancy and activation of the Electrical systems prior to Substantial Completion of the entire project. Subcontractor has included performance and acceptance testing of the equipment and systems as required by the Contract Documents and by the authorities having jurisdiction.  Subcontractor includes all costs associated with participating in the performance testing of the fire alarm system and associated fire safety ventilation equipment as required.  This testing may require "off-hour" and weekend testing if required by Project conditions, Project schedule, the Engineer, and/or by the authorities having jurisdiction.  Provide all labor, materials, and documentation necessary to obtain the required "Temporary Certificates of Occupancy" (TCO). |
| 104 | Subcontractor shall demonstrate to the Engineer, Owner and Whiting-Turner, prior to final acceptance by the Owner, that all systems and/or equipment have been adjusted properly per the Contract Documents. This includes off hours verification of foot candles achieved. |
| 105 | Subcontractor includes all testing, test equipment, cooperation, coordination, participation, documentation, roles and responsibilities, etc. as established in the Commissioning Requirements per the Contract Documents.  Electrical Commissioning is primarily the responsibility of this Subcontractor, but is led under the guidance and approval of the Commissioning Agent. The commissioning process does not diminish the role and obligations of this subcontractor to complete all portions of work in a satisfactory and fully operational manner. |
| 106 | Title 24 requirements, as relates to this scope of work, are acknowledged and included. |
| 107 | Subcontractor shall coordinate for early fixture install at bridge for mockup of "bridge section with rail, lighting, and caps" |
| 108 | Subcontractor shall provide all spare parts and attic stock as indicated in the Contract Documents. |
| 109 | Subcontractor shall provide an early light fixture mockup of the decorative trellis shade structure (V-shaped louvers). |
| 110 | Subcontractor shall provide submittals within fifteen 15) days of contract award. Subcontractor shall confirm fixtures and equipment have been ordered within five (5) days of submittal approval. Subcontractor shall provide weekly updates of procurement items along with vendor contact information. |
| 111 | Subcontractor shall verify existing panels are sufficient within ten (10) days of contract award. Subcontractor shall submit a formal RFI if issues arise. |
| 112 | Subcontractor shall follow all electrical notes per the Contract Documents. |
| 113 | Subcontractor shall furnish and install all electrical components at the Friars Road Improvement areas per the Contract Documents. |
| 114 | Subcontractor includes all work as Night Shift 4x10's Monday - Thursday nights 10:00 PM - 8:00 AM. |
| 115 | All subs shall participate in pull plan nightly updates with superintendent and (1) 1hour weekly team meetings.  Nightly updates will be mandatory for all foreman onsite for 30min starting at 11PM each night. |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT C**

Dear Subcontractor and/or Seller:

As a government contractor, The Whiting-Turner Contracting Company must comply with the provisions of Executive Order 11246, the Rehabilitation Act, or the Vietnam Era Veterans' Readjustment Assistance Act, and other existing laws related to Equal Employment Opportunity (EEO). Part of our commitment to EEO is to employ and advance in employment and shall not discriminate against individuals on the basis of their race, color, religion, sex, national origin, sexual orientation, gender identity, status as a qualified individual with a disability or protected veteran (meaning disabled veterans, recently separated veterans, active-duty wartime or campaign badge veterans, and Armed Forces service medal veterans.)

You can support and share in our commitment when you assist us with project staffing needs. We encourage you to help identify qualified applicants for employment consideration. Whenever possible, please utilize qualified minorities, women, qualified individuals with disabilities, and protected veterans.

Although, we specifically have requested that you company utilize minorities, women, qualified individuals with a disability and protected veterans, Whiting-Turner welcomes all qualified personnel regardless of any legally protected status.

You are requested to take appropriate action to assist us in complying with our policy and to comply with your own affirmative action obligations.

Sincerely,
THE WHITING-TURNER CONTRACTING COMPANY

*David McGinnis, Courtney Moore, and Albert Huang*

David McGinnis
Courtney Moore
Albert Huang
Equal Employment Opportunity Officer(s)

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# EXHIBIT D

## CONTRACTOR / SUBCONTRACTOR EH&S MANUAL

All contractors and subcontractors on Whiting-Turner's projects bid and awarded after January 1, 2019 or earlier if provided in the Subcontract by Whiting-Turner, are expected to be in full compliance with all applicable requirements of the Whiting-Turner Contracting Company's Contractor/Subcontractor EH&S Manual ("Manual"). This Manual incorporates current Whiting-Turner requirements along with new practices that have become available and generally accepted in the industry. To obtain a copy of the Manual please contact the Whiting-Turner Project Manager on your project.

The information contained in this Manual is not intended to serve as a substitute for the exercise of good engineering judgment by the engineers nor as a substitute for determinations made by contractors/subcontractors of appropriate manner and methods of operations and safety aspects of work under their control. This Manual is also not intended to be all inclusive or replace a contractor's or subcontractor's corporate or site-specific safety program and is not intended to, nor shall it, supersede any more stringent federal, state, local and other applicable laws, codes, rules, regulations, and/or practices. All contractor's and subcontractor's site-specific safety programs must meet or exceed the requirements of the Whiting-Turner EH&S program, the contract documents and all federal, state, local and other applicable laws, codes, rules, regulations, and/or practices. In the event of any conflicts between the material contained therein and any more stringent laws, codes, rules, regulations, and/or practices, the more stringent laws, codes, rules, regulations, and/or practices shall govern.

This Manual and all information contained therein is confidential and intended for the sole use of contractors and subcontractors on Whiting-Turner projects. Contractors/subcontractors are prohibited from distributing this information to any third parties. The Whiting-Turner Contracting Company expressly disclaims warranties for the information contained in this Manual and makes no representations to third parties regarding the reliability, suitability, correctness, or completeness of such information. Whiting-Turner assumes no responsibility or liability and shall not be responsible and/or liable for damages or losses of any kind, including but not limited to direct, indirect, incidental, exemplary, special or consequential damages or losses, arising from, attributable to and/or resulting from the use of such information by third parties however caused and on any theory of liability, whether in contract, strict liability or tort.

For contractor/subcontractor convenience only, a synopsis of the Manual requirements is attached hereto. This synopsis is not intended to, nor shall it alleviate contractors'/subcontractors' obligations to comply with the requirements of the Manual as applicable to their work.

(Revised 1/2/19)

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## The Whiting-Turner Contracting Company
### Contractor/Subcontractor EH&S Manual Synopsis

**DISCLAIMER:** For Contractor/Subcontractor's convenience only, the following is a Synopsis of some of the more significant provisions of The Whiting-Turner Contracting Company's Contractor/Subcontractor EH&S Manual ("Manual") requirements. This Synopsis is not intended to, nor shall it alleviate Contractor/Subcontractor's obligations to comply with all of the requirements of the Manual as applicable to Contractor/Subcontractor's scope of work, whether or not they are included in the Synopsis.

The information in the Manual and this Synopsis are not intended to serve as a substitute for the exercise of good engineering judgment by the engineers nor as a substitute for determinations made by Contractor/Subcontractor of appropriate manner and methods of operations and safety aspects of work under their control. The Manual and this Synopsis are also not intended to be all inclusive or replace a contractor's or subcontractor's corporate or site-specific safety program and is not intended to, nor shall they, supersede any more stringent federal, state, local and other applicable laws, codes, rules, regulations, and/or practices. All contractor's and subcontractor's site-specific safety programs must meet or exceed the requirements of the Whiting-Turner EH&S program, the contract documents and all federal, state, local and other applicable laws, codes, rules, regulations, and/or practices. In the event of any conflicts between the material contained therein and any more stringent laws, codes, rules, regulations, and/or practices, the more stringent laws, codes, rules, regulations, and/or practices shall govern.

The Contractor/ Subcontractor EH&S Manual, this Synopsis, and all information contained therein is confidential and intended for the sole use of contractors and subcontractors on Whiting-Turner projects. Contractors/subcontractors are prohibited from distributing this information to any third parties. The Whiting-Turner Contracting Company expressly disclaims warranties for the information contained in the Manual and this Synopsis and makes no representations to third parties regarding the reliability, suitability, correctness, or completeness of such information. Whiting-Turner assumes no responsibility or liability and shall not be responsible and/or liable for damages or losses of any kind, including but not limited to direct, indirect, incidental, exemplary, special or consequential damages or losses, arising from, attributable to and/or resulting from the use of such information by third parties however caused and on any theory of liability, whether in contract, strict liability or tort.

### Pre-Construction Submittals

1.  Contractor/subcontractor must identify and submit the qualifications of a safety representative/competent person to Whiting-Turner as the primary, on-site contact for safety related issues.
    *   The safety representative may be a supervisor and they shall have as a minimum, the OSHA 30-hour Outreach Training Program for Construction.
    *   The subcontractor will provide a first aid/CPR/AED trained competent person when one or more of the subcontractor's employees are working

2.  Contractor/subcontractor must submit a completed prequalification form and respond in writing to Whiting-Turner's requests for additional information/explanation.

3.  A site-specific safety plan (SSSP) shall be developed for the project by each contractor/subcontractor. The plan should address hazards and mitigation strategies related to the scope of work for the project. Activity Hazard Analysis (AHA) for major phases of work, submitted with the company safety program may be accepted in lieu of SSSP – at the discretion of the Whiting-Turner project team.

4.  Site-specific Safety Data Sheets (SDS) are required to be submitted prior to bringing any chemical product on site. A current chemical inventory is to be maintained with Whiting-Turner.

5.  An Activity Hazard Analysis (AHA) shall be submitted ten days prior to the start of work.

SC17

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

6.    A competent person's acknowledgement form must be completed, and their qualifications submitted for activities where OSHA requires a competent person.

### Safety Management

1.    All on site personnel, (contractor/subcontractors, tiered contractors/subcontractors, and their employees) are required to participate in a mandatory safety orientation session prior to commencing with any work on site. Contractor/subcontractor shall provide a translator for any non-English speaking employees during orientation and any job wide meetings/stand-downs. Employees may be asked to attend orientation again for repeat violations or deficiencies.

2.    Each contractor/subcontractor is required to designate a site safety representative (SSR). SSR shall be on site at all times and shall have the knowledge and authority of the competent person. SSR shall be able to conduct site walks with Whiting-Turner personnel to ensure the safety of contractor's/subcontractor's workers on the project. Manpower totals below include all tiered contractor/subcontractor employees. Proof of training must be submitted prior to mobilization or at orientation. The qualifications for the SSR are as follows:
   - Minimum requirement proof of OSHA 30 hour submitted
   - Contractors/subcontractors with (30) or more workers on site will be evaluated by the Whiting-Turner's management team along with Whiting-Turner's EH&S Manager regarding the contractor's/subcontractor's site-specific safety performance. If the contractor's/subcontractor's past or current site safety performance indicates improved safe work practices and conditions are needed to help ensure the safety of the contractor/subcontractor crews and others, Whiting-Turner at its discretion, may require the contractor/subcontractor to provide a fulltime Site Safety Representative to be present onsite with no other collateral duties.

3.    The contractor's/subcontractor's supervisor(s) and safety representative must make frequent and regular inspections of their work areas and activities.
   - Hazards identified that are under their control must be corrected immediately and all other identified hazards must be reported to the Whiting-Turner superintendent.
   - One documented inspection shall be conducted each week.

4.    The contractor's/subcontractor's on-site supervisor and the contractor's/subcontractor's designated on-site safety representative must schedule and attend a pre-construction safety meeting with the Whiting-Turner Superintendent to discuss the contractor/subcontractor safety requirements.
   - The pre-construction safety meeting should take place at least five (5) working days before startup to allow for review of required documentation.

5.    The subcontractor shall provide a translator whenever there are non-English speaking tradespersons on site.

6.    Contractor/subcontractors, who in turn contract out parts of their work, have sole responsibility to see that their lower tier contractors comply with project safety requirements. Additionally, Whiting-Turner's Project Manager and/or Whiting-Turner's Superintendent shall be notified that the lower tier contractors are arriving at least five (5) days before work starts. The Contractor/subcontractors will be held directly accountable for all lower tier contractors. Contractors/subcontractors must provide a competent person onsite fulltime to oversee and direct lower tier contractors' while actively performing work.

7.    The subcontractor's superintendent(s) and/or designated safety representative must attend the weekly coordination meeting where safety issues will be addressed.

8.    Emergencies shall be handled through the Whiting-Turner Field Office according to the posted Emergency Action Plan.

SC18

Rev. 1/2/15

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

9.  All work-related injuries, regardless of severity, must be reported to Whiting-Turner immediately. An accident/incident investigation report must be completed by the appropriate subcontractor supervisor and submitted to Whiting-Turner within 24 hours of the incident. Further, all work-related injuries will be recorded on an injury log. A completed injury log will be submitted to Whiting-Turner by the 5th of the month for the previous month.

10. Incidents involving the public, regardless of severity, must be reported to Whiting-Turner immediately. An accident/incident investigation report must be completed by the appropriate subcontractor supervisor and submitted to Whiting-Turner within 24 hours of the incident.

11. Only communication radios are permitted on Whiting-Turner projects.

### General Safe Work Practices and Guidelines

**The following are prohibited on Whiting-Turner Projects**

1.  The use of the following administrative controls as a means of fall protection
    - Controlled Access Zone as a means of fall protection
    - Controlled Decking Zone as a means of fall protection
    - Safety Monitor System as a means of fall protection
2.  The use of load handling equipment to hoist personnel—please see the Manual for exceptions and provisions
3.  Working from the midrail or top rail of any lift
4.  The use of cell phones for signaling of cranes and equipment
5.  The use of open hooks during lifting operations/picks.
6.  Fish tapes or lines made of metal or any other conductive material when potential for contact with energized circuits exists
7.  The use of particle board, medium density fiber board (MDF) or similar material as floor hole covers
8.  The use of open turnbuckles as part of the perimeter cable system
9.  Other construction processes below steel erection are prohibited unless overhead protection for the employees below is provided
10. Harassment of any kind, to any person
11. Smoking or use of vaporized equipment (except in designated areas)
12. Radios, media players, headphones, or other listening devices
13. Guns or weapons of any kind
14. Use or possession of alcohol or drugs of any kind (except for prescription drugs)
15. Riding on equipment that is not equipped with proper seating and seat belt
16. Open fires, fire barrels, or hot boxes
17. The use of metal ladders

### Carbon Monoxide Exposure Prevention

1.  In enclosed or poorly ventilated spaces tools and equipment shall be powered by electricity, batteries, or compressed air.
2.  All fuel driven equipment being used indoors or in partially enclosed spaces must have scrubbers where carbon monoxide exposure exists.
3.  When using gasoline powered generators and compressors, place them outside away from air intakes to ensure that the exhaust is not being drawn back indoors.

### Concrete and Masonry

1.  Each contractor/subcontractor, with employees exposed to a fall 6' or greater to a lower level must ensure that effective fall protection measures and rescue procedures are addressed in their company Activity Hazard Analysis prior to beginning work on site. This is to include the name and qualifications of the designated competent person.

### Confined Space Entry

SC19

Rev. 1/2/15

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

    1.    It is Whiting-Turner's position that all confined spaces are permit required until proven otherwise [in writing] by the contractor/subcontractor's competent person.

    2.    All confined spaces, regardless of classification, shall have continuous multi-gas/4-gas air monitoring while the space is occupied by tradespersons.

### Cranes and Derricks

1. Personnel hoisting requirements - The use of load handling equipment to hoist personnel is prohibited unless the employer can demonstrate that other methods would be more hazardous and is able to comply with the personnel hoisting requirements that are established in the standard.
2. Hoisting personnel on Whiting-Turner projects shall be considered a critical lift or activity, and therefore shall meet all requirements of a critical lift before the lift may begin.
3. A crane checklist must be completed prior to each initial lift.
4. Post Assembly – a post assembly inspection is required for all Crawlers and Tower Cranes by a person properly trained and qualified to inspect such equipment.
5. Boom-tip anemometer or equivalent device is required.
6. All loads to be lifted at Whiting-Turner project sites shall have a tag line attached.
   - The competent person shall determine the size, rope materials, and length of the tag line.
   - The line shall be attached in a way that maintains control of the load to reduce the risk of caught-in-/between and struck-by hazards to employees and surroundings during any lift.

### Critical Lifts

1. The Whiting-Turner Contracting Company identifies a critical or special lift as
   - any lift where the total weight of the load and the deductions for the equipment combined exceeds 75% of the capacity of the crane capacity chart at the specific boom length and radius of the load,
   - any lift where there will be more than one (1) crane or piece of load handling equipment attached to the load at a time;
   - any lift that involves the lifting of personnel;
   - any lift where the contents of the lift are considered hazardous to health or environment, and an accidental release could result harm to either;
   - any lift where encroachments precautions are required for power lines.

### Demolition

1. Contractor/subcontractor shall verify that all local ordinances and permitting issues have been addressed as they relate to demolition.
2. Generic safety data sheets for demolished material must be provided by the creating contractor.
3. Task lighting—which meets or exceeds the requirements of the standard—shall be provided by the demolition contractor/subcontractor.

### Electrical Hazards Prevention

1. Whiting-Turner requires that all projects are 100% GFCI compliant. An Assured Equipment Grounding Conductor Program may be used in addition to—but not in lieu of—the GFCI program.
2. The installing contractor, i.e. the electrical contractor/subcontractor, shall test each power receptacle for proper installation including polarity, grounding, etc. and forward that documentation to Whiting-Turner before the circuit is used.
3. The electrical contractor/subcontractor will conduct and document monthly tests after the initial installation.
4. Only round, heavy-duty (type S, SJO, SJTW, ST, SO, STD) extension cords are acceptable for use on a construction site; at least 12 gauge or larger.
5. Damaged cords may only be repaired by a qualified electrician in accordance with manufacturer's requirements for such repairs.
6. Where feasible, all extension cords will be suspended (8') above the floor or working surface.
7. Extension cords shall not be fastened with staples, hung from nails, or suspended with non-insulated wire.

SC20

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

8. All temporary lighting circuits must originate from GFCI protected breakers.
9. Temporary wiring must be rated for all conditions it may be subjected to and be installed as per NEC, OSHA, NFPA and Authorities Having Jurisdiction requirements

**Energy Control**
1. Lockout/tagout (LOTO) shall not be considered for use until all other avenues of attaining a "zero-energy state" have been exhausted.
2. All contractor/subcontractors working with electrical systems are required to have a written Lockout/tagout procedure. A competent person shall be responsible to control all aspects of the LOTO procedure. They will ensure coordination with the appropriate tradesmen.
3. If a system can be locked out through design or by other means, this will be the preferred method.
4. The lockout device shall be substantial enough to prevent removal.
5. The lock shall be a separately keyed lock for use only with the lockout system.
6. The lockout device must be tagged with the name of the employee and their company. There shall be one lock for each employee (including Whiting-Turner) exposed to the system.
7. The use of 100% LOTO must be maintained until the completion of the task. Verification by all competent persons in charge of the LOTO shall be completed prior to re-energizing the system.
8. In the event an employee is discovered tampering with or violating the LOTO procedure, the employee will be removed from the project indefinitely.
9. A log shall be maintained on site that identifies the following:
   - Date of usage
   - Number of locks and tags used
   - Contractors involved
   - Time of LOTO initiation
   - Time of LOTO removal
   - Designated competent persons
   - Location of LOTO Devices
10. Electrical or piping & instrumentation drawings or identifying specific locations of the LOTO devices shall accompany the LOTO log.

**Excavations**
1. Prior to the commencement of excavation activities where the excavation will be greater than 3 feet in depth, a pre-excavation checklist must be completed by the contractor/subcontractor's competent person and submitted to Whiting-Turner upon request.
2. Underground utility installations must be identified and marked prior to beginning any excavation. To prevent unintentional contact, all necessary measures must be employed to locate underground utilities prior to excavating. Acceptable methods include but are not limited to the following: test pitting, ground penetrating radar (GPR), use of as-built drawings and any other obtainable information.
3. A competent person must be identified on Whiting-Turner's competent person designation form and their qualifications submitted to Whiting-Turner prior to the start of work.
4. All excavations shall be protected by snow fence, at a minimum.
5. Persons walking or working adjacent to a trench with vertical/shear walls that is equal to or greater than six (6) feet in depth must be protected from fall hazards unless it has been determined by the competent person that it is infeasible or creates a greater hazard.
6. Persons crossing an excavation that is equal to or greater than six (6) feet in depth must be protected from fall hazards by means of a guardrail system.

**Fall Protection and Prevention**
1. Prior to creating a hole or opening in any elevated work surfaces, contractors/subcontractors must submit an elevated surface modification permit.
2. Particle board, medium density fiber board (MDF) or similar material is prohibited from being used as floor hole covers on Whiting-Turner projects All holes must remain properly covered, secured, and labeled / signed.

SC21

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

3.  Each contractor/subcontractor, with employees exposed to a fall 6' or greater to a lower level must ensure that effective fall protection measures and rescue procedures are addressed in their company Activity Hazard Analysis prior to beginning work on site. This is to include the name and qualifications of the designated competent person.

4.  A Personal Fall Arrest System (PFAS) [comprised of a full body harness, double lanyards, anchorage point and anchorage connector], a personal fall restraint system (PFRS) [comprised of a full body harness, lanyard, anchorage point and anchorage connector], a guardrail, or safety net system must be in place to protect all trade persons from exposure to falls working at or above 6 feet.

5.  Employees working on ladders must be at least one and a half times the height of the ladder away from any perimeter, shaft, stairway, and opening where the fall distance exceeds 6'. If that distance isn't feasible, a conventional fall protection method must be employed.

6.  Stilts are only permitted in broom swept areas, where there is no change in elevation.

7.  Every hatchway and chute floor opening shall be guarded by a hinged floor-opening cover. The opening shall be barricaded with railings to leave only one exposed side. The exposed side shall be provided either with a swinging gate or so offset that a person cannot walk into the opening.

8.  An extension platform outside a wall opening onto which materials can be hoisted for handling shall have a standard railing that meets handrail standards. However, one side of an extension platform may have removable railings to facilitate handling materials; in this instance a personal fall restraint or arrest system shall be utilized to protect the exposed worker.

9.  Perimeter cable shall not be less than 3/8" steel cable.

10. Corner uprights must be braced so that the required tension may be maintained.

11. The cable must be terminated with three U-bolt wire rope clips that maintain an efficiency rating of at least 80% of the wire rope's breaking strength as proven through product documentation (e.g. Crosby clips).

12. Perimeter cable shall not be used as part of a personal fall arrest or fall restraint system unless designed to be used in that manner by a registered engineer.

13. The use of open turnbuckles as part of the perimeter cable system is prohibited.

14. All guardrail systems [with the exception of scaffold systems or where it can be proven to create a greater hazard] must be equipped with orange perimeter screening or mesh to prevent the ability to breach the system by climbing through rails. The installation of the screening must be compliant with Whiting-Turner's orange perimeter screening guidelines.

15. A fall restraint system must be employed when working from articulating boom lifts.

16. A PFAS is not required when climbing up or down a ladder. Fall protection shall be considered by the competent person if employees work from a ladder 6' or more above a lower level and are exposed to a fall.

17. Steel erectors and metal decking installers must utilize 100% fall protection devices at all times when working over 6'.

18. Horizontal lifelines must be designed by an engineer and installed under the supervision of a qualified person. A safety factor of two must be maintained.

19. Adequate fall protection devices must be provided, installed, and used at all loading platforms by the contractor/subcontractor wishing to remove existing perimeter protection prior to its removal.

20. All anchorage points utilized in a personal fall arrest system must be capable of supporting a load of no less than 5000 lbs.

21. Retraining documentation—to include instructor's name and qualifications, training literature and sign-in sheet—must be submitted to Whiting-Turner on company letterhead.

**Fire Prevention and Protection**

1.  A 20 lb. ABC dry chemical fire extinguisher or equivalent must be provided for each 3,000 square feet of protected building area. An extinguisher shall be placed at every stairwell on each level.

2.  Residential-like wood framing construction shall have a 20 lb. ABC dry chemical fire extinguisher or equivalent for each 1,500 square feet of protected building area.

3.  Storage of flammable/combustible liquids on or inside of buildings under construction shall be no more than one-day supply.

SC22

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

    4.    Provide a 20-pound ABC dry chemical type extinguisher between 25'-75' from areas where flammable liquids are being handled.

**Housekeeping**
1. Clean-as-you-go practices are required.
2. Sort and organize material, sweep daily, and standardize activities to aid in the elimination of storage of excess/unused material in active work areas
3. Work that may temporarily block emergency exits, safety showers, elevators, corridors, and hallways will require prior Whiting-Turner approval.
4. Materials stored in the vicinity of the area where work is performed should be limited to only those materials that will be used in the same shift.
5. Any material stored in a work area longer than 24 hours must be approved by Whiting-Turner.
6. Gang boxes, toolboxes, and sea containers/conex boxes shall not have materials stored on top of them.
7. All chemicals brought on site must be approved by Whiting-Turner.
8. The user of the chemical must provide Whiting-Turner an SDS prior to bringing the substance on site.
9. Chemical/gas cylinders (welding, purging, leak detection cylinders, etc.) must be secured.
10. All dedicated chemical storage areas must have safety data sheets (SDS) available at the storage location.

**Mobile Elevated Work Platform**
1. Employees must keep both feet on the floor of the basket; use of guardrails to gain additional height is prohibited on Whiting-Turner project sites.
2. Where aerial and scissor lifts are used on concrete slabs, any floor depressions or grade changes are required to be barricaded to restrict travel onto that area.
3. The area(s) below the basket or platform of aerial lifts shall be cordoned off using reinforced danger tape—or something of equivalent or greater tensile strength—and by using signage to identify the overhead hazard when a potential for falling objects exists
4. Field modifications are not allowed on aerial lifts. Aerial lifts shall not be used to hoist, raise, or position material outside of the platform or basket unless manufactured to do so.

**Personal Protective Equipment**
1. Prescription eyeglasses and sunglasses that do not comply with ANSI Z87.1 are prohibited.
2. Aluminum hardhats, and bump caps are not permitted on Whiting-Turner projects.
3. For security and identification purposes, all hardhats shall display the contractor/subcontractor name and/or decal identifying the employer as well as the employee's name.
4. Employees exposed to electrical voltages of 600 V or greater shall wear hardhats that meet the requirements of ANSI Z89.2 type Hardhats
5. Hand protection is required when employee's hands are exposed to hazards such as those from skin absorption of harmful substances, cuts or lacerations, abrasions, punctures, chemical burns, thermal burns, and harmful temperature extremes.
6. High visibility vests/gear are required by each person on site.
7. Long pants and shirts with at least a 4" sleeve is required. Shorts, cut offs, tank tops, and net shirts are not permitted.

**Scaffolds**
1. Contractor/subcontractor whose employees will need to access a scaffold system for work shall have a competent person present to inspect and sign off on the scaffold prior to the start of work each day.
2. Employees erecting or dismantling a scaffold are required to utilize appropriate fall protection at heights six (6) feet or above unless proven to be infeasible or more hazardous as determined by their company's competent person.
3. All scaffolds, including carpenters' bracket scaffolds, over six (6) feet in height shall have guardrails on all open sides. If guardrails cannot be used on a walking/working platform, contractor/subcontractors are required to use another means to protect employees from a fall.
4. Cross-braces are not considered to be an adequate guardrail (fall protection) system and shall not be used as a top or mid rail on Whiting-Turner projects.

SC23

Rev. 1/2/15

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

5.  Contractors shall utilize a scaffold tag system. The scaffold tag system shall be color coded and visible. The competent person shall inspect the scaffolding system before each work shift. The competent person shall sign and date the scaffold tag.
    - Green tags are reserved for complete systems
    - Red tags are reserved for erection/dismantling activities and for scaffolds with deficiencies in the system
    - Yellow tags are reserved for systems that require the use of both PFAS and guardrail systems for incomplete scaffold systems or platforms.

### Signs, Signals and Barricades

1.  All caution and danger tape used on Whiting-Turner project sites shall be of the reinforced type and shall be supplemented with a tag/label affixed with the responsible party's name, company, contact number, and potential hazard.
2.  All flagmen shall be trained on appropriate procedures before controlling traffic, as required by the Manual on Uniform Traffic Control Devices (MUTCD) and any municipal or state guidelines.
3.  All flagmen shall utilize sign paddles and shall be outfitted with high visibility garments, as required by current ANSI standards. All PPE and traffic control equipment shall be outfitted with reflectorized material for night work as required by current ANSI standards.

### Stairways and Ladders

1.  All aluminum and commercially manufactured wooden ladders shall not be used on Whiting-Turner projects.
2.  Fall protection shall be considered by the competent person if employees work from a ladder 6' or more above a lower level and are exposed to a fall.
3.  Employees working on ladders must be at least one and a half times the height of the ladder away from any perimeter, shaft, stairway, and opening where the fall distance exceeds 6' without employing additional means of fall protection.
4.  Subcontractors shall provide ladders with duty ratings that meet the needs of their employees. Workers are required to select ladders that are capable of safely supporting their weight and the weight of their tools.

### Steel Erection

1.  Fall protection provided by the steel erector shall remain in the area where steel erection activity has been completed to be used by other trades; if / when Whiting-Turner accepts and takes custody of the system.
2.  All tradespersons, including connectors, engaged in steel erection activities on a walking/working surface with an unprotected side or edge more than six (6) feet above a lower level shall be protected from fall hazards by a conventional fall protection method.
3.  Roof penetrations are to be made only when equipment is ready to be installed.
4.  Safety latches on hooks shall not be disengaged or made inoperable.

### Welding and Cutting

1.  A Hot Work Permit must be completed daily by each contractor/subcontractor performing all welding, burning/cutting operations.
2.  Contractor/subcontractors are responsible for providing a fire watch and a charged, 20lb ABC dry chemical fire extinguisher for each welding and burning activity.
3.  A fire watch is always required to remain in place during the hot work activity and for a minimum of one half (1/2) hour after the welding or burning operation has been completed.
4.  Additional permits may be required by the local Fire Department and will be at the contractor/subcontractor's expense.
5.  All shields shall be compatible with a hardhat.
6.  All cylinders shall be considered in storage at the end of each shift; cylinders must have gauges removed and caps in place.

SC24

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3



© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved

# Exhibit E
# PROJECT-SPECIFIC
# QUALITY MANAGEMENT PLAN

*for 019777– Fashion Valley Mall Redevelopment*
*Rodriguez Group – San Diego, CA*
*May 2022*



Rev. 09/19

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT | QUALITY MANAGEMENT**

## Contents

1.  Introduction ............................................................................................................................ 3
2.  Quality Management Plan Administration ............................................................................ 3
    a.  Roles & Responsibilities of the Whiting-Turner Project Team ......................................... 3
    b.  Trade Responsibilities ..................................................................................................... 3
    c.  Tracking and Communication ......................................................................................... 4
    d.  Continuous Improvement ............................................................................................... 6
3.  Planning and Execution ......................................................................................................... 6
    a.  Planning: Pre-Preparatory Activities ............................................................................... 6
    b.  Execution: 3 Phases of Quality ....................................................................................... 7
4.  Third-Party Inspections .......................................................................................................... 9
    a.  Authorities Having Jurisdiction (AHJ) ............................................................................. 9
    b.  Minimum Critical DFoWs Requiring Third-Party Inspections per Corporate Policy ............ 10
    c.  Factory Acceptance Testing ........................................................................................... 10
    d.  Commissioning ............................................................................................................. 10
5.  Trade-Specific Quality Management Plans (TSQMPs) ........................................................ 11
6.  Design Integration Management and Coordination ............................................................. 11
    a.  Constructability Reviews ............................................................................................... 12
    b.  Integration and Collaboration with Collective Team during Design ................................ 12
7.  Quality Management Integration with Other Project Processes ........................................ 13
    a.  Bidding and Contracting ............................................................................................... 13
    b.  Document Control ......................................................................................................... 13
    c.  Virtual Design and Construction ................................................................................... 13
    d.  Procurement ................................................................................................................. 13
    e.  Project Scheduling ........................................................................................................ 13
    f.  As-Built Documentation Process .................................................................................... 14
    g.  Operation and Maintenance (O&M) Manual Compilation .............................................. 14
    h.  Close-out ...................................................................................................................... 14
8.  Project-Specific Special Processes ....................................................................................... 14
9.  Establishing and Maintaining a Proactive Project Quality Culture .................................... 15




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WT | QUALITY MANAGEMENT

**NOTES:**

o   In the event that this project-specific Quality Management Plan (QMP) conflicts with executed contracts, the contracts take precedence.

o   References to "inspection(s)" herein refer to observations and inspections as defined in and consistent with executed contracts and Contract Document requirements and is limited in liability consistent with the same.

o   All changes or modifications to the Contract Documents must be formally documented to constitute contractual acceptance by all parties.

o   The Whiting-Turner Project Team must appropriately document, distribute, and retain records of quality management-related efforts including, but not limited to, meeting minutes, review notes, and observation and inspection reports.

o   Where "subcontractor" or "trade" are used in this document, these terms may refer to a subcontractor, trade partner, or trade contractor and are used interchangeably.

o   Where the general term "Project Team" is referenced in this document, this represents the collective project team including the Owner, designers, Whiting-Turner, subcontractors, etc.




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT** | **QUALITY MANAGEMENT**

## I. Introduction

The purpose of this project-specific QMP is to support our Project Team's ability to build with quality as a foundation, striving to build right the first time every time. Our quality management efforts, which include both quality assurance and quality control, will begin by explicitly identifying and understanding what our Owner values and prioritizes relative to the delivery of this project. All work must be in conformance with the Contract Documents, which must reflect what we have agreed to provide.

## 2. Quality Management Plan Administration

### a. Roles & Responsibilities of the Whiting-Turner Project Team

The Whiting-Turner Project Team must take responsibility and ownership of the development, delivery and documentation of the project-specific QMP. Quality roles and responsibilities must be clearly and appropriately established based on knowledge and experience, promoting a sense of ownership for each definable feature of work (DFoW). Roles include the following at a minimum:

**Project Quality Manager (or Coordinator) [Shane Willingham]**
Works with the Project Team to set up and maintain the project-specific QMP and related processes, including documentation. Sets and facilitates Pre-Installation Meetings (Preparatory Phase). Reports quality progress and metrics to the Project Team. In addition to the Lead Project Manager, Lead Superintendent and the Whiting-Turner Project Team, the Project Quality Manager (or Coordinator) has the authority to stop work at any time if necessary, to confirm quality standards are met.

**Lead Project Manager [JJ Sellner]**
Participates in the development and execution of the project-specific QMP. Ensures participation of trades in the development and execution of the project-specific QMP. Develops subcontracts to include and enforce quality standards. Coordinates Owner and AHJ participation in Pre-Installation Meetings.

**Lead Superintendent [Paul Perry]**
Participates in the development and execution of the project-specific QMP. Leads and conducts Initial and Follow-up Phase inspections. Enforces continuous compliance with project quality standards by subcontractors.

**Whiting-Turner Project Team**
Participates in all phases of the execution of the project-specific QMP. Supports the Quality Manager and Lead Superintendent in enforcing quality standards and executing quality-related roles and responsibilities as defined.

**Regionally Dedicated Quality Manager [Luke Logan]**
Supports the Whiting-Turner Project Team while connecting them to the appropriate corporate resources.

### b. Trade Responsibilities

Each trade is responsible for assuring that its work is in compliance with the Contract Documents. Each trade is required to participate in the execution of this project-specific QMP and documentation




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.
Page 53 of 474

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT | QUALITY MANAGEMENT**

of the same. Trade-Specific Quality Management Plans (TSQMPs) that have been submitted by the trade and reviewed by the Whiting-Turner Project Team will be kept on file by Whiting-Turner and furnished upon request to the Owner and design team. Completeness and adequacy of these TSQMPs is the responsibility of the trade, inclusive of any additions or adjustments to the TSQMPs as project conditions and contract documents change.

Trade-specific documentation will be reviewed at the discretion of the Whiting-Turner Project Team. Corrections of any deficiencies in documentation are to be made promptly by the trade. All trades must be represented by the appropriate personnel and are required to participate in project meetings from pre-installation through close-out.

Each trade is responsible for determining the appropriate means and methods for performing its work as well as compliant installation tolerances subject to review by Whiting-Turner. All trades must communicate with one another in an effort to eliminate conflicts, especially where multiple scopes of work interface.

### c. Tracking and Communication

#### i. Tracking Tools and Processes

| Process | Tracking / Management Tool |
|---|---|
| Document control (maintaining current drawings, specifications, etc.) | Procore |
| Documentation of tests and inspections | Procore/Checklists |
| Submittals | Procore |
| Constructability reviews | Excel |
| Quality incident tracking log | Excel/CMiC |
| Quality metric reporting | Excel |
| Punchlist | Procore |

Quality inspection report templates and completed reports will be stored on the Whiting-Turner Fashion Valley SharePoint. Whiting-Turner staff will post inspection reports and related documentation from Owner, trades, and vendors to the Whiting-Turner Fashion Valley SharePoint upon receipt of those documents.

#### ii. Owner Communication

The Project Team has established the following protocol to encourage effective and ongoing communication of inspections, deficiencies and corrections with Owner.  Communication and reporting of the quality management process to <Simon Property Group> will meet or exceed the requirements of the Contract Documents and Owner contract.  These requirements will be reviewed at the onset of the project, and a mutually agreeable communication plan will be developed among




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

the collective project team members including, but not limited to, the Whiting-Turner Project Team, Owner and the design team.

This team has decided on the following communication guidelines related to quality:

- **Method of communication:** Electronic communication except for punch list sign offs, which will be via hard copy signatures.
- **Frequency of communication:** Quality will be addressed in all Owner progress meetings and otherwise "on demand".
- **Communication related to quality:**
    1. Monthly report (e.g. dashboard)
    2. Review of quality planning and inspection logs at Owner progress meetings
    3. Weekly field updates
    4. Non-conforming inspections with resolution tracking available upon request
    5. All inspections will be available upon request
    6. Upcoming Inspection Milestones included in look-ahead schedule
    7. Constraints controlled by this team (Owner, design team and Whiting-Turner) will be communicated and addressed as necessary for resolution

**iii. Project-Wide Communication**

The Project Team has established the following communication plan regarding quality management and deficiency tracking with the subcontractors during Subcontract negotiation (buy-out), which will also be reviewed during project onboarding. The communication plan must follow a regular pattern to set expectations and avoid lapse. Items to consider in development of this plan include:

- **Method of communication:** Match method established with Owner as applicable.
- **Frequency of communication:**
    o Distribution and review of quality tracking log at weekly subcontractor meetings
    o Review of non-conforming items, plan for resolution, and constraints in daily huddles.
- **Expected response from subcontractor regarding non-conforming items:**
    o Immediate recognition of deficiency
    o Corrective work plan
    o Response times and allowable durations for remediation specific to quality incident
    o Documentation of completion
    o Reinspection (by Whiting-Turner or party that identified non-conformance)

- **Consequence of failed correction within allowed duration for remediation**
- **Celebrate successes:**
    o Recognize notable quality management efforts at daily huddles or weekly meetings. (Notable efforts could include proactive recognition of issues in the field.)
    o Implement a quality management incentive program.




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WT | QUALITY MANAGEMENT

#### d. Continuous Improvement

Continuous improvement is a priority on this project. Processes, protocol and expectations have been established to help all on this project continuously improve successful delivery. The Project Team will engage in root cause analysis for identified issues. At all Pre-Installation Meetings as well as weekly or bi-weekly quality tracking meetings, the Project Team will track and document lessons learned. The project team will track lessons learned via excel files and will review during weekly Trade Partner meetings to avoid future issues. The project team will include deficient work, delayed work, and failed inspections (with photo documentation to support) specific to each subcontractor in order to reinforce the importance of quality and continuous improvement to the overall team.

### 3. Planning and Execution

#### a. Planning: Pre-Preparatory Activities

The following pre-preparatory activities should be completed prior to advancing into the 3 Phases of Quality:

##### i. Complete a quality planning meeting prior to construction start

The Whiting-Turner Project Team must coordinate with their regionally dedicated Quality Manager to schedule and perform a quality planning meeting at the time of project kick-off. This meeting with the Whiting-Turner Project Team will include review of the project-specific QMP template and discussion of the processes and protocols that will be used throughout the project, including definition of metrics, which will be used to measure the quality health of the project.

##### ii. Perform constructability reviews

With each issuance of design documentation, the Project Team will perform a constructability review and communicate concerns related to constructability, coordination, performance, operation and value. Issues raised will be reviewed with the Owner and design team, vetted and properly documented as necessary. Constructability reviews will be performed upon every issuance of documents, including change directives.

##### iii. Identify DFoWs, highlighting those that are critical

A DFoW is defined as any task that is separate and distinct from other work, has separate control requirements, or is identified by different trades or disciplines and is usually unique in nature. At the project onset, the Whiting-Turner Project Team will identify and log each of the DFoWs for the project along with their related requirements (e.g. mock-ups, first work inspections, follow-up inspections, etc.). Critical DFoWs, both defined as critical by corporate policy (reference Section 4.b.) and additional items as determined by the Project Team, are highlighted in the DFoW log to encourage special consideration and focus. The DFoW log will be used as a tracking tool throughout the project to monitor progress. See Appendix A for Definable Features of Work Log.

##### iv. Align with leadership, maintaining a common understanding of quality planning, execution and health

Develop an understanding with project leadership, including Whiting-Turner and the Owner, on how success related to quality will be tracked and measured for this project.

##### v. Participate in regular visits/check-ins with regionally dedicated Quality Manager





© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

The Whiting-Turner Project Team will meet regularly with their regionally dedicated Quality Manager to review the project-specific QMP, project progress and quality health indicators.

### vi. Submittal review and approval

Submittals will be reviewed by trades prior to submission to the Whiting-Turner Project Team, which will subsequently review them prior to transmission to the design team. Additionally, submittals and means and methods for each DFoW will be coordinated with other DFoWs as appropriate. Approved submittals will be shared with affected or potentially affected trades for coordination. Submittals should be reviewed and approved prior to Phase 1 of each DFoW.

To properly manage the submittal process, the Project Team will develop a manageable submittal register prior to beginning the review process. All submittals will be created, reviewed, and distributed through Procore. The submittal register will be derived from the Contract Documents and reviewed with the Owner and design team to determine if there are extraneous items that can be excluded. (Software solutions, i.e. Pype, will be explored to expedite the development of the Submittal Register.) The Submittal Register will include target dates for submission from the subcontractor, review by Whiting-Turner, submission to the design team and Owner, return of the reviewed submittal, fabrication and procurement durations, and shipment and delivery dates. The Submittal Register will be reviewed at both the weekly subcontractor meetings and the Owner progress meetings.

Once the subcontractor has compiled and reviewed a submittal for conformance to the Contract Documents, they will submit it to Whiting-Turner. Whiting-Turner will perform their own review of the Submittal for conformance with the Contract Documents, including issued and accepted change documentation. Following review, Whiting-Turner will issue to the designated design team and Owner representatives for review and approval. The review path will include concurrent distribution from Whiting-Turner to all reviewers, but the return path must include compilation of all notes and comments by one party, typically the Architect. Upon return of an approved submittal, Whiting-Turner will distribute to the submitting subcontractor as well as all other subcontractors whose scope of work will be affected by or coordinated with this work.

Return of the approved submittal indicates direction to release the work to the subcontractor. Changes to the scope of work indicated in the Contract Documents should not be made by the design team or Owner through the submittal process. If changes are identified, it will be the subcontractor's responsibility to indicate this to Whiting-Turner by submitting an RFI. If the change is confirmed through the RFI process, a formal revision to the Contract Documents will be issued by the design team. The subcontractor must allow adequate time for review and approval of each submittal to maintain the project schedule. Additionally, if a submittal is rejected and requires re-submission because it does not conform to the Contract Documents, the subcontractor is responsible for any associated schedule impact.

## b. Execution: 3 Phases of Quality

The 3 Phases of Quality refer to the breakdown of activities by definable feature of work (DFoW) into a Preparatory Phase, Initial Phase and Follow-up Phase. Repeat these phases for each DFoW.

### i. Phase 1 Preparatory | Set Standards and Expectations



© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT** | **QUALITY MANAGEMENT**

The Preparatory Phase includes all efforts to make the jobsite, materials and installing contractor ready for installation to begin. All project stakeholders (including the Owner, designers, Whiting-Turner, trades, vendors, manufacturers and inspectors) are expected to actively participate in the Preparatory Phase of this project-specific QMP. Steps in this phase include: Whiting-Turner to host Pre-Installation meetings with responsible subcontractors performing DFoW activities, review the QAQC program with trades, and set forth the Owner's/Designer's/AHJ's expectations for QAQC to be fully transparent with all subcontractors.

1. **Pre-Installation Meetings**
   The Project Team is committed to developing a common understanding of the project's requirements prior to the start of work. Therefore, a Pre-Installation Meeting will be held for every DFoW. These meetings will include, at a minimum:

   a. **Participation by all stakeholders** for the referenced DFoW. This includes, but is not limited to, Whiting-Turner, the installing contractor (including field supervision responsible for the work), designers as applicable, inspectors, Owner representatives and Authorities Having Jurisdiction (AHJs). Participation by Owner representatives and AHJs is strongly encouraged, but at their discretion unless contractually required otherwise.

   b. **Review of specification sections** relevant to the DFoW, including quality requirements and related standards.

   c. **Review of Initial Phase requirements** and development of a plan to ensure the requirements are met. This may include mock-ups and/or inspections of first work in place with documented reviews.

   d. **Review of the status of related submittals and RFIs** as well as identification of new RFIs or clarifications required prior to commencement of work.

   e. **Review of any existing construction and/or prior work** by other trades that the DFoW will be building upon. The installing contractor will have reviewed the prior work of others in advance of the meeting, and any concerns not yet addressed will be discussed.

   f. **Discussion of the means and methods** of performing the work, including an Activity Hazard Analysis (AHA). At the time of the meeting, the AHA is to include the anticipated hazards associated with the DFoW under review. However, the AHA is to be updated and refined at the time the work begins to ensure its completeness and accuracy in accordance with the project safety requirements. The intent of this portion of the meeting is to inform stakeholders of these details, not establish or approve them.

   g. **Distribution of meeting minutes** to all meeting participants and stakeholders. These minutes will become part of the project record and will be used as a reference during the Initial and Follow-up Phases.

2. **Set Standards and Expectations**




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT | QUALITY MANAGEMENT**

Diligently review and verify that the Contract Documents reflect the collective team's common understanding of project expectations. Confirm that these expectations reflect what we have agreed to provide in accordance with the Contract.

**ii. Phase 2 Initial | Verify Terms of Acceptance**

The Initial Phase serves as the Project Team's first opportunity to evaluate the work of the installing contractor, confirm the common understanding of requirements and expectations set in the Preparatory Phase, and establish workmanship standards. Mock-ups required by the Contract Documents or otherwise agreed to be necessary during the pre-preparatory and preparatory activities will be reviewed during this phase. Otherwise and in addition to mock-ups, the first representative portion of installed work will be reviewed (i.e. *"first work inspection"*). Pre-Installation Meeting minutes will be revisited to confirm the stakeholders' understanding of the requirements and any additional clarifying expectations of the DFoW. Initial Phase inspections will be documented according to the process described in Section 2.c.

**iii. Phase 3 Follow-up | Validate Installation**

Continued inspections in the Follow-up Phase – both scheduled and ongoing unscheduled – serve to confirm continued compliance with the Contract Documents and adherence to the standards established in the Preparatory and Initial Phases. Inspection methods and frequencies are defined in the Testing and Inspection Log in Appendix B. All inspections, whether conforming or non-conforming, will be logged according to the process defined in Section 2.c. The Project Team and subcontractors will remain committed to timely remediation and close-out of non-conformances, also ensuring photographic documentation of remediated non-conformances associated with any photographed non-conformances. All non-conformances must be tracked and closed with the appropriate sign-offs of the parties that originally identified and logged the non-conformance.

The Project Team will use project-specific checklists for appropriate DFoWs to review installed work. The Project Team will use a continuous punch approach (see Section 7.h).

## 4. Third-Party Inspections

As required by the Contract Documents, the Project Team will engage special inspectors and laboratories as participants in the project-specific QMP, all of which are required to meet and maintain the qualifications specified by the Contract Documents. Each must submit testing documentation and reports in accordance with the defined processes and expectations in a timely manner consistent with the project schedule. A list of required tests and inspections is included in Appendix B. See Appendix D for qualifications and credentials of each special inspector and laboratory as required.

Whiting-Turner is to be given copies of all third-party inspectors' reports. All third-party inspectors must be involved in mock-ups and first work inspections. All third-party inspections and associated reports will be incorporated into the project-specific QMP documentation and tracking protocol.

### a. Authorities Having Jurisdiction (AHJ)

Each trade is responsible for ensuring their work is compliant with the Contract Documents and all applicable laws, codes, rules and regulations, as well as planning and managing each inspection.




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT | QUALITY MANAGEMENT**

General AHJ inspections such as those for Certificate of Occupancy will be coordinated and hosted by Whiting-Turner. Trades with scope under review during general inspections are required to attend the inspections.

### b. Minimum Critical DFoWs Requiring Third-Party Inspections per Corporate Policy

Whiting-Turner corporate policy mandates that the following items be carefully inspected by competent, experienced, independent inspectors. The Owner may provide these services directly or the third-party inspectors may be hired through Whiting-Turner provided that the inspections are happening correctly and as often as needed, performed by competent experts in that field and provide an unbiased, objective account of the project conditions.

| Critical Definable Feature of Work requiring third-party inspections per corporate policy | Contracted by | | | DFoW not in project scope |
|---|---|---|---|---|
| | Owner | Whiting-Turner | Trade | |
| Initial project surveys and controls | | X | | |
| Structural earthwork | X | | | |
| Pilings, caissons and similar deep foundation systems | X | | | |
| Structural concrete | X | | | |
| Structural masonry | | | | X |
| Structural steel | X | | | |
| Building envelope system* | X | | | |
| Any other DFoW involved in the structural integrity of the work | X | | | |

*Building envelope system: The Whiting-Turner Project Team will engage a building envelope consultant to review the design, submittals, mock-ups and first work installations. The consultant will also identify potential areas of concern, propose appropriate, potential modifications to the design team and confirm that materials and installation methods are in accordance with the Contract Documents (*still maintaining the latter as a primary responsibility of the subcontractor*). See the Building Envelope TSQMP accompanied by credentials in the Appendix.

### c. Factory Acceptance Testing

The purpose of factory acceptance tests (FATs) is to assure that equipment is acceptable for use on the project prior to shipment according to manufacturers' and designers' standards. Below is a summary of items that have been selected for factory acceptance testing. This list is intended to include all contractually required FATs. Each trade is responsible for submitting its FAT plan for each applicable DFoW to Whiting-Turner prior to performing testing. The vendor is responsible for conducting and documenting the FAT as well as hosting project representatives during testing.

- Sump Pumps
- Air Handling Units
- Elevators/Escalators and Components

### d. Commissioning

The Project Team will establish a plan for commissioning electrical, mechanical and other systems in accordance with the Contract Documents. Delivery inspections, pre-start-up inspections (i.e. pre-




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

NOTICE OF REMOVAL EXHIBIT 1  p. 78

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WT | QUALITY MANAGEMENT

functional), vendor start-up and post-start-up inspections are described in the TSQMPs. Functional testing and enhanced commissioning are described in the project-specific commissioning plan under separate cover.

## 5. Trade-Specific Quality Management Plans (TSQMPs)

Subcontractors must document their TSQMPs prior to mobilizing on site. The TSQMPs will be reviewed by the Whiting-Turner Project Team. Subcontractors are responsible for sub-tier subcontractors and vendors following all project quality requirements.

TSQMPs should address the following:

**a.  GENERAL:**
   i.   The TSQMP is project-specific and comprehensive.
   ii.  Include acknowledgement and commitment to actively participate in execution of the project-specific QMP.
   iii. Describe process to be used for document control and maintenance of as-built documentation.

**b.  ROLES & RESPONSIBILITIES:**
   i.   Designate trade's on-site quality management representative(s).
   ii.  Clearly identify which trade personnel have authority to stop work when a quality issue is identified.

**c.  PLANNING FOR QUALITY:**
   i.   Describe how this trade plans to install all work right the first time. What is the trade's quality plan or process?
   ii.  Identify and address specific risk issues for trade's scope.
   iii. Identify who will attend the trade's Pre-Installation Meeting(s).
   iv.  Identify manufacturers or vendors that must be available for Pre-Installation Meeting(s).

**d.  ACCOUNTABILITY AND INSPECTION TRACKING:**
   i.   Identify how each trade will track, communicate and resolve its quality issues including non-conformances.
   ii.  Provide checklists for work to be performed.
   iii. Define roles and responsibilities related to third-party inspection coordination.
   iv.  Establish a process to gather all required quality documents and certifications.

## 6. Design Integration Management and Coordination

Coordination between our Whiting-Turner Project Team and the design team will be an interactive, collaborative process focusing on open lines of communication and proactive efforts between all parties, committing to a value-added approach to resolve issues in a manner that best suits the goals of the Owner and the Project, rather than individual interests.  All parties are encouraged to contact other members of this group directly and follow up with documentation of the issue/resolution copied to all team members.  This will streamline communication, eliminate wasteful efforts, and result in stronger relationships.




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT** WHITING-TURNER | **QUALITY** MANAGEMENT

### a. Constructability Reviews

**i.  Readiness for field use**

At each level of design documentation, the Whiting-Turner Project Team will complete or update a Constructability Review using the provided Whiting-Turner template. During this process, all design issues noted will be compiled into a report for review with the design team. Depending on the magnitude of this list, we will request a meeting to review the items with the design team or process by email if the list is minimal. Following review and resolution, the design team will issue a Change Bulletin to capture any modifications to the issued Contract Documents or the Project Team will document changes via the RFI process.

**ii.  Coordination between disciplines**

Coordination of the structure and MEP trades, including footings/foundations, structural steel, miscellaneous metals, underground utilities, in-wall rough-in, and above-ceiling rough-in will be coordinated through weekly Subcontractor and Coordination Meetings. The base model will be provided by the design team for incorporation of the subcontractor's scopes of work. Coordination meetings will be held every week and resultant issues with proposed solutions will be submitted to the design team as an RFI for acceptance or subsequent contractual documentation.

**iii.  Common design conflicts**

The following items have been identified by the Project Team as common design conflicts that may apply to this project and warrant special attention by this team.

* Coordination of lighting between Architectural and Electrical drawings. Both disciplines will be reviewed, and discrepancies will be noted and resolved.
* Coordination of MEP requirements, especially electrical, with Owner provided equipment. Project-specific cut sheets of equipment will be requested and reviewed.

### b. Integration and Collaboration with Collective Team during Design

**i.  Planning check-in frequency**

Formal in-person Owner Architect Contractor (OAC) Meetings will be held on site every week. Additionally, Whiting-Turner and the design team will have calls as needed to discuss outstanding coordination and other follow up items.

**ii.  Defined decision process regarding design**

If modification to the Contract Documents is required as the result of an RFI, submittal comment, or other design discussion, the design team will issue a Change Bulletin to formally document the change. It is the design team's responsibility to review the change with the Owner prior to issuing to Whiting-Turner. Direction accompanying the issued Change Bulletin must include Owner acceptance of the design modification and direction to proceed (or price and proceed, etc.).



© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.
Page 62 of 174





DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## 7. Quality Management Integration with Other Project Processes

### a. Bidding and Contracting

Bid packages and contracts will establish standards and expectations related to quality, including the requirement for a TSQMP. When pre-bid conferences are held, quality-related standards and expectations will be emphasized.

### b. Document Control

The Project Team understands the importance of maintaining an accurate, current set of documents to establish a single source of truth. Since building a quality project requires conformances with the Contract Documents, this team will define its method of maintaining this accurate set. The Project Team will maintain a current set document log and post all changes to the Contract Documents (e.g. RFIs, sketches, etc.). Procore will be used on this project to maintain current sets of drawings, sketches, RFIs, submittals, and all other document control items. The most current plan sets will also be stored as physical copies and will be kept in the Whiting-Turner jobsite trailer. Subcontractors will be responsible for ensuring that their own project managers, superintendents, foremen, crews, etc. are provided with and working off of the most current set of documents.

### c. Virtual Design and Construction

Not Applicable on this project.

### d. Procurement

As key inspections are conducted during the procurement and delivery process, the project schedule will be used by the Project Team to plan the following:

i. **Factory Acceptance Tests** – see section 4.c. for more detail. FATs will be planned with distinct activities in the project schedule.

ii. **Delivery Inspections** – with the delivery of material and equipment to the project site, inspections for material compliance will be conducted and documented. Delivery activities or milestones will be established in the schedule for key items requiring special focus for inspection.

### e. Project Scheduling

All stakeholders must be aware of the project schedule and be prepared to support all quality-related activities and milestones.

i. **Scheduling of Pre-Installation Meetings** – Pre-Installation Meetings will be included in short-term look-ahead schedules. The Project Team may identify DFoWs for which they will include Pre-Installation meetings in the long-term forecasting (CPM) as a network of related activities.

ii. **Scheduling of Mock-ups and First Work Inspections** – Initial Phase inspections include mock-ups and first work inspections. Contractually required mock-ups will be included as activities in the long-term forecasting (CPM). First work inspections will be included, at a minimum, in the short-term look-ahead schedules. For each DFoW, the mock-up inspections and associated documentation will be predecessors to the installation of the respective features of work.




© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT** WHITING-TURNER | **QUALITY MANAGEMENT**

    **iii. Scheduling of Testing and Inspections** – Follow-up Phase inspections will not all have corresponding distinct activities in the schedule due to the expected quantity. Rather, inspections are summarized in the Testing and Inspection Log with distinct, key tests and inspections pulled into the long-term forecast (CPM), particularly those with critical handoffs.

### f. As-Built Documentation Process

As-built documentation will be managed as a DFoW. It will have its own Preparatory Phase (including a meeting), Initial Phase (including confirmation of the intended level of detail) and Follow-up Phase (including comparison of conditions in the field with the documentation to confirm accuracy).

### g. Operation and Maintenance (O&M) Manual Compilation

O&M manual compilation will be managed as a DFoW. It will have its own Preparatory Phase (including a meeting), Initial Phase (including confirmation of conformance with the agreed-upon format and completeness of initial sections) and Follow-up Phase (including a final review for completeness before submission).

### h. Close-out

    **i. Continuous Punch**
    The Project Team will use a continuous punch, "close-as-you-go" approach for the duration of the project to strive for zero punchlist items, which will also help to verify that all work is complete to streamline close-out and turnover.

    **ii. Completion List**
    As project elements near completion, completion lists will be created and managed to ensure all scope is complete prior to final punch-out. Completion lists are not considered punchlists; they are lists of remaining tasks to be performed.

    **iii. Pre-Punch**
    The Project Team will perform a pre-punch process on project elements as they near completion. This means identifying and correcting deficient items early to avoid a bottleneck at the end of the project. This precedes the formal Final Punch-out with the owner and design team.

    **iv. Final Punch-out**
    The project punch-out process will be managed as a DFoW. Stakeholders will participate in a Preparatory Phase meeting to establish the document management process and define participants in future punchlist compilation walks. Additionally, at this meeting, the Project Team will establish the approval and sign-off process for non-conformance corrections. It is important to differentiate between unacceptable work, requests for additional scope, and work in progress.

## 8. Project-Specific Special Processes

Not Applicable.





© Copyright 2019 The Whiting-Turner Page 64 of 174 Company. All rights reserved.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT | QUALITY MANAGEMENT**

## 9. Establishing and Maintaining a Proactive Project Quality Culture

This project will include a culture of quality focus. This culture will be reinforced through project management meetings and a recognition and incentive program. Awards and incentives will be established at the discretion of the Project Team to drive and reinforce the desired behaviors, roles and responsibilities relative to a proactive culture of quality.

DISCLAIMER: Effective January 2019, all contractors and subcontractors on Whiting-Turner's projects are expected to be in full compliance with all applicable requirements of Whiting-Turner's project-specific Quality Management Plan (QMP). The information contained in this QMP is not intended to serve as a substitute for the exercise of good engineering judgment by the engineers nor as a substitute for determinations made by contractors/subcontractors of appropriate manner and methods of operations and aspects of work under their control. This QMP is also not intended to be all inclusive or replace a contractor's or subcontractor's corporate or site-specific quality management plan and is not intended to, nor shall it, supersede any federal, state, local and other applicable laws, codes, rules, regulations, and/or practices. All contractor's and subcontractor's site-specific quality management plans must meet or exceed the requirements of the Whiting-Turner project-specific Quality Management Plan, the contract documents (including any applicable Owner Quality Management Plans referenced therein), and all federal, state, local and other applicable laws, codes, rules, regulations, and/or practices.

This QMP and all information contained herein is confidential and intended for the sole use of contractors and subcontractors on Whiting-Turner projects. Contractors/subcontractors are prohibited from distributing this information to any third parties. The Whiting-Turner Contracting Company expressly disclaims warranties for the information contained in this QMP and makes no representations to such third parties regarding the reliability, suitability, correctness, or completeness of such information. Whiting-Turner assumes no responsibility or liability and shall not be responsible and/or liable for damages or losses of any kind, including but not limited to direct, indirect, incidental, exemplary, special or consequential damages or losses, arising from, attributable to and/or resulting from the use of such information by third parties however caused and on any theory of liability, whether in contract, strict liability or tort.



© Copyright 2019 The Whiting-Turner Contracting Company. All rights reserved.
Page 65 of 174



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT F**

**SUBCONTRACTOR PLAN FOR COVID-19**

This subcontract was executed during the worldwide pandemic of the coronavirus (COVID-19), as declared by the World Health Organization (WHO) in March 2020. In response to the COVID-19 pandemic and in accordance with the guidance of public health authorities, Subcontractor is required to reasonably cooperate with and, to the extent applicable, comply with all applicable Jobsite COVID Protocols for the Project. Subcontractor is further required to provide Whiting-Turner with Subcontractor's infectious disease preparedness and response plan for the Project, which, at a minimum, ensures that Subcontractor will follow all applicable WHO, CDC, OSHA, and local, state and federal orders and regulations and project-specific requirements as it pertains to the performance of their scope of work in light of COVID-19. Specifically, Subcontractor's infectious disease preparedness and response plan must specifically identify how Subcontractor will satisfy applicable requirements in the following areas:

- Responsibilities of managers, supervisors and employees
- Basic infection prevention measures for all workers regardless of exposure risk including but not limited to:
    - Hygiene protocols including but not limited to hand washing, etc.
    - Stay-home-when-sick protocols
    - Respiratory etiquette
    - Avoiding close contact with people who are sick
    - Social/physical distancing strategies
- Training and project orientation procedures including but not limited to:
    - Understanding symptoms of COVID-19
- Jobsite exposure situations and stay-at-home and do-not-come-to-work protocols including but not limited to:
    - Employee experiencing COVID-19 symptoms
    - Employee tests positive for COVID-19
    - Employee has close contact with an individual who has tested positive for COVID-19
    - Employee return-to-work procedures
    - Confidentiality
- Project staffing strategy to both adequately staff the project and limit exposure (e.g., dividing crews, etc.)
- Jobsite protective measures including but not limited to:
    - General safety policies and rules
    - Office and jobsite sanitation
    - Meeting protocols
    - Personnel and work area sanitation protocols
    - Equipment and tool usage protocols
    - Common drink source/watercooler protocols
    - Jobsite visitors
    - Delivery procedures
    - PPE program including but not limited to mask, glove, respirator and eye protection use
    - Lift and hoist use
    - Stair, common corridor and tight workspace, etc. use
    - Breaktime and lunch policies
    - Work practice controls including but not limited to housekeeping and dust control, etc.
    - Personnel wellness check procedures including but not limited to:
        - Self-reporting
        - Temperature checks, if applicable
        - Employee questionnaires and wellness checklists
        - Travel inquiries
        - Contact tracing
        - To mitigate the spread and exposure of COVID-19, Subcontractor will follow CDC recommendations, project-specific requirements, and all other applicable federal, state and local orders, including restrictions and self-quarantining requirements and will determine, to the best of their ability, that each employee is cleared to work that day including but not limited to:

(Exhibit Revised 3/2020)

SC26

Rev. 1/2/15

Document Generated from CMiC

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

- Employee is not experiencing any symptoms of COVID-19 including without limitation fever, shortness of breath or loss of taste or smell
- Employee has not traveled internationally or in a high-risk area domestically over the past 14 days outside of the employee's typical commute
- Employee has not had prolonged, unprotected, close contact (without proper PPE) with anyone who has been diagnosed with COVID-19 and who has not fully recovered from COVID-19
- Employee has not had direct contact with infectious secretions (been coughed/sneezed upon) with anyone who has been diagnosed with COVID-19 and who has not fully recovered from COVID-19
    - o Jobsite social/physical distancing including but not limited to strategies for integrating social/physical distancing into activity hazard analysis:
        - Engineered controls
        - Administrative controls – work process changes
        - PPE
- Jobsite cleaning and disinfecting protocols including but not limited to:
    - o Jobsite trailers and break areas
    - o Trash collection
    - o Sanitary facilities, if applicable
    - o Vehicles, tools and equipment
    - o Sanitizing equipment and supplies program
    - o Material Safety Data Sheets
- Travel restrictions (e.g., public transportation, etc.)
- Procedures and protocols for unique project conditions including but not limited to occupied buildings, facilities with high-risk residents (e.g., healthcare, senior living), public interface, etc.
- Job suspension procedures
- Project start-up/return to shuttered project procedures
- Supply chain monitoring/continuity plan
- Record keeping program including but not limited to internal, external and OSHA

The guidelines set forth herein are based on current public health guidance (as of April 3, 2020). Any requirements which are contingent on the pandemic declaration including without limitation those pertaining to medical inquiries and examinations, shall be deemed to lapse when the WHO declares an end to the COVID-19 pandemic, or such other time as may be required by applicable law.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# EXHIBIT G

# Proposed Construction Schedule

## Fashion Valley Mall Redevelopment
## Phase 4

JS  AL

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| Activity ID | Activity Name | Orig Dur | ating ition | Start | Finish |
|---|---|---|---|---|---|
| | FVM - Renovation Phase 3, 4, 5 - 10/11/2022 | | | | SD TEMPLATE - ARE · 12-Oct-22 03:17 |
| CAT.1350 | Parapet Flashing & Sealants | 2 | 0 | 31-Aug-22 A | 09-Sep-22 A |
| CAT.1320 | Roofing at Niches & AMC Roof | 4 | 0 | 31-Aug-22 A | 09-Sep-22 A |
| CAT.1120 | Decorative Tile Pockets | 12 | 0 | 30-Aug-22 A | 13-Sep-22 A |
| CAT.1410 | Lower level Dense Glass | 3 | 0 | 16-Sep-22 A | 16-Sep-22 A |
| CAT.1340 | Install Light Fixtures | 4 | 0 | 28-Sep-22 A | 07-Oct-22 A |
| CAT.1470 | Paint Tower Complete | 1 | 0 | 05-Oct-22 A | 07-Oct-22 A |
| CAT.1090 | Lath & Plaster Tower Complete | 16 | 0 | 26-Aug-22 A | 10-Oct-22 A |
| CAT.1140 | Remove Scaffold | 3 | 3 | 12-Oct-22 A | 13-Oct-22 A |
| | PLAZA DEL RIO Phase 3 | 73 | 15 | 27-Jun-22 A | 07-Nov-22 |
| | Sequence 1 | 16 | 0 | 27-Jun-22 A | 26-Jul-22 A |
| | Sequence 2 | 28 | 0 | 21-Jul-22 A | 16-Sep-22 A |
| | Sequence 3 | 28 | 15 | 14-Sep-22 A | 07-Nov-22 |
| | CONCOURSE EAST Phase 4 | 262 | 262 | 19-Oct-22 | 02-Nov-22 |
| | Bridge #1 ( Full Scope @ Rolex) | 115 | 115 | 19-Oct-22 | 04-Apr-23 |
| BRI1.1200 | Remove Trees | 3 | 3 | 19-Oct-22 | 21-Oct-22 |
| BRI1.1020 | Demo Bridge | 10 | 10 | 19-Oct-22 | 07-Nov-22 |
| BRI1.1040 | Column Improve @ Rolex | 6 | 6 | 07-Nov-22 | 16-Nov-22 |
| BRI1.1030 | Structural Steel | 10 | 10 | 16-Nov-22 | 06-Dec-22 |
| BRI1.1050 | Scaffold Bridge | 2 | 2 | 03-Jan-23* | 05-Jan-23 |
| BRI1.1060 | Framing | 10 | 10 | 05-Jan-23 | 24-Jan-23 |
| BRI1.1070 | Planter Sheathing | 3 | 3 | 24-Jan-23 | 31-Jan-23 |
| BRI1.1090 | MEP Rough in | 3 | 3 | 31-Jan-23 | 08-Feb-23 |
| BRI1.1080 | Lath & Plaster | 16 | 16 | 24-Jan-23 | 21-Feb-23 |
| BRI1.1110 | Scaffold Remove | 3 | 3 | 21-Feb-23 | 27-Feb-23 |
| BRI1.1100 | Fiberglass Liner Field Measure & Procure | 16 | 16 | 31-Jan-23 | 28-Feb-23 |
| BRI1.1120 | Planter Waterproof | 4 | 4 | 28-Feb-23 | 07-Mar-23 |
| BRI1.1130 | MEP Trim | 2 | 2 | 07-Mar-23 | 09-Mar-23 |
| BRI1.1140 | Planter fill & Irrigation | 4 | 4 | 07-Mar-23 | 14-Mar-23 |
| BRI1.1150 | Glass Railing & Base Shoe | 4 | 4 | 09-Mar-23 | 16-Mar-23 |
| BRI1.1160 | Bridge Pavers | 4 | 4 | 14-Mar-23 | 21-Mar-23 |
| BRI1.1170 | Stainless Coping & Flashings | 3 | 3 | 16-Mar-23 | 22-Mar-23 |
| BRI1.1180 | Bridge Tile | 4 | 4 | 21-Mar-23 | 28-Mar-23 |
| BRI1.1190 | Bridge Lighting | 4 | 4 | 28-Mar-23 | 04-Apr-23 |
| | Bridge #2 (Reduced Scope) | 92 | 92 | 19-Oct-22 | 02-Mar-23 |
| BRI2.1010 | MEP Safe off | 3 | 3 | 19-Oct-22 | 25-Oct-22 |
| BRI2.1130 | Remove Trees | 2 | 2 | 24-Oct-22 | 25-Oct-22 |
| BRI2.1020 | Demo Bridge | 10 | 10 | 07-Nov-22 | 23-Nov-22 |
| BRI2.1040 | Framing | 8 | 8 | 01-Dec-22 | 14-Dec-22 |
| BRI2.1050 | MEP Rough in | 2 | 2 | 15-Dec-22 | 20-Dec-22 |
| BRI2.1030 | Scaffold Bridge | 2 | 2 | 03-Jan-23* | 05-Jan-23 |
| BRI2.1070 | Glass Railing & Base Shoe | 8 | 8 | 05-Jan-23 | 19-Jan-23 |
| BRI2.1060 | Lath & Plaster | 16 | 16 | 05-Jan-23 | 02-Feb-23 |
| BRI2.1080 | Stainless Coping & Flashings | 4 | 4 | 02-Feb-23 | 09-Feb-23 |
| BRI2.1090 | Scaffold Remove | 4 | 4 | 02-Feb-23 | 09-Feb-23 |
| BRI2.1100 | Bridge Pavers | 4 | 4 | 09-Feb-23 | 16-Feb-23 |
| BRI2.1110 | Bridge Tile | 4 | 4 | 16-Feb-23 | 23-Feb-23 |

Legend: Remaining Level of Effort · Actual Level of Effort · Remaining Work · Planned Level of Effort · Actual Work · Critical Remaining...

Page 3 of 10

TASK filter: All Activities

© Oracle Corporation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| Activity ID | Activity Name | Orig Dur | ining ition | Start | Finish |
|---|---|---|---|---|---|
| BRI2.1120 | Bridge Lighting | 4 | 4 | 21-Feb-23 | 02-Mar-23 |
| **Concourse East Lower Level** | | 129 | 129 | 23-Nov-22 | 13-Jul-23 |
| CELL.1020 | Demo Ramp Soffit | 6 | 6 | 23-Nov-22 | 06-Dec-22 |
| CELL.1030 | Frame Ramp Soffit | 3 | 3 | 06-Dec-22 | 12-Dec-22 |
| CELL.1040 | MEPF Ramp Soffit | 2 | 2 | 12-Dec-22 | 14-Dec-22 |
| CELL.1050 | Lath & Plaster Plaster Ramp Soffit | 16 | 16 | 14-Dec-22 | 16-Jan-23 |
| CELL.1140 | Temp Condition Hardscapes | 4 | 4 | 27-Feb-23 | 06-Mar-23 |
| CELL.1060 | Demo Hardscape for Civil Improvements | 8 | 8 | 06-Mar-23 | 20-Mar-23 |
| CELL.1100 | Renovate Water Feature | 16 | 16 | 06-Mar-23 | 03-Apr-23 |
| CELL.1070 | Civil Improvements | 12 | 12 | 20-Mar-23 | 10-Apr-23 |
| CELL.1150 | SD to Escalator | 4 | 4 | 10-Apr-23 | 17-Apr-23 |
| CELL.1160 | Electrical To Escalator | 4 | 4 | 10-Apr-23 | 17-Apr-23 |
| CELL.1080 | Hardscapes | 20 | 20 | 10-Apr-23 | 15-May-23 |
| CELL.1090 | Landscaping | 16 | 16 | 15-May-23 | 13-Jun-23 |
| CELL.1110 | MEP Trims | 4 | 4 | 13-Jun-23 | 20-Jun-23 |
| CELL.1120 | Final Clean | 4 | 4 | 20-Jun-23 | 27-Jun-23 |
| CELL.1130 | Remove Barricades | 3 | 3 | 27-Jun-23 | 03-Jul-23 |
| BLE1120 | New Escalator/Canopy Footings | 6 | 6 | 03-Jul-23 | 13-Jul-23 |
| **Concourse East Upper Level** | | 60 | 60 | 07-Nov-22 | 23-Feb-23 |
| CEUL.1000 | Temp Barricades | 3 | 3 | 07-Nov-22 | 10-Nov-22 |
| CEUL.1010 | Demo Piers | 8 | 8 | 10-Nov-22 | 28-Nov-22 |
| CEUL.1020 | Demo (E) Canopy & Shade Structures | 8 | 8 | 28-Nov-22 | 12-Dec-22 |
| CEUL.1030 | Strucural Steel (HSS) Install (Canopy) | 10 | 10 | 12-Dec-22 | 28-Dec-22 |
| CEUL.1040 | Frame Parepet & Piers | 5 | 5 | 28-Dec-22 | 09-Jan-23 |
| CEUL.1050 | Waterproof Parapet & Piers | 4 | 4 | 09-Jan-23 | 16-Jan-23 |
| CEUL.1060 | Paving at Parapet & Piers | 5 | 5 | 16-Jan-23 | 24-Jan-23 |
| CEUL.1070 | Decorative Metal at Shade Structures | 10 | 10 | 24-Jan-23 | 09-Feb-23 |
| CEUL.1080 | Decorative Metal Parapets | 8 | 8 | 09-Feb-23 | 23-Feb-23 |
| **Bloomingdale's Escalator** | | 70 | 70 | 29-Jun-23 | 02-Nov-23 |
| BLE1000 | Temporary Conditions | 1 | 1 | 29-Jun-23 | 03-Jul-23 |
| BLE1010 | Decommission and Demo Bloomingdale's Escalator | 16 | 16 | 03-Jul-23 | 01-Aug-23 |
| BLE1040 | Install New Escalator Assembly | 16 | 16 | 01-Aug-23 | 29-Aug-23 |
| BLE1050 | Framing/Drywall at Escalator and Hardlid | 8 | 8 | 29-Aug-23 | 13-Sep-23 |
| BLE1060 | Escalator Canopy Steel | 8 | 8 | 13-Sep-23 | 27-Sep-23 |
| BLE1130 | Canopy SD to Grade | 4 | 4 | 27-Sep-23 | 04-Oct-23 |
| BLE1070 | Escalator Canopy Glazing | 8 | 8 | 27-Sep-23 | 11-Oct-23 |
| BLE1080 | Finishes | 6 | 6 | 11-Oct-23 | 23-Oct-23 |
| BLE1090 | MEP Trims | 4 | 4 | 23-Oct-23 | 30-Oct-23 |
| BLE1100 | Final Clean | 2 | 2 | 30-Oct-23 | 01-Nov-23 |
| BLE1110 | Remove Barricades | 2 | 2 | 31-Oct-23 | 17-Jul-23 |
| **PERFORMANCE COURT Phase 4** | | 183 | 183 | 24-Oct-22 | 17-Jul-23 |
| **Bridge 3 (Center)** | | 52 | 52 | 23-Nov-22 | 27-Feb-23 |
| BRI3.1010 | MEP Safe off | 2 | 2 | 23-Nov-22 | 28-Nov-22 |
| BRI3.1020 | Demo Bridge | 8 | 8 | 23-Nov-22 | 05-Dec-22 |
| BRI3.1030 | Structural Steel Upgrade | 8 | 8 | 05-Dec-22 | 22-Dec-22 |
| BRI3.1050 | Framing | 8 | 8 | 22-Dec-22 | 10-Jan-23 |

FVM - Renovation Phase 3, 4, 5 - 10/11/2022          SD TEMPLATE - ARE          12-Oct-22 03:17

Legend: Remaining Level of Effort / Actual Level of Effort / Remaining Work / Planned Level of Effort / Actual Work / Critical Remaining...

Page 4 of 10          TASK filter: All Activities          © Oracle Corporation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| FVM - Renovation Phase 3, 4, 5 - 10/11/2022 | | | | SD TEMPLATE - ARE | 12-Oct-22 03:17 |
|---|---|---|---|---|---|

| Activity ID | Activity Name | Orig Dur | Rem Dur | Start | Finish |
|---|---|---|---|---|---|
| BRI3.1060 | MEP Rough in | 2 | 2 | 10-Jan-23 | 12-Jan-23 |
| BRI3.1080 | Glass Railing & Base Shoe | 2 | 2 | 10-Jan-23 | 12-Jan-23 |
| BRI3.1040 | Scaffold Bridge | 3 | 3 | 10-Jan-23 | 16-Jan-23 |
| BRI3.1090 | Planter Sheathing | 3 | 3 | 10-Jan-23 | 16-Jan-23 |
| BRI3.1070 | Lath & Plaster | 12 | 12 | 18-Jan-23 | 06-Feb-23 |
| BRI3.1100 | Fiberglass Liner Field Measure & Procure | 12 | 12 | 18-Jan-23 | 06-Feb-23 |
| BRI3.1130 | Planter Waterproofing | 2 | 2 | 06-Feb-23 | 07-Feb-23 |
| BRI3.1110 | Stainless Coping & Flashings | 3 | 3 | 06-Feb-23 | 07-Feb-23 |
| BRI3.1120 | Scaffold Remove | 4 | 4 | 06-Feb-23 | 13-Feb-23 |
| BRI3.1150 | Planter Landscape | 5 | 5 | 07-Feb-23 | 15-Feb-23 |
| BRI3.1140 | Bridge Pavers | 4 | 4 | 09-Feb-23 | 16-Feb-23 |
| BRI3.1160 | Bridge Tile | 4 | 4 | 16-Feb-23 | 23-Feb-23 |
| BRI3.1170 | Bridge Lighting | 2 | 2 | 23-Feb-23 | 27-Feb-23 |
| **Bridge 4 (Lotus Vuitton)** | | | | 24-Oct-22 | 14-Mar-23 |
| BRI3.1180 | Owner relocate Vender Carts 8' | 0 | 0 | | 24-Oct-22 |
| BRI4.1180 | Remove Trees | 3 | 3 | 26-Oct-22 | 28-Oct-22 |
| BRI4.1010 | MEP Safe off | 2 | 2 | 23-Nov-22 | 29-Nov-22 |
| BRI4.1020 | Demo Bridge | 8 | 8 | 08-Dec-22 | 22-Dec-22 |
| BRI4.1030 | Structural Steel | 8 | 8 | 22-Dec-22 | 12-Jan-23 |
| BRI4.1050 | Framing | 8 | 8 | 10-Jan-23 | 20-Jan-23 |
| BRI4.1060 | MEP Rough in | 3 | 3 | 24-Jan-23 | 30-Jan-23 |
| BRI4.1040 | Scaffold Bridge | 3 | 3 | 24-Jan-23 | 30-Jan-23 |
| BRI4.1090 | Planter Sheathing | 3 | 3 | 24-Jan-23 | 30-Jan-23 |
| BRI4.1080 | Glass Railing & Base Shoe | 4 | 4 | 24-Jan-23 | 31-Jan-23 |
| BRI4.1070 | Lath & Plaster | 12 | 12 | 30-Jan-23 | 20-Feb-23 |
| BRI4.1100 | Fiberglass Liner Field Measure & Procure | 12 | 12 | 30-Jan-23 | 20-Feb-23 |
| BRI4.1130 | Planter Waterproofing | 3 | 3 | 20-Feb-23 | 23-Feb-23 |
| BRI4.1110 | Stainless Coping & Flashings | 4 | 4 | 20-Feb-23 | 27-Feb-23 |
| BRI4.1120 | Scaffold Remove | 4 | 4 | 20-Feb-23 | 27-Feb-23 |
| BRI4.1140 | Bridge Pavers | 4 | 4 | 27-Feb-23 | 06-Mar-23 |
| BRI4.1150 | Planter Landscape | 5 | 5 | 23-Feb-23 | 06-Mar-23 |
| BRI4.1160 | Bridge Tile | 4 | 4 | 06-Mar-23 | 13-Mar-23 |
| BRI4.1170 | Bridge Lighting | 2 | 2 | 13-Mar-23 | 14-Mar-23 |
| **Bridge 5 (Reduced Scope)** | | | | 15-Dec-22 | 13-Mar-23 |
| BRI5.1130 | Remove Trees | 4 | 4 | 15-Dec-22 | 20-Dec-22 |
| BRI5.1020 | MEP Safe off | 2 | 2 | 22-Dec-22 | 27-Dec-22 |
| BRI5.1010 | Demo Bridges | 8 | 8 | 22-Dec-22 | 10-Jan-23 |
| BRI5.1040 | Framing | 8 | 8 | 10-Jan-23 | 24-Jan-23 |
| BRI5.1050 | MEP Rough in | 2 | 2 | 24-Jan-23 | 26-Jan-23 |
| BRI5.1070 | Glass Railing & Base Shoe | 2 | 2 | 24-Jan-23 | 26-Jan-23 |
| BRI5.1030 | Scaffold Bridge | 3 | 3 | 24-Jan-23 | 30-Jan-23 |
| BRI5.1060 | Lath & Plaster | 16 | 16 | 30-Jan-23 | 27-Feb-23 |
| BRI5.1080 | Stainless Coping & Flashings | 4 | 4 | 27-Feb-23 | 06-Mar-23 |
| BRI5.1090 | Scaffold Remove | 4 | 4 | 27-Feb-23 | 06-Mar-23 |
| BRI5.1100 | Bridge Pavers | 4 | 4 | 06-Mar-23 | 13-Mar-23 |
| BRI5.1110 | Bridge Tile | 4 | 4 | | |

Legend: Remaining Level of Effort, Actual Level of Effort, Remaining Work, Planned Level of Effort, Actual Work, Critical Remaining

| Page 5 of 10 | TASK filter: All Activities | © Oracle Corporation |
|---|---|---|

DocuSign Envelope ID: 1738A269-C665-466F-A93C-574C6FE7D5A3

| Activity ID | Activity Name | Orig Dur | ining tion | Start | Finish |
|---|---|---|---|---|---|
| | FVM - Renovation Phase 3, 4, 5 - 10/11/2022 | | | SD TEMPLATE - ARE | 12-Oct-22 03:17 |
| BRI5.1120 | Bridge Lighting | 2 | 2 | 20-Mar-23 | 21-Mar-23 |
| **Performance Court Lower Level** | | 105 | 105 | 10-Jan-23 | 17-Jul-23 |
| PCL.1020 | Demo Ramp Soffits | 6 | 6 | 10-Jan-23 | 19-Jan-23 |
| PCL.1030 | Framing Soffits | 5 | 5 | 19-Jan-23 | 30-Jan-23 |
| PCL.1040 | MEP Soffits | 2 | 2 | 30-Jan-23 | 31-Jan-23 |
| PCL.1050 | Lath & Plaster Soffits | 12 | 12 | 31-Jan-23 | 21-Feb-23 |
| PCL.1140 | Temp Conditions Hardscape | 2 | 2 | 06-Mar-23 | 08-Mar-23 |
| PCL.1060 | Demo Hardscape | 8 | 8 | 08-Mar-23 | 22-Mar-23 |
| PCL.1070 | Civil Improvements | 16 | 16 | 22-Mar-23 | 19-Apr-23 |
| PCL.1080 | Hardscapes | 24 | 24 | 19-Apr-23 | 01-Jun-23 |
| PCL.1090 | Landscaping | 12 | 12 | 01-Jun-23 | 22-Jun-23 |
| PCL.1110 | MEP Trims | 4 | 4 | 22-Jun-23 | 29-Jun-23 |
| PCL.1120 | Final Clean | 4 | 4 | 29-Jun-23 | 10-Jul-23 |
| PCL.1130 | Remove Barricades | 4 | 4 | 10-Jul-23 | 17-Jul-23 |
| **Performance Court Upper Level** | | 53 | 53 | 22-Dec-22 | 28-Mar-23 |
| PCUL.1000 | Temp Barricades | 2 | 2 | 22-Dec-22 | 27-Dec-22 |
| PCUL.1010 | Demo Piers | 5 | 5 | 27-Dec-22 | 04-Jan-23 |
| PCUL.1020 | Demo (E) Canop & Shade Structures | 5 | 5 | 05-Jan-23 | 16-Jan-23 |
| PCUL.1030 | Strucrual Steel (HSS) Install (Canopy) | 10 | 10 | 16-Jan-23 | 31-Jan-23 |
| PCUL.1040 | Frame Parapet & Piers | 5 | 5 | 01-Feb-23 | 08-Feb-23 |
| PCUL.1050 | Waterproof of Parapet & Piers | 4 | 4 | 08-Feb-23 | 15-Feb-23 |
| PCUL.1060 | Paving at Parapet & Piers | 5 | 5 | 15-Feb-23 | 23-Feb-23 |
| PCUL.1070 | Decorative Metal at Shade Structures | 10 | 10 | 23-Feb-23 | 14-Mar-23 |
| PCUL.1080 | Decorative Metal Parapets | 8 | 8 | 14-Mar-23 | 28-Mar-23 |
| **Mesa Park Escalator** | | 48 | 48 | 05-Apr-23 | 29-Jun-23 |
| MPE1000 | Temporary Conditions | 1 | 1 | 05-Apr-23 | 05-Apr-23 |
| MPE1010 | Decommission and Demo Mesa Park Escalator | 12 | 12 | 06-Apr-23 | 24-Apr-23 |
| MPE1090 | Install new Elevator Pit | 16 | 16 | 06-Apr-23 | 03-May-23 |
| MPE1030 | Install New Escalators | 12 | 12 | 04-May-23 | 24-May-23 |
| MPE1040 | Framing/Drywall at Escalator and Hardlid | 8 | 8 | 25-May-23 | 08-Jun-23 |
| MPE1050 | Finishes | 4 | 4 | 12-Jun-23 | 15-Jun-23 |
| MPE1060 | MEP Trims | 4 | 4 | 19-Jun-23 | 22-Jun-23 |
| MPE1070 | Final Clean | 2 | 2 | 26-Jun-23 | 27-Jun-23 |
| MPE1080 | Remove Barricades | 2 | 2 | 27-Jun-23 | 29-Jun-23 |
| **MACY'S COURT Phase 4** | | 170 | 170 | 03-Jan-23 | 29-Aug-23 |
| **Facade Structures** | | 25 | 25 | 03-Jan-23 | 15-Feb-23 |
| MCF.1000 | Demo East Facade Structure | 15 | 15 | 03-Jan-23 | 30-Jan-23 |
| MCF.1010 | Demo West Facade Structure | 15 | 15 | 19-Jan-23 | 15-Feb-23 |
| **Bridge 6 (Full Scope)** | | 90 | 90 | 29-Dec-22 | 08-May-23 |
| BRI6.1200 | Owner Relocate Carts | 0 | 0 | 29-Dec-22 | |
| BRI6.1190 | Remove Planter & Trees | 5 | 5 | 29-Dec-22 | 05-Jan-23 |
| BRI6.1020 | MEP Safe off | 2 | 2 | 10-Jan-23 | 11-Jan-23 |
| BRI6.1010 | Demo Bridge | 10 | 10 | 10-Jan-23 | 24-Jan-23 |
| BRI6.1030 | Structural Steel | 10 | 10 | 26-Jan-23 | 14-Feb-23 |
| BRI6.1040 | Scaffold Bridge | 2 | 2 | 14-Feb-23 | 15-Feb-23 |
| BRI6.1050 | Framing | 8 | 8 | 16-Feb-23 | 02-Mar-23 |

Remaining Level of Effort — Actual Level of Effort — Remaining Work
Planned Level of Effort — Actual Work — Critical Remaining...

© Oracle Corporation

NOTICE OF REMOVAL EXHIBIT 1   p. 92

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| FVM - Renovation Phase 3, 4, 5 - 10/11/2022 | | | | | SD TEMPLATE - ARE | | | | | | | | | | | | | | 12-Oct-22 03:17 |

| Activity ID | Activity Name | Orig Dur | Rem Dur | Start | Finish |
|---|---|---|---|---|---|
| BRI6.1060 | Planter Sheathing | 4 | 4 | 02-Mar-23 | 09-Mar-23 |
| BRI6.1090 | Planter Waterproof | 3 | 3 | 09-Mar-23 | 15-Mar-23 |
| BRI6.1080 | MEP Rough in | 3 | 3 | 09-Mar-23 | 15-Mar-23 |
| BRI6.1110 | MEP Trim | 2 | 2 | 15-Mar-23 | 20-Mar-23 |
| BRI6.1070 | Lath & Plaster | 12 | 12 | 02-Mar-23 | 20-Mar-23 |
| BRI6.1120 | Glass Railing & Base Shoe | 4 | 4 | 20-Mar-23 | 27-Mar-23 |
| BRI6.1130 | Scaffold Remove | 4 | 4 | 23-Mar-23 | 30-Mar-23 |
| BRI6.1100 | Planter FiberGlass Liner | 12 | 12 | 09-Mar-23 | 30-Mar-23 |
| BRI6.1140 | Stainless Coping & Flashings | 4 | 4 | 27-Mar-23 | 03-Apr-23 |
| BRI6.1150 | Planter fill & Irrigation | 8 | 8 | 03-Apr-23 | 17-Apr-23 |
| BRI6.1160 | Bridge Pavers | 4 | 4 | 17-Apr-23 | 24-Apr-23 |
| BRI6.1170 | Bridge Tile | 4 | 4 | 24-Apr-23 | 01-May-23 |
| BRI6.1180 | Bridge Lighting | 4 | 4 | 01-May-23 | 08-May-23 |
| **Bridge 7 (Full Scope)** | | **118** | **118** | **06-Jan-23** | **13-Jun-23** |
| BRI7.1190 | Remove Planter & Trees | 5 | 5 | 06-Jan-23 | 12-Jan-23 |
| BRI7.1010 | MEP Safe off | 2 | 2 | 26-Jan-23 | 30-Jan-23 |
| BRI7.1020 | Demo Bridge | 10 | 10 | 26-Jan-23 | 14-Feb-23 |
| BRI7.1030 | Structural Steel | 10 | 10 | 14-Feb-23 | 02-Mar-23 |
| BRI7.1040 | Scaffold Bridge | 3 | 3 | 02-Mar-23 | 08-Mar-23 |
| BRI7.1050 | Framing | 8 | 8 | 08-Mar-23 | 22-Mar-23 |
| BRI7.1060 | Planter Sheathing | 3 | 3 | 22-Mar-23 | 28-Mar-23 |
| BRI7.1080 | MEP Rough in | 3 | 3 | 28-Mar-23 | 03-Apr-23 |
| BRI7.1070 | Lath & Plaster | 12 | 12 | 22-Mar-23 | 12-Apr-23 |
| BRI7.1100 | Scaffold Remove | 3 | 3 | 12-Apr-23 | 18-Apr-23 |
| BRI7.1090 | Planter Fiberglass Liner | 12 | 12 | 28-Mar-23 | 18-Apr-23 |
| BRI7.1110 | Planter Waterproof | 3 | 3 | 18-Apr-23 | 24-Apr-23 |
| BRI7.1120 | MEP Trim | 2 | 2 | 24-Apr-23 | 25-Apr-23 |
| BRI7.1130 | Glass Railing & Base Shoe | 5 | 5 | 25-Apr-23 | 03-May-23 |
| BRI7.1140 | Stainless Coping & Flashings | 3 | 3 | 03-May-23 | 09-May-23 |
| BRI7.1150 | Planter fill & Irrigation | 8 | 8 | 09-May-23 | 23-May-23 |
| BRI7.1160 | Bridge Pavers | 4 | 4 | 23-May-23 | 31-May-23 |
| BRI7.1170 | Bridge Tile | 4 | 4 | 31-May-23 | 07-Jun-23 |
| BRI7.1180 | Bridge Lighting | 3 | 3 | 07-Jun-23 | 13-Jun-23 |
| **Macy's Court Lower Level** | | **118** | **118** | **14-Feb-23** | **22-Aug-23** |
| MCLL.1000 | Demo Ramp Soffits | 5 | 5 | 14-Feb-23 | 22-Feb-23 |
| MCLL.1010 | Framing Soffits | 6 | 6 | 22-Feb-23 | 06-Mar-23 |
| MCLL.1020 | MEP Soffits | 2 | 2 | 06-Mar-23 | 08-Mar-23 |
| MCLL.1030 | Lath & Plaster Soffits | 12 | 12 | 08-Mar-23 | 29-Mar-23 |
| MCLL.1040 | Temp Conditions Hardscape | 3 | 3 | 29-Mar-23 | 04-Apr-23 |
| MCLL.1050 | Demo Hardscape for Civil Improvements | 8 | 8 | 04-Apr-23 | 18-Apr-23 |
| MCLL.1060 | Civil Improvements | 10 | 10 | 18-Apr-23 | 04-May-23 |
| MCLL.1090 | Renovate Water Feature | 20 | 20 | 04-May-23 | 12-Jun-23 |
| MCLL.1070 | Hardscapes | 20 | 20 | 12-Jun-23 | 18-Jul-23 |
| MCLL.1080 | Landscaping | 12 | 12 | 18-Jul-23 | 08-Aug-23 |
| MCLL.1100 | MEP Trims | 4 | 4 | 08-Aug-23 | 15-Aug-23 |
| MCLL.1110 | Final Clean | 4 | 4 | 15-Aug-23 | 22-Aug-23 |

| Remaining Level of Effort | Actual Level of Effort | Remaining Work | Page 7 of 10 | TASK filter: All Activities |
| Planned Level of Effort | Actual Work | Critical Remaining... | | © Oracle Corporation |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D5A3

| | | | | SD TEMPLATE - ARE | | 12-Oct-22 03:17 |

FVM - Renovation Phase 3, 4, 5 - 10/11/2022

| Activity ID | Activity Name | Orig/ining Dur | Rem/ition | Start | Finish |
|---|---|---|---|---|---|
| MCUL1120 | Remove Barricades | 4 | 4 | 22-Aug-23 | 29-Aug-23 |
| **Macy's Court Upper Level** | | **62** | **62** | **14-Feb-23** | **05-Sep-23** |
| MCUL1000 | Temp Barricades | 2 | 2 | 14-Feb-23 | 15-Feb-23 |
| MCUL1010 | Demo Piers | 5 | 5 | 15-Feb-23 | 23-Feb-23 |
| MCUL1020 | Demo (E) Canop & Shade Structures | 10 | 10 | 23-Feb-23 | 14-Mar-23 |
| MCUL1030 | Strucural Steel (HSS) Install (Canopy) | 10 | 10 | 14-Mar-23 | 30-Mar-23 |
| MCUL1040 | Frame Parapet & Piers | 6 | 6 | 30-Mar-23 | 11-Apr-23 |
| MCUL1050 | Waterproof of Parapet & Piers | 6 | 6 | 11-Apr-23 | 20-Apr-23 |
| MCUL1060 | Paving at Parapet & Piers | 6 | 6 | 20-Apr-23 | 02-May-23 |
| MCUL1070 | Decorative Metal at Shade Structures | 10 | 10 | 02-May-23 | 18-May-23 |
| MCUL1080 | Decorative Metal Parapets | 8 | 8 | 18-May-23 | 05-Jun-23 |
| **Macy's Escalator** | | **37** | **37** | **25-May-23** | **01-Aug-23** |
| MCE1000 | Temporary Conditions | 1 | 1 | 25-May-23 | 25-May-23 |
| MCE1010 | Demo Escalator Finishes & Canopy Structure | 4 | 4 | 30-May-23 | 05-Jun-23 |
| MCE1040 | Framing/Drywall at Escalator and Hardlid | 8 | 8 | 12-Jun-23 | 26-Jun-23 |
| MCE1050 | Escalator Canopy Steel | 6 | 6 | 26-Jun-23 | 06-Jul-23 |
| MCE1060 | Escalator Canopy Glazing | 3 | 3 | 06-Jul-23 | 13-Jul-23 |
| MCE1070 | Finishes | 4 | 4 | 13-Jul-23 | 20-Jul-23 |
| MCE1080 | MEP Trims | 3 | 3 | 20-Jul-23 | 26-Jul-23 |
| MCE1090 | Final Clean | 2 | 2 | 26-Jul-23 | 27-Jul-23 |
| MCE1100 | Remove Barricades | 2 | 2 | 27-Jul-23 | 01-Aug-23 |
| **CONCOURSE WEST Phase 4** | | **212** | **212** | **03-Jan-23** | **01-Nov-23** |
| **Facade Structure** | | **41** | **41** | **03-Jan-23** | **28-Feb-23** |
| CWFS.1020 | Start at New Year Per SPG Direction | 0 | 0 | 03-Jan-23 | |
| BRI6.1210 | Owner Relocate Carts Concourse West | 0 | 0 | 03-Jan-23 | |
| BRI9.1160 | Remove Trees | 3 | 3 | 03-Jan-23 | 05-Jan-23 |
| CWFS.1010 | Demo Large Facade Structure ( soft demo only) | 30 | 30 | 09-Jan-23 | 28-Feb-23 |
| **Bridge 8 (Reduced Scope)** | | **55** | **55** | **14-Feb-23** | **02-May-23** |
| BRI8.1010 | MEP Safe off | 2 | 2 | 14-Feb-23 | 15-Feb-23 |
| BRI8.1130 | Remove Trees | 3 | 3 | 14-Feb-23 | 28-Feb-23 |
| BRI8.1020 | Demo Bridge | 8 | 8 | 14-Feb-23 | 28-Feb-23 |
| BRI8.1040 | Framing | 8 | 8 | 28-Feb-23 | 14-Mar-23 |
| BRI8.1050 | MEP Rough in | 2 | 2 | 14-Mar-23 | 16-Mar-23 |
| BRI8.1030 | Scaffold Bridge | 3 | 3 | 14-Mar-23 | 20-Mar-23 |
| BRI8.1070 | Glass Railing & Base Shoe | 4 | 4 | 16-Mar-23 | 21-Mar-23 |
| BRI8.1060 | Lath & Plaster | 12 | 12 | 20-Mar-23 | 10-Apr-23 |
| BRI8.1090 | Scaffold Remove | 3 | 3 | 10-Apr-23 | 13-Apr-23 |
| BRI8.1080 | Stainless Coping & Flashings | 4 | 4 | 10-Apr-23 | 17-Apr-23 |
| BRI8.1100 | Bridge Pavers | 4 | 4 | 17-Apr-23 | 24-Apr-23 |
| BRI8.1110 | Bridge Tile | 4 | 4 | 24-Apr-23 | 01-May-23 |
| BRI8.1120 | Bridge Lighting | 2 | 2 | 01-May-23 | 02-May-23 |
| **Bridge 9 (Full Scope)** | | **62** | **62** | **28-Feb-23** | **25-May-23** |
| BRI9.1010 | MEP Safe off | 2 | 2 | 28-Feb-23 | 01-Mar-23 |
| BRI9.1020 | Demo Bridge | 8 | 8 | 01-Mar-23 | 15-Mar-23 |
| BRI9.1030 | Structural Steel Upgrade | 6 | 6 | 15-Mar-23 | 27-Mar-23 |
| BRI9.1050 | Framing | 8 | 8 | 27-Mar-23 | 10-Apr-23 |

Legend: Remaining Level of Effort | Actual Level of Effort | Remaining Work | Planned Level of Effort | Actual Work | Critical Remaining …

Page 8 of 10

TASK filter: All Activities

© Oracle Corporation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| Activity ID | Activity Name | Original Duration | Start | Finish |
|---|---|---|---|---|
| BRI9.1060 | MEP Rough in | 2 | 2 | 10-Apr-23 | 13-Apr-23 |
| BRI9.1040 | Scaffold Bridge | 3 | 3 | 10-Apr-23 | 13-Apr-23 |
| BRI9.1080 | Glass Railing & Base Shoe | 4 | 4 | 10-Apr-23 | 17-Apr-23 |
| BRI9.1090 | Planter Sheathing | 5 | 5 | 10-Apr-23 | 18-Apr-23 |
| BRI9.1070 | Lath & Plaster | 12 | 12 | 18-Apr-23 | 04-May-23 |
| BRI9.1100 | Planter Fiberglass Liner | 12 | 12 | 18-Apr-23 | 09-May-23 |
| BRI9.1120 | Scaffold Remove | 5 | 5 | 04-May-23 | 15-May-23 |
| BRI9.1110 | Stainless Coping & Flashings | 6 | 6 | 04-May-23 | 16-May-23 |
| BRI9.1130 | Bridge Pavers | 5 | 5 | 16-May-23 | 24-May-23 |
| BRI9.1140 | Bridge Tile | 5 | 5 | 24-May-23 | 05-Jun-23 |
| BRI9.1150 | Bridge Lighting | 10 | 10 | 05-Jun-23 | 21-Jun-23 |
| **Concourse West Lower Level** | | **143** | **143** | **15-May-23** | **01-Nov-23** |
| CWLL.1040 | Temp Conditions Hardscape | 2 | 2 | 15-May-23 | 18-May-23 |
| CWLL.1050 | Demo Hardscape for Civil Improvements | 10 | 10 | 16-May-23 | 07-Jun-23 |
| CWLL.1060 | Civil Improvements | 12 | 12 | 07-Jun-23 | 28-Jun-23 |
| CWLL.1070 | Hardscapes | 20 | 20 | 28-Jun-23 | 03-Aug-23 |
| CWLL.1080 | Landscape | 20 | 20 | 03-Aug-23 | 11-Sep-23 |
| CWLL.1100 | MEP Trims | 10 | 10 | 11-Sep-23 | 27-Sep-23 |
| CWLL.1110 | Final Clean | 10 | 10 | 27-Sep-23 | 16-Oct-23 |
| CWLL.1120 | Remove Barricades | 10 | 10 | 16-Oct-23 | 01-Nov-23 |
| **Concourse West Upper Level** | | **53** | **53** | **15-Mar-23** | **19-Jun-23** |
| CWUL.1000 | Temp Barricades | 2 | 2 | 15-Mar-23 | 20-Mar-23 |
| CWUL.1010 | Demo Piers | 5 | 5 | 20-Mar-23 | 28-Mar-23 |
| CWUL.1020 | Demo (E) Canop & Shade Structures | 5 | 5 | 28-Mar-23 | 04-Apr-23 |
| CWUL.1030 | Strucrual Steel (HSS) Install (Canopy) | 10 | 10 | 04-Apr-23 | 20-Apr-23 |
| CWUL.1040 | Frame Parapet & Piers | 5 | 5 | 20-Apr-23 | 01-May-23 |
| CWUL.1050 | Waterproof Parapet & Piers | 4 | 4 | 01-May-23 | 08-May-23 |
| CWUL.1060 | Paving at Parapet & Piers | 5 | 5 | 08-May-23 | 16-May-23 |
| CWUL.1070 | Decorative Metal at Shade Structures | 10 | 10 | 16-May-23 | 05-Jun-23 |
| CWUL.1080 | Decorative Metal Parapets | 8 | 8 | 05-Jun-23 | 19-Jun-23 |
| **NORDSTROM NORTH CORRIDOR Phase 4** | | **73** | **73** | **25-May-23** | **05-Oct-23** |
| NNC.1000 | Planter Infill & Civil Improvements | 20 | 20 | 18-Jul-23 | 22-Aug-23 |
| **Nordstrom Escalator** | | **123** | **123** | **25-May-23** | **05-Oct-23** |
| NCE.1000 | Temporary Conditions | 1 | 1 | 25-May-23 | 25-May-23 |
| NCE.1010 | Decommission and Demo Nordstrom Escalator | 16 | 16 | 30-May-23 | 21-Jun-23 |
| NCE.1090 | Install Footings | 6 | 6 | 27-Jun-23 | 10-Jul-23 |
| NCE.1020 | Install New Escalators | 16 | 16 | 10-Jul-23 | 07-Aug-23 |
| NCE.1030 | Framing/Drywall at Escalator and Hardlid | 8 | 8 | 07-Aug-23 | 21-Aug-23 |
| NCE.1080 | Hardscape | 8 | 8 | 07-Aug-23 | 21-Aug-23 |
| NCE.1040 | Finishes | 8 | 8 | 21-Aug-23 | 05-Sep-23 |
| NCE.1050 | MEP Trims | 8 | 8 | 05-Sep-23 | 19-Sep-23 |
| NCE.1060 | Final Clean | 5 | 5 | 19-Sep-23 | 27-Sep-23 |
| NCE.1070 | Remove Barricades | 5 | 5 | 27-Sep-23 | 05-Oct-23 |
| **BLANCO TACO RESTROOM RENOVATION Phase 4** | | **69** | **69** | **19-Jun-23** | **06-Jul-23** |
| FCRR.1000 | Demo | 10 | 10 | 19-Jun-23 | 03-Jul-23 |
| FCRR.1010 | Framing | 10 | 10 | 19-Jul-23 | 25-Jul-23 |

© Oracle Corporation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

FVM - Renovation Phase 3, 4, 5 - 10/11/2022    SD TEMPLATE - ARE    12-Oct-22 03:17

| Activity ID | Activity Name | Orig Dur | Rem Dur | Start | Finish |
|---|---|---|---|---|---|
| FCRR.1020 | MEP | 15 | 15 | 25-Jul-23 | 21-Aug-23 |
| FCRR.1030 | Tile | 10 | 10 | 21-Aug-23 | 07-Sep-23 |
| FCRR.1040 | Finishes | 10 | 10 | 07-Sep-23 | 26-Sep-23 |
| FCRR.1050 | Trim, Partitions & accessories | 10 | 10 | 26-Sep-23 | 12-Oct-23 |
| FCRR.1060 | Final Clean | 4 | 4 | 12-Oct-23 | 19-Oct-23 |
| **WETZELS KIOSK** | | 26 | 26 | 17-Oct-22 | 21-Nov-22 |
| A1000 | RFI Response | 0 | 0 | 17-Oct-22* | |
| A1010 | Electrical Rough In | 4 | 4 | 17-Oct-22 | 20-Oct-22 |
| A1011 | Plumbing Rough In | 4 | 4 | 21-Oct-22 | 26-Oct-22 |
| A1020 | Layout Footing Location | 1 | 1 | 27-Oct-22 | 27-Oct-22 |
| A1030 | Remove Pavers/Excavate Footings | 2 | 2 | 28-Oct-22 | 31-Oct-22 |
| A1040 | Form & Pour Footings | 5 | 5 | 01-Nov-22 | 07-Nov-22 |
| A1050 | Move Existing Kiosk | 3 | 3 | 08-Nov-22 | 10-Nov-22 |
| A1060 | Electrical Finishes | 3 | 3 | 11-Nov-22 | 15-Nov-22 |
| A1070 | Install Kiosk Canopy | 4 | 4 | 16-Nov-22 | 21-Nov-22 |
| **RED DOOR RESTROOM RENOVATION Phase 4** | | 69 | 69 | 15-Feb-23 | 19-Jun-23 |
| FCRR.1070 | Demo | 10 | 10 | 15-Feb-23 | 06-Mar-23 |
| FCRR.1080 | Framing | 10 | 10 | 06-Mar-23 | 22-Mar-23 |
| FCRR.1090 | MEP | 15 | 15 | 22-Mar-23 | 18-Apr-23 |
| FCRR.1100 | Tile | 10 | 10 | 18-Apr-23 | 04-May-23 |
| FCRR.1110 | Finishes | 10 | 10 | 04-May-23 | 23-May-23 |
| FCRR.1120 | Trim, Partitions & accessories | 10 | 10 | 23-May-23 | 12-Jun-23 |
| FCRR.1130 | Final Clean | 4 | 4 | 12-Jun-23 | 19-Jun-23 |
| **PERFORMANCE COURT NORTH CORRIDOR & VALET Phase 5** | | 19 | 19 | 17-Jul-23 | 17-Aug-23 |
| PCNC.1000 | Landscape Improvements - Alt #10 | 19 | 19 | 17-Jul-23 | 17-Aug-23 |
| **MESA PARK Phase 5** | | 120 | 120 | 12-Jan-23 | 03-Jul-23 |
| **FRIARS RD OFFSITE- Phase 5** | | 32 | 32 | 19-Jun-23 | 15-Aug-23 |
| FR1010 | Landscape | 32 | 32 | 19-Jun-23 | 15-Aug-23 |



Remaining Level of Effort   Actual Level of Effort   Remaining Work
Planned Level of Effort   Actual Work   Critical Remaining...

Page 10 of 10      TASK filter: All Activities      © Oracle Corporation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# EXHIBIT H

# Document Log

## Fashion Valley Mall Redevelopment
## Phase 4

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY** — A SIMON MALL

**WT** — Wallace Engineering

## PHASE 4 DOCUMENT LOG (RDC.)

| Sheet # | Sheet Title | City Submittal 11/15/19 | Addendum A 01/03/20 | Addendum B 01/13/20 | Addendum C 02/18/20 | Addendum D 03/16/20 | Addendum E 07/25/21 | Addendum F | Most Current Date | Most Current Set By |
|---|---|---|---|---|---|---|---|---|---|---|
| **GENERAL** | | | | | | | | | | |
| A0.00 | TITLE SHEET | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/20 | | 07/25/20 | Addendum E |
| A0.01 | PROJECT SHEET INDEX | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.05 | SYMBOLS, ABBREVIATIONS, MASTER KEYNOTE LEGEND, AND GENERAL NOTES | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.31 | EGRESS AND OCCUPANCY PLAN - LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.22 | EGRESS AND OCCUPANCY PLAN - LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.31 | LOWER LEVEL ACCESSIBILITY PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.32 | UPPER LEVEL ACCESSIBILITY PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.41 | ACCESSIBILITY DETAILS - GENERAL | 11/15/19 | | | | | | | 11/15/19 | City Submittal |
| A0.42 | ACCESSIBILITY DETAILS - INTERIOR | | | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.43 | ACCESSIBILITY DETAILS - SITE | 11/15/19 | | | | | | | 11/15/19 | City Submittal |
| A0.51 | OVERALL SITE PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum A |
| A0.53 | OVERALL SITE PLAN - FLOOD PLAIN | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| A0.54 | FIREPROOFING WALL PLAN - UPPER LEVEL | | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.55 | FIREPROOFING WALL PLAN - ROOF | | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| A0.56 | FIREPROOFING ENLARGED PLANS | | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| **CIVIL** | | | | | | | | | | |
| C1.0 | LOWER LEVEL EROSION AND SEDIMENT CONTROL PLAN 1 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C2.0 | LOWER LEVEL EROSION AND SEDIMENT CONTROL PLAN 2 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C3.0 | LOWER LEVEL SITE DETAILS | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.0 | LOWER LEVEL GENERAL NOTES | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.1 | LEVEL 1 SITE PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.2 | LEVEL 1 APPLICABILITY CHECKLIST | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.3 | LOWER LEVEL ALTA 1 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.4 | LOWER LEVEL ALTA 2 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C4.5 | LOWER LEVEL ALTA 3 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C5.0 | LEVEL 1 SITE IMPROVEMENTS 1 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C6.0 | LEVEL 1 SITE IMPROVEMENTS 2 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C7.0 | LEVEL 1 SITE IMPROVEMENTS 3 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C8.0 | LEVEL 1 SITE IMPROVEMENTS 4 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C9.0 | LEVEL 1 SITE IMPROVEMENTS 5 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C10.0 | LEVEL 1 SITE IMPROVEMENTS 6 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C11.0 | LEVEL 1 SITE IMPROVEMENTS 7 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C12.0 | LEVEL 1 SITE IMPROVEMENTS 8 | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/29/22 | | 07/29/22 | Addendum E |
| C12.0 | LEVEL 2 ADA GENERAL NOTES | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C13.0 | LEVEL 2 ADA SITE IMPROVEMENTS 1 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C14.0 | LEVEL 2 ADA SITE IMPROVEMENTS 2 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C15.0 | LEVEL 2 ADA SITE IMPROVEMENTS 3 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C16.0 | LEVEL 2 ADA SITE IMPROVEMENTS 4 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C17.0 | LEVEL 2 ADA SITE IMPROVEMENTS 5 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| C18.0 | LEVEL 2 ADA SITE IMPROVEMENTS 6 | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| **LANDSCAPE DEMO** | | | | | | | | | | |
| L0.00 | OVERALL TITLE SHEET & SHEET INDEX | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.01 | LANDSCAPE SCHEDULE AND NOTES | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.01 | LANDSCAPE DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.02 | LANDSCAPE DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.03 | PARTIAL DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.04 | LANDSCAPE DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.05 | LANDSCAPE DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.06 | LANDSCAPE DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.07 | PARTIAL DEMO PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.08 | FRIAR'S ROAD ENTRIES DEMO PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.09 | FRIAR'S ROAD ENTRIES DEMO PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.10 | LANDSCAPE DEMO DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.11 | LANDSCAPE DEMO DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.12 | FRIAR'S ROAD STREETSCAPE DEMO PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L0.20 | MESA PARK HARDSCAPE DEMO PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | | | | 02/18/20 | Addendum C |
| **LANDSCAPE** | | | | | | | | | | |
| L1.01 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.02 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.03 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.04 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.05 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.06 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.07 | PARTIAL SITE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.08 | FRIAR'S RD VIEWS & M.SIGN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L1.09 | FRIAR'S RD VIGNETTE VIEWS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| L1.10 | FRIAR'S RD VIGNETTE VIEWS | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| L2.01 | MESA PARK HARDSCAPE PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| L2.02 | MESA PARK FF&E LAYOUT PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| L2.03 | MESA PARK PLANTER LAYOUT PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| L3.01 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L3.02 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L3.03 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L3.04 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L3.05 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L3.06 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/23/22 | | 07/25/22 | Addendum E |
| L3.07 | PARTIAL LAYOUT PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/21 | | 07/25/21 | Addendum E |
| L4.00 | IRRIGATION LEGEND LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L4.01 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L4.02 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/23/22 | Addendum E |
| L4.03 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/23/22 | Addendum E |
| L4.04 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| L4.05 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY**
A SIMON MALL

**PHASE 4 DOCUMENT LOG (RDC.)**

WT
WITHEE • MALCOLM

| Sheet | Sheet Title | Issue Date 11/15/19 Drawing Date | CD Submittal 01/03/20 Drawing Date | Addendum A 01/13/20 Drawing Date | Addendum B 02/18/20 Drawing Date | Addendum C 03/16/20 Drawing Date | Addendum D 07/25/22 Drawing Date | Addendum E Drawing Date | Addendum F | Addendum J | Most Current Date | Most Current Set | MISCMISC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LA.06 | IRRIGATION PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.07 | FRIAR'S ROAD ENTRIES IRRIGATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.08 | FRIAR'S ROAD STREETSCAPE IRRIGATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.09 | FRIAR'S ROAD STREETSCAPE IRRIGATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.10 | FRIAR'S ROAD STREETSCAPE IRRIGATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.11 | FRIAR'S ROAD STREETSCAPE IRRIGATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.12 | IRRIGATION PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.13 | IRRIGATION PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.14 | IRRIGATION PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.15 | MESA PARK IRRIGATION PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.16 | IRRIGATION DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LA.17 | IRRIGATION DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LS.01 | HARDSCAPE DETAILS LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LS.02 | HARDSCAPE DETAILS LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LS.03 | SHADE ELEMENT DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LS.04 | MACY'S PLAZA FOUNDATN DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| LS.05 | TOT-LOT ENLARGED PLAN | 11/15/19 | 01/03/20 | | | | | | | | 01/03/20 | Addendum A | |
| LS.06 | HARDSCAPE DETAILS LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| LS.07 | MESA PARK HARDSCAPE DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| LS.08 | MESA PARK PLANTER DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| LS.09 | MESA PARK PLANTER DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| LG.00 | OVERALL TREE PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LG.01 | OVERALL TREE PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | | | | | | 01/03/20 | Addendum A | |
| LG.02 | PLANTING & TREE PRUNING NOTES | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LB.03 | PLANTING DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| LG.04 | OVERALL PLANTING SCHEDULE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.01 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.02 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.03 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.04 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.05 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.06 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.07 | LANDSCAPE PLANTING PLAN LEVEL 1 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.08 | FRIAR'S RD LANDSCAPE PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.09 | FRIAR'S RD LANDSCAPE PLANTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.10 | FRIAR'S ROAD STREETSCAPE PLANTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.11 | FRIAR'S ROAD STREETSCAPE PLANTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L7.12 | FRIAR'S ROAD STREETSCAPE PLANTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L8.01 | MESA PARK PLANTING PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| L8.02 | LEVEL 2 PLANTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L8.03 | MESA PARK PLANTING PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| L8.04 | PLANTING PLAN LEVEL 2 | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |

**ARCHITECTURAL DEMO**

| Sheet | Sheet Title | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AD1.10 | DEMOLITION LOWER LEVEL FLOOR PLAN | 11/15/19 | | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.11 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.12 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.13 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.14 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.15 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.16 | DEMOLITION PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 02/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.20 | DEMOLITION UPPER LEVEL FLOOR PLAN | 11/15/19 | | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.21 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.22 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.23 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.24 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.25 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.26 | DEMOLITION PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.30 | DEMOLITION ROOF PLAN | 11/15/19 | | | | | | | | | 11/15/19 | City Submittal | |
| AD1.31 | DEMOLITION PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.32 | DEMOLITION PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.33 | DEMOLITION PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.34 | DEMOLITION PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.35 | DEMOLITION PARTION ROOF PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD1.36 | DEMOLITION PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD2.15 | PARTIAL LOWER LEVEL RCP DEMO | | | | 02/18/22 | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.01 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.02 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.03 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.04 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.05 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.06 | DEMOLITION CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.11 | DEMOLITION MALL NE EXTERIOR ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.12 | DEMOLITION MALL NW EXTERIOR ELEVATIONS | 11/15/19 | | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.13 | DEMOLITION MALL SW EXTERIOR ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD3.14 | DEMOLITION MALL SE EXTERIOR ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.01 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |
| AD4.02 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.03 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.04 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.05 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.06 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.07 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | | | 07/25/22 | Addendum E | |
| AD4.08 | DEMOLITION SECTIONS | 11/15/19 | 01/03/20 | | | | | | | | 01/03/20 | Addendum A | |
| AD6.01 | DEMOLITION ENLARGED RESTROOM PLANS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | | 03/16/20 | Addendum D | |

Page 81 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

FASHION VALLEY — A SIMON MALL

**PHASE 4 DOCUMENT LOG (RDC.)**

WT Watkins Lechner

| Sheet # | Sheet Title | City Submittal 11/15/19 | Addendum A 01/03/20 | Addendum B 01/13/20 | Addendum C 02/18/20 | Addendum D 03/16/20 | 07/25/22 | Most Current Date | Most Current Set | MISSING |
|---|---|---|---|---|---|---|---|---|---|---|
| AD6.22 | DEMOLITION ENLARGED CAFÉ TERRACE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| AD6.23 | MESA PARK ESCALATORS | 11/15/19 | | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| AD6.21 | DETAILS - DEMOLITION | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| **ARCHITECTURAL** | | | | | | | | | | |
| A1.10 | LOWER LEVEL FLOOR PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A1.11 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A1.12 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.13 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.14 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.15 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.16 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A1.20 | UPPER LEVEL FLOOR PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A1.21 | PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.22 | PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.23 | PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.24 | PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.25 | PARTIAL PLAN UPPER LEVEL - MESA PARK | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.26 | PARTIAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.30 | OVERALL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.31 | PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.32 | PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.33 | PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.34 | PARTIAL ROOF PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A1.35 | PARTIAL ROOF PLAN - MESA PARK | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.36 | PARTIAL ROOF PLAN | 11/13/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A1.40 | DETAILS - RAILINGS TYPES | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.10 | LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.11 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.12 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.13 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.14 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A2.15 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.16 | PARTIAL LOWER LEVEL RCP | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.20 | UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A2.21 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A2.22 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.23 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A2.24 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A2.25 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A2.26 | PARTIAL UPPER LEVEL RCP | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A3.01 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.02 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.03 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A3.04 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A3.05 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.06 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A3.07 | CONCOURSE ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A3.08 | CONCOURSE ELEVATIONS | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.11 | NE EXTERIOR ELEVATIONS | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.12 | NW EXTERIOR ELEVATIONS | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.13 | SW EXTERIOR ELEVATIONS | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A3.14 | SE EXTERIOR ELEVATIONS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.01 | AMC TOWER ELEVATIONS | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A4.02 | ENLARGED ELEVATIONS AND SECTIONS - CAFE TERRACE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.11 | AMC TOWER SECTION AND PERSPECTIVES | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.12 | NORDSTROM/NIEMAN CONCOURSE SECTION AT CANOPY | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.13 | BRIDGE SECTION | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.14 | AMC TOWER ENLARGED SECTIONS | 11/15/19 | | 01/03/20 | | | 07/25/22 | 07/25/22 | Addendum E | |
| A4.15 | AMC ENLARGED TOWER SECTIONS | 11/15/19 | | 01/03/20 | | | 07/25/22 | 07/25/22 | Addendum E | |
| A4.21 | SECTIONS | 11/15/19 | | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.22 | SECTION AT NEW TENANT | 11/15/19 | 11/15/19 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A4.31 | RAILING TYPE 'A' | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.32 | RAILING TYPE 'B' | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A4.33 | RAILING TYPE 'C' | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A5.01 | MACY'S COURT ESCALATOR CANOPY | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A5.02 | BLOOMINGDALE COURT ESCALATOR CANOPY | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A5.03 | NORDSTROM/NIEMAN COURT ESCALATOR CANOPY | 11/15/19 | 01/03/20 | | | | 07/25/22 | 07/25/22 | Addendum E | |
| A5.04 | MESA PARK ESCALATOR FLOOR PLANS | | | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A5.05 | MESA PARK ESCALATOR CANOPY PLANS | | | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A5.30 | ESCALATORS MACY'S COURT SECTIONS | | | | | | | | City Submittal | MISSING |
| A5.31 | ESCALATORS MACY'S COURT PERSPECTIVES | | | | | | | | City Submittal | MISSING |
| A5.32 | ESCALATOR COVER - NORDSTROM | | | | | | | | City Submittal | MISSING |
| A5.34 | ELEVATOR PERSPECTIVES - MESA PARK | | | | | | | | City Submittal | MISSING |
| A6.01 | ENLARGED PLANS LOWER LEVEL | 11/15/19 | 01/03/20 | | | | | 01/03/20 | Addendum A | |
| A6.02 | ENLARGED PLANS LOWER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.03 | ENLARGED PLANS LOWER LEVEL | 11/15/19 | 01/03/20 | | | | | 01/03/20 | Addendum A | |
| A6.04 | ENLARGED PLANS LOWER LEVEL | 11/15/19 | 01/03/20 | | | | | 01/03/20 | Addendum A | |
| A6.11 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.12 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.13 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.14 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.15 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | 07/25/22 | Addendum E | |
| A6.16 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | | 03/16/20 | Addendum D | |
| A6.17 | ENLARGED PLANS UPPER LEVEL - MESA PARK | 11/15/19 | 01/03/20 | | 02/18/20 | | 07/25/22 | 07/25/22 | Addendum E | |

Page 82 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY** — A SIMON MALL

**WT** WALTMAN·SIMON

**PHASE 4 DOCUMENT LOG (RDC.)**

| Sheet # | Sheet Title | Issue Date / City Submittal 11/15/19 | Addendum A 01/03/20 | Addendum B 01/13/20 | Addendum C 02/18/20 | Addendum D 03/16/20 | Addendum 1 07/25/22 | Addendum | Most Current Date | Most Current Set | Missing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A6.18 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.19 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.20 | ENLARGED PLANS UPPER LEVEL | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.21 | ENLARGED ROOF PLAN - MESA PARK | 11/15/19 | 01/03/20 | | 02/18/20 | | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.31 | ENLARGED RESTROOM PLANS | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A6.32 | ENLARGED PLAN - CAFE TERRACE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.33 | ENLARGED ROOF PLAN - CAFE TERRACE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.41 | ENLARGED RESTROOM REFLECTED CEILING PLANS | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A6.42 | ENLARGED RCP - CAFE TERRACE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A6.51 | INTERIOR ELEVATIONS RESTROOMS | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A6.61 | ENLARGED RESTROOM FLOOR FINISH PLAN | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.00 | EXISTING SHADE STRUCTURE TYPE 'C' AND TYPE 'G' | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.01 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.02 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.03 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.04 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.05 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.06 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.07 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.08 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.09 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | | | | | | | | City Submittal | | MISSING |
| A7.10 | SHADE STRUCTURE TYPE 'A1' - MALL CONCOURSE | | | | | | | | City Submittal | | MISSING |
| A7.11 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.12 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.13 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.14 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.15 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.16 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.17 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.18 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.19 | SHADE STRUCTURE TYPE 'A2' - MALL CONCOURSE | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.19A | SHADE STRUCTURE TYPE 'A3' AND 'A4' - MALL CONCOURSE | | | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.21 | SHADE STRUCTURE TYPE 'B1' - MACY'S COURT | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.22 | SHADE STRUCTURE TYPE 'B2' - MACY'S COURT | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.31 | SHADE STRUCTURE TYPE 'E' - NORDSTROM COURT | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.41 | SHADE STRUCTURE 'F1' SECTION AND ENLARGED ROOF PLAN | 11/15/19 | | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.42 | SHADE STRUCTURE 'F2' SECTION AND ENLARGED ROOF PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.43 | SHADE STRUCTURE 'F3' SECTION AND ENLARGED ROOF PLAN | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A7.44 | SHADE STRUCTURE TYPE 'F' PERSPECTIVES - MESA PARK | 11/15/19 | | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.01 | DETAILS - GENERAL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.02 | DETAILS - GENERAL | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.03 | DETAILS - STAIRS | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.04 | DETAILS - RESTROOMS | | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A8.11 | DETAILS - CANOPIES | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.12 | DETAILS - LASER CUT METAL PANELS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A8.21 | DETAILS - CAFÉ TERRACE DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| A10.10 | LOWER LEVEL AMENITY PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | | Addendum B | |
| A10.11 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.12 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.13 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.14 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.15 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.16 | PARTIAL AMENITY PLAN LOWER LEVEL | 11/15/19 | | | | 03/16/20 | | | | Addendum A | |
| A10.20 | UPPER LEVEL AMENITY PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.21 | PARTIAL AMENITY PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.22 | PARTIAL AMENITY PLAN UPPER LEVEL | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.23 | PARTIAL AMENITY PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.24 | PARTIAL AMENITY PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.25 | PARTIAL AMENITY PLAN UPPER LEVEL - MESA PARK | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.26 | PARTIAL AMENITY PLAN UPPER LEVEL | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| A10.31 | FF&E SCHEDULE | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| **STRUCTURAL** | | | | | | | | | | | |
| S0.01 | GENERAL NOTES | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S0.02 | GENERAL NOTES | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S0.03 | GENERAL NOTES | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| S0.10 | UPPER LEVEL LOADING CRITERIA PLAN | 11/15/19 | | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| S0.11 | UPPER LEVEL LOADING CRITERIA PLAN | 11/15/19 | | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| S1.01 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.02 | TYPICAL DETAILS | 11/15/19 | | | 02/18/20 | 03/16/20 | | | 03/16/20 | Addendum D | |
| S1.03 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.04 | TYPICAL DETAILS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E | |
| S1.05 | TYPICAL DETAILS | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A | |
| S1.06 | TYPICAL DETAILS | 11/15/19 | | | | 03/16/20 | | | 03/16/20 | Addendum D | |
| S1.07 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.08 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.09 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.10 | TYPICAL DETAILS | 11/15/19 | | | | | | | 11/15/19 | City Submittal | |
| S1.11 | TYPICAL DETAILS | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A | |
| S2.10 | (E) OVERALL FOUNDATION - KEY PLAN | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A | |
| S2.11 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| S2.12 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |
| S2.13 | (E) FOUNDATION PLAN | 11/15/19 | | | | | | | 01/03/20 | Addendum A | |
| S2.14 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | | 07/25/22 | | 07/25/22 | Addendum E | |
| S2.15 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E | |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY** — WT (Whitaker-Ellis)

## PHASE 4 DOCUMENT LOG (RDC.)

| # Sheet | Sheet Title | City Submittal 11/15/19 | Addendum A 01/03/20 | Addendum B 01/13/20 | Addendum C 02/18/20 | Addendum D 03/16/20 | Addendum E 07/25/23 | Addendum F | Most Current Date | Most Current Set |
|---|---|---|---|---|---|---|---|---|---|---|
| 12.16 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| 12.17 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.18 | (E) FOUNDATION PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.19 | | | | | | | | | City Submittal | MISSING |
| 12.20 | (E) OVERALL UPPER LEVEL - KEY PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| 12.21 | (E) OVERALL UPPER LEVEL AREA 1 - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.21A | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| 12.21B | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.22 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.22A | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.22B | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.23 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.24 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.25 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.25A | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.26 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.26A | CANOPY FRAMING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.27 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 12.28 | (E) UPPER LEVEL - FRAMING PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| 13.01 | (E) COLUMN STRENGTHENING SCHEDULE | 11/15/19 | | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S4.01 | FOUNDATION SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S4.02 | FOUNDATION SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.01 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.02 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.03 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.04 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.05 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| S5.06 | STEEL SECTIONS AND DETAILS | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| **MECHANICAL** | | | | | | | | | | |
| MP0.01 | MECHANICAL AND PLUMBING TITLE SHEET | 11/15/19 | 01/03/20 | | 02/18/20 | | | | 02/18/20 | Addendum A |
| M3.20 | UPPER LEVEL MECHANICAL PLAN | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| M3.21 | PARTIAL MECHANICAL PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| M3.10 | ENLARGED RESTROOM DEMO & NEW MECHANICAL PLANS | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| **PLUMBING** | | | | | | | | | | |
| P1.10 | LOWER LEVEL PLUMBING PLAN | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| P1.13 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| P1.15 | PARTIAL PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum A |
| P1.16 | PARTIAL PLUMBING PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | | | | 02/18/20 | Addendum C |
| P1.17 | PARTIAL PLUMBING PLAN LOWER LEVEL | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| P1.20 | UPPER LEVEL PLUMBING PLAN | 11/15/19 | | | 02/18/20 | | | | 02/18/20 | Addendum C |
| P1.23 | PARTIAL PLUMBING PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum C |
| P1.25 | PARTIAL PLUMBING PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | | | | | 01/03/20 | Addendum C |
| P1.26 | PARTIAL PLUMBING PLAN UPPER LEVEL | 11/15/19 | 01/03/20 | | 02/18/20 | | | | 02/18/20 | Addendum C |
| P1.36 | PARTIAL PLUMBING PLAN ROOF LEVEL | 11/15/19 | | | 02/18/20 | | | | 02/18/20 | Addendum C |
| P2.10 | ENLARGED RESTROOM DEMO & NEW PLUMBING PLANS | 11/15/19 | 01/03/20 | | | 03/16/20 | | | 03/16/20 | Addendum D |
| P3.10 | PLUMBING SCHEDULES AND DETAILS | 11/15/19 | | | 02/18/20 | | | | 02/18/20 | Addendum D |
| **ELECTRICAL** | | | | | | | | | | |
| E0.00 | ELECTRICAL TITLE SHEET | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.10 | EXISTING LOWER LEVEL OVERALL POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.11 | LOWER LEVEL - AREA 'A' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.12 | LOWER LEVEL - AREA 'B' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.13 | LOWER LEVEL - AREA 'B' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.14 | LOWER LEVEL - AREA 'B' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.15 | LOWER LEVEL - AREA 'C' - POWER PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.16 | LOWER LEVEL - AREA 'D' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.20 | EXISTING UPPER LEVEL OVERALL POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.21 | UPPER LEVEL - AREA 'A' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.22 | UPPER LEVEL - AREA 'B' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.23 | UPPER LEVEL - AREA 'B' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.24 | UPPER LEVEL - AREA 'F' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E1.25 | UPPER LEVEL - AREA 'C' - POWER PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E1.26 | UPPER LEVEL - AREA 'D' - POWER PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.10 | EXISTING LOWER LEVEL OVERALL LIGHTING PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.11A | LOWER LEVEL - AREA A - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.11B | LOWER LEVEL - AREA A - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.11C | LOWER LEVEL - AREA A - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.12A | LOWER LEVEL - AREA B - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.12B | LOWER LEVEL - AREA B - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.12C | LOWER LEVEL - AREA B - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.13A | LOWER LEVEL - AREA B - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.13B | LOWER LEVEL - AREA B - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.13C | LOWER LEVEL - AREA B - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.14A | LOWER LEVEL - AREA F - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.14B | LOWER LEVEL - AREA F - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.14C | LOWER LEVEL - AREA F - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.15A | LOWER LEVEL - AREA C - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.15B | LOWER LEVEL - AREA C - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.15C | LOWER LEVEL - AREA C - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.16A | LOWER LEVEL - AREA D - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.16B | LOWER LEVEL - AREA D - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.16C | LOWER LEVEL - AREA D - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.20 | EXISTING UPPER LEVEL OVERALL LIGHTING PLAN | 11/15/19 | 01/03/20 | | | | 07/25/23 | | 07/25/23 | Addendum E |
| E2.21A | UPPER LEVEL - AREA A - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | 01/13/20 | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |
| E2.21B | UPPER LEVEL - AREA A - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/23 | | 07/25/23 | Addendum E |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY** — A SIMON MALL — **WT** Walker-Tulloch

## PHASE 4 DOCUMENT LOG (RDC.)

| Sheet | Sheet Title | Issue Date 11/15/19 | 100% Submittal 01/03/20 | Addendum A 01/13/20 | Addendum B 02/18/20 | Addendum C 03/16/20 | Addendum D 07/25/22 | Addendum E | Most Current Date | Most Current Set |
|---|---|---|---|---|---|---|---|---|---|---|
| E2.21C | UPPER LEVEL - AREA A - EM PHOTOMETRIC SURVEY | | | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E2.22A | UPPER LEVEL - AREA B - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.22B | UPPER LEVEL - AREA B - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.22C | UPPER LEVEL - AREA B - EM PHOTOMETRIC SURVEY | | | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E2.23A | UPPER LEVEL - AREA C - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | 01/13/20 | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.23B | UPPER LEVEL - AREA C - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.23C | UPPER LEVEL - AREA C - EM PHOTOMETRIC SURVEY | | | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E2.24A | UPPER LEVEL - AREA D - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | 01/13/20 | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.24B | UPPER LEVEL - AREA D - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.24C | UPPER LEVEL - AREA D - EM PHOTOMETRIC STUDY | | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E2.25A | UPPER LEVEL - AREA E - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | 01/13/20 | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.25B | UPPER LEVEL - AREA E - FLOOR LIGHTING PLAN | | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.25C | UPPER LEVEL - AREA E - EM PHOTOMETRIC STUDY | | | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E2.26A | UPPER LEVEL - AREA F - CEILING LIGHTING PLAN | 11/15/19 | 01/03/20 | 01/13/20 | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.26B | UPPER LEVEL - AREA F - FLOOR LIGHTING PLAN | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E2.26C | UPPER LEVEL - AREA F - EM PHOTOMETRIC STUDY | | | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E3.01 | SINGLE LINE DIAGRAMS (BLDGS. 'C' & 'D') | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E3.02 | SINGLE LINE DIAGRAMS (BLDGS. 'E' & 'F') | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E3.03 | SINGLE LINE DIAGRAMS (BLDGS. 'X' & 'Y') | 11/13/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E4.01 | PANEL SCHEDULES | 11/15/19 | 01/03/20 | | 02/18/20 | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E4.02 | PANEL SCHEDULES | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E4.03 | EXISTING FIXTURE SCHEDULE | 11/13/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E4.04 | NEW FIXTURE SCHEDULE (PART 1 OF 3) | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E4.05 | NEW FIXTURE SCHEDULE (PART 2 OF 3) | 11/15/19 | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E4.06 | NEW FIXTURE SCHEDULE (PART 3 OF 3) | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E5.01 | LARGE SCALE ELECTRICAL PLANS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E5.02 | LARGE SCALE ELECTRICAL PLANS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E5.03 | LARGE SCALE RESTROOM PLANS | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E6.01 | TITLE 24 - ENERGY COMPLIANCE FORMS - OUTDOOR | 11/15/19 | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E6.02 | TITLE 24 - ENERGY COMPLIANCE FORMS - INDOOR | | 01/03/20 | | | 03/16/20 | 07/25/22 | | 07/25/22 | Addendum E |
| E7.01 | LIGHTING FIXTURE DETAILS (PART 1 OF 2) | | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| E7.02 | LIGHTING FIXTURE DETAILS (PART 2 OF 2) | | 01/03/20 | | | | 07/25/22 | | 07/25/22 | Addendum E |
| **TOTAL SHEETS:** | | 393 | 373 | 6 | 60 | 500 | 341 | 0 | 428 | |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY** · A SIMON MALL · **WT** Wasser-Turner

## PHASE 4 DOCUMENT LOG (MG2)

| Sheet | Sheet Title | Permit Set / Issue Date: 08/03/22 / Drawing Date | Drawing Date | Most Current Date / Drawing Date | Most Current Set / Most Current Set |
|---|---|---|---|---|---|
| **GENERAL** | | | | | |
| N/A | COVER SHEET | 08/03/22 | | 08/03/22 | Permit Set |
| G101 | GENERAL NOTES | 08/03/22 | | 08/03/22 | Permit Set |
| G110 | SITE PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| G400 | ACCESSIBILITY INFORMATION | 08/03/22 | | 08/03/22 | Permit Set |
| G401 | ACCESSIBILITY INFORMATION | 08/03/22 | | 08/03/22 | Permit Set |
| **ARCHITECTURAL** | | | | | |
| A110 | ESCALATOR - IMAGERY | 08/03/22 | | 08/03/22 | Permit Set |
| A111 | ESCALATOR AT MACY'S | 08/03/22 | | 08/03/22 | Permit Set |
| A121 | ESCALATOR AT NORDSTROMS | 08/03/22 | | 08/03/22 | Permit Set |
| A131 | ESCALATOR AT BLOOMINGDALES | 08/03/22 | | 08/03/22 | Permit Set |
| A141 | ESCALATOR AT MESA PARK | 08/03/22 | | 08/03/22 | Permit Set |
| A142 | ESCALATOR AT MESA PARK | 08/03/22 | | 08/03/22 | Permit Set |
| A150 | ESCALATOR AT FRIT PATTERNS | 08/03/22 | | 08/03/22 | Permit Set |
| A401 | RESTROOM | 08/03/22 | | 08/03/22 | Permit Set |
| A402 | RESTROOM | 08/03/22 | | 08/03/22 | Permit Set |
| A403 | RESTROOM | 08/03/22 | | 08/03/22 | Permit Set |
| **DEMOLITION** | | | | | |
| D111 | DEMO - ESCALATOR AT MACY'S | 08/03/22 | | 08/03/22 | Permit Set |
| D121 | DEMO - ESCALATOR AT NORDSTROMS | 08/03/22 | | 08/03/22 | Permit Set |
| D131 | DEMO - ESCALATOR AT BLOOMINGDALES | 08/03/22 | | 08/03/22 | Permit Set |
| D401 | RESTROOM | 08/03/22 | | 08/03/22 | Permit Set |
| D402 | RESTROOM | 08/03/22 | | 08/03/22 | Permit Set |
| **STRUCTURAL** | | | | | |
| S0.01 | GENERAL NOTES | 08/03/22 | | 08/03/22 | Permit Set |
| S0.02 | GENERAL NOTES | 08/03/22 | | 08/03/22 | Permit Set |
| S0.03 | GENERAL NOTES | 08/03/22 | | 08/03/22 | Permit Set |
| S1.01 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.02 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.03 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.04 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.05 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.06 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.07 | TYPICAL DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S1.10 | (E) OVERALL FOUNDATION - KEY PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S1.11 | (E) FOUNDATION PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S1.12 | (E) FOUNDATION PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S1.13 | (E) FOUNDATION PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S1.14 | (E) FOUNDATION PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.20 | (E) OVERALL UPPER LEVEL - KEY PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.21 | (E) UPPER LEVEL - FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.21A | CANOPY FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.22 | (E) UPPER LEVEL - FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.22A | CANOPY FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.23 | (E) UPPER LEVEL - FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.23A | CANOPY FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.24 | (E) UPPER LEVEL - FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S2.24A | CANOPY FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S3.01 | (E) UPPER LEVEL - FRAMING PLAN | 08/03/22 | | 08/03/22 | Permit Set |
| S4.01 | FOUNDATION SECTIONS & DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S5.01 | STEEL SECTIONS AND DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S5.02 | STEEL SECTIONS AND DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| S5.03 | STEEL SECTIONS AND DETAILS | 08/03/22 | | 08/03/22 | Permit Set |
| **MECHANICAL** | | | | | |
| M000 | MECHANICAL TITLE SHEET | 08/03/22 | | 08/03/22 | Permit Set |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**FASHION VALLEY**
A SIMON MALL

**WT** Whiting-Turner

## PHASE 4 DOCUMENT LOG (MG2)

| | | Permit Set | | Most Current Date | Most Current Set | |
|---|---|---|---|---|---|---|
| | Issue Date: | 08/03/22 | | | | |
| Sheet | Sheet Title | Drawing Date | Drawing Date | Drawing Date | Most Current Set | |
| M001 | OVERALL MECHANICAL SITE PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| M111 | ESCALATOR AT MACY'S - PLUMBING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| M121 | ESCALATOR AT NORDSTROMS - PLUMBING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| M131 | ESCALATOR AT BLOOMINGDALES - PLUMBING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| M241 | ESCALATOR AT MESA PARK - PLUMBING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| M400 | RESTROOM PLUMBING & HVAC DEMOLITION PLANS | 08/03/22 | | 08/03/22 | Permit Set | |
| M401 | RESTROOM PLUMBING & HVAC PLANS | 08/03/22 | | 08/03/22 | Permit Set | |
| M501 | MECHANICAL DETAILS & SCHEDULES | 08/03/22 | | 08/03/22 | Permit Set | |
| **ELECTRICAL** | | | | | | |
| E000 | ELECTRICAL TITLE SHEET | 08/03/22 | | 08/03/22 | Permit Set | |
| E001 | OVERALL LIGHTING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| E002 | OVERALL POWER & SYSTEMS PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| E101 | RESTROOM LIGHTING PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| E102 | RESTROOM POWER & SYSTEMS PLAN | 08/03/22 | | 08/03/22 | Permit Set | |
| E201 | ESCALATOR LIGHTING PLANS | 08/03/22 | | 08/03/22 | Permit Set | |
| E202 | ESCALATOR POWER & SYSTEMS PLANS | 08/03/22 | | 08/03/22 | Permit Set | |
| E800 | ELECTRICAL SCHEDULES | 08/03/22 | | 08/03/22 | Permit Set | |
| **LIGHTING** | | | | | | |
| L101 | ESCALATOR CANOPY - MACY'S | 08/03/22 | | 08/03/22 | Permit Set | |
| L102 | ESCALATOR CANOPY - NORDSTROM & BLOOMINGDALES | 08/03/22 | | 08/03/22 | Permit Set | |
| L103 | GLASS ESCALATOR CANOPIES IMAGERY | 08/03/22 | | 08/03/22 | Permit Set | |

TOTAL SHEETS: 69    0    69

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

EXHIBIT __I__

ADDENDUM TO SUBCONTRACT
FOR CALIFORNIA PROJECTS

In the event the Project for which this Subcontract is being entered is located in California, Subcontractor's obligations under the Subcontract shall include the following revisions to the Subcontract which shall be made part of the Subcontract as if fully set forth therein.

1.  Nothing contained in the Subcontract is meant to allow for the recovery of attorneys' fees in a direct action by Contractor with its Subcontractor, except to the extent expressly permitted by California law.

2.  Replace Article 9(d) with the following provision:
    To the fullest extent permitted by applicable law, including without limitation California Civil Code sections 2782 and 2782.05, Subcontractor agrees to defend, indemnify and hold harmless the Contractor and/or Owner, their officers, directors, consultants, agents and employees, from and against any and all claims, suits, liens, judgments, damages, losses and expenses, including, but not limited to, reasonable attorneys' fees, arising in whole or in part and in any manner related to or arising from the acts or omissions of the Subcontractor, its officers, directors, consultants, agents, employees or subcontractors, in the performance of this Contract. Nothing herein shall be construed to require Subcontractor to indemnify Contractor and Owner and/or their respective officers, directors, consultants, agents and employees from the active negligence or willful misconduct of Contractor or Owner, and/or their respective officers, directors, consultants, agents and employees, or to indemnify Contractor or Owner, and/or their respective officers, directors, consultants, agents and employees for their own negligence in connection with claims of construction or design defects that are subject to the provisions of California Civil Code section 895, et. seq.

    To the fullest extent permitted by law, including without limitation California Civil Code sections 2782(e) and 2782.05(e), Subcontractor's duty to defend and indemnify the Contractor and/or Owner, their officers, directors, agents and employees, is effective immediately upon tender of written notice by the Contractor or Owner requesting that Subcontractor undertake its duty to defend and indemnify. Should Subcontractor elect to appoint counsel to defend the Contractor or Owner under California Civil Code sections 2782(e) and 2782.05(e), to the fullest extent permitted by law, only counsel that is reasonably acceptable to Contractor may be appointed, and Subcontractor is prohibited from using counsel that has a conflict, bias or prejudice or is otherwise incapable of representing Contractor or Owner. Subcontractor will provide its written response to the Contractor's and/or Owner's tender, including a detailed explanation of whether the tender has been fully or partially accepted, no later than twenty (20) days after receipt thereof, as Subcontractor agrees that twenty (20) days is a reasonable time period for Subcontractor to respond to the tender of any claims. If Subcontractor fails to inform the Contractor in writing within twenty (20) days of such tender, Subcontractor will be liable to the Contractor for all reasonable attorneys' fees and costs of defense, including those

Page 88 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

apportioned to the Subcontractor in accordance with Civil Code sections 2782(e)(2) and 2782.05(e)(2).

To the fullest extent permitted by law, Subcontractor acknowledges and agrees that the allocation of attorneys' fees and costs of defense in accordance with California Civil Code Sections 2782 and 2782.05 must be reasonable based upon the facts then known to the Contractor and/or Owner. A defense or objection by Subcontractor regarding its allocated fees and costs under California Civil Code Sections 2782 and 2782.05 may be raised only after such allocation has been the subject of a request for reallocation by Subcontractor made within 20 days after full and final determination of the claim. Any dispute between Subcontractor and Contractor and/or Owner, their officers, directors, agents and employees,   regarding a reallocation of fees and costs shall be resolved in the same forum as the underlying dispute. Contractor and/or Owner shall have the right to join in any such dispute all other potential subcontractors with whom allocation or reallocation may be an issue.

Nothing herein shall be construed to create an indemnity obligation prohibited by applicable law or to waive Subcontractor's rights against any other subcontractor or supplier which may have contributed to causing the injury or damage. In claims against any person or entity indemnified under this Section by an employee of the Subcontractor or Sub-Subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts they may be liable, the indemnification obligation under this Section shall not be limited by a limitation in amount or types of damages, compensation or benefits payable by or for the Subcontractor or Sub-Subcontractors under workers compensation acts, disability benefits, acts or other employee benefit acts.

3.  Article 9(n) – Delete the third and fourth sentences.

4.  Article 9(r) is deleted and replaced with the following provision:
    This Subcontract shall be governed by the laws of the State of California, without regard to principles of conflicts of law.

5.  Article 5 (a) Payment – the following language of this provision shall be deleted:
    Subcontractor expressly assumes the risk of the Owner's non-payment and the subcontract price includes this risk as the Subcontractor understands and acknowledges that it is to be paid exclusively out of a fund the sole source of which is the Owner's payment to the Contractor. The Owner's non-payment to Contractor will result in non-payment to Subcontractor by Contractor.

6.  Article 5 (d) Payment – the following language of this provision shall be deleted:
    Subcontractor expressly assumes the risk of the Owner's non-payment and the subcontract price includes this risk as the Subcontractor understands and acknowledges that it is to be paid exclusively out of a fund the sole source of which is the Owner's payment to the Contractor. The Owner's non-payment to Contractor will result in non-payment to Subcontractor by Contractor.

<div align="center">2</div>

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT J**

**RATES, SCHEDULES, & UNIT PRICES**

Refer to the enclosed tables listed below for rates, breakdowns, and schedules related to this subcontract.
Subcontractor is responsible to provide any applicable backup (labor agreements, rental rate sheets, etc).
All information included in this Exhibit is subject to General Contractor and Owner approval, inclusion in the executed subcontract does not represent approval or acceptance of the information listed.

Exhibit Sections Enclosed:

    A.   Accounting Breakdown of the Subcontract Amount
    B.   Labor Rates
    C.   MBE / WBE Participation

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT J**

**RATES, SCHEDULES, and UNIT PRICES**

**A.  Accounting Breakdown of the Subcontract Amount  (Schedule of Values)**

Please complete your proposed Schedule of Values (SOV) from the subcontract amount.  SOV is subject to General Contractor and Owner approval.

| Item No. | Description | Scheduled Value |
|---|---|---|
| 01. | Electrical | $1,189,000.00 |
| 02. | Main Concourse Safe Off | $12,000.00 |
| 03. | Escalator Safe Off, Rough In, & Lights | $68,000.00 |
| 04. | Food Court Restroom Safe Off, Rough In, & Lights | $104,000.00 |
| 05. | Temporary Power | $20,000.00 |
| 06. | Temporary Lighting | $10,000.00 |
| 07. | Vans Restroom Safe Off, Rough In, & Lights (MG2 Drawings) | $28,000.00 |
| 08. | Light Fixtures | $1,416,000.00 |
| 09. | Relocate & Modify Fire Alarm for Structural and MEP Improvements | $28,000.00 |
| 10. | Relocate Electrical Allowance (To be tracked T&M) | $24,000.00 |
| 11. | P&P Bond | $28,990.00 |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| | **Sub-Total:** (Must be equal to the Subcontact Amount - verify on sheet SC-8) | $2,927,990.00 |



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT J**
**RATES, SCHEDULES, and UNIT PRICES**

**B. Labor Rate Calculation for Subcontractors**

List occupation classification across the top of the form to develop billing rates.  Use photocopies of this form if there are more occupations than available spaces.

All rates listed are subject to approval and acceptance by Whiting-Turner and/or the Owner.

Subcontractor responsible to verify rates by payroll documents and/or union documentation upon request by Whiting-Turner or Owner.

NOTE: Subcontractor must attach a copy of the Trade Agreement Wage & Benefit Documents to the back of this Exhibit.

| | | EMPLOYEE OCCUPATION (or Classification ie. Foreman, Journeyman, Carpenter, Taper, etc) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Electrician | Electrician | Electrician | | | | |
| | (List if Rate is Straight Time / 1.5x / 2x) | Straight | 1.5x | 2x | Straight | 1.5x | 2x | |
| A. | BASE RATE ($/Hr): | $49.70 | $74.55 | $99.40 | | | | |
| | **Insurance & Taxes** | | | | | | | |
| | (Enter %, and descriptions as applicable) | | | | | | | |
| 5.2 % | Liability Insurance | $2.58 | $3.29 | $5.17 | | | | |
| % | Workers Compensation | $3.48 | $3.15 | $3.15 | | | | |
| % | FICA | $3.80 | $5.70 | $7.60 | | | | |
| % | Federal Unemployment (FUTA) | $1.34 | $2.01 | $2.68 | | | | |
| % | State Unemployment (SUTA) | $2.73 | $4.10 | $5.47 | | | | |
| Other: | SSI | | | | | | | |
| Other: | | | | | | | | |
| B. | INSURANCE & TAXES SUB-TOTAL: | $13.93 | $18.25 | $24.07 | $0.00 | $0.00 | $0.00 | $0.00 |
| | **Benefits: Union / Other** (as applicable) | | | | | | | |
| | (Enter %, and descriptions as applicable) | | | | | | | |
| % | Vacation and Holiday | | | | | | | |
| % | Health and Welfare | $7.16 | $7.16 | $7.16 | | | | |
| % | Training | $0.87 | $0.87 | $0.87 | | | | |
| % | Pension | $6.85 | $6.85 | $6.85 | | | | |
| % | Other Payments | $0.68 | $0.88 | $1.08 | | | | |
| % | Nat'l Elec Bene Fund | $1.49 | $2.24 | $2.98 | | | | |
| % | | | | | | | | |
| % | | | | | | | | |
| % | | | | | | | | |
| C. | BENEFITS SUB-TOTAL: | $17.05 | $18.00 | $18.94 | $0.00 | $0.00 | $0.00 | $0.00 |
| D. | TOTAL BILLING RATE (A+B+C): (Not including OH Markup %) | $80.68 | $110.80 | $142.41 | $0.00 | $0.00 | $0.00 | $0.00 |

**STRAIGHT TIME RATES - are to be developed as itemized below:**

Base Rate $ Per Hour - shall be actual wage rate paid to labor classification per union or mutual agreement.

Vacation Allowance - rate per hour per union or mutual agreement.

Insurance - indicate percentage of Item A plus B and resulting cost per hour.  Furnish detailed breakdown in proposal letter.

Taxes - indicate percentage of Item A plus B and resulting cost per hour.

Union / Fringe Benefits - cost per hour based on union or mutual agreement.  See note above (OCCUPATIONS).

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**EXHIBIT J**
**RATES, SCHEDULES, and UNIT PRICES**

**B. Labor Rate Calculation for Subcontractors**

List occupation classification across the top of the form to develop billing rates. Use photocopies of this form if there are more occupations than available spaces.

All rates listed are subject to approval and acceptance by Whiting-Turner and/or the Owner.

Subcontractor responsible to verify rates by payroll documents and/or union documentation upon request by Whiting-Turner or Owner.

NOTE: Subcontractor must attach a copy of the Trade Agreement Wage & Benefit Documents to the back of this Exhibit.

| | | | EMPLOYEE OCCUPATION (or Classification ie. Foreman, Journeyman, Carpenter, Taper, etc) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | (List if Rate is Straight Time / 1.5x / 2x): | Straight | 1.5x | 2x | Straight | 1.5x | 2x | |
| **A.** | **BASE RATE ($/Hr):** | | | | | | | |
| **Insurance & Taxes** | | | | | | | | |
| (Enter %, and descriptions as applicable) | | | | | | | | |
| % | Liability Insurance | | | | | | | |
| % | Workers Compensation | | | | | | | |
| % | FICA | | | | | | | |
| % | Federal Unemployment (FUTA) | | | | | | | |
| % | State Unemployment (SUTA) | | | | | | | |
| Other: | | | | | | | | |
| Other: | | | | | | | | |
| **B.** | **INSURANCE & TAXES SUB-TOTAL:** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Benefits: Union / Other** (as applicable) | | | | | | | | |
| (Enter %, and descriptions as applicable) | | | | | | | | |
| % | Vacation and Holiday | | | | | | | |
| % | Health and Welfare | | | | | | | |
| % | Training | | | | | | | |
| % | Pension | | | | | | | |
| % | Other Payments | | | | | | | |
| % | | | | | | | | |
| % | | | | | | | | |
| % | | | | | | | | |
| % | | | | | | | | |
| **C.** | **BENEFITS SUB-TOTAL:** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **D.** | **TOTAL BILLING RATE (A+B+C):** (Not Including OH Markup %) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**STRAIGHT TIME RATES - are to be developed as itemized below:**

Base Rate $ Per Hour - shall be actual wage rate paid to labor classification per union or mutual agreement.

Vacation Allowance - rate per hour per union or mutual agreement.

Insurance - indicate percentage of Item A plus B and resulting cost per hour. Furnish detailed breakdown in proposal letter.

Taxes - indicate percentage of Item A plus B and resulting cost per hour.

Union / Fringe Benefits - cost per hour based on union or mutual agreement. See note above (OCCUPATIONS).

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

### EXHIBIT J
### MBE / WBE PARTICIPATION

**E. MBE / WBE Participation**   (if applicable, list scheduled participation by your firm, suppliers, or tiered subs)

☑ Check if your company **will not** have any MBE / WBE participation for this project.   (no additional info is needed if so)

☐ Check if your company will have related participation on this project.

The company contact for additional information on participation is _____

_____   *Name*

_____   _____
*Email*                          *Phone No.*

| Item No. | MBE / WBE / DBE Contractor Company Name | Item of Work | Scheduled Value ($) |
|---|---|---|---|
| 01. | | | |
| 02. | | | |
| 03. | | | |
| 04. | | | |
| 05. | | | |
| 06. | | | |
| 07. | | | |
| 08. | | | |
| 09. | | | |
| 10. | | | |

Page 94 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## EXHIBIT  K
## Discount Billing Program

The Whiting-Turner Contracting Company offers a discount billing program to all Trade Contractors and suppliers involved in this project.

In exchange for a discounted bill amount, Whiting-Turner will expedite payment once it is received. The discounted amount and billing period is indicated below:

> Payment by the 5th of the following month: 3% discount
> Payment by the 10th of the following month: 2% discount
> Payment by the 20th of the following month: 1 ½% discount

This program is offered on a monthly basis. The Trade Contractor can select this option each month with no further obligation beyond each month's billing period.  The Trade Contractor must submit the signed and completed Authorization Form with the Pay Application on the 18th of the month in order for this program to be selected.

### *RIGHT TO EXERCISE THE DISCOUNT BILLING OPTIONS*

At any time during the duration of this project, Whiting-Turner, at its sole discretion, has the right to terminate this discount billing option. Similarly, the Trade Contractor/vendor can select this option on a monthly basis with no further obligation beyond each month's billing period.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**The Whiting-Turner Contracting Company**
**Trade Contractor / Supplier Discount Authorization Form**

**Whiting-Turner Job:** _____

The Whiting-Turner Contracting Company offers a discount billing program to all Trade Contractors and suppliers involved in this project as outlined in the invoicing procedure package issued prior to the first billing period.

This is to confirm that in exchange for expedited payment once the entire invoice is received by Whiting-Turner (approvable per the standards defined in the invoicing procedure package), this supplier / Trade Contractor,_____, accepts a discounted bill amount for this month's invoice:  Invoice No._____dated_____(period to_____, 20    ).

| | |
|---|---|
| Payment by the 5th of the following month: | 3% discount |
| Payment by the 10th of the following month: | 2% discount |
| Payment by the 20th of the following month: | 1 1/2% discount |

- Conditions of this payment are_____% discount for payment by_____, 20___.

- **Accepted this month is a discount of_____% of the total invoice amount due of**

   **$_____, resulting in a discount of $_____.**

This program is offered on a monthly basis. The Trade Contractor / supplier can select this option each month with no further obligation beyond each month's billing period.  The Whiting-Turner Contracting Company may, in its  discretion, decline to offer the discount billing program in any given month.

Discount conditions Submitted by:   _____        _____
                                                          Trade Contractor/Supplier Signature                          Date

                                            _____
                                               Typed or Printed Name

*RIGHT TO EXERCISE THE DISCOUNT BILLING OPTIONS*

At any time during the duration of this project, Whiting-Turner, at its sole discretion, has the right to terminate this discount billing option. Similarly, the Trade Contractor/vendor can select this option on a monthly basis with no further obligation beyond each month's billing period.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

THE WHITING-TURNER CONTRACTING COMPANY

**EXHIBIT "L"**
**Construction and Administration Package**
**Waivers & Inducement Forms**
**Form of Invoice**

**A. EXTRA WORK/CHANGE ORDER PROCEDURES**

1. The General Contractor shall have the right to order changes in the work including, without limitation, alterations, additions, deviations, or omissions from the work. The ordering of any such changes, regardless of their magnitude, shall in no way invalidate the Subcontract and such changes shall be governed by the terms of the Subcontract.

2. For purposes of this Subcontract, "Change Order" shall mean the written instruction to Subcontractor by the General Contractor, to proceed with changes in the work. Subcontractor shall not implement any change in the work until the General Contractor has issued a "Change Request Authorization" (CR) authorizing the Subcontractor to proceed. The original CR will be sent to the Subcontractor's office and a copy presented to his Field Representative. Failure of the Subcontractor to obtain a written Change Request shall bar the Subcontractor from obtaining additional compensation for any change. The Subcontractor may refuse to implement any change in the work if the Subcontractor has not received a written Change Request

3. Upon recognition of a change in the scope of work, the General Contractor may request the Subcontractor to submit either a "Lump Sum" or a "Time and Materials, Not to Exceed" proposal for the change. The Subcontractor shall deliver such estimates to the General Contractor within a maximum of five (5) calendar days after the General Contractor's request, unless extended by mutual agreement. Each estimate shall be accompanied by an itemized breakdown of all additions to or deductions from the subcontract amount. Each estimate shall be in such form and in such detail as may be required by the General Contractor, and shall include, without limitation, all units of measure, quantities or materials, hours of labor required with respect to each class of work, and all other data necessary to substantiate fully and completely such addition to or deductions from the subcontract amount. In addition, the Subcontractor must clearly indicate time extension required to complete the scope of change, if applicable.

**B. TYPES OF AUTHORIZATION**

1. If a change is to a portion of the Work that is covered by Unit Prices or Alternate Prices, then with respect to any part of the change to the work that is covered by such Unit Prices or Alternate Prices, the cost of work shall be adjusted accordingly. A Change Request must be initiated to document this change, and the original copy of the CR submitted, requesting a subcontract change. Quantities installed must be measured and reported _daily_ for verification.

2. When work is performed on a purely "Time and Material" or a "Time and Materials, Not to Exceed" basis, the Subcontractor will present all appropriate T & M tickets to the General Contractor for signature on a _daily basis_. A sample of the standard "Daily Time and Materials" ticket is provided in this attachment.  No other ticket forms will be accepted.  Daily T & M tickets, prior to being signed, will contain each laborer's man-hours and any material and/or equipment used. Time and Material tickets will contain all applicable charges for each Change Request. If an item does not appear on the T & M ticket _at the time of signature_, it will not be considered for compensation.  The Change Request number must be clearly indicated on each ticket.
   - Within 5 days of the last labor performed on a T & M Not To Exceed or a T & M Change Request the Subcontractor will submit to the General Contractor a Change Request (CR) package consisting of the following:
   - The _original_ Change Request with signature and date.
   - A Time and Material Cost Summary Sheet
   - Original signed Daily Tickets, arranged by Subcontractor and tier-Subcontractor.
   - Material invoices.
   - Equipment rental invoices, if applicable.

Page 97 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

THE WHITING-TURNER CONTRACTING COMPANY

3. Daily T & M tickets will have been properly extended using labor rates previously approved. All material costs will be accompanied by appropriate vendor invoices. Subcontractor-owned equipment will be charged per previously approved equipment rates, or in absence of an approved rate 70% of AED will be used over the duration of time the equipment was on site. Rented equipment may be charged only when accompanied by appropriate invoice back-up. Incidental tools (value less than $200.00/item) are included in the allowable markups for Overhead and Profit. The Subcontractor's allowable markup for Overhead and Profit will be in accordance with the information provided under the General Conditions of the Owner contract. In absence of such determinations allowable markup will not exceed 10% total OH & P for direct work and 5% OH & P for subcontracted work. The same will hold true for all tier-subcontractors.

4. Immediately upon receipt of a Lump Sum Change Request (CR), but not later than 20 calendar days after the last labor performed on the Lump Sum Extra Work, the Subcontractor will submit to the General Contractor a Change Order to which is attached the original CR. The General Contractor reserves the right not to entertain any request for payment not submitted within the 30 calendar days allotted.

5. After review and approval by the General Contractor of the Subcontractor's Change Order, a Contract Supplement will be issued for either: (1) the Lump Sum amount, (2) the T & M amount or (3) the lesser of the T & M and the "Not to Exceed" figures, depending upon the type of Change Authorization originally issued.

6. Only after receipt of the Executed Contract Supplement can the Subcontractor invoice for the extra work. This invoice will become part of the next monthly application for payment.

**C. DISPUTED CHANGE REQUEST/AUTHORIZATION**

1. In the event a dispute arises as to whether an item of work is included in the Subcontractor's current scope of work, every effort will be made between the Subcontractor's and the General Contractor's field representative to come to an agreement.

2. Failing this, and so as not to delay work, the General Contractor will issue a "Disputed" Change Authorization directing the Subcontractor to proceed with the work in questions and maintain daily, signed Time and Material records. This document is not to be construed as an admission or agreement that the work is extra to the Contract or that the Subcontractor will receive payment, but only recognizes the Subcontractor's claim to that effect. The home office management of both the General Contractor and the Subcontractor will later attempt resolution. A "Disputed" Change Request can be converted into a regular Change Request Authorization or voided at any time when an agreement is reached.

3. Should disagreement still remain, the General Contractor will make an unprejudiced presentation of the Claim to the Owner.

4. Under no circumstances are any disputes or disagreements regarding Change Requests to jeopardize the progress of the work and/or the overall project schedule.

**D. APPLICATION FOR PAYMENT**

*It is required that all Subcontractors, as well as their suppliers, use the Conditional and Unconditional Payment forms that are included in this package. Subcontractors who have a direct contract with Whiting-Turner must use the Whiting-Turner Application for Payment Form (WT-001), Schedule of Values Form (WT-002), Change Order Summary Sheet (WT-003), and Partial Release Affidavit form included in this package. These forms are available on disk and will be furnished upon request or such forms may be photocopied and filled out manually.*
   *NOTE: W-T FORMS -001, -002, CONFORM TO AND ARE MODIFIED AIA G702 AND G703 FORMS RESPECTIVELY. ANY REFERENCES HEREIN TO "MODIFIED"AIA FORMS REFER TO THE APPLICABLE WHITING-TURNER FORM.*

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

THE WHITING-TURNER CONTRACTING COMPANY

The following procedures must be followed in the submission of invoices for this project.

1. *Prior to the first invoice:* The following items are prerequisites to the submission of your first invoice. The General Contractor cannot accept any invoice until these items are complete.
   - Subcontract document that has been fully executed and submitted to the General Contractor.
   - Certificates of Insurance must be submitted to and approved by the General Contractor.
   - Schedule of Values in accordance with Owners & General Contractor's accounting requirements to be approved by the General Contractor

2. *Monthly Invoice:* A draft should be sent to the General Contractor's Project Manager no later than the 20th of the month, forecasting cost through the end of the month. Upon receipt of requested revisions or approval of draft, Subcontractor shall deliver to the General Contractor by the 25th day of each month (or the next work day), either electronically (preferred) or physically the application for payment with notarized releases for payment in the amount of ninety percent (90%) of the portion of the contracted sum properly allocated to labor, material and equipment incorporated into the work by the end of the month, less the aggregate of previous requested payments made through the course of the contract until the time that all contract work and all extra work has been completed. The amount requested shall be based on the percent complete of the various items, and shall have previously presented and agreed to by the General Contractor's on-site Project Manager for the purpose of later verification and approval.

   **ANY INVOICES NOT RECEIVED IN THE DESIGNATED CONTRACTORS OFFICE BY THE DATE SPECIFIED WILL BE HELD UNTIL THE NEXT MONTH'S BILLING SO AS NOT TO HOLD UP PAYMENT TO OTHER SUBCONTRACTORS.**

   a. All payment requests will clearly indicate the Job Name and Contract Number, and shall be submitted on Modified AIA Payment Form G702 accompanied by a completed G703 "Schedule of Values", notarized, and supported by all data sustaining the Subcontractor's right to payment as the General Contractor may require.

   **ANY INVOICE SUBMITTED ON A FORM OTHER THAN THE CORRECT MODIFIED AIA DOCUMENT WILL BE RETURNED FOR PROPER SUBMISSION ON THE FOLLOWING BILLING CYCLE.**

   b. Submission shall be *one (1) properly completed and notarized original Invoice* submitted on Form WT-001.

   c. Along with the invoice shall be included one (1) **properly executed original** of:
      - Subcontractor's Partial Release/Waiver of Lien and Affidavit.
      - Conditional Waiver and Release Upon Progress Payment.
      - Unconditional Waiver and Release Upon Progress Payment. (To begin with second invoice.)
         And *EITHER*
         - Conditional Waiver and Joint Check Request showing amounts for all subcontractors/vendors who have preliminary notices (whether invoicing this period or not)
            *OR*
         - Unconditional Waiver which is fully executed throughout the billing period for those subcontractors who have preliminary notices

   d. Contract Supplement for any changes included in the invoice must be fully executed and submitted to the General Contractor.

   e. Subcontractor may requisition for stored material. As used herein, "Stored Materials" shall mean materials which are to be incorporated into the Project and which, at the time of payment, are stored at the premises or at a bonded warehouse or storage site approved by the Owner. Transfer of title and proof of proper insurance and storage is required.

   f. Suppliers and tier-subcontractors will be joint checked if Unconditional Waiver from your Supplier/Subcontractor is not provided with your invoice. If waivers are not provided the name, address, and amount due each supplier or tier-subcontractor must be furnished with your invoice. (Whiting-Turner form attached).

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

THE WHITING-TURNER CONTRACTING COMPANY

g.  On or before the 25th of the month Whiting-Turner will review all billings with our job superintendent. The processing of your invoice will be delayed if:
- Your foreman did not check in each and every day at start and end of the day.
- Daily Field Reports are not current.
- Your work is not per plans and specifications.
- As-builts are not up to date.
- Your insurance is not up to date

3.  *Final Invoice*: The following forms (copies attached) must be submitted with your application for Final Payment:

a.  One (1) original of the properly executed and notarized Final Invoice with updated Final Pay Request breakdown; "Subcontractor's Final Pay Request". To be noted on the invoice.

b.  One (1) properly executed original of:
- Conditional Waiver and Release Upon Final Payment (from Subcontractor, all tier subcontractors and vendors)
- One (1) properly executed and notarized original of Certificate of Substantial Completion AIA Document G704.
- One (1) properly executed and notarized original of Consent of Surety to Final Payment - AIA Document G707, if applicable.

4.  A proper submission of releases will include the following:

a.  First Invoice Documents:
- Modified AIA G702 "Application for Payment" including Modified AIA 702 "Schedule of Values" as submitted by subcontractor and approved by Whiting-Turner.
- Subcontractor's Partial Release Waiver and Affidavit/Declaration to Induce Payment for current invoice amount due.
- Conditional Waiver and Release upon Progress Payment from Subcontractor and Subcontractor's suppliers and tier subcontractors if joint checks are requested.
- Joint Check Request for all tier subcontractors and suppliers or Unconditional Releases for amounts due for current invoice.

b.  Progress Payment Documents:
- Modified AIA G702 "Application and Certificate for Payment" including AIA 703 "Schedule of Values" as submitted by subcontractor and approved by Whiting-Turner.
- Subcontractor's Partial Release Waiver and Affidavit/Declaration to Induce Payment for current invoice amount due.
- Conditional Waiver and Release upon Progress Payment from Subcontractor and Subcontractor's suppliers and tier subcontractors if joint checks requested.
- Joint Check Request for all tier subcontractors and suppliers or Unconditional releases for amounts due for current invoice.
- Unconditional Waiver and Release upon Progress Payment from Subcontractor for previous paid invoice.
- Unconditional Waiver and Release upon Progress Payment from Subcontractor's suppliers and tier subcontractors who have filed a Preliminary Notice on this project, through the date of previous invoice.

c.  Final Payment (Retention)
- Modified AIA G702 "Application and Certificate for Payment" including AIA 703 "Schedule of Values" as submitted by subcontractor and approved by Whiting-Turner.
- Subcontractor's Final Release and Affidavit.
- Conditional Waiver and Release upon Final Payment from Subcontractor and Subcontractor's suppliers and tier subcontractors if joint checks are requested.
- Joint Check Request for all tier-subcontractors and suppliers or unconditional final releases.
- Unconditional Waiver and Release upon Progress Payment from Subcontractor for previous paid invoice.
- Unconditional Waiver and Release upon Progress Payment from Subcontractor's suppliers and tier subcontractors who have filed a Preliminary Notice on this project, through the date of previous invoice.
- Upon receipt of Final Payment check(s) sign & return Subcontractor and Subcontractor's suppliers and tier subcontractors Unconditional Waiver upon Final Payment.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

THE WHITING-TURNER CONTRACTING COMPANY

    d.   SUBCONTRACTOR INVOICES NOT INCLUDING THE PROPER RELEASES WILL BE HELD UNTIL THE 10th DAY OF THE FOLLOWING MONTH. IF THE RELEASES ARE NOT COMPLETE AT THAT TIME THE INVOICE WILL BE RETURNED FOR PROPER SUBMISSION IN THE NEXT BILLING CYCLE.

5.   *Attachments*
    a.   Included with this section:
- Change Request / Authorization Form - WT PM-001
- Sample Daily Time and Material Work Report – WT PA-004
- Application for Payment Forms Whiting-Turner - 001, 002, 003
- Subcontractor's Partial Release Affidavit
- Subcontractor's Final Release Affidavit
- Joint Check Agreement
- Joint Check Request Form
- Conditional Progress Payment Release
- Conditional Final Payment Release
- Unconditional Progress Payment Release
- Unconditional Final Payment Release
- Contract Supplement
- Contract Warranty and Guarantee

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3



## Change Request Authorization

| | | |
|---|---|---|
| Project: | Fashion Valley Mall Redevelopment | W-T Job Number: 018146 |
| | 7007 Friars Road | PCI No: XXXXXX |
| | San Diego, CA 92108 | Date: MM/DD/YYYY |
| | | Project Area: |
| To: | | Contract No : |
| | | Reason: |

Attn:

Description:

Scope of Work:

Instructions:

Scope of Work                                                     Instructions

Authorization:

_____
Subcontractor                    Date

_____                _____
WT Project Manager               Date            Owner's Representative                    Date

☐    **Owner Authorization Not Required**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3
THE WHITING-TURNER CONTRACTING COMPANY

*Fashion Valley Mall Redevelopment*

# THE WHITING-TURNER CONTRACTING COMPANY
San Diego, CA
858-792-0600 FAX 858-792-9600

## DAILY TIME AND MATERIAL WORK REPORT
No. XXXX

| CUSTOMER: Simon Property Group, LP | W-T JOB NO. 018146 | DATE: MM/DD/YYYY |
|---|---|---|
| LOCATION: 7007 Friars Road, San Diego, CA 92108 | CONTRACT EXTRA NO. | |

| MATERIAL | | | | | LABOR | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Quantity | DESCRIPTION | Unit Price | PER | TOTAL | CRAFT | CLASS. | Reg.Hrs | O.T.Hrs | RATE | TOTAL |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

TOTAL MATERIAL $

| TOOL AND EQUIPMENT RENTAL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Quantity | DESCRIPTION | Unit Price | PER | TOTAL | | | TOTAL LABOR | $ |

FRINGE BENEFITS

| | CRAFT | TOTAL HRS. X TOTAL BEN./HRS. | |
|---|---|---|---|
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |
| | | HRS. X | $ |

TOTAL RENTALS $ — TOTAL BENEFITS; $

DESCRIPTION OF WORK:

| MATERIAL | $ |
|---|---|
| RENTALS | $ |
| SALES TAX @     % | $ |
| LABOR | $ |
| INSURANCE @     % | $ |
| BENEFITS | $ |

CUSTOMER ACKNOWLEDGEMENT: The undersigned agrees that this work was ordered by him or his agent and that the materials, labor and other items were expended as represented above

| OVERHEAD @     % | $ |
|---|---|
| PROFIT @ ___% | $ |

Signature _____
WHITING-TURNER REPRESENTATIVE:

Signature _____

| TOTAL PRICE | $ |
|---|---|

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**APPLICATION FOR PAYMENT**                          *Form WT-001*

| SUBMIT  ELECTRONICALLY TO: | | Project Name: Fashion Valley Mall |
|---|---|---|
| THE WHITING-TURNER CONTRACTING COMPANY | Contractor: | Project Number: 019777 |
| 3911 Sorrento Valley Blvd. | Remittance | Subcontract No: 019777-XXX |
| Suite #100 | Address: | Application No: |
| San Diego, CA 92121 | | Invoice No: |
| Email: Shane.Willingham@Whiting-Turner.com | Phone No: | Period To: |
| ATTN: Shane Willingham & JJ Sellner | Email: | Invoice Date: |

**APPLICATION:**

Application is made for Payment, as shown below, in connection with the Contract. Schedule of Values, WT-002, is attached.

| | | |
|---|---|---|
| 1 | ORIGINAL CONTRACT SUM | $ - |
| 2 | NET CHANGE BY CHANGE ORDERS | $ - |
| 3 | CONTRACT SUM TO DATE (Line 1 +/- 2) | $ - |
| 4 | TOTAL COMPLETED & STORED TO DATE | $ - |
| | (Column H on *WT-002*) | |
| 5 | RETENTION | $ |
| | (Column P on *WT-002*) | |
| 6 | TOTAL EARNED LESS RETENTION | $ |
| | (Line 4 less Line 5 Total) | |
| 7 | LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ |
| | (Line 6 from Previous Invoice) | |
| 8 | CURRENT PAYMENT DUE | $ - |
| | (Line 6 less line 7) | |

**CHANGE ORDER SUMMARY**

| | Additions | Deductions | Net Change |
|---|---|---|---|
| Previously Approved | $ - | $ - | $ - |
| Approved this Month (From WT-003) | $ - | $ - | $ - |
| Totals | $ - | $ - | $ - |

**CERTIFICATION:**

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from Whiting-Turner, and that the current payment shown herein is now due.

CONTRACTOR: _____

By: _____ Date: _____

Printed Name and Title

State of: _____

Subscribed and sworn to before me this _____

Notary Public: _____

My Commission expires: _____

**For Whiting-Turner Use Only:**

| PROJECT #  018146 | | | SUBCONT# | | |
|---|---|---|---|---|---|
| **Current - Progress Billing** | | | **Retention Release** | | |
| CURRENT GROSS | | 0.00 | TOTAL RETENT | | 0.00 |
| CURRENT RETENTION | | 0.00 | REMAINING RETENT | | 0.00 |
| CURRENT PAY | | 0.00 | RELEASE RETENT | | 0.00 |
| VENDOR | APPV | DATE | APPV | DATE | VP |

**EARLY PAYMENT DISCOUNT OPTION:**

Payment terms shall be in accordance with the above referenced Contract No. In the event that Whiting-Turner elects to provide for shorter payment terms, we agree to do so for the following discount structure:

_____% Discount, net _____ days, if paid by

Whiting-Turner's election to take a discount will be a unilateral decision made by Whiting-Turner alone. The decision to take a discount on one progress payment does not represent a decision to implement early payments for any other work performed by this subcontractor or supplier.

10/21/2015  -Whiting-Turner

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| ORIGINAL SCHEDULE OF VALUES | | Form WT-002 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contractor: | | | | | | | | | | | | APPLICATION NO: | | | |
| Remittance | | | | | | PROJECT: Fashion Valley Mall | | | | | | | | | |
| Address: | | | | | | PROJECT NO: 018146 | | | | | | PERIOD TO: | | | |
| | | | | | | CONTRACT NO: 018146-XX | | | | | | INVOICE DATE: | | | |

WT-001 Application for Payment, containing Contractor's signed Certification is attached. In tabulations below, amounts are stated to the nearest dollar.

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Work Completed | | | | | | | | | | | | |
| Task Code | Description | Contract Amount | Previous Certified Amount | This Period | Materials Presently Stored (Not in D or E) | Total Current Amount (E+F) | Total Completed Amount (D+G) | % (H/C) | Balance to Finish (C-H) | % Ret this Period | Previous Retainage | Current Amount Retained (K*G) | Total Amount Retained (L+M) | Retainage Released | Total retainage held to date (N-O) |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| | | | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| Subtotal | | $ - | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| Summary of Changes (from W-T 003) | | $ - | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |
| Totals: | | $ - | $ - | $ - | $ - | $ - | $ - | 0% | $ - | | $ - | $ - | $ - | $ - | $ - |

10.2.2015 - Whiting-Turner

Page 105 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**CHANGE ORDER SCHEDULE OF VALUES**      *Form WT-001*

Contractor: _____
Remittance: _____
Address: _____

PROJECT: Easton Valley Mall
PROJECT NO: 018146
CONTRACT NO: 018146-XX

APPLICATION NO: _____
PERIOD TO: _____
INVOICE DATE: _____

WT-001 Application for Payment, containing Contractor's signed Certification is attached. In tabulations below, amounts are stated to the nearest dollar.

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Work Completed | | | | | | | | | | | | |
| Task Code | Description | Contract Amount | Previous Certified Amount | This Period | Materials Presently Stored (Not in D or E) | Total Current Amount (E+F) | Total Completed Amount (D+G) | % (H/C) | Balance to Finish (C+H) | % Ret this Period | Previous Retainage | Current Amount Retained (K*G) | Total Amount Retained (L+M) | Retainage Released | Total retainage held to date (N-O) |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| | | | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |
| Totals: | | $    - | $    - | $    - | $    - | $    - | $    - | 0% | $    - | | $    - | $    - | $    - | $    - | $    - |

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3
THE WHITING-TURNER CONTRACTING COMPANY

## JOINT CHECK AGREEMENT

This Joint Check Agreement is made as of this _____ day of_____20____, between The Whiting-Turner Contracting Company (Contractor) and_____(the "Subcontractor") and_____(the "Supplier").  Subcontractor and Supplier are collectively referred to herein as the Parties.

1.    Whiting-Turner is the General Contractor/ Construction Manager on the project known as (the Project). Whiting-Turner has entered into a subcontract with Subcontractor to provide certain labor and materials under the terms and conditions set forth in the subcontract.  Supplier has entered into an agreement with Subcontractor to provide materials to Subcontractor in connection with the Project, at an agreed upon cost of  $_____, including delivery and taxes.

2.    Whiting-Turner hereby agrees with the Parties that, in the event the Subcontractor submits a request for payment for materials provided to Subcontractor by Supplier, Whiting-Turner, subject to the terms and conditions of this Agreement, will make the check in payment for such request payable jointly to Subcontractor and Supplier.  The total of such checks are not to exceed cumulatively the amount set forth above.

3.    This method of payments for the convenience of Whiting-Turner, to assure that materials provided for the Project are paid for, and is not for the benefit of the Parties. Whiting-Turner's obligation to issue joint checks under this Agreement is not a guarantee of payment to any of the Parties and further is contingent upon receipt by Whiting-Turner of payment from the Owner for the materials which are the subject of the payment request and upon the amount requested being actually due and payable to the Subcontractor under the terms of the subcontract.

4.    Prior issuance of a joint check, the Parties must deliver to Whiting-Turner a copy of the invoice for which the joint payment is sought and such invoice copy shall be signed by the Parties to evidence their agreement that the invoice is correct and that payment is due. In the event that the Parties do not submit a signed copy of the invoice, Whiting-Turner shall have no obligation hereunder to prepare or to deliver a joint check.

5.    Supplier understands that Whiting-Turner has no obligation to prepare and deliver a joint check in an amount greater than is due under the subcontract. Whiting-Turner will respond to inquiries from the Supplier in the event it wishes to ascertain whether there are sufficient funds available under the subcontract to pay for the materials in question.

6.    Supplier warrants and represents to Whiting-Turner that Supplier will not endorse and deliver the joint check to the Subcontractor until Supplier has received the equivalent of cash payment from the Subcontractor.

7.    This Joint Check Agreement may be terminated at any time by Whiting-Turner upon 24 hours notice to the Parties. Such termination shall not affect the operation of this Agreement with respect to payment for labor and materials provided prior to the date of termination, but such payment shall be subject to the other terms and conditions of this Agreement.  This Agreement shall terminate automatically, without notice, upon a breach of the terms of the subcontract by the Subcontractor or upon a declaration by Whiting-Turner that the Subcontractor is in default under the subcontract.

8.    Subcontractor hereby agrees to indemnify, defend and hold harmless, Whiting-Turner, its directors, officers, employees and agents from and against any and all claims, demands, judgments, damages, and expenses, including reasonable attorneys' fees, arising out of or in connection with the failure of the Subcontractor to comply with the terms and conditions of this Agreement.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3
THE WHITING-TURNER CONTRACTING COMPANY

IN WITNESS WHEREOF, Whiting-Turner and the Parties have caused this Agreement to be signed by their duly authorized representatives as of the date set forth above.


WITNESS                          THE WHITING-TURNER CONTRACTING COMPANY

_____          _____    _____
                                 Signature, Title                        Date


WITNESS                          SUBCONTRACTOR

_____          _____    _____
                                 Signature, Title                        Date


WITNESS                          SUPPLIER

_____          _____    _____
                                 Signature, Title                        Date

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3
THE WHITING-TURNER CONTRACTING COMPANY

# THE WHITING-TURNER CONTRACTING COMPANY

### JOINT CHECK REQUEST

**PROJECT NAME**        Fashion Valley Mall Redevelopment        **Date** _____

**W-T OFFICE**        **San Diego, California Office**

**W-T JOB NUMBER**        018146 _____

**Subcontractor Name** _____
**Address** _____
_____        Amount _____

**Check #1**
**Co-Signee** _____
**Address** _____
_____
_____        Amount _____

**Check #2**
**Co-Signee** _____
**Address** _____
_____
_____        Amount _____

**Check #3**
**Co-Signee** _____
**Address** _____
_____
_____        Amount _____

**Check #4**
**Co-Signee** _____
**Address** _____
_____
_____        Amount _____

TOTAL        _____

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## INTERIM CONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT - SUBCONTRACTOR

STATE OF <u>CALIFORNIA</u>
COUNTY OF <u>SAN DIEGO</u>

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as <u>FASHION VALLEY MALL REDEVELOPMENT</u> ("Project"), which is located within the City <u>SAN DIEGO, CA</u> ("Site City"), County of <u>SAN DIEGO, CA</u> ("Property"), and is owned by <u>SIMON PROPERTY GROUP</u> ("Owner"), and more particularly described as follows:

<div align="center">

_____ 7007 Friars Road _____
(Site Address)

_____ San Diego, CA 92108 _____
(Site City, State, Zip Code)

</div>

Upon receipt of the sum of $_____ ("Current Payment") for Payment Request No. ___, the Company waives and releases any and all liens or claims of liens and all claims, demands, actions, causes of action or other rights against the Owner and the Property or any right against any labor and/or material payment bond, has or may have through the date of _____, 20____, ("Current Date") and reserving those rights and/or that the Company might have in any retainage on account of materials, equipment, services, and/or labor furnished by the undersigned to or on account of the Owner or any other person or entity for the Project.

The Company acknowledges that this Waiver and Release is given to induce the payment set forth above, and that this Waiver and Release is in substantial conformance with the requirements of applicable law.

Applicable to Payment Request(s) No._____
(or) Invoice(s) No._____

Given under hand and seal this _____ day of _____, 20____.

<div align="right">

Company _____

_____(SEAL)

By: _____

Title _____

</div>

Before me the undersigned, a Notary Public for _____ County, State of _____,
personally appeared _____, and acknowledged the execution of this
instrument this ___ day of _____, 20___.

_____                                      (Seal)
Notary Public

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## INTERIM UNCONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT - SUBCONTRACTOR

STATE OF <u>CALIFORNIA</u>
COUNTY OF <u>SAN DIEGO</u>

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as <u>FASHION VALLEY MALL REDEVELOPMENT</u> ("Project"), which is located within the City <u>SAN DIEGO, CA</u> ("Site City"), County of <u>SAN DIEGO, CA</u> ("Property"), and is owned by <u>SIMON PROPERTY GROUP</u> ("Owner"), and more particularly described as follows:

<div align="center">

_____7007 Friars Road_____
(Site Address)

_____San Diego, CA 92108_____
(Site City, State, Zip Code)

</div>

Having received the sum of $_____ for Payment Request No. ____, the Company
unconditionally waives and releases any and all liens or claims of liens and all claims, demands, ___ns, causes
action or other rights against the Owner and the Property or any right against any labor and/or mater. __aym'
bond it has or may have through the date of _____, 20____, and re___ing those rights and ___ that
the Company might have in any retainage on account of materials, equipment, serv___ and/or labor furni___ed by the
undersigned to or on account of the Owner or any other person or entity fo___ Proje___

The Company acknowledges that this Waiver and Release in substa___ conform__ce with ___ quirements of
applicable law.

Given under hand and seal this _____ day of _____, 20____.

<div align="right">

_____
___any

Si___ _____ (SEAL)

By: _____

Title _____

</div>

Before me the undersign__ __otary Pub__ for _____ County, State of _____,
personally appeared _____, and acknowledged the execution of this
instrument this ___ day of _____ 20___.

_____           (Seal)
Notary Public

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# FINAL CONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT

STATE OF <u>CALIFORNIA</u>

COUNTY OF <u>SAN DIEGO</u>

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as
<u>FASHION VALLEY MALL REDEVELOPMENT</u> ("Project"), which is located within the City <u>SAN DIEGO, CA</u> ("Site City"), County of <u>SAN DIEGO, CA</u> ("Property"), and is owned by <u>SIMON PROPERTY GROUP</u> ("Owner"), and more particularly described as follows:

<div align="center">

_____
7007 Friars Road
(Site Address)

_____
San Diego, CA 92108
(Site City, State, Zip Code)

</div>

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION, THE LAND LOT DISTRICT, BLOCK AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Upon receipt of the sum of $_____, the Company waives and releases any and all claims, demands, actions, causes of action or other rights against the Owner and the Property, law, under contract, in tort, equity or otherwise, and any and all liens or claims of liens or any rights against any labor and/or material payment bond it has, may have had or may have in the future upon the foregoing described property or in relation to the Company's performance of work on or the furnishing of equipment, services, and/or labor on the Project.

This Waiver and Release applies to all facts, acts, events, circumstances, changes, constructive or actual delays, accelerations, extra work, disruptions, interferences and the like which have occurred, or may be claimed to have occurred prior to the date of this Waiver and Release, whether or not known to the Company at the time of execution of this Waiver and Release.

The Company acknowledges that this Waiver and Release is in substantial conformity with the requirements of applicable law and shall be binding and conclusive against the Company for all purposes, subject only to payment in full of the amount set forth above.

Given under hand and seal this _____, 20____.

_____
Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____, personally appeared _____, and acknowledged the execution of this instrument this ___ day of _____, 20___.

_____
Notary Public

(Seal)

Form SPG-9 (06/17/2019)

<div align="center">1</div>

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WT**
**WHITING-TURNER**

**Subcontract Supplement**
The Whiting-Turner Contracting Company

| PROJECT | Fashion Valley Mall Redevelopment | W-T Job Number: | 018146 |

TO

ATTN

DATE
CONTRACT SUPPLEMENT NO.
CONTRACT NO.
CONTRACT DATE
W-T PROJECT MANAGER

YOUR CONTRACT IS HEREBY AMENDED TO INCLUDE THE PROVISIONS OF THE EXTRA WORK ORDERS LISTED BELOW.

This supplement constitutes full and equitable adjustment and compensation attributable to the facts or circumstances giving rise to the changed work described in the Extra Work Orders and/or Change Requests listed, including, but not limited to any changes, differing site conditions, suspensions, delays, rescheduling, acceleration, impact or other causes resulting therefrom.

| PCI | Description | Amount |
|-----|-------------|--------|

TOTAL ADD THIS SUPPLEMENT                                    Dollars:

| Original Contract Amount | Previous Supplements | Amount of This Supplement | Revised Contract Amount* |
|--------------------------|----------------------|---------------------------|--------------------------|
|                          |                      |                           |                          |

THE WHITING-TURNER CONTRACTING COMPANY

APPROVED _____          APPROVED _____

Signature                                    Signature

Printed Name                                 Printed Name

Title                                        Title

DATE _____               DATE _____

\* Consent of Surety - If original Contract Amount is increased by more than 10% resulting from this and previous Contract Supplements, or original scope of work has been substantially changed, Consent of Surety Company is required below.

_____          _____          _____
Surety Company              Attorney-In-Fact           Date

Rev. 03/08/16  **DOCUSIGN VERSION**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## GUARANTEE AND WARRANTY

WHEREAS,_____ _____

hereinafter called the "Guarantor", entered into a contract dated_____,

hereinafter called the "Contract" with Whiting-Turner, hereinafter called the "General Contractor (GC)",

for Fashion Valley Mall Redevelopment (hereinafter referred to as the "Work"), at San Diego, CA for

(item of work) the Phase 2 Performance Court    scope of work.

WHEREAS, the GC has performed, kept, observed, and fulfilled each and every one of the obligations, promises, stipulations, terms and conditions on its part, and

WHEREAS, by the terms of the Contract, one of the conditions precedent the making of final payment is the execution and delivery by the Guarantor of this guaranty and warranty; and

WHEREAS, the Guarantor is now desirous of obtaining payment pursua the terms of said Contract and as a condition precedent to such payment, furnishes this separate guara e and rranty for all work and material included in said Contract,

NOW, THEREFORE, in consideration of the premise of the ayment ade to the Guarantor under said Contract and in further consideration of al pay ent, the Grantor does hereby for itself and its successors, heirs and assigns, guarantee a warran o the Ge its successors and assigns, that the Guarantor has performed all the work required sa Contract in accordance with the terms thereof including but not limited to satisfactory ope n of quipment by means of acceptance tests, correction of items on all punch lists prepare by e Ow r/Architect, and that all portions of the work completed under the Contract are perfect as to ate ls and workmanship and will so remain from  the date of final completion of the Pr 8/27/20 for eriod of **one (1)** year.

The Guarantor does hereby further guar tee an arrant that the Guarantor will make good and replace at its own cost and expens fects in erial and workmanship appearing during the period aforesaid and the Guarantor ill o onsib e for all damage caused to the GC by such defects or by the work required to remedy ch ects All corrections to material workmanship shall be made at the convenience of and sh be performed in a good workmanlike manner.

The Guarant does arr t and represent that it has obtained warranties and guarantees from its material and ent sup ers and from its subcontractors to the fullest extend possible and as customary in the various tr es and has delivered all assignable warranties and guarantees to the GC.

It is understood that this guarantee shall in no way be construed to limit in any manner any of the provisions of the Contract or to modify or limit any of the obligations, liabilities, and duties of the Guarantor thereunder.

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

It is further understood that this guarantee shall remain binding and irrevocable during the above stated periods and that the Guarantor shall not contest the validity of, or in any way attempt to revoke or withdraw from, this guarantee for any cause whatsoever, whether arising before or after the execution of the Contract or this guarantee.

IN WITNESS WHEREOF, the Guarantor has caused this instrument to be signed and executed this _____ day of _____, 20____.

_____
(Guarantor)

WITNESS:                                    By: _____
                                            (President or Vice President)

_____    T_____

STATE OF _____       )
                              )
                              ) SS:
COUNTY OF _____        )

On the _____, 20____, before me personally came _____, to me known who being by me duly sworn, did depose and say that he resides at _____ that he is _____ of _____ the corporation that executed the foregoing instrument signed his name thereto by like order of the Board of Directors.

_____

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Exhibit M
**PAYMENT BOND**

## THE WHITING-TURNER CONTRACTING COMPANY
### 300 EAST JOPPA ROAD
### TOWSON, MARYLAND   21286

BOND NO.  _____

KNOW ALL MEN BY THESE PRESENTS:
    That _____

_____

as Principal, hereinafter called Principal, and _____

_____

_____

      (here insert the name, address and state of incorporation of Surety)

as Surety, hereinafter called Surety, are held and firmly bound unto THE WHITING-TURNER
CONTRACTING COMPANY, 300 East Joppa Road, Towson, Maryland   21286 as Obligee,
hereinafter called Obligee, in the amount of _____
Dollars ($ _____), for the payment whereof Principal and Surety bind themselves, their heirs,
executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated _____ entered into
Contract No _____ with Obligee for _____

_____

_____.

in accordance with drawings and specifications prepared by _____

_____.

which Contract is by reference made a part hereof, and is hereinafter referred as a Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such, that if the Principal
shall promptly make payments to all persons supplying labor, material, rental equipment,
supplies, or services in the performance of the said Contract and any and all modifications of said
Contract that may hereafter be made, then this obligation shall be null and void; otherwise it shall
remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other
modification of the terms of either the said Contract or the said Prime Contract, or both, or in the
said work to be performed, or in the specifications, or in the plans, shall in anywise affect its
obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time,
alterations, additions, omissions, and other modifications.

PA-015
8/95

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor, material, rental equipment, supplies, or services in the performance of the said Contract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond, in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, _____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

<div align="right">

_____
Principal

(Seal)

</div>

Witness:

_____       By: _____
                                         Signature

                                    _____
                                    Name and title - type or print

                                    _____
                                    Surety

                               By: _____
                                    Signature    Attorney-in-Fact

PA-015
8/95

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Exhibit N
**PERFORMANCE BOND**

**THE WHITING-TURNER CONTRACTING COMPANY**
**300 EAST JOPPA ROAD**
**TOWSON, MARYLAND  21286**

BOND NO.  _____

KNOW ALL MEN BY THESE PRESENTS:

That _____

_____

as Principal, hereinafter called Principal, and _____

_____

_____

(here insert the name, address and state of incorporation of Surety)

as Surety, hereinafter called Surety, are held and firmly bound unto THE WHITING-TURNER CONTRACTING COMPANY, 300 East Joppa Road, Towson, Maryland  21286 as Obligee, hereinafter called Obligee, in the amount of _____

Dollars ($ _____), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated _____ entered into Contract No _____ with Obligee for _____

_____

_____

_____.

in accordance with drawings and specifications prepared by _____

_____

_____.

which Contract is by reference made a part hereof and is hereinafter referred as a Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms, conditions, schedules, warranties, guarantees, and agreements of said Contract, and shall well and truly perform all the undertakings, covenants, terms, conditions, schedules, warranties, guarantees, and agreements of any and all duly authorized modifications of said Contract that may hereafter be made, and shall pay to said Obligee and save harmless said Obligee of and from any and all loss, damage, expense, interest, costs, attorney's fees, and statutory liabilities, fines or penalties of any kind, including but not limited to treble damages, which the said Obligee may sustain by reason of Principal's failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

PA-016
8/95 Nov 5, 2018

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Contract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

Whenever Principal shall be declared by the Obligee to be in default under the Contract, the Surety shall, within ten (10) calendar days after notice of default from the Obligee, notify the Obligee of its election either to promptly proceed to remedy the default or promptly proceed to complete the contract in accordance with and subject to its terms and conditions.  In the event the Surety does not elect to exercise either of the above stated options, then the Obligee thereupon shall have the remaining work completed, Surety to remain liable hereunder for all expenses, including attorney's fees, of completion.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, _____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____
Principal

(Seal)

Witness:

_____    By: _____
                                          Signature

_____         _____
Bonding Agent                          Name and title - type or print

_____         _____
Address                                         Surety

_____    By: _____
Phone                                       Signature    Attorney-in-Fact

PA-016
8/95 Nov 5, 2018



DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# Exhibit O

# ENVIRONMENTAL, HEALTH & SAFETY

## Site Specific Safety Plan

© Copyright 2020
The Whiting-The Whiting-Turner Contracting Company
All Rights Reserved

**WT**
WHITING-TURNER

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

# WHITING-TURNER SITE SPECIFIC SAFETY PLAN

Fashion Valley Mall Redevelopment

7007 Friars Road

San Diego, California, 92108

Prepared by:

Devin Merker

The Whiting-Turner Contracting Company

300 E. Joppa Road

Towson, Maryland 21286

Updated May 2022

1 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 121 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

## 1.    Environmental, Health and Safety Policy

The elimination of accident/incidents related to Whiting-Turner operations is one of our greatest responsibilities. Morally, legally, and financially, we are compelled to make every reasonable effort to eliminate hazards from our operations and to complete our projects without accident/incidents.

We must constantly strive to improve our safety success through the implementation of best practices that will enable us to more effectively identify and mitigate potential hazards. Unless predetermined otherwise, our project superintendent is our job site safety representative, and as such is primarily responsible for maintaining an effective culture of safety excellence.

It is vital to our continuing success that all Whiting-Turner operations personnel be constantly vigilant in planning and executing our work in a manner that provides a safe environment for everyone. We must instill this same commitment and attitude toward safety in all workers on all projects!

Thank you for all you do every day to maximize our safety success.

Timothy J. Regan

President

2 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 122 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 2.    Commitment to Safety Excellence

The Whiting-Turner Contracting Company firmly believes that safety is of paramount importance on all its projects.  It is widely known that there is a direct correlation between unsafe acts and (a) incidental injury, (b) occupational illness, and (c) property damage.  For that reason, Whiting-Turner strives to create a culture of safety excellence through leadership, integrity, collaborative risk assessments and pre-planning strategies that provide tradespersons with the tools to perform their tasks safely and deters unsafe acts.

Whiting-Turner's Environmental, Health and Safety Manual will serve as the basis on which the culture of safety excellence will be upheld and improved upon.  Maintaining a culture of safety excellence through commitment, communication, and compliance makes more attainable our goals of

- zero fatalities;
- zero permanent injuries;
- zero impact on public personnel or property;
- and zero accident/incidents that would adversely impact the client, cost, or schedule.

All Whiting-Turner employees shall adhere to all the principles, policies, and procedures of Whiting-Turner's EH&S Manual.  Likewise, all contractors/subcontractors engaged in work on Whiting-Turner projects or on behalf of Whiting-Turner shall adhere to all the applicable principles, policies, and procedures of Whiting-Turner's Contractor/Subcontractor EH&S Manual and this Site-Specific Safety Plan.

Adherence to this plan and Whiting-Turner's Contractor/Subcontractor Plan does not absolve any contractor/subcontractor from its legal/contractual obligation to submit a safety program, which meets or exceeds the requirements of the Whiting-Turner Contractor/Subcontractor EH&S Manual, the contract documents and federal, state, local or other applicable regulations.

| *JJ Sellner* | *Paul Perry* | *Rick Jackson* |
|---|---|---|
| JJ Sellner | Paul Perry | Rick Jackson |
| Project Manager | Project Superintendent | EH&S Manager |

3 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 123 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 3.    Background Information

### 3.1.    Project Organization:

Owner: Simon Property Group (SPG)

Architect: Retail Design Collaborative (RDC)

Whiting-Turner Project Executive: Art Rodriguez

Whiting-Turner Project Lead Superintendent: Paul Perry

Whiting-Turner Project Night Superintendent: Paul Perry

Whiting-Turner Project Manager: JJ Sellner

Whiting-Turner Project Manager: Shane Willingham

Whiting-Turner Project Safety Manager: Rick Jackson

### 3.2.    Project Description:

The Fashion Valley Mall Redevelopment project is located in San Diego, CA in the existing and live mall. This includes selective demolition of plaster, railings, an elevator and structure, unit pavers, and existing tile. New structural concrete includes retrofit of the existing footings, new spread footings and caissons, and related excavation. New structural steel include new members and retrofit of existing beams and columns. New railings include perforated metal rails, picket rails, glass guardrails and stainless steel handrails. New shade structures and panels throughout. There are tie ins to existing waterproofing and roofing at multiple locations. There is a new door, frame, and hardware. New plaster, EIFS, and DIFS throughout and paint of plaster existing and new. New wall and floor tile throughout. New bathroom specialties and new water feature. New escalators throughout. Modifications and additions to the existing fire sprinkler, HVAC, and plumbing systems. New electrical including light fixtures, fire alarm, and conduit to future signage. New landscaping throughout and at Friar's Road. New site concrete and replacement of unit pavers where affected. Schedule and written scopes of work to follow. Specific scopes are to supersede the above general description

### 3.3.    Site History and Hazard Assessment:

This site is extremely constrained by existing conditions and the mall operating from 10am-10pm. Subcontractors must utilize their safety procedures, ample precautions, and due diligence to avoid disruption or harm to the public, or damage to existing surfaces to remain. Subcontractors will

4 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 124 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

need to exercise above average coordination including diagrams and plans with Whiting-Turner to ensure optimal operations and safety with the mall and the public. Deliveries will be limited to constrained access areas. Work will be constrained to off hours.

### 3.4.    Phases of Work:

The definable features of work contemplated for the project have been set forth and are listed below in Section 15. The Activity Hazard Analysis (AHA) for each definable feature of work will be prepared to identify hazardous activities and set forth safe practices and procedures for each hazardous activity associated with the work phase. The AHA will be further defined and discussed during the preconstruction meeting.

5 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 125 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 4.    Project Responsibilities

### 4.1.    Project Manager

4.1.1.  Overall authority and responsibility to implement and manage the project's Site-Specific Safety Plan.

### 4.2.    Project Superintendent

4.2.1.  Responsible to enforce compliance with Whiting-Turner's Site-Specific Safety Plan, OSHA Standards, and all other Federal, State, and Local Safety Codes and Regulations.

4.2.2.  Responsible for coordination of Whiting-Turner workforce and contractors/subcontractors to ensure that a logical, systematic progression of work takes place.

4.2.3.  Responsible to assist contractors/subcontractors in pre-planning their operations to prevent personal injury and property damage.  AHAs and pre-task plans for new or modified operations are to be reviewed prior to the operation's commencement.

4.2.4.  Responsible to schedule, distribute notification, and chair mandatory safety meetings.

4.2.5.  Responsible to notify contractors/subcontractors of a safety noncompliance. This notification will include the allowable time limit for compliance or correction shall be made by Whiting-Turner and back charged to the contractor/subcontractor .  A copy of any written notice, including all noncompliance items and date of correction will be filed in the project files.

4.2.6.  Responsible to assist in the investigation of accidents, incidents and near misses in conjunction with the contractor's/subcontractor's  foreman, and safety representative.

### 4.3.    Subcontractor Project Managers/Outside Superintendents/Foreman

4.3.1.  Has overall responsibility for ensuring the safety of the workers reporting to him/her.

4.3.2.  Shall ensure that his/her employees comply with their Company's Safety Program and all federal, state, and local codes and regulations, including Whiting-Turner's Contractor/Subcontractor EH&S Manual, and this Site-Specific Safety Plan.

4.3.3.  Shall ensure compliance with the site-specific safety orientation process for all their personnel assigned to the project.

4.3.4.  For activities where pre-task plans are required, shall ensure that daily pre-task plans are completed, submitted to Whiting-Turner for review, and then reviewed with the work crew(s) prior to commencing.

4.3.5.  Shall ensure that workers under his/her command have the adequate training and knowledge to complete the task at hand.

4.3.6.  Shall attend all required meetings for which Whiting-Turner requests their presence.

6 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 126 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

4.3.7.   Shall investigate all accident/incidents and near misses in conjunction with the Whiting-Turner Superintendent, and contractor/subcontractor safety representative.

**4.4.     Contractor/Subcontractor Safety Representative**:

4.4.1.   Shall ensure that their employees comply with their Company's Safety Program and all federal, state, and local codes and regulations, including Whiting-Turner's Contractor/Subcontractor EH&S Manual and this Site-Specific Safety Plan.

4.4.2.   Shall ensure compliance with the site-specific safety orientation process for all personnel assigned to the Project.

4.4.3.   Shall train their employees to perform their work in a safe manner and to recognize [and correct] unsafe condition and unsafe acts.

4.4.4.   Shall make a minimum of one complete safety inspection of their work per week with a written report to the Whiting-Turner Project Team noting the corrective action to identified hazards.

4.4.5.   Shall attend each weekly project safety representative meeting.

4.4.6.   Shall chair each weekly tool-box talk, with written minutes and provide copies weekly to the Whiting-Turner Project Team.

4.4.7.   Shall report all safety-related matters to the imbedded Whiting-Turner EH&S Personnel (if applicable) and Whiting-Turner Superintendent.

4.4.8.   Shall be responsible for the contractor/subcontractor accident/incident reporting requirements.

4.4.9.   Shall investigate any accident/incident involving their employee and submit accident/incident investigation reports to Whiting-Turner Safety Department within 24 hours.

4.4.10. Shall ensure that workers under his/her command have the adequate training and knowledge to complete the task at hand.

**4.5.     Project Employee**

4.5.1.   Shall attend the project safety orientation and complete the orientation acknowledgement form prior to beginning work on this project.

4.5.2.   Shall perform their work in a safe manner for prevention of harm to themselves, fellow workers, the general public, and to prevent property damage of all concerned.

4.5.3.   Shall attend weekly Tool-Box Talks.

4.5.4.   Shall alert their foreman of hazards and unsafe acts.

4.5.5.   Shall notify their foreman immediately of any accident/incident.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 127 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

4.5.6. Shall comply with their company's safety program, Whiting-Turner's Contractor/Subcontractor EH&S Manual, this Site-Specific Safety Plan, and all applicable Federal, State, and Local Codes and Regulations.

## 5. Responsibilities and Lines of Authority

**5.1. Identification and Accountability of Personnel:**

The Whiting-Turner Contracting Company does not intend to insert itself in the employer-employee relationship. Therefore, each employer on Whiting-Turner's project will be accountable for monitoring compliance and enforcing the policies and procedures as set forth in this Site-Specific Safety Plan, and all applicable contractual documents, for their respective employees. If compelled and to uphold the commitment to safety excellence, Whiting-Turner will engage any worker or tradesperson (and their direct supervisor) who has left an unsafe condition or who has been observed committing an unsafe act.

**5.2. Lines of Authority:**

The following personnel shall have the authority to intervene and suspend work in the interest of safety policy compliance:

5.2.1. ALL Project Personnel and Vendors

*Note: that following a safety work stoppage, the responsible contractor/subcontractor and the Whiting-Turner project team shall be notified immediately. Whiting-Turner will facilitate the prompt corrective action of the unsafe act or condition with the responsible contractor/subcontractor . After satisfactory correction of the unsafe act or condition, the Whiting-Turner project team will authorize work to resume.*

**5.3. List of Emergency Phone Numbers and Points of Contact:**

Whiting-Turner Site EH&S Personnel: Paul Perry; Shane Willingham; JJ Sellner

Cell:                                  (619) 571-0367; (858) 210-2074; (619) 964-3157

Project Superintendent: Paul Perry

Cell: (619) 571-0367

Project Manager: JJ Sellner

Cell: (619) 964-3157

Area EH&S Manager: Rick Jackson

Cell: (858) 583-9467

Vice President: Art Rodriguez

Cell: (949) 254-2422

8 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 128 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 6. Subcontractors and Suppliers

### 6.1. Identification of contractor/subcontractor s and Suppliers:

6.1.1. A list of contractor/subcontractor s and suppliers by name, discipline, contact name, and telephone number shall be available at the project office for review.

### 6.2. Means for Controlling and Coordinating contractor/subcontractors and Suppliers:

6.2.1. A copy of the Site-Specific Safety Plan will be made available to all contractor/subcontractors at the Project Site and are required to comply with the requirements as set forth therein.

6.2.2. All contractor/subcontractor s and vendors, shall be required to comply with the policies and procedures indicated within this Site-Specific Safety Plan as well as the policies and procedures contained within the following publications:

6.2.2.1. Occupational Safety & Health Standards for the Construction Industry (CFR) 29 Part 1926

6.2.2.2. Occupational Safety Standards for General Industry CFR 29 Part 1910.

6.2.2.3. The Whiting-Turner Contracting Company EH&S Manual

6.2.2.4. Contractor/Subcontractor EH&S Manual

### 6.3. Safety Responsibilities of contractor/subcontractor s and Suppliers:

6.3.1. Subcontractors are required, upon execution of subcontract, to comply will all safety policies and procedures in effect on the job site.

6.3.2. All contractor/subcontractor s shall be responsible for providing all necessary safety equipment, training, and shall assure a drug-free work force for their personnel. The responsible contractor/subcontractor shall ensure that all safety information is communicated to workers in a language they understand. contractor/subcontractor s must provide someone to translate for employee's who are not fluent in English.

6.3.3. Each contractor/subcontractor with personnel on the job site shall be required to attend each job site safety meeting conducted by The Whiting-Turner Contracting Company's Site Safety Manager. contractor/subcontractor s are required to hold their own individual safety meetings weekly and provide a copy of the meeting to The Whiting-Turner Contracting Company.

6.3.4. Each contractor/subcontractor shall be required to have a person trained in CPR and First Aid on site during contractor/subcontractor -construction activity.

6.3.5. Each contractor/subcontractor to maintain first aid kits on the job site.

6.3.6. Subcontractors are required to develop the Activity Hazard Analysis (AHA) for their definable feature of work, per the AHA Form and as outlined in paragraph 3.4.

9 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
**Page 129 of 174**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## WHITING-TURNER SITE SPECIFIC SAFETY PLAN

**6.4.    Pre-Construction Submittals**

6.4.1. Contractor/subcontractor must identify and submit the qualifications of a safety representative/competent person to Whiting-Turner as the primary, on-site contact for safety related issues.

    6.4.1.1.    The safety representative may be a supervisor and they shall have as a minimum, the OSHA 30-hour Outreach Training Program for Construction.

    6.4.1.2.    The contractor/subcontractor will provide a first aid/CPR/AED trained competent person when one or more of the contractor's/subcontractor's employees are working

6.4.2. Contractor/subcontractor must submit a completed prequalification form and respond in writing to Whiting-Turner's requests for additional information/explanation.

6.4.3. A site-specific safety plan (SSSP) shall be developed for the project by each contractor/subcontractor. The plan should address hazards and mitigation strategies related to the scope of work for the project. Activity Hazard Analysis (AHA) for major phases of work, submitted with the company safety program may be accepted in lieu of SSSP – at the discretion of the Whiting-Turner project team.

6.4.4. Site-specific Safety Data Sheets (SDS) are required to be submitted prior to bringing any chemical product on site. A current chemical inventory is to be maintained with Whiting-Turner.

6.4.5. An Activity Hazard Analysis (AHA) shall be submitted ten days prior to the start of work.

6.4.6. A competent person's acknowledgement form must be completed, and their qualifications submitted for activities where OSHA requires a competent person.

**6.5.    Safety Management**

6.5.1. All on site personnel, (contractor/subcontractors, tiered contractors/subcontractors, and their employees) are required to participate in a mandatory safety orientation session prior to commencing with any work on site. Contractor/subcontractor shall provide a translator for any non-English speaking employees during orientation and any job wide meetings/stand-downs. Employees may be asked to attend orientation again for repeat violations or deficiencies.

6.5.2. Each contractor/subcontractor is required to designate a site safety representative (SSR). SSR shall be on site at all times and shall have the knowledge and authority of the competent person. SSR shall be able to conduct site walks with Whiting-Turner personnel to ensure the safety of contractor's/subcontractor's workers on the project. Manpower totals below include all tiered contractor/subcontractor employees. Proof of training must be submitted prior to mobilization or at orientation. The qualifications for the SSR are as follows:

    6.5.2.1.    Minimum requirement proof of OSHA 30 hour submitted

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
**Page 130 of 174**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## WHITING-TURNER SITE SPECIFIC SAFETY PLAN

6.5.2.2.  Contractors/subcontractors with (30) or more workers on site will be evaluated by the Whiting-Turner's management team along with Whiting-Turner's EH&S Manager regarding the contractor's/subcontractor's site-specific safety performance. If the contractor's/subcontractor's past or current site safety performance indicates improved safe work practices and conditions are needed to help ensure the safety of the contractor/subcontractor crews and others, Whiting-Turner at its discretion, may require the contractor/subcontractor to provide a fulltime Site Safety Representative to be present onsite with no other collateral duties.

6.5.3.  The contractor's/subcontractor's supervisor(s) and safety representative must make frequent and regular inspections of their work areas and activities.

6.5.3.1.  Hazards identified that are under their control must be corrected immediately and all other identified hazards must be reported to the Whiting-Turner superintendent.

6.5.3.2.  One documented inspection shall be conducted each week.

6.5.4.  The contractor's/subcontractor's on-site supervisor and the contractor's/subcontractor's designated on-site safety representative must schedule and attend a pre-construction safety meeting with the Whiting-Turner Superintendent to discuss the contractor/subcontractor safety requirements.

6.5.4.1.  The pre-construction safety meeting should take place at least five (5) working days before startup to allow for review of required documentation.

6.5.5.  The contractor/subcontractor shall provide a translator whenever there are non-English speaking tradespersons on site.

6.5.6.  Contractor/subcontractors, who in turn contract out parts of their work, have sole responsibility to see that their lower tier contractors comply with project safety requirements. Additionally, Whiting-Turner's Project Manager and/or Whiting-Turner's Superintendent shall be notified that the lower tier contractors are arriving at least five (5) days before work starts. The Contractor/subcontractors will be held directly accountable for all lower tier contractors. Contractors/subcontractors must provide a competent person onsite fulltime to oversee and direct lower tier contractors' while actively performing work.

6.5.7.  The contractor/subcontractor 's superintendent(s) and/or designated safety representative must attend the weekly coordination meeting where safety issues will be addressed.

6.5.8.  Emergencies shall be handled through the Whiting-Turner Field Office according to the posted Emergency Action Plan

6.5.9.  All work-related injuries, regardless of severity, must be reported to Whiting-Turner immediately. An accident/incident investigation report must be completed by the appropriate contractor/subcontractor supervisor and submitted to Whiting-Turner within 24 hours of the accident/incident. Further, all work-related injuries will be recorded on an

11 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 131 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

injury log. A completed injury log will be submitted to Whiting-Turner by the 5th of the month for the previous month.

6.5.10. Accident/incidents involving the public, regardless of severity, must be reported to Whiting-Turner immediately. An accident/incident investigation report must be completed by the appropriate contractor/subcontractor supervisor and submitted to Whiting-Turner within 24 hours of the accident/incident.

6.5.11. Only communication radios are permitted on Whiting-Turner projects.

12 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 132 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

| | |
|---|---|
| | **WHITING-TURNER SITE SPECIFIC SAFETY PLAN** |

## 7.    Training and Project Meetings

### 7.1.    Safety Indoctrination Training Subjects:

7.1.1.    The following must be presented to all Whiting-Turner employees and contractor/subcontractor employees prior to beginning work:

    7.1.1.1.    The Whiting-Turner safety orientation and the orientation acknowledgement form

    7.1.1.2.    Expectations for controlling water & moisture on the project

    7.1.1.3.    Hazard communication information specific to the project

    7.1.1.4.    Project specific emergency action plan

    7.1.1.5.    Safety programs specific to the project (AHA's, PTP's, PPE)

    7.1.1.6.    Other specific safety related information about the project

7.1.2.    Hazard Communication Program:

    7.1.2.1.    Written HAZCOM programs, Chemical Inventory Lists and SDS's shall be kept in the Whiting-Turner site office for all hazardous chemicals

    7.1.2.2.    All containers shall be labeled in accordance with the Globally Harmonized System for Hazard Communication

    7.1.2.3.    Each employee must be trained in the recognition and avoidance of hazards when asked to work with any chemical

7.1.3.    Emergency Procedures:

    7.1.3.1.    Supervisor shall be notified immediately of any injury, illness, or accident/incident; they will notify Whiting-Turner.

    7.1.3.2.    Injuries must be treated by a person who holds a valid first aid certification. Call designated emergency numbers for assistance. Report all injuries regardless of severity.

    7.1.3.3.    Emergency contact numbers and maps to the nearest hospital are to be posted at entrances to trailers/field offices.

    7.1.3.4.    A job wide first-aid kit must be on-site and easily accessible; <u>all medications must be removed</u>.  Each contractor/subcontractor is also responsible for providing a first aid kit.

### 7.2.    Mandatory Meetings

7.2.1.    In the interest of eliminating job safety risks and heightening awareness of project safety, <u>job wide safety meetings shall be conducted every month</u> while work on the job site is in progress.  Safety meetings shall be conducted based on the following format:

    7.2.1.1.    A review of past unsafe conditions, accident/incidents, or activities.

13 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 133 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

    7.2.1.2.      Review of pertinent aspects of the applicable Activity Hazard Analysis.

    7.2.1.3.      Review of safe working procedures and safety training.

    7.2.1.4.      Review of accident/incident and emergency procedures.

7.2.2.  Supervisory safety meetings shall be conducted to discuss all applicable activity hazard analyses and all project safety concerns.  <u>These meetings shall be held weekly.</u>

7.2.3.  Safety task force meetings build camaraderie and cohesion among different tradespersons and build a system of accountability.  The task force shall consist of one representative from each contractor/subcontractor.  The functionality and effectiveness of this task force is maximized by conducting a joint safety survey of the site. The task force members may determine the focus of these meetings based on .  <u>These meetings shall take place on a biweekly basis.</u>

7.2.4.  Quarterly Safety Focus - All projects and offices shall participate in the Quarterly Safety Focus meetings; these meetings will take place at 11:30am local time in February, May, August, and November

**7.3.    Additional Training and Certification**

7.3.1.  Additional safety training may be conducted under the direction of the Whiting-Turner team and in cooperation with supervisory, contractor/subcontractor , vendor personnel.

14 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 134 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 8.    Safety Inspections

**8.1.**    The Whiting-Turner Superintendent will conduct and document a weekly safety inspection.  The inspections shall focus on, but are not limited to the following:

    **8.1.1.**  Compliance with the site-specific safety plan, the Whiting-Turner EH&S Manuals and provisions set forth by OSHA.

    **8.1.2.**  Safe delivery and storage of project materials.

    **8.1.3.**  Ensure daily inspections and follow up the project foreman.

    **8.1.4.**  Proper maintenance of project equipment and tools

**8.2.**    The Whiting-Turner Project Manager will perform and document a monthly safety inspection with the Whiting-Turner or contractor/subcontractor superintendent.

**8.3.**    Items found to be deficient shall be corrected or abated immediately or the area of work affected by the deficiency shall be cordoned off to prevent personnel access until corrective action can be taken.  The responsible contractor/subcontractor  shall confirm the safety deficiency is corrected or abated. The Whiting-Turner team shall exercise authority as outlined to expedite safety-deficiency corrective action and/or abatement.

**8.4.**    Hole and Perimeter Protection Safety Inspections - All Whiting-Turner field management employees who are routinely in the field are required to attend the safety inspection and fall protection inspection training and are required to perform compliance surveys. The 2-a-day floor hole and perimeter protection compliance survey's may be conducted twice a day by any trained Whiting-Turner team member.

**8.5.**    In addition to the inspections conducted by the contractor/subcontractor s and the Whiting-Turner project team,  the Whiting-Turner Area EH&S Manager will perform a minimum of one site specific safety survey each month.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 135 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 9.    Safety Goals, Incentives, Compliance and Accountability

### 9.1.    Safety Goals and Objectives:

9.1.1.    It is the Contractor's responsibility to provide a place of employment free from recognized hazards that could cause death or serious physical injury to personnel working at the job site.

### 9.2.    Safety Incentives:

9.2.1.    Whiting-Turner shall continue its current safety-incentive program to award its personnel for reaching milestone dates for days-without-lost-time accident/incident. Milestone dates shall be determined by the Site Safety Manager taking into consideration the magnitude and scope of the project and personnel safety moral levels.

### 9.3.    Safety Non-Compliance Procedure:

9.3.1.    Any and all violations of the procedures or practices stipulated or intended from this Site-Specific Safety Plan shall be directed to project supervisory personnel immediately. Employees shall be encouraged to report close calls, unsafe conditions, and unsafe acts to project management without consequence.

9.3.2.    Personnel that are determined to be responsible and negligent for violating safety policies shall be issued a "Written Warning" form, with a copy becoming part of their personnel file. Employee(s) shall also be instructed in the proper procedures for the applicable task(s). In the event, personnel are employed by contractor/subcontractor s, suppliers, or the owner; all violation forms shall be sent to their respective supervisory personnel.

9.3.3.    Upon the second violation of any safety guideline, the involved personnel, including second tier contractor/subcontractor s, suppliers, or project owner representatives shall, at the discretion of The Whiting-Turner Contracting Company, be removed from the job site for an indeterminate time period and up to termination. In addition, the contractor/subcontractor may be subject to a fine for non-compliance.

### 9.4.    Accountability:

9.4.1.    Project Managers and Safety Personnel shall be accountable to ensure provisions for a place of employment free from recognized hazards that could cause death or serious physical injury to personnel. Project Managers and Safety Personnel must ensure total compliance by all project personnel and second tier groups of the policies and procedures as set forth in the Site-Specific Safety Plan.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 136 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 10.    Accident/Incident Reporting

### 10.1.    Exposure Data:

10.1.1. The Whiting-Turner Superintendent shall maintain man-hour exposure data. Data for both Whiting-Turner employees and contractor/subcontractor employees shall be recorded and shall reflect the actual man-hours worked on the project.

### 10.2.    Accident/Incident Investigations, Reports, and Logs:

10.2.1.    All accidents/incidents, injuries, near-miss accidents/incidents, unsafe conditions, and unsafe acts that occur shall be reported immediately to project supervisory personnel. No supervisor may decline to accept an accident/incident, injury, near-miss accident/incident, unsafe condition, or unsafe act report.

10.2.2.    Investigations should be conducted as soon as possible after the occurrence to ensure the most accurate information is being captured. In addition, a prompt investigation reflects and promotes Whiting-Turner's culture of safety excellence.

10.2.3.    The Superintendent and/or site supervision should investigate and provide a written report of all accident/incidents to the Claims Manager.

10.2.4.    In the case of serious accident/incident, the Claims Manager and Area EH&S Manager should be called to assist in the accident/incident investigation and provide guidance with the documentation.

10.2.5.    Identify witnesses. Record their names, contact information and employers. Interview witnesses in private regarding accident/incident description and cause. Ask them to sign a statement of description and cause.

10.2.6.    The goal is to ask questions and record information. Ask the six probing questions to obtain detailed information to gain insight into the accident/incident:

10.2.6.1.    The "who" question provides information about those involved

10.2.6.2.    The "what" question leads into actions, events, and physical objects

10.2.6.3.    The "where" question may help with the determination what caused the Accident/incident and discover the conditions that brought it about

10.2.6.4.    The "when" question will often prompt information regarding relationships between pairs of activities or events

10.2.6.5.    The "how" question should provide information on the interaction and relationships among the activities and events

10.2.6.6.    The "why" question offers clues concerning the corrective measures, since the answers will focus on unsafe acts or hazardous conditions

10.2.7.    If possible, if the scene has not been altered, take pictures of the scene. Include the following information with the photo:

17 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 137 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

|  |  |
|---|---|
| 10.2.7.1. | Date of accident/incident |
| 10.2.7.2. | Brief description of accident/incident |
| 10.2.7.3. | Location |
| 10.2.7.4. | Name and number of the person who took the photo |
| 10.2.7.5. | Retain any evidence related to the accident/incident |
| 10.2.7.6. | Draw diagrams, mark up drawings |
| 10.2.7.7. | Obtain copies of reports from others (police, fire department, contractors/subcontractors, doctors, etc.). |

**10.3. Reporting Procedures:**

10.3.1. Contractor/subcontractor employees must immediately report all accident/incidents to their company's supervisory personnel.

10.3.2. The contractor/subcontractor employee's supervisor has the responsibility to immediately report all accident/incidents to the Whiting-Turner Superintendent or designee. The supervisor, in consultation with the injured or reporting employee, completes the contractor's/subcontractor's written investigation report and submits it to the Whiting-Turner Superintendent or designee within twenty-four (24) hours of the accident/incident.

10.3.3. All injuries or accident/incidents regardless of how small must be reported immediately to the foreman or Superintendent on the jobs and treated at once.

**10.4. Correction Procedures:**

10.4.1. Place additional warning signs, barricades, warnings lights, if needed as indicated, and illumination, etc.

10.4.2. Determine cause or causes. Often accident/incidents occur as a result of a combination of unsafe conditions and unsafe acts.

10.4.3. Correct unsafe physical conditions or equipment deficiencies immediately after the investigation. Check other equipment to make sure it does not have similar defects.

10.4.4. Make improvements in maintenance and inspection procedures or provide means for better enforcement of existing procedures.

10.4.5. Review indoctrination, tool box meetings and on job instruction to see if more educational material should be added or improvements can be made in presenting it.

10.4.6. Prepare a detailed report on the findings and corrective measure to be taken.

10.4.7. Institute any follow up procedures required, with target dates, to ensure compliance with changes made.

**10.5. Accident/Incident Review Process:**

10.5.1. The Whiting-Turner Superintendent or designee will schedule an accident/incident review meeting within three (3) days of the accident/incident. At a minimum, the

18 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 138 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

contractor/subcontractor employee's supervision, the Whiting-Turner Project Manager and Area EH&S Manager should be invited.

10.5.2.  The Whiting-Turner Superintendent or designee is then responsible for documenting a summary of the meeting, reviewing it with an Area EH&S Manager, and distributing it to all contractors/subcontractors and Whiting-Turner project team to prevent further occurrences.  The names of the individuals involved shall be kept out to protect their privacy.

19 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 139 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 11.    Medical Support

11.1.    Prior to the start of work, the Whiting-Turner project team shall post the nearest medical support facilities in the job bulletin as provided by Travelers.  The medical support facilities closest to the project site are listed below:

**Hospital: UCSD Medical Center, Hillcrest**

**Address: 200 West Arbor Drive, San Diego, California 92103**

**Telephone Number: (619) 543-6222 [Emergency Number]**


**Hospital: Scripps Mercy Hospital San Diego**

**Address: 4077 Fifth Ave, San Diego, California 92103**

**Telephone Number: (619) 294-8111**


**Urgent Care: Concentra Urgent Care**

**Address: 5333 Mission Center Road Suite 100, San Diego, California 92108**

**Telephone Number: (619) 295-3355**


11.2.    An emergency response bulletin board shall be conspicuously posted on the job site identifying medical support facilities, poison control center contacts, fire response, hot work permit contact, ambulance, and the emergency action plan.  In addition, the emergency response bulletin board shall show a project location map with primary medical support facilities identified. This map shall also identify where personnel are to meet incoming emergency response teams and direct them to the accident/incident scene as necessary. Other State and Federal Employee Notices will be conspicuously posted along with the other data required by the emergency response bulletin board.

11.3.    The project safety orientation shall include a segment where the emergency action plan shall be explained in detail. Additional refresher training shall be conducted frequently by Whiting-Turner and contractor/subcontractor s supervisory personnel for their respective employees.

11.4.    No less than one first aid and CPR trained personnel certified to render aid in the event of an injury shall be provided on the job site at all times. Copies of current personnel first aid and CPR certificates shall be retained on file by The Whiting-Turner Contracting Company.

11.5.    The job site office shall be equipped with a large capacity first aid kit and shall be placed in a conspicuous location.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 140 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

<div style="background:black;color:white">WHITING-TURNER SITE SPECIFIC SAFETY PLAN</div>

## 12.   General Public Safety

**12.1.   All visitors, salesman, delivery persons, vendors, etc. must report to the Whiting-Turner field office to obtain permission to enter.**

    12.1.1.   Client's contractor/subcontractor s and vendors are visitors to our site and must complete a waiver/release form.

    12.1.2.   The aforementioned shall not be granted access to the site without signing a waiver/release form, obtaining a visitor's badge (if applicable), and wearing proper personal protective equipment.

    12.1.3.   In addition, Whiting-Turner requires visitors to be escorted at all times during their visit.

**12.2.   Prominent project signage shall be placed at the perimeter fencing that outlines the proper entrances and exits, visitor check in policy to gain site access and the proper protection gear that is required.**

**12.3.   Site Security:**

    12.3.1.   A high, strong, and rigid post driven fence with scrim [opaque screen or fabric, black visqueen screening] will be installed around the perimeter of the project. In cases where fence installation is infeasible, a plan for site security shall be drafted and made available for review by an Area EH&S Manager.

        12.3.1.1.   If the fence is constructed near walkways, roadways, etc. where pedestrians will pass, the potential passage of material through the construction side to the pedestrian side must be controlled.

        12.3.1.2.   Care must be taken to secure fence from blowing over in high winds— also consider scrim ventilation methods. The fence must be secured per Whiting-Turner's project fencing procedures.

        12.3.1.3.   The perimeter fences will not have openings greater than 4" between vertical supports.

        12.3.1.4.   This 4" requirement will also include the gap between the bottom of the fence and the ground to ensure perimeter security.

        12.3.1.5.   Barbed wire shall not be used.

    12.3.2.   Construction gates – Construction gates will be kept closed; to the greatest extent possible and the gates are to be locked after normal working hours.

    12.3.3.   Whiting-Turner and all contractors/subcontractors are to remove keys from all vehicles, lifts, equipment, and machinery at the end of the work day and ensure machinery is effectively locked out.

    12.3.4.   A Whiting-Turner staff person shall walk the site at the end of the day. Whiting-Turner staff person shall verify gates are closed, no gaps are in the fence, machines are turned

21 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 141 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

off and keys removed, no running water, all contractor/subcontractor personnel, vendors, and visitors have left the jobsite, etc.

### 12.4.   Trenches (Excavations) in Walkways and Roadbeds:

Pedestrians tripping or falling in temporarily closed trenches or excavations are a constant liability concern. The following precautions shall be considered:

12.4.1.   If the trench or excavation is in an area open to the public, then adequate warning signs and barricades must be installed, such as fencing or wood guardrails.

12.4.2.   Temporary trench covering for two or less weeks should be backfilled with material that can be tamped securely. Any movement in the material is to be noted and stabilized immediately.

12.4.3.   Temporary trench covering for two weeks or more should be concrete or macadam top. Steel dock plates may be used in lieu of concrete and macadam.

12.4.4.   Steel plates over the trench excavation may be the most economical method for short or long durations for temporary trench covering. Be sure to adjust the plates and provide a smooth transition with asphalt or concrete to minimize the tripping hazard potential.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 142 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 13.    General Site Prohibitions

*The following are <u>prohibited</u> on all Whiting-Turner Projects:*

**13.1.**    The use of the following administrative controls as a means of fall protection

    **13.1.1.**    Controlled Access Zone as a means of fall protection

    **13.1.2.**    Controlled Decking Zone as a means of fall protection

    **13.1.3.**    Safety Monitor System as a means of fall protection

**13.2.**    The use of load handling equipment to hoist personnel—please see the Manual for exceptions and provisions

**13.3.**    Working from the midrail or top rail of any lift

**13.4.**    The use of cell phones for signaling of cranes and equipment

**13.5.**    The use of open hooks during lifting operations/picks.

**13.6.**    Fish tapes or lines made of metal or any other conductive material when potential for contact with energized circuits exists

**13.7.**    The use of particle board, medium density fiber board (MDF) or similar material as floor hole covers

**13.8.**    The use of open turnbuckles as part of the perimeter cable system

**13.9.**    Other construction processes below steel erection are prohibited unless overhead protection for the employees below is provided

**13.10.**    Harassment of any kind, to any person

**13.11.**    Smoking or use of vaporized equipment (except in designated areas)

**13.12.**    Radios, media players, headphones, or other listening devices

**13.13.**    Guns or weapons of any kind

**13.14.**    Use or possession of alcohol or drugs of any kind (except for prescription drugs)

**13.15.**    Riding on equipment that is not equipped with proper seating and seat belt

**13.16.**    Open fires, fire barrels, or hot boxes

**13.17.**    The use of metal ladders

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 143 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 14. Safe Work Practices, Programs, and Procedures

### 14.1. Carbon Monoxide Exposure Prevention

14.1.1. In enclosed or poorly ventilated spaces tools and equipment shall be powered by electricity, batteries, or compressed air.

14.1.2. All fuel driven equipment being used indoors or in partially enclosed spaces must have scrubbers where carbon monoxide exposure exists.

14.1.3. When using gasoline powered generators and compressors, place them outside away from air intakes to ensure that the exhaust is not being drawn back indoors.

### 14.2. Concrete and Masonry

14.2.1. Each contractor/subcontractor, with employees exposed to a fall 6' or greater to a lower level must ensure that effective fall protection measures and rescue procedures are addressed in their company Activity Hazard Analysis prior to beginning work on site. This is to include the name and qualifications of the designated competent person.

14.2.2. **General requirements:**

14.2.2.1. Rebar caps shall be used on all reinforcing steel that personnel could fall upon or become impaled in any way.

14.2.2.2. No personnel shall be permitted to work under concrete buckets while buckets are being elevated, moved laterally, or lowered into position.

14.2.2.3. No personnel shall be permitted to place concrete through a pneumatic hose unless the personnel are wearing protective hand and face equipment.

14.2.2.4. No personnel shall be permitted to tie reinforcing steel more than 6 feet above an adjacent surface without the use of satisfactory fall protection and/or fall restraints.

14.2.3. **Equipment and tool requirements:**

14.2.3.1. Powered and rotating type concrete troweling machines that are manually guided shall be equipped with a control switch that shall automatically shut off the power whenever the hands of the operator are removed from the equipment handles.

14.2.3.2. Masonry saws shall be guarded with a semicircular enclosure over the blade.

14.2.3.3. All equipment that is to receive maintenance or repair shall be properly locked-out to prevent the inadvertent operation of equipment during such sessions.

24 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 144 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.2.4.  **Cast-in-place concrete requirements:**

14.2.4.1.  Formwork shall be designed, fabricated, erected, supported, braced, and maintained so that it shall be capable of supporting without failure all vertical and lateral loads that may reasonably be anticipated to be applied to the Formwork.

14.2.4.2.  All base plates, shore heads, extension devices, and adjustment screws shall be in firm contact, and secured when necessary, with the foundation and the form.

14.2.4.3.  Jacks and vertical supports shall be positioned in such a manner that the loads do not exceed the rated capacity of the jacks.

14.2.4.4.  Reinforcing steel for walls, piers, columns, and similar vertical structures shall be adequately supported to prevent over turning and to prevent collapse.

14.2.4.5.  Unrolled wire mesh shall be prevented from recoiling.

14.2.4.6.  Forms and shores shall not be removed until the concrete has gained sufficient strength to support its weight and superimposed loads.

14.2.5.  **Pump Truck requirements:**

14.2.5.1.  Equipment must be fully inspected and in good running condition per the manufacturer before it is allowed on the project. Any equipment not meeting the manufacturers' specifications for safe operations will be turned away or removed from the project.

14.2.5.2.  Daily checklist all equipment must be maintained by the contractor.

14.2.5.3.  Operator's certification shall be submitted prior to commencement of the operation

14.2.5.4.  Adequate ground conditions shall be provided for the pump truck

14.2.5.5.  Flaggers shall be used when backing up trucks to the pump

14.2.5.6.  Back-up alarms are required

14.2.5.7.  When operating on outriggers:

14.2.5.7.1.  Outriggers must be fully extended

14.2.5.7.2.  Outriggers pads must have solid bearing

14.2.5.7.3.  Outrigger pads must be level

14.2.5.7.4.  Outrigger pads must be pinned

14.2.5.7.5.  Full coverage of outrigger pad sized per load

14.2.5.7.6.  Front outrigger pads must be provided coverage even if load is not swinging in the front

14.2.5.7.7.  Support under outrigger pads must be solid

14.2.5.7.8.  All tires must be off of the ground or per manufactures recommendations

14.2.5.7.9.  Maintain minimum 20' from power lines

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 145 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.2.5.7.10.    Must be setup on stable, level ground

14.2.5.8.        Mixing stations must have proper guardrails and work platforms.  Steps may not be created from concrete blocks.

## 14.3.    Confined Space Entry

14.3.1.    It is Whiting-Turner's position that all confined spaces are permit required until proven otherwise [in writing] by the contractor/subcontractor's competent person.

14.3.2.    All confined spaces, regardless of classification, shall have continuous multi-gas/4-gas air monitoring while the space is occupied by tradespersons.

## 14.4.    Contingency Plan for Severe Weather:

14.4.1.    Whiting-Turner and its contractor/subcontractor s shall be responsible for regular monitoring of job site weather conditions in an effort to avoid hazardous conditions caused by severe weather. In the event of severe weather conditions procedures shall be done in a timely manner to reduce job-site danger. Based upon the type of weather condition the proper methods may include but are not limited to the following:

14.4.1.1.        Notification to personnel, in transit or prior to, of hazardous job site conditions.

14.4.1.2.        Securing of all equipment and materials in place or stored on the job site.

14.4.1.3.        Immediate evacuation of job site

14.4.1.4.        Utilization of hazardous condition protection facilities as required. (i.e. shelters)

## 14.5.    Cranes and Derricks

14.5.1.    Personnel hoisting requirements - The use of load handling equipment to hoist personnel is prohibited unless the employer can demonstrate that other methods would be more hazardous and is able to comply with the personnel hoisting requirements that are established in the standard.

14.5.2.    Hoisting personnel on Whiting-Turner projects shall be considered a critical lift or activity, and therefore shall meet all requirements of a critical lift before the lift may begin.

14.5.3.    A crane checklist must be completed prior to each initial lift.

14.5.4.    Post Assembly – a post assembly inspection is required for all Crawlers and Tower Cranes by a person properly trained and qualified to inspect such equipment.

14.5.5.    Boom-tip anemometer or equivalent device is required.

14.5.6.    All loads to be lifted at Whiting-Turner project sites shall have a tag line attached.

26 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 146 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.5.7.   The competent person shall determine the size, rope materials, and length of the tag line.

14.5.8.   The line shall be attached in a way that maintains control of the load to reduce the risk of caught-in/-between and struck-by hazards to employees and surroundings during any lift.

## 14.6.   Critical Lifts

14.6.1.   The Whiting-Turner Contracting Company identifies a critical or special lift as

14.6.1.1.   any lift where the total weight of the load and the deductions for the equipment combined exceeds 75% of the capacity of the crane capacity chart at the specific boom length and radius of the load,

14.6.1.2.   any lift where there will be more than one (1) crane or piece of load handling equipment attached to the load at a time;

14.6.1.3.   any lift that involves the lifting of personnel;

14.6.1.4.   any lift where the contents of the lift are considered hazardous to health or environment, and an accidental/incidental release could result harm to either;

14.6.1.5.   any lift where encroachments precautions are required for power lines.

## 14.7.   Demolition

14.7.1.   Contractor/subcontractor shall verify that all local ordinances and permitting issues have been addressed as they relate to demolition.

14.7.2.   Task lighting—which meets or exceeds the requirements of the standard—shall be provided by the demolition contractor/subcontractor.

14.7.3.   **Preparatory Operations:**

14.7.3.1.   Service lines shall be shut off, capped, or otherwise controlled, inside the building line before demolition work is started.  Following these "make safe" activities, actual selective demolition within the structure will be performed.  In each case, any utility company or designated authority shall be notified in advance.

14.7.3.2.   Where a hazard exists from fragmentation of glass, such hazards shall be removed.

14.7.3.3.   Where a hazard exists to personnel falling through wall openings, the opening shall be protected to a height of 42 inches.

14.7.4.   **Entryways:**

27 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 147 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

## WHITING-TURNER SITE SPECIFIC SAFETY PLAN

14.7.4.1.   During demolition, access to the structures will be controlled through specified access and egress points as outlined in the <u>Demolition Plan</u>, to be submitted by the demolition contractor.

**14.7.5.   Removal of walls, masonry section, and chimneys:**

14.7.5.1.   No wall section, which is more than one story in height, shall be permitted to stand alone without lateral bracing, unless such wall was originally designed and constructed to stand without such lateral support, and is in a condition safe enough to be self-supporting. All walls shall be left in a stable condition at the end of each shift.

14.7.5.2.   Structural or load-supporting members shall not be cut or removed until all live loads have been secured.

14.7.5.3.   Walkways or ladders shall be provided to enable personnel to safely reach or leave any scaffold or wall.

**14.7.6.   Manual Removal of Floors:**

14.7.6.1.   Safe walkways, not less than 18 inches wide, formed of planks not less than 2 inches thick if wood, or of equivalent strength if metal, shall be provided and used by workers when necessary to enable them to reach any point without walking upon exposed beams.

14.7.6.2.   When floor areas are being removed, personnel shall not be allowed in the area directly underneath, and such an area shall be barricaded to prevent access to it.

**14.7.7.   Mechanical Demolition:**

14.7.7.1.   No personnel shall be permitted in any area which shall be adversely affected by mechanical demolition operations. Only those workers necessary for the performance of the operations shall be present.

## 14.8.   Electrical Hazards Prevention

14.8.1.   Whiting-Turner requires that all projects are 100% GFCI compliant.   An Assured Equipment Grounding Conductor Program may be used in addition to—but not in lieu of—the GFCI program.

14.8.2.   The installing contractor, i.e. the electrical contractor/subcontractor, shall test each power receptacle for proper installation including polarity, grounding, etc. and forward that documentation to Whiting-Turner before the circuit is used.

14.8.3.   The electrical contractor/subcontractor will conduct and document monthly tests after the initial installation.

28 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 148 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.8.4.  Only round, heavy-duty (type S, SJO, SJTW, ST, SO, STD) extension cords are acceptable for use on a construction site; at least 12 gauge or larger.

14.8.5.  Damaged cords may only be repaired by a qualified electrician in accordance with manufacturer's requirements for such repairs.

14.8.6.  Where feasible, all extension cords will be suspended (8') above the floor or working surface.

14.8.7.  Extension cords shall not be fastened with staples, hung from nails, or suspended with non-insulated wire.

14.8.8.  All temporary lighting circuits must originate from GFCI protected breakers.

14.8.9.  Temporary wiring must be rated for all conditions it may be subjected to and be installed as per NEC, OSHA, NFPA and Authorities Having Jurisdiction requirements

## 14.9.  Energy Control

14.9.1.  Lockout/tagout (LOTO) shall not be considered for use until all other avenues of attaining a "zero-energy state" have been exhausted.

14.9.2.  All contractor/subcontractors working with electrical systems are required to have a written Lockout/tagout procedure. A competent person shall be responsible to control all aspects of the LOTO procedure.  They will ensure coordination with the appropriate tradesmen.

14.9.3.  If a system can be locked out through design or by other means, this will be the preferred method.

14.9.4.  The lockout device shall be substantial enough to prevent removal.

14.9.5.  The lock shall be a separately keyed lock for use only with the lockout system.

14.9.6.  The lockout device must be tagged with the name of the employee and their company. There shall be one lock for each employee (including Whiting-Turner) exposed to the system.

14.9.7.  The use of 100% LOTO must be maintained until the completion of the task. Verification by all competent persons in charge of the LOTO shall be completed prior to re-energizing the system.

14.9.8.  In the event an employee is discovered tampering with or violating the LOTO procedure, the employee will be removed from the project indefinitely.

14.9.9.  A log shall be maintained on site that identifies the following:

14.9.9.1.  Date of usage

14.9.9.2.  Number of locks and tags used

14.9.9.3.  Contractors involved

29 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 149 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.9.9.4.     Time of LOTO initiation

14.9.9.5.     Time of LOTO removal

14.9.9.6.     Designated competent persons

14.9.9.7.     Location of LOTO Devices

14.9.10. Electrical or piping & instrumentation drawings or identifying specific locations of the LOTO devices shall accompany the LOTO log.

## 14.10. Excavations

14.10.1.  Prior to the commencement of excavation activities where the excavation will be greater than 3 feet in depth, a pre-excavation checklist must be completed by the contractor/subcontractor's competent person and submitted to Whiting-Turner upon request.

14.10.2.  Underground utility installations must be identified and marked prior to beginning any excavation. To prevent unintentional contact, all necessary measures must be employed to locate underground utilities prior to excavating. Acceptable methods include but are not limited to the following: test pitting, ground penetrating radar (GPR), use of as-built drawings and any other obtainable information.

14.10.3.  A competent person must be identified on Whiting-Turner's competent person designation form and their qualifications submitted to Whiting-Turner prior to the start of work.

14.10.4.  All excavations shall be protected by snow fence, at a minimum.

14.10.5.  Persons walking or working adjacent to a trench with vertical/shear walls that is equal to or greater than six (6) feet in depth must be protected from fall hazards unless it has been determined by the competent person that it is infeasible or creates a greater hazard.

14.10.6.  Persons crossing an excavation that is equal to or greater than six (6) feet in depth must be protected from fall hazards by means of a guardrail system.

## 14.11. Fall Protection and Prevention

14.11.1.  Prior to creating a hole or opening in any elevated work surfaces, contractors/subcontractors must submit an elevated surface modification permit.

14.11.2.  Particle board, medium density fiber board (MDF) or similar material is prohibited from being used as floor hole covers on Whiting-Turner projects All holes must remain properly covered, secured, and labeled / signed.

30 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 150 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.11.3. Each contractor/subcontractor, with employees exposed to a fall 6' or greater to a lower level must ensure that effective fall protection measures and rescue procedures are addressed in their company Activity Hazard Analysis prior to beginning work on site. This is to include the name and qualifications of the designated competent person.

14.11.4. A Personal Fall Arrest System (PFAS) [comprised of a full body harness, double lanyards, anchorage point and anchorage connector], a personal fall restraint system (PFRS) [comprised of a full body harness, lanyard, anchorage point and anchorage connector], a guardrail, or safety net system must be in place to protect all trade persons from exposure to falls working at or above 6 feet.

14.11.5. Employees working on ladders must be at least one and a half times the height of the ladder away from any perimeter, shaft, stairway, and opening where the fall distance exceeds 6'. If that distance isn't feasible, a conventional fall protection method must be employed.

14.11.6. Stilts are only permitted in broom swept areas, where there is no change in elevation.

14.11.7. Every hatchway and chute floor opening shall be guarded by a hinged floor-opening cover. The opening shall be barricaded with railings to leave only one exposed side. The exposed side shall be provided either with a swinging gate or so offset that a person cannot walk into the opening.

14.11.8. An extension platform outside a wall opening onto which materials can be hoisted for handling shall have a standard railing that meets handrail standards. However, one side of an extension platform may have removable railings to facilitate handling materials; in this instance a personal fall restraint or arrest system shall be utilized to protect the exposed worker.

14.11.9. Perimeter cable shall not be less than 3/8" steel cable.

14.11.10. Corner uprights must be braced so that the required tension may be maintained.

14.11.11. The cable must be terminated with three U-bolt wire rope clips that maintain an efficiency rating of at least 80% of the wire rope's breaking strength as proven through product documentation (e.g. Crosby clips).

14.11.12. Perimeter cable shall not be used as part of a personal fall arrest or fall restraint system unless designed to be used in that manner by a registered engineer.

14.11.13. The use of open turnbuckles as part of the perimeter cable system is prohibited.

14.11.14. All guardrail systems [with the exception of scaffold systems or where it can be proven to create a greater hazard] must be equipped with orange perimeter screening or mesh to prevent the ability to breach the system by climbing through rails. The installation of the screening must be compliant with Whiting-Turner's orange perimeter screening guidelines.

14.11.15. A fall restraint system must be employed when working from articulating boom lifts.

31 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.11.16. A PFAS is not required when climbing up or down a ladder. Fall protection shall be considered by the competent person if employees work from a ladder 6' or more above a lower level and are exposed to a fall.

14.11.17. Steel erectors and metal decking installers must utilize 100% fall protection devices at all times when working over 6'.

14.11.18. Horizontal lifelines must be designed by an engineer and installed under the supervision of a qualified person. A safety factor of two must be maintained.

14.11.19. Adequate fall protection devices must be provided, installed, and used at all loading platforms by the contractor/subcontractor wishing to remove existing perimeter protection prior to its removal.

14.11.20. All anchorage points utilized in a personal fall arrest system must be capable of supporting a load of no less than 5000 lbs.

14.11.21. Retraining documentation—to include instructor's name and qualifications, training literature and sign-in sheet—must be submitted to Whiting-Turner on company letterhead.

**14.12. Fire Prevention and Protection**

14.12.1. A 20 lb. ABC dry chemical fire extinguisher or equivalent must be provided for each 3,000 square feet of protected building area. An extinguisher shall be placed at every stairwell on each level.

14.12.2. Residential-like wood framing construction shall have a 20 lb. ABC dry chemical fire extinguisher or equivalent for each 1,500 square feet of protected building area.

14.12.3. Storage of flammable/combustible liquids on or inside of buildings under construction shall be no more than one-day supply.

14.12.4. Provide a 20-pound ABC dry chemical type extinguisher between 25'-75' from areas where flammable liquids are being handled.

**14.13. Hand and Power Tools:**

14.13.1. All power tools that are designed to accommodate guards shall have such guards attached at all times of operation.

14.13.2. Machines designed for a fixed location shall be securely anchored to prevent walking or moving.

14.13.3. Personnel using hand and power tools and exposed to the hazards of falling, flying, abrasive, and splashing objects, or exposed to harmful dusts, fumes, mists, vapor, or gases shall be supplied with proper PPE necessary to protect them from such hazards.

32 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 152 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

14.13.4. All hand held powered sanders, grinders, etc. with wheel 2-inch diameter or less and any routers, planers, jigsaws, etc. with blade shanks one-fourth of an inch wide or less may be equipped with only a positive "on-off" control.

14.13.5. Any hand held power equipment with wheel diameters or blade shanks in excess of those stated in 14.13.4 may be equipped with a momentary contact "on-off" switch.

14.13.6. All other hand-held power tools, such as circular saws, chain saws, and percussion tools shall be equipped with a constant pressure switch that shall shut off the power when the pressure is released.

14.13.7. All electrically powered hand tools shall be ground fault circuit interrupter protected—double insulated tools included.

14.13.8. Personnel must apply the use of PPE such as but not limited to a hardhat, eye, face, and hearing protection, work boots and protective gloves as required for the task(s) contemplated. Long pants with shirts with long or short sleeves required.

14.13.9. Regular inspections of hand tools shall be performed with the removal of any hand tool deemed to be hazardous by the personnel in charge of the tool and or inspection.

14.13.10. If personnel feel that a hand tool is of a hazardous condition, he or she shall immediately remove the tool from the work area.

14.13.11. The use of electric cords for the purpose of hoisting or lowering shall not be permitted.

14.13.12. Compressed air shall not be used as a cleaning device unless reduced to 30 psi.

14.13.13. Powdered actuated hand tools shall be used only by trained and certified personnel.

14.13.14. Powder actuated tools shall not be loaded until just prior to the intended firing time.

14.13.15. Powder actuated tools, loaded or unloaded, shall at no time be pointed at any other personnel.

14.13.16. Loaded powder actuated tools shall never be left unattended.

14.13.17. Powder actuated tools shall not be used in an explosive or flammable atmosphere.

**14.14. Hazard Communications Program:**

14.14.1. The Whiting-Turner Contracting Company shall maintain onsite and enforce its written Hazard Communication Program to provide the means necessary to transmit information to personnel regarding chemical and other hazardous products to which they may be exposed. Section 14.12.1.1 herewith shows The Whiting-Turner Contracting Company Hazard Communication Program and is outlined as follows:

14.14.1.1. List of chemicals and other hazardous products: A list of chemicals and other hazardous products used on the job site shall be maintained on the job site at all times. The list shall be updated as new chemicals and

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 153 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

hazardous products are imported to the job site not shown in the original list.

14.14.1.2.  Labeling:    All containers of chemicals and hazardous materials shall be properly labeled or tagged. Chemicals and hazardous materials transferred to other containers must be properly labeled to indicate the product stored within.

14.14.1.3.  Safety Data Sheets (SDS): A binder of SDS for all chemicals and hazardous materials used on the job site shall be maintained on the job site in a conspicuous location and made available to all personnel and interested parties. The SDS books shall be updated as new chemicals and hazardous products are imported to the job site not originally included in the SDS binder.

14.14.1.4.  Training: All personnel shall be provided training in reading and interpreting SDS and labels. Personnel working with chemicals and/or hazardous materials shall consult the SDS and labels prior to the use of chemicals and hazardous materials.

14.14.1.5.  Each respective contractor/subcontractor  shall be responsible for maintaining their own Hazard Communications Program, list of chemicals and hazardous products, SDS, and training.  Copies shall be provided to Whiting-Turner for any site-specific issues.

**14.15. Health Hazard Controls:**

14.15.1.  Accident/Incident Prevention:

14.15.1.1.  It shall be the responsibility of each and every personnel to inspect his/her work area before each shift and periodically throughout the day to ensure a safe work area. If any personnel feel their area is unsafe, they shall report this to their supervisor immediately.

14.15.1.2.  The job site shall be inspected daily by the job-site foreman to ensure a safe working environment.

14.15.1.3.  All machines, tools, materials, or equipment that is deemed to be unsafe shall be locked and tagged out, as to render them inoperable, and shall be removed from the job site.

14.15.1.4.  Only qualified personnel shall operate equipment.

14.15.2.  Housekeeping:

14.15.2.1.  All forms and/or scrap lumber with protruding nails and other hazardous debris shall be kept clear of all work areas, passageways, and stair, in and around building and construction activities.

34 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 154 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

> 14.15.2.2.   Combustible scrap and debris shall be removed at regular intervals as required.

> 14.15.2.3.   Containers for disposal of waste shall be provided by the contractor. If flammable or hazardous materials require disposal, appropriate containers will be provided.   Waste shall be disposed of at frequent and regular intervals.

14.15.3.  Means of Egress:

> 14.15.3.1.   In every occupied building or structure, exits shall be arranged so as to provide free and unobstructed egress from all areas of the building structure or construction site. No locks or fastening devices may be used if they prevent the free escape of personnel during emergency situations.

> 14.15.3.2.   Exits shall be marked by a readily visible sign in all cases where the exit or the way to reach an exit is not visible to the occupants.

> 14.15.3.3.   All exits shall be maintained and kept free from obstructions.

## 14.16. Housekeeping

14.16.1.  Clean-as-you-go practices are required.

14.16.2.  Sort and organize material, sweep daily, and standardize activities to aid in the elimination of storage of excess/unused material in active work areas

14.16.3.  Work that may temporarily block emergency exits, safety showers, elevators, corridors, and hallways will require prior Whiting-Turner approval.

14.16.4.  Materials stored in the vicinity of the area where work is performed should be limited to only those materials that will be used in the same shift.

14.16.5.  Any material stored in a work area longer than 24 hours must be approved by Whiting-Turner.

14.16.6.  Gang boxes, toolboxes, and sea containers/conex boxes shall not have materials stored on top of them.

14.16.7.  All chemicals brought on site must be approved by Whiting-Turner.

14.16.8.  The user of the chemical must provide Whiting-Turner an SDS prior to bringing the substance on site.

14.16.9.  Chemical/gas cylinders (welding, purging, leak detection cylinders, etc.) must be secured.

14.16.10. All dedicated chemical storage areas must have safety data sheets (SDS) available at the storage location.

## 14.17. Mobile Elevated Work Platform

35 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 155 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.17.1.  Employees must keep both feet on the floor of the basket; use of guardrails to gain additional height is prohibited on Whiting-Turner project sites.

14.17.2.  Where aerial and scissor lifts are used on concrete slabs, any floor depressions or grade changes are required to be barricaded to restrict travel onto that area.

14.17.3.  The area(s) below the basket or platform of aerial lifts shall be cordoned off using reinforced danger tape—or something of equivalent or greater tensile strength—and by using signage to identify the overhead hazard when a potential for falling objects exists

14.17.4.  Field modifications are not allowed on aerial lifts.  Aerial lifts shall not be used to hoist, raise, or position material outside of the platform or basket unless manufactured to do so.

**14.18.  Motor Vehicles and Mechanize Equipment**

14.18.1.  Equipment:

14.18.1.1.  Whenever the equipment is parked, the parking brake shall be set. Equipment parked on inclines shall have the wheels chocked and the parking brake set.

14.18.1.2.  All cab glass shall be safely glass, or equivalent, that introduces no visible distortion affecting the safe operation of any machine.

14.18.2.  Motor Vehicles:

14.18.2.1.  Tools and materials shall be secured to prevent movement when transported in the same compartment with personnel.

14.18.2.2.  Vehicles used to transport personnel shall have seats firmly secured and adequate for the number of personnel to be carried.

14.18.2.3.  All motor vehicles shall be equipped with seat belts, and these seat belts shall be worn by personnel at all times during operation.

14.18.3.  Material Handling Equipment:

14.18.3.1.  These rules apply to the following types of earth moving equipment: loaders, crawler or wheel tractors, bulldozers, graders, agricultural and industrial tractors, and similar equipment.

14.18.3.2.  Seat belts shall be provided on all equipment covered by this section except as follows:

14.18.3.2.1. Equipment which is designed only for standup operation.

14.18.3.2.2. Equipment which does not have roll-over protective structure or adequate canopy protection.

36 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
**Page 156 of 174**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

14.18.3.3.      All earth moving equipment mentioned in this section shall have a service braking system capable of stopping and holding the equipment fully loaded.

14.18.3.4.      All equipment shall have backup alarms which shall be maintained and operable at all times in which the equipment is backing up.

14.18.4. Site Clearing:

14.18.4.1.      Personnel engaged in site clearing shall be protected from hazards of irritant and toxic plants and suitably instructed in the first aid treatment available.

14.18.4.2.      All equipment used in site clearing operations shall be equipped with ROPS.

## 14.19. Personal Protective Equipment

14.19.1. Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, protective shield and barriers, and fall protection equipment shall be the contractor/subcontractor 's responsibility to oversee the proper use of such equipment by their personnel as the job dictates. Personnel of second tier contractor/subcontractor s, suppliers, and owner shall also be responsible to oversee the proper use of such equipment by their respective personnel.

14.19.2. Prescription eyeglasses and sunglasses that do not comply with ANSI Z87.1 are prohibited.

14.19.3. Aluminum hardhats, and bump caps are not permitted on Whiting-Turner projects.

14.19.4. For security and identification purposes, all hardhats shall display the contractor/subcontractor name and/or decal identifying the employer as well as the employee's name.

14.19.5. Employees exposed to electrical voltages of 600 V or greater shall wear hardhats that meet the requirements of ANSI Z89.2 type Hardhats

14.19.6. Hand protection is required when employee's hands are exposed to hazards such as those from skin absorption of harmful substances, cuts or lacerations, abrasions, punctures, chemical burns, thermal burns, and harmful temperature extremes.

14.19.7. High visibility vests/gear are required by each person on site.

14.19.8. Long pants and shirts with at least a 4" sleeve is required. Shorts, cut offs, tank tops, and net shirts are not permitted.

14.19.9. All personal protective equipment shall be of safe design and construction.

14.19.10. Where personnel provide their own protective equipment, respective employers shall be responsible to assure that equipment is in adequate condition to provide the designed protection

37 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 157 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

14.19.11. Specific tasks requiring additional eye, face protection or goggles may be required by personnel as listed here for example but are not limited to the following:

14.19.11.1.    Concrete placement.

14.19.11.2.    Using a powder actuated device.

14.19.11.3.    During some demolition tasks.

14.19.11.4.    Metal grinding.

14.19.11.5.    Welding and cutting operations.

14.19.11.6.    Cutting operations regardless of material type.

14.19.12. Shorts, tank tops, and loose clothing are not permitted to be worn by personnel on the job site

14.19.13. For ALL fall hazards that are equal to or greater than 6', fall protection must be provided. This includes all trades and tasks. Fall protection equipment including personal fall protection equipment, systems, and hardware shall be provided by The Whiting-Turner Contracting Company for all its personnel. contractor/subcontractor s, suppliers, and the Owner shall provide fall protection equipment, systems, and hardware for their respective personnel as required. Employees shall be trained in the proper use of fall protection equipment, systems, and hardware.

14.19.14. Respirators and protective coverings shall be issued by Whiting-Turner, contractor/subcontractor s, suppliers, and owner to their respective personnel and utilized by personnel in all instances that require such. Training shall be provided in the proper use, fit, and care of respirators and protective coverings and documented on file for future reference.

## 14.20. Scaffolds

14.20.1. Contractor/subcontractor whose employees will need to access a scaffold system for work shall have a competent person present to inspect and sign off on the scaffold prior to the start of work each day.

14.20.2. Employees erecting or dismantling a scaffold are required to utilize appropriate fall protection at heights six (6) feet or above unless proven to be infeasible or more hazardous as determined by their company's competent person.

14.20.3. All scaffolds, including carpenters' bracket scaffolds, over six (6) feet in height shall have guardrails on all open sides. If guardrails cannot be used on a walking/working platform, contractor/subcontractors are required to use another means to protect employees from a fall.

14.20.4. Cross-braces are not considered to be an adequate guardrail (fall protection) system and shall not be used as a top or mid rail on Whiting-Turner projects.

38 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 158 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

14.20.5.  Contractors shall utilize a scaffold tag system. The scaffold tag system shall be color coded and visible. The competent person shall inspect the scaffolding system before each work shift. The competent person shall sign and date the scaffold tag.

    14.20.5.1.  Green tags are reserved for complete systems

    14.20.5.2.  Red tags are reserved for erection/dismantling activities and for scaffolds with deficiencies in the system

    14.20.5.3.  Yellow tags are reserved for systems that require the use of both PFAS and guardrail systems for incomplete scaffold systems or platforms.

## 14.21. Signs, Signals and Barricades

14.21.1.  All caution and danger tape used on Whiting-Turner project sites shall be of the reinforced type and shall be supplemented with a tag/label affixed with the responsible party's name, company, contact number, and potential hazard.

14.21.2.  All flagmen shall be trained on appropriate procedures before controlling traffic, as required by the Manual on Uniform Traffic Control Devices (MUTCD) and any municipal or state guidelines.

14.21.3.  All flagmen shall utilize sign paddles and shall be outfitted with high visibility garments, as required by current ANSI standards. All PPE and traffic control equipment shall be outfitted with reflectorized material for night work as required by current ANSI standards.

## 14.22. Stairways and Ladders

14.22.1.  All aluminum and commercially manufactured wooden ladders shall not be used on Whiting-Turner projects.

14.22.2.  Fall protection shall be considered by the competent person if employees work from a ladder 6' or more above a lower level and are exposed to a fall.

14.22.3.  Employees working on ladders must be at least one and a half times the height of the ladder away from any perimeter, shaft, stairway, and opening where the fall distance exceeds 6' without employing additional means of fall protection.

14.22.4.  Subcontractors shall provide ladders with duty ratings that meet the needs of their employees. Workers are required to select ladders that are capable of safely supporting their weight and the weight of their tools.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 159 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

### 14.23. Steel Erection

14.23.1.  Fall protection provided by the steel erector shall remain in the area where steel erection activity has been completed to be used by other trades; if / when Whiting-Turner accepts and takes custody of the system.

14.23.2.  All tradespersons, including connectors, engaged in steel erection activities on a walking/working surface with an unprotected side or edge more than six (6) feet above a lower level shall be protected from fall hazards by a conventional fall protection method.

14.23.3.  Roof penetrations are to be made only when equipment is ready to be installed.

14.23.4.  Safety latches on hooks shall not be disengaged or made inoperable.

### 14.24. Welding and Cutting

14.24.1.  A Hot Work Permit must be completed daily by each contractor/subcontractor performing all welding, burning/cutting operations.

14.24.2.  Contractor/subcontractors are responsible for providing a fire watch and a charged, 20lb ABC dry chemical fire extinguisher for each welding and burning activity.

14.24.3.  A fire watch is always required to remain in place during the hot work activity and for a minimum of one half (1/2) hour after the welding or burning operation has been completed.

14.24.4.  Additional permits may be required by the local Fire Department and will be at the contractor/subcontractor's expense.

14.24.5.  All shields shall be compatible with a hardhat.

14.24.6.  Welding and Cutting of Hazardous Materials:

14.24.6.1.  Before welding, cutting, or heating is commenced on any surface covered by a preservative coating whose flammability is not known, a test shall be made to determine its flammability.

14.24.6.2.  Preservative coatings shall be removed a sufficient distance from the area to be heated to ensure any temperature increase of the unstripped metal will not be appreciable.

14.24.7.  Transporting, moving, and storing compressed gas cylinders.

14.24.7.1.  All cylinders shall be considered in storage at the end of each shift; cylinders must have gauges removed and caps in place.

14.24.7.2.  Valve protection caps shall be in place and secured.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 160 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

14.24.7.3. Personnel shall inspect all hoses and connectors periodically throughout the day. Any damaged or defective items shall not be used and should be removed from the job site.

14.24.7.4. When cylinders are hoisted, they shall be secured on a cradle, sling board, or pallet. They shall not be hoisted or transported by means of magnets or choker slings.

14.24.7.5. When cylinders are transported by powered vehicles, they shall be secured in a vertical position.

14.24.7.6. Unless cylinders are firmly secured on a special carrier intended for this purpose, regulators shall be removed, and valve protection caps put in place before cylinders are moved.

14.24.7.7. A suitable cylinder truck, chain, or other steadying device shall be used to keep cylinders from being knocked over while in use or in storage.

14.24.8. Placing cylinders:

14.24.8.1. Cylinders shall be kept far enough away from the actual welding or cutting operation so that sparks, hot slag, or flame shall not reach them. When this is impractical, fire resistant shields shall be provided.

14.24.8.2. Cylinders shall be placed where they cannot become part of an electrical circuit.

14.24.8.3. Cylinders containing oxygen or acetylene, or other fuel gas shall not be taken into confined spaces.

14.24.9. Treatment of cylinders:

14.24.9.1. Cylinders whether full or empty shall not be used as rollers or supports.

14.24.9.2. Smoking shall be prohibited wherever cylinders are stored, handled or used.

14.24.9.3. Areas containing hazardous gas in storage shall be appropriately placarded.

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 161 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 15.    Activity Hazard Analysis Procedures:

**15.1.**    This procedure is developed to preplan project work activities and thereby minimizes the opportunities for accident/incidents when the work is actually done.

**15.2.**    Each definable feature of work will be analyzed by the company and crew assigned to perform the work. The work activity will be broken down into small steps where notes will be made concerning the potential for accident/incident/injury during the work and the planned method of preventing the accident/incident/injury.

**15.3.**    Each contractor/subcontractor will prepare an Activity Hazard Analysis (AHA) specific for the definable feature of work which will be reviewed and discussed at the preconstruction meeting and with the crew prior to the start of work.

**15.4.**    Below is a preliminary listing of the project's definable features of work. An AHA will be prepared for each definable feature of work and AHA's may also be used for topics for weekly Tool Box Talks.

| Definable Feature: |
|---|
| Temp Protection Work |
| Selective Demolition Work |
| Hazardous Material Removal |
| Underground Storage Tank Removal |
| Earthwork |
| Sheeting & Shoring |
| Subdrainage System |
| New Storm/Sanitary/Water/Other Utilities |
| Relocate Existing Utilities |
| Selective Paving |
| Paving and Surfacing |
| Baseball & Softball Field Construction |

42 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
**Page 162 of 174**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

| |
|---|
| Chain Link Fences and Gates |
| Ornamental Metal Fences and Gates |
| Segmental Retaining Walls |
| Site Furnishings |
| Sports Field Equipment |
| Seeding & Sodding |
| Landscape |
| Silva Cell Tree Soil Panel |
| Athletic Field Irrigation Systems |
| Concrete Formwork |
| Concrete Reinforcement & Embeds |
| Cast-in-Place Concrete |
| Structural Steel Erection |
| Structural Steel Connections |
| Steel Deck |
| Steel Deck Concrete |
| Metal Fabrications |
| Ornamental Metal |
| Monumental Stairs |
| Masonry |
| Cast Stone |
| Rough Carpentry |

43 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 163 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

| |
|---|
| Finish Carpentry |
| Architectural Woodwork |
| Sheet Membrane Waterproofing |
| Hot Fluid-Applied Waterproofing |
| Cementitious Waterproofing |
| Building Insulation |
| Air Barrier Systems |
| Composite Panels |
| Built-up Bituminous Roofing |
| Sheet Metal Flashing and Trim |
| Roof Accessories |
| Applied Fireproofing |
| Firestopping |
| Joint Sealants |
| Steel & Aluminum Doors & Frames |
| Access Doors and Panels |
| Metal-Framed Skylights |
| Doors Hardware |
| Exterior Direct-Applied Finish System |
| Gypsum Board |
| Tile |
| Painting & Finishing |

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 164 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

| |
|---|
| Toilet Compartments |
| Toilet Accessories |
| Louvers & Vents |
| Signage |
| Fire Protection Specialties |
| Water Feature |
| Digital, Addressable Fire Alarm System |
| Hangers/Supports/Sleeves – Fire Suppression |
| Hangers/Supports/Sleeves – Plumbing |
| Hangers/Supports/Sleeves – HVAC |
| Insulation – Plumbing Piping |
| Insulation – HVAC |
| Piping – Plumbing |
| Piping – HVAC |
| Piping – Fire Suppression Wet-Pipe |
| Piping – Fire Suppression Dry-Pipe |
| Piping – Sanitary and Waste |
| Piping – Storm |
| Piping – Water |
| Piping – Natural Gas |
| Duct – HVAC |
| Sump Pumps |

45 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

| |
|---|
| Diffusers, Registers, and Grilles |
| Hangers/Supports/Sleeves – Electrical |
| Conductors & Cables |
| Raceways & Boxes |
| Wiring Devices |
| Lighting Control Devices |
| Electricity Metering |
| Packaged Engine Generators |
| Enclosed Switches & Circuit Breakers |
| Transfer Switches |
| Enclosed Controllers |
| Underground Electrical Service |
| Switchboards |
| Panelboards |
| Low-Voltage Transformers |
| Interior Lighting |
| Exterior Lighting |
| Exterior Landscape Lighting |
| Sound and Intercommunications System |
| Cabling for Telephone and Data |

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 166 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

## 16. Spill Prevention and Containment Plan

### 16.1. Purpose

This policy has been developed to protect the environment by preventing spills and leaks from occurring, or minimizing the impact, during the course of construction. This plan is also written to meet regulatory & client requirements along with best practices adopted at the Fashion Valley Mall Redevelopment Project relating to Spill Prevention and Containment Plan (SPCP) and the Storm Water Pollution Prevention Plan (SWPPP). Contractors/subcontractors shall develop their own contingency plans for spills to prepare for spill situations arising from their operations.

### 16.2. Planning and Preparation-Spill Kits

Each trade having vehicles, equipment, or chemicals on-site or responsible for the handling or installation of equipment containing chemicals (radiators, batteries, etc.) on site shall have the appropriate resources for spill prevention and abatement.

16.2.1. Standard spill kit contents should include, but are not limited to:

16.2.1.1. Pads, booms, pillows, and/or granular/powder absorbents

16.2.1.2. Gloves, goggles, apron

16.2.1.3. Dustpan and hand broom

16.2.1.4. Poly disposal bags and labels

16.2.2. Absorbent materials should be appropriate to the types & volume of chemicals/products used or stored, or that contractors are otherwise responsible for.

16.2.3. Universal Sorbents

16.2.3.1. Absorb all types of water-based and oil-based liquids

16.2.3.2. Ideal where many types of liquids are present or in use such as cutting fluids, lubricants, and coolant

16.2.3.3. Not appropriate for a spill kit for work that is near a creek area, bar ditch, pond, or where water may otherwise be standing or flowing

16.2.4. Oil-Only Sorbents

16.2.4.1. Absorb all petroleum-based liquids and repel water

16.2.4.2. Will float on water and absorb oil/fuel products

16.2.5. Hazmat Sorbents

16.2.5.1. Specifically designed and intended for use with aggressive fluids such as acids and bases

16.2.5.2. Acid neutralizing or amalgamation powders should also be on hand to deal with battery or mercury spills, or stand-alone spill kits should be available

47 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 167 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

16.2.6.  Spill Kit Materials Contained in Vehicles & Equipment

16.2.6.1.  To minimize the potential impact of a spill, contractors should keep sorbents (boom, pad, granular, etc.) in vehicles and equipment to immediately abate the flow of any spilled material. As an alternative option, spill kits may be maintained in the immediate work area or close proximity to work operations where vehicles or equipment are in operation.

## 16.3.  Fuel and Chemical Storage

Each company or contractor/subcontractor storing chemicals or fuels on the Fashion Valley Mall Redevelopment Project site is responsible for safe storage meeting recognized best management practices (BMP's) and specific requirements meeting Federal, State and Local requirements.

16.3.1.  Fuels, chemicals, and chemical storage tanks must be approved by Whiting-Turner before arriving on-site

16.3.2.  All fuels stored in quantities greater than 5 gallons shall be contained/stored within a secondary containment unit or double-wall tank

16.3.2.1.  Truck mounted transfer tanks are authorized when properly secured in or on truck bed and used in accordance with manufacturer requirements. Transfer tanks shall not be used in any other manner or method.

16.3.3.  Fuel storage should be located away from areas that may be accessed by vehicles/ equipment or protected from vehicle equipment damage by "jersey barriers"/"k-rails", bollards, or other substantial protection approved by Whiting-Turner

16.3.4.  Fuel and chemical storage is only authorized in areas designated by Whiting-Turner.

16.3.5.  Fuel cans are to be a metal-type safety can with flame arrestor

16.3.6.  Fuel cans when not in use shall be stored in an approved flammable locker/cabinet, grounded per manufacturer requirements

16.3.7.  Fuel and chemical storage areas shall have the appropriate number and type of fire extinguishers based on the size, configuration, and fuels or chemicals stored in the location(s) specified per OSHA requirement

16.3.8.  Fuel storage areas are to have a spill kit in the immediate area

16.3.9.  A catch pan should be utilized to capture small leaks when fueling

16.3.9.1.  Any spilled material into a tub shall be immediately cleaned up with absorbent material and properly disposed of at Fashion Valley Mall Redevelopment Site waste collection point

16.3.10.  Fuel or chemical drums stored on site shall be placed on containment pallets with a cover over the storage area to prevent rainwater collection

48 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 168 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

    16.3.10.1.    Water-based floor sealers and concrete curing compounds are exempted from this requirement

16.3.11.  Chemicals may not be stored within any building without consent from the Whiting-Turner superintendent. Chemicals in the building are restricted to immediate use, within 24 hours, and must have signage affixed identifying the chemical/product, hazards, the responsible contractor, contact information. Proper barricades must be in place to prevent inadvertent contact or spills and to prevent work over the area.

16.3.12.  See CFR 1926.152 and NFPA 30 for additional requirements

### 16.4.   Tank truck loading/unloading (40 CFR 112.7(h))

Tank truck unloading procedures shall meet the minimum requirements and regulations established by the Department of Transportation in 49 CFR 177 Subpart B which are summarized below.

16.4.1.    No product shall be unloaded unless the hand brake is securely set and all other reasonable precautions (i.e., wheel chocking) are taken to prevent motion of the tank truck.

16.4.2.    No smoking or any other sources of spark or flame will be allowed in the vicinity of the unloading operation.

16.4.3.    Unless the engine of the tank truck is to be used for the operation of a pump, no product shall be unloaded while the engine is running.

16.4.4.    No product shall be unloaded until all bonding and grounding requirements have been met.

16.4.5.    A minimum of two (2) people will be present during unloading to visually observe transfer operations. At a minimum this will include the delivery driver and a responsible designated person from the contracting company purchasing the fuel.

16.4.6.    Drip pans, catchment basins, or absorbent materials will be used where small drips and spills occur. Spill kits are commonly carried on the delivery truck. Spill kits are available at several locations on the site.

16.4.7.    Each tank truck will be visually inspected prior to departure to prevent accidental/incidental disconnection of flexible transfer lines.

16.4.8.    Significant spillage will be handled by outside contract assistance as needed.

16.4.9.    All vehicles entering the facility shall be warned not to endanger aboveground piping or other oil transfer operations.

### 16.5.   Maintenance Procedures

Vehicle and equipment maintenance on the construction site can easily pose environmental risks if adequate precautions are not taken. Maintenance on vehicles and equipment shall only be conducted by qualified, designated persons to minimize the potential for error, injury, and spills.

49 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 169 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

contractor/subcontractor s are responsible for service trucks and maintenance conducted to ensure work is conducted with controls in place to capture or minimize spills.

When performing work on fuel or hydraulic systems, changing fuel/oil filters, radiators, and other components that have the potential to leak or bleed during maintenance procedures, the following controls shall be in place.

16.5.1.  Notification of service work is to be given before work commences to responsible trade

16.5.2.  Personnel performing maintenance have emergency contact information in the event of a spill or work is supervised by the contractor/subcontractor /subcontractor

16.5.3.  Maintenance personnel are to be instructed on the requirements of this program and their associated duties/responsibilities

16.5.4.  Designated maintenance areas do not currently exist at the Fashion Valley Mall Redevelopment Project, but maintenance is NEVER to be conducted adjacent to any creek, stream, ditch, or other waterway

16.5.5.  Plastic sheeting or catch pans properly positioned under equipment

16.5.6.  Spill kit materials in service truck or within a short distance of the area in which work is being performed\

16.5.7.  Any spilled material onto sheeting or into secondary containment shall be immediately cleaned up with absorbent material and properly disposed of by the service contractor/subcontractor or taken to the Fashion Valley Mall Redevelopment Site waste collection point

**16.6. Spills**

Each contractor/subcontractor on the Fashion Valley Mall Redevelopment Project is responsible for any spills as a result of their work operations, vehicles, equipment, or fuels/chemicals brought on site or otherwise responsible for. Any spill of petroleum product or chemical requires notification to Whiting-Turner Superintendent and EH&S Manager immediately after spill is abated, and sooner if assistance is required.

Spill Response Procedures from Fashion Valley Mall Redevelopment SPCP Plan

16.6.1.  Secure the area and identify the spilled material using the container label and/or the SDS.

16.6.2.  If material is flammable, bring an appropriate fire extinguisher into the area.

16.6.3.  Turn off any operating equipment in the area.

16.6.4.  Notify Whiting-Turner Superintendent and EH&S Manager who will help determine the appropriate course of action.

50 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
**Page 170 of 174**

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

WHITING-TURNER SITE SPECIFIC SAFETY PLAN

16.6.5.  If a fire or other serious emergency occurs, follow the emergency response procedures for fire and evacuation.

16.6.6.  Responders should use gloves, boots, safety/goggles and other personal protective equipment as necessary. Do not work alone.

16.6.7.  Spills of hydraulic fluid, oil and other petroleum products should always be cleaned up immediately to prevent discharge of these fluids with storm water runoff. Use booms, pads, pillows, rags or other absorbent material contained in the spill kit.

16.6.8.  Spill kits are available on the site. Spill kits shall be provided by each contractor/subcontractor on the Fashion Valley Mall Redevelopment Project.

16.6.9.  Soil or other media that has been contaminated with petroleum or other pollutants should be excavated or removed to prevent contaminated discharges from reaching a property boundary or creek. Petroleum contaminated soil should be cleaned up and disposed of properly. Scoop up the material with appropriate equipment into a compatible leak-proof container or drum. Storage containers should be kept closed, clean, and free of oily residue.

16.6.10.  Initially label the container with a general description of the contents. Contact the Emergency Coordinator responsible for the tank for proper EPA and DOT Labels and disposition.

16.6.11.  Any reusable equipment used with flammable material should be cleaned and allowed to dry in a well-ventilated area away from heat, flame or spark.

16.6.12.  Replenish all spill response equipment used during the event.

16.6.13.  Complete a Spill Report Form and submit to Whiting-Turner Safety.

### 16.7.  Spills to Waterways

Spills to creeks, streams, bar ditches, surface water, or other waterway are generally considered the most severe type of spill situation, and all personnel must understand the importance of planning and response to avoid a catastrophic environmental situation. Oil-only/floating booms shall be placed and secured on the water, downstream, to prevent migration off site. Whiting-Turner EH&S Manager must be contacted immediately after spill is abated, or sooner if assistance is required. Spills to waterways can be disastrous and cleanup for the affected contractor(s) can be incredibly difficult and expensive.

16.7.1.  Develop of list of onsite contractors or personnel who may be able to assist.

16.7.2.  Fashion Valley Mall Redevelopment Spill Response Contractor Contacts

16.7.3.  The services of a spill response contractor/subcontractor should be retained, or service agreement planned and developed to expedite spill cleanup response.

51 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 171 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

    16.7.3.1.    Harmony Environmental Services, Inc.

- 1 (888) 623-4191
- info@sdhazmat.com

## 16.8. Cleanup

16.8.1. The abatement of the spill, including removal of contaminated soil, and confirmation of cleanup soil samples shall be taken for any spills not on a paved surface. Whiting-Turner requires over-excavation of the spilled area to ensure all contaminated soil/screenings are fully removed. Soil samples are to be taken after excavation of the area has been completed. Plastic sheeting may be placed over the excavated area to prevent runoff, contamination of adjacent areas, and to ensure accurate results are obtained. Proper disposal of the soil/screenings is to be completed by a certified waste hauler.

16.8.2. Disposal of small quantities of labeled & bagged sorbents or small quantities of bagged contaminated soil may be taken to the on-site collection area at the fenced in Whiting-Turner trailer compound. Antifreeze, petroleum, and battery acid contaminated material will be accepted.

## 16.9. Training

16.9.1. All employees at the Fashion Valley Mall Redevelopment Project will receive awareness-level instruction on the importance of spill prevention and reporting. Spill procedures will be covered periodically in site safety focus meetings by Whiting-Turner. It is however the responsibility of the contractor/subcontractor to train-to-competency competent persons for spill response, and all employees on the following:

    16.9.1.1.    The importance of spill prevention and protection of the environment

    16.9.1.2.    Spill reporting procedures for their company and emergency contacts

    16.9.1.3.    Where spill kits are located and what the contents are

    16.9.1.4.    Spill response procedures, what types and quantities of spills employees may abate and the safety procedures to do so

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 172 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C6FE7D8A3

**WHITING-TURNER SITE SPECIFIC SAFETY PLAN**

17.    **Emergency Action Plan**

53 | P a g e

© Copyright 2020
The Whiting-Turner Contracting Company
All Rights Reserved
Page 173 of 174

DocuSign Envelope ID: 1738A269-C865-466F-A93C-574C8FE7D8A3

# Emergency Evacuation Plan



**Nearest Hospital: UC San Diego Hillcrest**
**Phone Number: (619) 534-6222**

**Emergency Whiting-Turner Contact: Paul Perry**
**Phone Number: (619) 571-0367**

Page 174 of 174

# EXHIBIT 03



**Precision Electric Company**
8137 Winter Gardens Blvd.
Lakeside, California 92040
P: +16193902991

**Project: 22024 - Fashion Valley Mall - Phase 4**
7007 Friars Road
San Diego, California 92108

# CHANGE EVENT #088 - PCO#88 - PEC Cardinal Change Supplement

| | | | |
|---|---|---|---|
| **Origin:** | | | |
| **Date Created:** | 4/24/2024 | **Created By:** | Adam Cox |
| **Status:** | Open | **Scope:** | Out of Scope |
| **Type:** | Owner Change | **Change Reason:** | Client Request |
| **Description:** | PCO#88 - PEC Cardinal Change Supplement w/ 6-1-1-31 Job Status Report Backup. | | |

Cardinal Change "Change Order"

This "change order request" ("COR") is being submitted to facilitate a resolution to disputed issues between the parties related to the costs incurred by Precision as a result of the quantity, magnitude, and scope of the changes on the Project. The approved change orders issued to Precision are currently more than 59% of the original contract value, not including Precision's change order requests still pending. These changes have materially altered the nature of the original subcontract, not only in terms of the scope of work but in the resulting demand upon Precision's operations during the contract performance period. Had these changes been incorporated into the original subcontract scope of work at the time of bid, Precision's proposed price would have been substantially larger than the total of the original subcontract price plus Precision's change order requests to date. The scale of the Project drastically changed and as a result, this caused significant disruption and damage to Precision's work and operations. These changes accumulated over time and the impact of the changes could not be fully known at the time each of the change order requests was submitted.

Without addressing or waiving any disputes or rights Precision may have related to the cardinal change to the Subcontract Agreement, Precision is submitting this "COR" to resolve all outstanding disputes regarding additional work, additional costs, delays, inefficiencies, and damages Precision incurred as a result of the changes to the Project. This "COR" is based on Precision's analysis of total costs incurred by Precision for its performance on the Project to date minus the current revised subcontract price of $4,798,110.00 (i.e. the original subcontract price of $2,927,990.00 plus all approved change orders to date of $1,870,120.00). Precision's "COR" calculation methodology is designed to most accurately capture the costs incurred by Precision as a result of the changes on the Project. Precision's costs to date are $4,995,339.13. A 15% markup for overhead and profit ($749,300.87) would yield a value of work completed of $5,620,128.03. Removing the revised subcontract price would yield a "COR" value of $946,530.00.

We reserve the right to correct this quote for errors and omissions.

This quote covers direct costs only and we reserve the right to claim for impact and consequential costs.
This price is good for acceptance within 10 days from the date of receipt.
We request a time extension of TBD days.

Precision Electric Company

Page 1 of 2

Printed on: 5/3/2024 at 04:37PM PDT

We will supply and install all materials, labor, and equipment as per your instruction

**Attachments:** 📎 6-1-1-31-Job Status Report-2024-5-3 16 33 16.PDF, 📎 22024 - PCO#88.pdf

## CHANGE EVENT LINE ITEMS

| | | | | Revenue | | | | | Cost | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Code | Vendor / Contract | UOM | QTY | Unit Cost | ROM | Prime CCO | Latest Price | QTY | Unit Cost | ROM | RFQ | Commit. | Latest Cost | Over/ Under | Budget Mod. |
| | | | 1.0 | $946,530.00 | $946,530.00 | | $946,530.00 | 1.0 | $946,530.00 | $946,530.00 | | | $946,530.00 | $0.00 | |
| Description: PCO#88 - PEC Cardinal Change Supplement | | | | | | | | | | | | | | | |
| **Grand Totals** | | | | | $946,530.00 | $0.00 | $946,530.00 | | | $946,530.00 | $0.00 | $0.00 | $946,530.00 | $0.00 | $0.00 |

NOTICE OF REMOVAL EXHIBIT 1  p. 195

# EXHIBIT 04

# Thompson Law & Consultation
## Luke Thompson, Esq.
T-L-&-C   ••

**VIA USPS CERTIFIED MAIL AND EMAIL**
Art Rodriguez (Art.Rodriguez@whiting-turner.com); Meredith Phillips (meredith.phillips@whiting-turner.com).
CC: Will Turner (WTurner@pecsd.com); Adam Cox (acox@pecsd.com)

Date:          September 6, 2024

From:          Luke Thompson, Esq. SBN 282762
               Thompson Law & Consultation
               Attorney for **G.A. Abell, Inc. dba Precision Electric Company**
               9757 Marilla Drive, #248
               Lakeside, CA 92040
               619.987.3231

To:            **Whiting-Turner Contracting -**
               **Attn: Art Rodriguez - Vice President**
               3911 Sorrento Valley Blvd Suite 100
               San Diego, CA 92121


**PROJECT:**   Fashion Valley Mall Redevelopment Phase 3 Project (Phase 4 Electrical)

**Owner:**     Simon Property Group, Lp - 60 Columbia Road Building B, 3rd Floor Morristown, NJ 07960

**RE:**        **DEMAND FOR COMPENSATION FOR CARDINAL CHANGE**


Our offices represent G.A. Abell, Inc. dba Precision Electric Company ("Precision"). We have been asked by Precision to assist them in developing and advancing their claims regarding the size, frequency, quantity, and scope of the changes on the Fashion Valley Mall Redevelopment Phase 3 Project (Phase 4 Electrical), hereinafter referred to as the "Project". We believe there is ample evidence that the excessive Project changes produced a cardinal change to the nature and scope of Precision's original subcontract agreement with Whiting-Turner Contracting ("Whiting-Turner"). Precision, at Whiting Turner's direction, built a fundamentally different project than what they had bid and contracted for originally. As a consequence, Precision experienced significant cost overruns for which Whiting-Turner and the Owner are responsible.

As you know, Precision has presented its documentation and initial claims regarding these costs to you on several occasions. To date, all offers made by Whiting-Turner have fallen well short of any reasonable compensation for Precision's damages. Given the size and impact of the changes, Precision feels it has no

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

NOTICE OF REMOVAL EXHIBIT 1   p. 197

# Thompson Law & Consultation
## Luke Thompson, Esq.

T·L·&·C  ••

other option but to diligently seek recovery for its costs. This letter is intended to provide a more robust, though by no means exhaustive, presentation of Precision's demand.

## Project Summary

Precision entered into a subcontract agreement (the "Agreement") with Whiting-Turner Contracting ("Whiting-Turner") on October 13, 2022, for certain electrical work (the "Work") to be performed on the Project located at 7007 Friars Road, San Diego, CA 92108 (the "Property"). (**EXHIBIT 1 - Subcontract Agreement**). The original subcontract price, $2,927,990, was increased to an agreed upon revised contract value of $4,798,110.00 over the course of the Project through various Subcontract Supplements (i.e. change orders) totaling $1,870,120, or 64.64% of the original subcontract price. (**EXHIBIT 2 - Subcontract Supplements**).

According to the original Project preliminary schedule, dated July 28, 2022, Precision's Work began on July 11, 2022, and was to be completed by October 4, 2023. (**EXHIBIT 3 - Schedules**; see 07-28-2022 Schedule). Precision began its work on the original scope of work on October 13, 2022, when the Project was ready for the start of the electrical scope. (**EXHIBIT 4 - Labor Report**). Precision was not able to complete its work until March 27, 2024, due primarily to the size and frequency of unanticipated changes to its scope of work.

Precision incurred substantial additional costs as a direct result of the changes Whiting-Turner and the Project's owner, Simon Property Group, LP (the "Owner"), required Precision to perform. The quantity, size, and frequency of the changes, along with Whiting-Turner and/or the Owner's failure to properly plan for these changes added significant labor and overhead costs. At the time of Precision's bid, the signing of the contract, and even during Precision's performance, Precision could not have reasonably anticipated or accounted for the magnitude and impact of these changes. The effect of these changes is difficult to overstate but, in short, they amount to a substantive change to the very nature of the Agreement that, along with Whiting-Turner's handling of Precision's change order requests, cardinally changed the nature of the contract and reflect Whiting-Turner's breach of the Subcontract Agreement.

## Initial Damages Estimates

To calculate the estimated value of Precision's claim, we rely on the actual costs incurred, including Precision's actual overhead rate of 12% and a reasonable profit rate of 10%, based on industry standards. The following is a summary of Precision's current project estimates to date, though it is subject to change should any additional work be required.

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

NOTICE OF REMOVAL EXHIBIT 1   p. 198

# Thompson Law & Consultation
## Luke Thompson, Esq.

T L & C ••

### Table 1 - Accounting Summary

| Current Approved Contract | |
|---|---|
| Original Contract | $ 2,927,990.00 |
| Approved CO | $ 1,892,696.00 |
| **Revised Contract Total** | **$ 4,820,686.00** |

| Cardinal Change | |
|---|---|
| Costs to Date | $ 4,932,579.55 |
| Actual Overhead (12%) | $ 591,909.55 |
| Market Rate (10%) | $ 552,448.91 |
| **Subtotal** | **$ 6,076,938.01** |
| Credit for Full Contract Value Payments | $ (4,820,686.00) |
| **Cardinal Change Claim Total** | **$ 1,256,252.01** |

All Calculations are based on current or actual material and labor costs plus overhead plus profit minus the current approved contract value. This assumes the contract balance will be paid in full.

| Paid to Date | $ 4,761,607.45 |
|---|---|

## Contract Changes

The Project is a sub-phase ("Phase 4 Electrical") of the third phase of a larger project for improvements of the Fashion Valley Mall ("FMV"). Precision was asked to provide a bid on the Phase 4 Electrical portion after the previous electrical contractors on the earlier phases refused to perform additional work on FMV for Whiting-Turner.  Precision is unaware of the totality of the circumstances that led to the former electrical contractors' decisions, but based on Precision's experience on the Project, it appears those contractors suffered a similar fate—being bled out by excessive change orders.

The Project started out promising. The plans had been completed at the time of the bid and the scope of work appeared to be well-defined. Precision, with years of experience on similar projects as well as work at the FMV, submitted a fixed-price bid proposal based on the plans and specifications supplied by Whiting-Turner. A fixed amount of work for a fixed duration for a fixed price. Precision's pricing was based on their material and labor estimates. At the time of bid, Precision's overhead was approximately 12% and they anticipated profits on the project approaching 10%.

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

# Thompson Law & Consultation
## Luke Thompson, Esq.

T·L & C  ••

In February of 2023, at the beginning of Precision's performance, some immediate issues arose. Precision had issued Proposed Change Orders ("PCO") #'s 1-13[1]. (**EXHIBIT 5 - Precision PCOs**). As a result, Whiting-Turner issued Subcontract Supplements #'s 001-004, the total for all changes at this point was $66,168. (**EXHIBIT 2 - Subcontract Supplements**). These changes involved what appeared at the time to be some relatively minor issues involving mostly just fixture changes, some time & material work, and relocation of signage. Precision was forced to price this addition with only a 10% markup for overhead and profit, pursuant to the Subcontract's extra work provision. (**EXHIBIT 1 - Subcontract Agreement**, Art. 10).

By the end of March 2023, Precision had billed out already 33.47% of the then-total Subcontract value. This included $37,625 of the Subcontract Supplements work and $964,390.00 of the original Subcontract Value (**EXHIBIT 6 - Precision Billing**). Precision was well over a third of the way through the Subcontract scope of work and the modifications were well below 10% of the original subcontract value. Things would begin to take a radical turn shortly thereafter. During the next two months alone, Precision issued PCOs #'s 14-32, representing $1,299,483.00 in additional work. (**EXHIBIT 2 - Subcontract Supplements**).

Whiting-Turner issued its Subcontract Supplement #005 ("SS #005") for $723,646 on April 10, 2023, which covered a number of Precision's PCOs during this period and also included a revised construction schedule dated March 29, 2023, for the remaining activities. (*Id.*, SS#05). The largest portion of SS #005 ($671,000) was for "Phase 4b" which was based on a separate bid proposal offered by Precision over four months earlier on January 6, 2023—which at the time of bid Precision expected to be handled separately from the original Project. (**EXHIBIT 5 - Precision PCOs**, #28). That proposal was priced and offered on the basis of what was considered at the time of the proposal as a separate project. Instead, the change was incorporated into the Phase 4 Project as a part of Subcontract Supplement #05. (**EXHIBIT 2 - Subcontract Supplements**).

On May 10, 2023, Whiting-Turner issued a no-cost Subcontract Supplement with its May 9, 2023, revised construction schedule reflecting considerable changes to the original Project construction schedule at the time of contracting, but adding very little additional time to Precision's durations or time for the additional scope. (**EXHIBIT 2 - Subcontract Supplements**, SS #006). The schedule showed a completion date change for Precision's activities close to the revised construction schedule issued January 3, 2023, with Precision's activities completing mid-November of 2023 rather than late October 2023. (*Id.*). The next revised construction schedule would not be issued until December 13, 2023, well after the SS #06 revised completion date of November 21, 2023, for the Project. (*Id.*).

Clearly, Whiting-Turner was well aware by May 10, 2024, when Subcontract Supplement #06—a schedule change order— was issued, that the Subcontract Supplements were beginning to have a serious impact on the construction schedule. Instead of a simple construction schedule update, Whiting-Turner felt the need, and

---

[1] PCOs #'s 1, 3, 5, 7, 9, and 10 were ultimately rendered void. The total ultimately approved PCO's through Whiting-Turner's Subcontract Supplements #'s 001-004 was $66,168.

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

# Thompson Law & Consultation
## Luke Thompson, Esq.

T·L&C  ••

appropriately so, to properly address the serious impact of the previous Subcontract Supplements, in particular Supplement #05 which had a massive impact on the volume of work required in the ever-changing Project. Even while Supplement #06 was being produced and processed, new batches of PCOs from Precision had to be issued to keep pace with the changes. Whiting-Turner was obviously aware of the problem of the frequency and size of these changes to Project's schedule and planned completion dates, but no new Supplement(s) were issued to resolve the schedule problems arising over the next eight months. Precision was never afforded another opportunity to deal with the schedule and cost impact these changes were having on the Project as a whole.

Whiting-Turner's Subcontract Supplement #007 to Precision for $490,394, which captured the balance of Precision's March and April 2023 PCOs, was not issued until June 23, 2023. (*Id.*, SS#007). During the course of May and June, another $120,339 in PCOs would be issued by Precision. (**EXHIBIT 5 - Precision PCOs**; see, PCO Log). Whiting-Turner's next issued Subcontract Supplement #008 took until September 13, 2023. (**EXHIBIT 2 - Subcontract Supplements,** SS#008). It captured some of the PCOs issued by Precision in May, June, July, and a few in August of 2023. (*Id.*). Whiting-Turner's SS #'s 009 and 010 were not issued until October 9 & 10, respectively, captured the remaining PCO's issued during those months. (*Id., SS#s 009 & 010*). The vast majority of these changes were already performed by this time because Whiting-Turner had directed Precision to perform the work while still expecting Precision to meet the May 10, 2023 construction schedule demands.

It would take another three months until Whiting-Turner issued SS#012 on December 15, 2023 (SS #011 was not issued until January 14, 2024). (*Id.*, SS #'s 011, 012). The next Subcontract Supplements were issued on February 13 & 21, 2024 (SS #'s 014 & 013, respectively); with the last two, SS#'s 015 & 016 issued on May 3, 2024. (*Id., SS #'s 013 - 016*).

**Table 2 - Subcontract Supplement Summary**

| No. | | Date | Amount |
|---|---|---|---|
| **Whiting-Turner Issued Supplements** | | | |
| 001 | | 2/17/2023 | $ 4,733.00 |
| 002 | | | |
| 003 | | 2/17/2023 | $ 54,585.00 |
| 004 | | 3/24/2024 | $ 6,850.00 |
| 005 | | | $ 723,646.00 |
| 006 | | 5/10/2023 | $ - |
| 007 | | 6/23/2023 | $ 490,394.00 |

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O - 619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

# Thompson Law & Consultation
## Luke Thompson, Esq.

T L & C  ••

| | | | |
|---|---|---:|---|
| 008 | | 9/13/2023 | $ 75,720.00 |
| 009 | | 10/9/2023 | $ 26,013.00 |
| 010 | | 10/10/2023 | $ 90,778.00 |
| 011 | | 1/15/2024 | $ 7,065.00 |
| 012 | | 12/14/2023 | $ 108,504.00 |
| 013 | | 2/21/2024 | $ 19,529.00 |
| 014 | | 2/13/2024 | $ 126,821.00 |
| 015 | | 5/3/2024 | $ 135,482.00 |
| 016 | | | $ 22,576.00 |
| **TOTAL** | | | **$ 1,892,696.00** |

From May through December of 2023, even after the massive changes under SS#'s 005 and 007 were issued, Precision was inundated with scores of changes on nearly all phases and aspects of the Project. Delays, design changes, resequencing of activities, and poor coordination plagued Precision's ability to timely complete its original scope of work, not to mention all the new change orders Precision was thrown into.

On December 19, 2023, nearly a month later than the Project's completion date of November 21, 2023, Whiting-Turner issued a new updated fragnet schedule with a new completion date of March 14, 2024. According to that new schedule, Precision's activities had drastically expanded even though the original durations went unchanged or were even condensed.[2] By this point in time, the Project was a fundamentally different project and one that was still changing on almost a daily basis.

Nearly all the changes were changes that Precision was directed to proceed with prior to the execution of a Subcontract Supplement. In other words, Precision was forced to bear the costs for these changes, often for months, before Whiting-Turner would allow Precision to bill for the work.[3] Not only was Precision's overhead and profit limited to 10%, well below its actual overhead rate, it was forced to finance these changes until the Owner and Whiting-Turner could resolve the changes.

The problems related to these changes began to increase over time. As the Project progressed, the delays and changes began to take a significant toll on Precision's manpower and ability to efficiently perform its work. Whiting-Turner was well aware of the struggle Precision was under. On January 3, 2024, **prior to**

---

[2] It is outside the scope of this initial demand letter to complete a thorough schedule analysis, however even a preliminary review reveals massive disruptions to the original schedule as a result of the quantity and scope of the change directives demanded by Whiting-Turner.

[3] The Subcontract prohibits billing against unapproved change orders/subcontract supplements. (Exhibit 1 - Subcontract Agreement, Art. V).

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive · 248, Lakeside, CA 92040

# Thompson Law & Consultation
## Luke Thompson, Esq.
T-L-&-C  ••

Whiting-Turner issuing SS #'s 011, 012, 013 & 014 which captured work for August through December of 2023, Whiting-Turner assistant project manager sent out a letter stating:

> *As mentioned via letter on 09/13/2023 and on this morning's coordination call, Precision Electric has failed to meet the previously agreed upon substantial completion date of 11/10/2023 on the Fashion Valley Mall Redevelopment Phase 4 project. While Whiting-Turner understands that Precision Electric has been given additional scope of work throughout the project and some schedule dates have pushed due to reasons beyond their control, there are still numerous activities that are currently behind schedule.*

"Additional scope of work throughout" is an understatement. By the time of this letter there was a total of at least $1,811,950 in changes, 61.88% of the original subcontract value. (**EXHIBIT 5 - Precision PCOs**, PCO Log). Even from just the time of the new schedule being issued over half a million dollars of additional work was loaded on Precision's back. It would not be able to bill, let alone see payment, for this work for many months later when Whiting-Turner finally got around to issuing the much-needed Subcontract Supplements. By this time, Precision was forced to agree to these supplements or risk defaulting on its obligations.

Conveniently, Whiting-Turner attached its December 19, 2024 Fragnet Schedule to its January 3, 2024 notice along with the following warning:

> *The project schedule dated 12/19/2023 (attached in this email) is the final fragnet for the project and governs Precision Electric's new substantial completion date. Please see below summary of updated activity completion and substantial completion dates for the Fashion Valley Mall Redevelopment Phase 4 project. This list only includes activities that were officially delayed by Whiting-Turner/Simon, all other unfinished activities previously mentioned in the letter sent on 09/13/2023 are officially delayed as of 11/10/2023 and must be completed as soon as possible, no later than the substantial completion date.*

> - *Bloomingdale's Valet Canopy Lighting - 01/10/2024*
>
> - *Café Court Terrace Lighting - 02/27/2024*
>
> - *Nordstrom Court Lighting - 03/07/2024*
>
> - *FVM 4 Electrical Substantial Completion -  03/07/2024*

The letter was a not-so-subtle attempt to cover Whiting-Turner's failures to update and organize the Project, and, more importantly Whiting-Turner's failure to properly coordinate the work. The dates had been moved, as Whiting-Turner was well aware, because the vast number of changes to the Project dictated a very different

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

NOTICE OF REMOVAL EXHIBIT 1   p. 203

# Thompson Law & Consultation
## Luke Thompson, Esq.

T–L–&–C  ●●

schedule and sequence than its subcontractors had signed up for. The attempt was to shirk its responsibility for the schedule and design failures by Whiting-Turner and the Owner and improperly blame Precision for the delays. The fragnet-focused schedule reveals Whiting-Turner made little effort to properly account for the "additional scope of work" that was "given" to Precision, ignoring the fact that Precision's manpower was completely co-opted by the Owner's and Whiting-Turner's directed changes.

The changes involved in this Project were massive. And, by and large, were not come to by mutually positioned parties with the ability to negotiate the price, time needed, or impact on the original scope of work. Changes that easily could have and should have either been planned out well in advance of the start of work or incorporated into a separate phase of the Project. By directing Precision to proceed with the work and forcing them into an extra work pricing structure, Whiting-Turner and the Owner were able to add massive amounts of additional work to the Project while preventing Precision from securing its actual overhead costs, not to mention a reasonable profit rate. On top of that, by not properly sequencing the work and updating the schedule, Whiting-Turner forced Precision into expending massive amounts of inefficient labor to jump on any new change that the Owner or Whiting-Turner needed. Whiting-Turner and the Owner's conduct effectively changed the original subcontract agreement from a fixed price and fixed scope project to a cost plus (with only 10% for overhead and profit).

Based on the changes subsequently demanded by Whiting-Turner and Owner over the course of the Project, Precision believes that both the Owner and Whiting-Turner were well aware that significant additional scope would be added to the Project. These anticipated changes should have been disclosed prior to the start of work or packaged separately for bidding.

## Conclusion

Whiting-Turner has breached its subcontract agreement with Precision by, at a minimum, (a) failing to properly present the proper scope of work for the Project; (b) timely completing the Project's design in coordination with the Owner in order to provide a complete construction project for a firm fixed price bid; (c) manage the quantity and changes directed by the Owner to keep the total change impact on Precision to a reasonable rate in accordance with industry standards; and (d) failing to timely secure the necessary additional time for the changes directed by Whiting-Turner in order to allow Precision to perform its scope of work efficiently.

Accordingly, Precision demands that Whiting-Turner consider the original subcontract agreement as having been abandoned and compensate Precision for its actual costs, including overhead (12%) and profit (10%), to complete the work Whiting-Turner directed it to perform on the Project minus the revised subcontract value paid to Precision. The current projected cardinal change value is **$1,256,252.01** (see Table 1 above).

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O - 619-987-3231 C
9757 Marilla Drive #248, Lakeside, CA 92040

# Thompson Law & Consultation
## Luke Thompson, Esq.
T·L·&·C· ••

Sincerely,

Luke Thompson, Esq.
Attorney for **G.A. Abell, Inc. dba Precision Electric Company**

lthompson@thompsonlawconsultation.com
www.ThompsonLawandConsultation.com
619-663-4486 O  -  619-087-3231 C
9757 Marilla Drive  248. Lakeside, CA 92040

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Luke e. Thompson (SBN 282762)<br>9757 Marilla Dr. #248, Lakeside, CA 92040<br><br>TELEPHONE NO.: (619) 987-3231    FAX NO. :<br>EMAIL ADDRESS: lthompson@thompsonlawconsultation.com<br>ATTORNEY FOR *(Name):* G.A. Abell, Inc. | **FOR COURT USE ONLY**<br><br>ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br>11/14/2024 10:16:58 AM<br><br>Clerk of the Superior Court<br>By Y. Modica       ,Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego 92101
BRANCH NAME: Central Division

CASE NAME:
G.A. Abell, Inc. vs. The Whiting-Turner Contracting Company

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| ☒ **Unlimited** (Amount demanded exceeds $35,000) ☐ **Limited** (Amount demanded is $35,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 24CU022713C |
| | | JUDGE: Gregory W. Pollack<br>DEPT. : |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is    ☒ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* 1. Breach of Contract and Abandonment 2. Reasonable Value 3. Breach of Covenant
5. This case ☐ is    ☐ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: October 30, 2024
Luke E. Thompson, Esq.
_____    ►
(TYPE OR PRINT NAME)                                 (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only. Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

---

CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Page 2 of 2

For your protection and privacy, please press the Clear

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
| --- | --- |
| STREET ADDRESS: | 330 W. Broadway |
| MAILING ADDRESS: | 330 W. Broadway |
| CITY AND ZIP CODE: | San Diego, 92101 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: 619-450-7071 | |

PLAINTIFF(S) / PETITIONER(S):  G A Abell  Inc

DEFENDANT(S) / RESPONDENT(S):  Whiting-Turner Contracting Company

GA ABELL INC VS THE WHITING TURNER CONTRACTING COMPANY

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | CASE NUMBER: 24CU022713C |
| --- | --- |

**CASE ASSIGNED FOR ALL PURPOSES TO:**

Judge: GREGORY W. POLLACK                     Department: C-71

**COMPLAINT/PETITION FILED:** 11/14/2024

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT |
| --- | --- | --- | --- |
| Case Management Conference | 05/09/2025 | 1:30 PM | C-71 |

**Case Management Conferences (CMCs) may be conducted virtually or in person.** Anyone wishing to appear remotely should visit the "Appearing for Hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC.  (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal. Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):
- **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint.  An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint.  A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed.  If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
- **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
- **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6).  If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date.  See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged.  The court encourages and expects the parties to consider using ADR options prior to the CMC.  The use of ADR will be discussed at the CMC.  Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases. Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing. E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court. All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program." This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain. The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150. Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 24CU022713C

CASE TITLE: GA Abell Inc vs The Whiting Turner Contracting Company

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
      **(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),**
      **(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359),** _and_
      **(3) the Notice of Case Assignment form (SDSC form #CIV-721).**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

**Potential Advantages and Disadvantages of ADR**
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

**Most Common Types of ADR**
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

---

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

<u>Local ADR Programs for Civil Cases</u>

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

<u>On-line mediator search and selection:</u> Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

<u>More information about court-connected ADR</u>: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

<u>Legal Representation and Advice</u>

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

| | | FOR COURT USE ONLY |
|---|---|---|
| STREET ADDRESS: | 330 W. Broadway | |
| MAILING ADDRESS: | 330 W. Broadway | |
| CITY AND ZIP CODE: | San Diego, 92101 | |
| BRANCH NAME: | Central | |

PLAINTIFF(S):  G A Abell  Inc

DEFENDANT(S):  Whiting-Turner Contracting Company

SHORT TITLE: GA ABELL INC VS THE WHITING TURNER CONTRACTING COMPANY

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 24CU022713C |
|---|---|

Judge:  GREGORY W. POLLACK                                Department:  C-71

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                             ☐ Binding private arbitration

☐ Voluntary settlement conference (private)       ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                    ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                    Date: _____

Name of Plaintiff                                 Name of Defendant

Signature                                         Signature

Name of Plaintiff's Attorney                      Name of Defendant's Attorney

Signature                                         Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 11/15/2024                                 _____

                                                  JUDGE OF THE SUPERIOR COURT